ACCEPTED
05-15-01019-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
12/4/2015 12:04:49 PM
LISA MATZ
CLERK

NO. 05-15-01019-CV

IN THE COURT OF APPEALS
FOR THE FIFTH DISTRICT OF TEXAS
AT DALLAS

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
12/4/2015 12:04:49 PM
LISA MATZ
Clerk

AJREDIN "DANNY" DEARI,
*Appellants,*

v.

JANE DOE,
*Appellee.*

On Appeal from the 193rd Judicial District Court
of Dallas County, Texas
Cause No. DC-13-04564

**SUPPLEMENTAL APPENDIX IN SUPPORT OF CENTURY'S REPLIES TO THE
TRUSTEE'S AND JANE DOE'S RESPONSES TO MOTIONS TO INTERVENE
AND FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL**

Volume 2 of 2 (Bates Nos. 732-1260)

Charles T. Frazier, Jr.
State Bar No. 07403100
cfrazier@adjtlaw.com
Roger D. Townsend
State Bar No. 20167600
Dana Livingston
State Bar No. 12437420
Alexander Dubose Jefferson &
Townsend LLP
4925 Greenville Ave., Ste. 510
Dallas, Texas  75206-4087
(214) 369-2358
(214) 369-2359 Fax
**Attorneys for Intervenor
Century Surety Company**

**SUPPLEMENTAL APPENDIX IN SUPPORT OF CENTURY'S REPLIES TO THE TRUSTEE'S AND JANE DOE'S RESPONSES TO MOTIONS TO INTERVENE AND FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL**

Century Surety Company ("Century") hereby files this Supplemental Appendix in Support of Its Replies to the Trustee's and Jane Doe's Responses to Motions to Intervene and for Extension of Time to File Notice of Appeal.

| Ex. | Date | Document | Supp. App. Page(s) |
|---|---|---|---|
|  | Dec. 3, 2015 | **Supplemental Affidavit of James W. Bowen** | 0001 |
| 1 | Nov. 23, 2015 | Deposition of Scott Seidel in *In re Pastazios Pizza, Inc*., Case No. 14-34324-hdh11, filed in the Bankruptcy Court for the Northern District of Texas, including referenced exhibits | 0005 |
| 2 | Nov. 3, 2015 | Transcript of Hearing of [119] Motion for Leave – Trustee's Expedited Motion to Clarify Trust Agreement in *In re Pastazios Pizza, Inc*., Case No. 14-34324-hdh11, filed in the Bankruptcy Court for the Northern District of Texas | 0732 |
| 3 | Nov. 19, 2015 | Order on Trustee's Motion to Clarify [150] in *In re Pastazios Pizza, Inc*., Case No. 14-34324-hdh11, filed in the Bankruptcy Court for the Northern District of Texas | 0855 |
| 4 | Aug. 25, 2015 | Jane Doe's Unopposed Motion to Intervene [50] filed in *Century Surety Company v. Pastazios Pizza, Inc. Creditor Trust et al.*, Case No. 3:13-cv-02553-P, in the Northern District of Texas, Dallas Division | 0859 |

| 5 | Oct. 31, 2015 | Pastazios Pizza Inc. Creditor Trust's Amended Counterclaims [64] filed in *Century Surety Company v. Pastazios Pizza, Inc. Creditor Trust et al.*, Case No. 3:13-cv-02553-P, in the Northern District of Texas, Dallas Division | 0870 |
|---|---|---|---|
| 6 | Nov. 11, 2015 | ECF Docket for *In re Danny Deari*, Case No. 14-34323-hdh13, filed in the Bankruptcy Court for the Northern District of Texas | 1129 |
| 7 | Nov. 24, 2015 | Transcript of Hearing of [145] Expedited Motion to Enforce Confirmed Plan in *In re Pastazios Pizza, Inc.*, Case No. 14-34324-hdh11, filed in the Bankruptcy Court for the Northern District of Texas | 1141 |
| 8 | Nov. 2, 2015 | Trustee's Reply in Support of Motion to Clarify Trust Agreement [133] in *In re Pastazios Pizza, Inc.*, Case No. 14-34324-hdh11, filed in the Bankruptcy Court for the Northern District of Texas | 1250 |
| 9 | Nov. 23, 2015 | Order Denying Century Surety Company's Motion for Continuance [171] in *In re Pastazios Pizza, Inc.*, Case No. 14-34324-hdh11, filed in the Bankruptcy Court for the Northern District of Texas | 1258 |

# Exhibit 2

SUPP APP 0732

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

|  |  |
|---|---|
| In re | ) Case No. 14-34324-HDD-11 |
|  | ) Dallas, Texas |
|  | ) |
| PASTAZIOS PIZZA, INC., | ) |
|  | ) November 3, 2015 |
| Debtor. | ) 9:20 AM |
|  | ) |
| _____ | ) |

TRANSCRIPT OF HEARING
OF [119] MOTION FOR LEAVE - TRUSTEE'S
EXPEDITED MOTION TO CLARIFY TRUST AGREEMENT
BEFORE THE HONORABLE HARLIN D. HALE,
UNITED STATES BANKRUPTCY JUDGE

Transcription Services:                    eScribers
                                           700 West 192nd Street
                                           Suite #607
                                           New York, NY 10040
                                           (973) 406-2250


PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.
APPEARANCES:

SUPP APP 0733

For the Debtor:          JOYCE W. LINDAUER, ESQ.
JOYCE LINDAUER LAW OFFICE
8140 Walnut Hill Lane
Suite 301
Dallas, TX 75231

For the Trustee:        DAVOR RUKAVINA, ESQ.
THOMAS BERGHMAN, ESQ.
MUNSCH, HARDT, KOPF & HARR
500 North Akard Street
Suite 3800
Dallas, TX 75201

For Jane Doe:           LAURA M. FONTAINE, ESQ.
MICHAEL GRUBER, ESQ.
GRUBER HURST ELROD JOHANSEN
HAIL SHANK LLP
1445 Ross Avenue
Suite 2500
Dallas, TX 75202

For Century Surety     GREGORY HESSE, ESQ.
Company:            KEVIN W. BROOKS, ESQ.
HUNTON & WILLIAMS LLP
1445 Ross Avenue
Suite 3700
Dallas, TX 75202

SUPP APP 0734

THE COURT: Pastazios Pizza. Mr. Rukavina, are you in favor of debtors keeping yachts?

MR. RUKAVINA: I am in favor of renting yachts from debtors so long as they are well stocked with provisions. And you know what kind I mean.

Your Honor, good morning. Davor Rukavina and Thomas Berghman here for Scott Seidel. Mr. Seidel is also present.

THE COURT: Welcome.

MR. HESSE: Good morning, Your Honor. Excuse me, good morning, Your Honor. Greg Hesse and Kevin Brooks on behalf of Century Surety Company.

THE COURT: Welcome.

MS. FONTAINE: Thank you, Your Honor. Laura Fontaine for creditor Jane Doe. With me today in the courtroom is Mike Gruber of Gruber Hurst Elrod Johansen Hail Shank.

THE COURT: Welcome.

MS. LINDAUER: Your Honor, Joyce Lindauer, counsel for the debtor in the underlying bankruptcy case.

THE COURT: Welcome.

I know we have a standing argument, but I'd go ahead and -- let's go ahead and proceed through the evidence subject to that. We're not waiving the --

MR. HESSE: Your Honor, before we get started, I'd like to invoke the rule of witness preclusion. The -- I think really the two parties that are here, really, the trustee and

SUPP APP 0735

Century Surety Company.  The trustee filed a witness list that had Scott Seidel, Joyce Lindauer and Trey Crawford.  I'd actually ask that Ms. Lindauer and Mr. Crawford be excluded.

THE COURT:  Who is Crawford now?

MR. CRAWFORD:  Me, Your Honor.

THE COURT:  And whom is he?

MR. GRUBER:  He's my partner, Your Honor.  Mike Gruber.  He's my partner in private case with the underlying state court case.

THE COURT:  Um-hum.  All right.  That's overruled, these are all parties-in-interest.

You may proceed.

MR. RUKAVINA:  Your Honor, may I approach with a couple of binders?

THE COURT:  You may.

MR. HESSE:  Your Honor, may I approach as well?

THE COURT:  You may.

MR. HESSE:  With the binders?

THE COURT:  Yeah, you do the same.  Right up here, thank you.

MR. RUKAVINA:  Your Honor, the last time we were here we didn't really get a chance to give you kind of an update where we are, largely because of Century's oral motion to continue.  We do thank you for your hearing today.  But I do think it's time to give Your Honor some of the background,

SUPP APP 0736

more for context than anything.

We do not intend today to try some of these issues that Century raised this Friday in an amended objection to our motion seeking very targeted relief. But because Century has raised those, and because they are of relevance with respect to what's going on before Judge Solis, it merits some discussion at least.

So it's been some time I think since the Court has been involved with this case. But if we go back, on April the 2nd of this year, the Court confirmed the debtor's plan.

The debtor's plan clearly created a creditor trust. The plan had attached to it this trust document which, of course, as Your Honor mentioned last time, had certain blanks in it. Why those blanks were blanks at the time of confirmation, we as the trustee, of course, do not know.

What followed were several weeks of the debtor trying to find the 50,000-dollar seed money required by the confirmation order to effectuate the plan. And I don't know -- Mr. Seidel might remember more in detail, I don't remember exactly when that money came in, but it was quite some time later. The debtor had a difficult time finding the 50,000 dollars.

Consequently, on May 22nd of this year, the debtor signed this trust document which had the blanks in it.

THE COURT: They signed it with the blanks still?

SUPP APP 0737

MR. RUKAVINA:  Yes.  The debtor then sent -- Ms. Lindauer sent that document to Mr. Seidel.  Mr. Seidel signed that document.  At that time, both Mr. Seidel and I were discussing with Ms. Lindauer and with Mr. Erler, who represented Ms. Doe respectively, as to these blanks.

Ms. Lindauer will explain to Your Honor that it was her understanding that the trustee would fill in those blanks. That was not the trustee's understanding, this was a contract predating the trustee.  The trustee did not believe that he could just fill in whatever he wanted to.

And with my communications with Mr. Erler, I'd understood that there was a fully -- I'll just call it fully executed, fully filled-in document that was out there, but it was not provided to me.

And, finally, really it wasn't until October that Mr. Erler said whoops, this was not signed.  In other words, the full filled-in document did exist, but it was never signed.

So we have the signed document with blanks, we have an unsigned document, apparently with all the blanks filled in.

Let's go back now.  So the trustee becomes the trustee on or about May 22nd of this year.  The confirmation order and the plan provide for a trustee to retain insurance counsel, that would be Munsch Hardt.  There's a blank for how much we're entitled to be paid, another blank that hasn't been

SUPP APP 0738

filled in. And the trust document and the plan provide for this trust advisory board, which was subsequently modified pursuant to your confirmation order to have one person on there. But that person, again, is a blank.

Well, we have trial in the Jane Doe state court coming up in early July. We have before Judge Solis, once the stay lifted, proceedings to take care of there as well. So what does the trustee do? Well, on June 8th of this year, I personally appeared in front of the state court. Mr. Crawford was there. Ms. Doe, the ninety-nine percent beneficiary, knew that Mr. Seidel had hired Munsch Hardt as the insurance counsel. No problems with that, no objections, no nothing. Everyone wanted insurance counsel

On June 12th of this year, we filed -- I filed a motion to substitute in in the federal action before Judge Solis to substitute in for Pastazios Pizza, because the trust now owned these assets. We conferred with Mr. Shults for Century. Mr. Shults said no opposition to the motion to substitute. Judge Solis granted the motion. So by June 12th, if not a few days earlier, Century knew that Munsch Hardt was insurance counsel. No objection, no problem, no issue.

Back in state court we announced to the state court that we had hired the law firm of Chen Dotson, the trustee had, to defend the trust against Ms. Doe's tort claims. No objections, no issue, no nothing.

SUPP APP 0739

Technically, according to the language of the trust document, Mr. Seidel was supposed to confer with this trust advisory board for the retention of Chen Dotson, but, again, there was no advisory board. And our communications to that effect, frankly, were circular. Well, I think Ms. Lindauer has it, I think Mr. Erler has it, we're working on it, but we had to hire counsel because we had trial coming up. Everyone knew it, the beneficiary knew it. No objections, no problems.

Trial was held over the course of two or three days, it was a bench trial. And ultimately the state court entered a judgment, and the numbers -- I always get confused with the numbers, because there's a number against Mr. Deari, there's a number against Pastazios, but it's in the neighborhood of twenty million dollars, as against Pastazios.

We have multiple weeks of meetings and communications with Century thereafter regarding what to do with this judgment. We sent a Stowers demand beforehand. Ultimately, we agree, at Century's invitation, to a mediation on October 8th. We participate with Ms. Doe at this mediation. The mediation does not conclude until October the 20th. Two days later we filed this motion.

The reason why that is of some relevance is because we had hoped that all of these things would be cleaned up at a mediation if there was a settlement, which unfortunately was not reached. And I say that to address Century's argument of

SUPP APP 0740

delay.

The trustee did not delay, certainly not intentionally. And I represent to you that it was only a couple of weeks before we filed this motion that finally it became clear from Mr. Erler that, wait, this document had not been formally signed.

Now, underpinning all of this are certain arguments that Century has raised both here and in front of Judge Solis, that we take exceptionally seriously, and that we will do something about in the procedurally appropriate posture.

Your Honor may recall that Century filed a notice of appearance in the bankruptcy case. Century was served with the disclosure statement and the plan. Century did not file an objection to the plan. Century's lawyers stood right here before you at the confirmation, and when asked by Your Honor whether Century had any comments he basically said well, I'm not a bankruptcy lawyer, I don't really have any, I'm here to answer questions.

There is absolutely zero question of due process, and there is absolutely zero question of 11 U.S.C. 1141 that this plan is binding on Century.

Century now, months later, is making arguments that the transfer of the insurance policy to the trust was invalid. Century is now, months later, when the trustee has refused to do its bidding, arguing that somehow the plan is a sham, that

SUPP APP 0741

it's an irreconcilable conflict of interest, that Mr. Seidel is somehow colluding with everyone basically as a master trick against Century.  Century is collaterally attacking Your Honor's final binding nonappealable order.  And, again, I say we will do something about it.

But Century's really biggest defense is even more shocking, because Century's biggest defense is the disparagement of two judges.

First, they despair Judge Ginsberg by basically saying that he rubberstamped collusive and -- they don't use the word "false," but basically pre-engineered findings of fact and conclusions of law.  That somehow the trustee lost the case intentionally, that somehow Judge Ginsberg looked the other way, and somehow there's a miscarriage of justice, where Judge Ginsberg somehow awarded twenty million dollars based on collusion, even though Mr. Deari admitted to having sexual relations with the eighteen-year-old girl, even though he admitted to serving her alcohol, even though he admitted to taking her to a hotel, even though he admitted to after the act going to have a cigar and a nice meal, and even though he admitted then going back to the hotel to claim his underwear, that is Century's version of a collusive state court judge.

They also disparage you, because Your Honor entered, apparently, a sham plan, a plan that voids the policy.  Again, collusive, somehow all engineered to enrich the trustee.  I

SUPP APP 0742

wish, again, not to try those issues today.  Those issues are not before Your Honor.  Judge Solis will decide whether they will go before Your Honor or him.  Judge Solis has not granted Century leave to amend their complaint, he has, instead, ordered expedited briefing.  And although we have agreed to Century amending its complaint before Judge Solis, we will take these issues up with Judge Solis, because we believe that they're highly contentious, not to mention, utterly with basis -- utterly without basis in fact.

Where does that leave us today?  It leaves us now that settlement discussions have ended, mediation has ended with, basically, a war, a litigation war, which means that things have to be cleaned up.  This trust document exists for the benefit of Ms. Doe and other beneficiaries.  Mr. Seidel was not there when this trust document was negotiated.  Mr. Seidel finds himself on a situation where he has no really resort other than seeking clarification or guidance from this Court.

So Mr. Seidel has phrased the issue one of two ways. Just like with many plans, Judge, please compel the parties to do what they should have done.  That means designate who is on the trust advisory board, fill in the blank for Munsch Hardt, fill in the blank for fees, I need to know that if the fees are going to be 10,000 dollars for this, I'm not going to go forward.  Or, alternatively, Judge, because this trust

SUPP APP 0743

advisory board has not been effectuated for months, the provisions of that have been waived by Ms. Doe, for whose benefit the trust was created.

Your Honor will also hear from Mr. Berghman, my associate, that he spoke to the second largest unsecured creditor, Sam Johnson's law firm, 42,000 dollars. Mr. Johnson also wishes that the trust advisory board go away as having been waived.

Century is the only one contesting this. And Century is contesting this not because they have a legitimate interest in the governance of the plan or the trust document, but because this is as shot, a free shot, bite of the apple, for somehow gaining leverage in the district court action.

I was going to suggest to Your Honor one of three ways of proceeding today.

First, I was going to suggest that Your Honor take up the standing issue. It sounds like Your Honor's going to carry that issue, and I'm certainly not going to disagree with Your Honor's decision.

The second way is to just take up the facts as they are on the record. They're matters of public record, they're in front of Your Honor. There are blanks. All of the parties assigned that are parties to this trust agreement are here, and they're saying this was a mistake, we don't know why this wasn't filled in, but it's time to clean this up, get rid of

SUPP APP 0744

the trust advisory board, designate Munsch Hardt as counsel. What more is there to discuss? Everyone that has an interest in this trust is in agreement that this is what should be done.

The third way is if we're going to have an actual evidentiary hearing. Now, if Your Honor is going to take up any of these collateral issues that Century has raised, then I must seek a continuance, because I have a right to depose Mr. Shults, who is here, now objecting to the plan. I have a right to depose Century, asking what is your prejudice, what is your interest in this trust. So I don't think we can have a full and fair evidentiary hearing today. And that's exactly what Century wants.

Put Mr. Seidel on the stand on what are otherwise narrow issues, and try to take free testimony for subsequent use before Judge Solis. Really, I have nothing to say or no evidence other than what I've said. There's no smoking gun, there's obviously a mistake, and the Court has to do something about it.

Is the Court going to order the U.S. Marshals to bring Ms. Doe down here and sit on a trust advisory board? Is the Court going to conclude that Mr. Seidel can't have a lawyer? Is the Court going to conclude that the whole plan is a sham and convert the case? The Court doesn't have many options I think that are palatable. But the Court's

SUPP APP 0745

intervention is not necessarily required if all of the parties that are subject to distrust are in agreement as to what should be done. Thank you.

THE COURT: Thank you. Mr. Hesse, before you go let me just see if any of these other parties, so you can address all of them at one time.

MS. FONTAINE: Your Honor, Laura Fontaine for creditor Jane Doe.

We disagree with a couple of the trustee's recitation of the factual points, but we agree to the relief he seeks.

Our position is that at the time of plan confirmation Jane Doe's claim was scheduled as disputed. And the beneficiaries of the trust under the plan were the holders of allowed class 4 claims.

Your Honor previously lifted the stay to allow her claim to be tried in state court. The state court trial didn't occur till July. So we were in a bit of a quandary as of the effective date. We'd negotiated this trust, but we haven't been able to resolve our claim either with the debtor, and thereafter we weren't able to resolve our claim with the trustee. The trustee disputed our claim, hired counsel to oppose it.

So we weren't a beneficiary of the trust at the time that the trust needed to be executed. We didn't want to run afoul of the other allowed claims in the trust, potentially

SUPP APP 0746

prejudice the rights of the other class 4 members. So we decided not to take up our role on the trust advisory board.

When our claim was subsequently allowed after we obtained judgment in state court, we decided to intervene in the federal court litigation before Judge Solis directly. At that point, there's no longer a need for us to serve on the trust advisory board, that we could protect our own interests.

So there are other members of class 4 that could potentially be appointed to the trust advisory board. We don't want to be at this point. I don't think you're going to have much luck convincing one of the credit card companies, or Sam Johnson, he might have a conflict because he represented the debtor's principal individually at one point. So I don't think there's anybody who wants to be on the board.

So we don't disagree that the relief that the trustee seeks, but we think that we got here in a different way. I don't think we waived our right until recently. I don't think we could have been on the trust advisor board. But at this point I think that the trust advisory board no longer has purpose or a willing participant.

THE COURT: Thank you.

MS. LINDAUER: Your Honor, let me tell you what I recall about confirmation. The plan was confirmed, and then we spent the next couple of months working with Mr. Deari to get the 50,000 dollars.

SUPP APP 0747

When the plan was confirmed Mr. Deari had made arrangements to borrow 50,000 dollars. He had an agreement with a gentleman to loan him -- him personally the money. And then shortly after confirmation that person said, well, I really want to look at different terms. So we ended up with just a huge mess with finally arranged the 50,000 dollars, finally got the money over to Mr. Seidel. But that was the focus of probably the two months following confirmation was working through those issues.

As far as the creditor trust goes, I did talk to Mr. Seidel, I think I talked with his counsel. And Mr. Deari did sign off on the trust agreement, Mr. Seidel signed off on the trust agreement. As far as the blanks are concerned, my understanding was that the trustee would fill in the blanks because the confirmation order actually addressed a number of the blanks and said what needed to be in those blanks. For example, the trustee being Mr. Seidel. Mr. Seidel could choose his own attorney, so we wouldn't have filled that in. We might have been told who it was and could have filled it in. But, in essence, the trust document, the one the Court has, had all the material terms.

THE COURT: What about the trust board?

MS. LINDAUER: I'm sorry?

THE COURT: What did it have for the board in that blank?

SUPP APP 0748

MS. LINDAUER: Well, if you remember, the confirmation order changed the board to one member. My understanding leaving confirmation was that Ms. Doe would be the member on the advisory board because she held the largest claim. Whether it had been allowed or not wasn't really the issue. We knew she had a significant claim, much larger than any other creditors. And so my thought was was her or her counsel would be the participant on the board. So that was my understanding leaving. None of the other creditors had this -- on confirmation, none of the other creditors had really participated in this case to any extent. So Ms. Doe and her counsel were the primary persons that would benefit from the trust, and also the primary persons that were involved in helping establish the trust in the first instance.

So my understanding was that she would be the member of the board, and so that was --

THE COURT: Was that the one that Erler -- the one that's filled out, that's what it runs?

MS. LINDAUER: I don't know if the one -- I don't know if I've seen the one that was filled out, if that's what it provides or not. The one I saw was the one that we had attached originally to the plan, it had some blanks in it. But --

THE COURT: Ms. Fontaine was shaking her head yes, is that right? Or --

SUPP APP 0749

MS. LINDAUER: Is that right?

THE COURT: No.

MS. FONTAINE: We never filled in the trust ad -- we filled in Munsch Hardt, but we never filled in the trust --

MS. LINDAUER: Trust advisory board.

MS. FONTAINE: -- advisory board.

MS. LINDAUER: Yeah.

THE COURT: Okay.

MS. FONTAINE: That's the uncertainty about the allowance of the claim.

THE COURT: Okay.

MS. LINDAUER: My understanding -- well, and honestly, the -- the way the trust was created we provided a form over to Mr. Erler and his firm. They gave us comments. We went back and forth on the form of the trust -- the primary form of the trust really was a collaboration between both forms, but primarily their form. And so my understanding was that when Mr. Seidel got appointed we're kind of done. I mean the trustee would take over, he would run the creditor trust and he would be responsible for hiring counsel. And the debtor went off and is running his pizza business.

And if you remember, the way the plan set up, we split the unsecureds into two groups. There were the smaller unsecureds which the debtor was responsible for paying. There were the larger unsecureds that went into the trust.

SUPP APP 0750

So our focus was making sure that Mr. Deari paid the smaller unsecured creditors. We gave him a pay plan for that. He's been making those payments. And then the larger creditors went into the trust to be paid out of the trust. So, really, once the plan was approved we kind of, maybe right or wrong, kind of viewed the trustee as sort of the one responsible for all this. I didn't know who he was going to retain as counsel at the time of confirmation. I think that was determined very quickly thereafter. So we just didn't have that information.

When this all started to blow up over the last few days, and I started reading the papers, I was really surprised that this would be really an issue, because two things.

The trust itself says if there's any concerns about the trust, subject to bankruptcy court's jurisdiction, the bankruptcy court shall retain jurisdiction over the creditor trust, the trust estate, the trustee, the members of the trust advisory board. So it just seemed to me like if there were any issues, you could take care of those problems. But I also thought the things they were complaining about, frankly, were more ministerial than material. The actual terms of the trust were very straightforward, which is the trust was established to hold claims for the benefit of a group of creditors. That was the whole concept. And Mr. Seidel was appointed as trustee.

SUPP APP 0751

And we knew he would be trustee at confirmation because we filled him in in the confirmation order. So as far as what happened with the advisory committee, I really don't know anything about that, other than my understanding was that Mr. Erler's client would be the member of the advisory committee. So that was my understanding of what happened post-confirmation. But like I said, our focus was primarily on trying to get the 50,000 dollars and making sure the other unsecured creditors got paid.

THE COURT: Thank you.

MS. LINDAUER: So, thanks.

THE COURT: Mr. Hesse?

MR. HESSE: Good morning, Your Honor. Greg Hesse on behalf of Century Surety.

As was mentioned last week, we were brought in kind of late to the game. So I understand that there was no objection made by Century to the confirmation of the plan. I understand that. I understand that they were not scheduled as a creditor. I understand they were not schedule, or they did not file a proof of claim.

However, under the terms of the plan, the debtor transferred to this creditor's trust not only claims against Century, but also the Century insurance policy. They assigned that actual policy, itself. As such, that would provide Century with an interest in the plan of reorganization.

SUPP APP 0752

And, quite frankly, listening to the dialogue that's been going on here, I'm a little bit befuddled, because I, quite candidly, Your Honor, could make the argument now that we have discovered what's going on here, that the trust was never actually formed, because there is a suggest -- there's some very significant concerns as to what the terms of the document are. You can't even have the parties over here agree upon what the terms of the document are.

The debtor thought that Jane Doe was going to be the sole member of the trust advisory board. Jane Doe's counsel denies that that was going to be the case. Everybody kind of forgot about it. The document -- they thought there was a -- they fully filled out a document somewhere, and nobody's ever seen it. I'm not really sure that we actually have a trust that has been formed, which raises some fairly significant questions in and of itself.

And I actually, quite candidly, believe that the trust was properly formed up until the time that the trustee filed his motion asking for this Court to, quite candidly I believe, modify the terms of the plan.

So let's -- the quest -- what people are suggesting that you do here is to just ignore the trust advisory board and hope it goes away. But I think the Court needs to understand what that means. And I think I would like to, first of all, make reference to what the trustee had asked for

SUPP APP 0753

in their motion to clarify. They either -- the way I read it was they want the Court to appoint a person, or to appoint a person appointed, or to declare -- and I'm quoting here, "declare all provisions of the plan, the confirmation order, and the trust agreement related to the trust advisory board, or any permission or approval from the same to be void." They want you to declare all provisions of the plan, the confirmation order, and the trust agreement relating to the trust advisory board to be void. What does that mean, Your Honor?

I have a -- I have provided a copy of a -- of my exhibit book, so if you -- if you want to follow along, with Exhibit number 2, which is a copy of the plan of reorganization.

Section 7.01 provides in the last sentence, "That except as otherwise provided here, set forth herein, the trustee and the creditor trust shall be subject to the oversight by the trust advisory board, as provided in the creditor trust agreement." So a term of -- what is a fairly material term of the plan, which is the governance of the trust, is going to be gutted by the proposal from the trustee, because there's no longer going to be a trust advisory board overseeing the creditor trust and the trustee.

From Century's perspective, that was kind of an important term, because that means that there's someone

SUPP APP 0754

keeping track of the trustee to make sure that he is doing what he is supposed to be doing.

With regards to the actual terms of the trust agreement, I'll go through a few of the terms, once again in Exhibit 2 attached as Exhibit 1 to the plan, or Exhibit A to the plan.  I'll get you to the -- actually the document filing, page -- at the top, Your Honor.

THE COURT:  Okay.

MR. HESSE:  Page 30.  It talks about the administrative powers of the trustee.  Section 4.2(b)(iii), "With prior approval of the trust advisory board -- the trustee may exercise the power with the prior approval of the trust advisor board, to enter into, perform and exercise rights under contracts belonging to the creditor trust."

Remember, Your Honor, there was the assignment of the insurance policy with Century into the creditor trust, that would provide protection for Century, because it would be dealing with our contract.

4.2(b)(v), "With the prior approval of the trust advisory board the trustee can employ attorneys."

Moving over to page 31, 4.2(b)(x), I'm going to invert it, "With the prior approval of the trust advisory board, the trustee can compromise, adjust, or settle, or abandon causes of action."  Once again, this relates to Century.

SUPP APP 0755

And, interestingly, Your Honor, it was mentioned in the trustee's response, they didn't file this motion until after there was the mediation with Century. Based upon the document that they now rely upon, they didn't have authority to enter into the mediation and to try to settle the claim with Century. They wasted a significant amount of our time going into this mediation because they did not have authority.

(xi) also provides "With the consultation of the advisory board, they will compromise, adjust, settle or abandon any avoidance actions."

Over on the next page, page 32, "With prior approval of the trust advisory board, they can sue in connection with matters."

(xviii) "With prior approval of the trust advisory board, they can borrow money."

(xix) "With prior approval of trust advisory board, they can use net causes of action to pay expenses."

So those are all fairly significant provisions that require trust advisory board approval.

And I'd also like to direct Your Honor's attention to -- bear with me for just a moment. There is a provision in the trust agreement that provides for the ability to amend the trust agreement. They chose not to amend the trust agreement. And probably one of the reasons that they chose not to amend the trust agreement is over here in Section 10.1 starting with

SUPP APP 0756

the fifth line from the top. It says that "The trustee is not entitled to amend or modify Sections 4.2(x) and 4.2(xi)." And, again, going back to (x) that is "The trust advisory board has to be consulted and has to approve any settlement of any claims or causes of action." Once again, relating to Century.

So this all has -- Century has an interest in what's going on in the trust advisory board, because its contract was assigned to the trust advisory board. And, secondly, that it was -- these doc -- the way that the governance is done with regards to the claim against trust -- Century, provides that the trust advisor board will be consulted.

And then I'll also point out to you one fairly significant, just wholesale gutting of the document, is in page 37 of the -- of the plan as it was filed, page 17 of the trust agreement. Starting with Section 6, "The establishment of the trust advisory board in all related matters."

And then there's one final point that I would make, Your Honor, is that dealing with the removal of a trustee in Section 8.8(b), "The trustee may be removed by the order of the bankruptcy court, but only upon motion of the trust advisory board with less than a unanimous vote, or upon unanimous vote of the trust advisory board."

So to completely eliminate all references to the trust advisory board, you basically have an -- the trustee not

SUPP APP 0757

being able to be under the oversight of anyone, and being able to do as he sees.

So this a material change to the trust -- trust agreement, which was incorporated by reference into the plan of reorganization, which plan was sent to creditors and parties-of-interest, which creditors and parties-of-interest relied upon in whatever decisions they ultimately made.

So, quite candidly, Your Honor, this is a significant modification to the plan of reorganization. And I cited in our objection a fairly lengthy quote from Judge Sharp in the U.S. Brass case, in which he noted that any -- you can file a motion, and you can set it up as trying to describe it as an interpretation of the plan, or kind of a -- an interpretation of a trust agreement, but if it results in material changes to a confirmed -- a substantially confirmed plan, he didn't have -- you don't have authority to modify those provisions.

Which then raises the question has the plan been substantially consummated? I'll note, Your Honor, that the debtor did file an application for -- an application to enter a final decree and close the case in which the debtor represented that the plan has been substantially consummated. If the plan, in fact, has been substantially consummated, there's no authority under Section 1127 to modify it, even indirectly by merely seeking to waive these provisions. That ends up being effectively a material modification.

SUPP APP 0758

So we would ask that -- I mean, just based upon what they're seeking to do, we'd ask the Court to deny it.

This is not a problem that Century caused. We thought that we were dealing with someone who has been properly appointed and has authority to act as they did. The fact that the trustee represented that the trust had been appointed -- the trustee had been appointed, that he had hired -- properly hired counsel in order to try to intervene into the -- litigate the coverage action in federal district court, was based upon the understanding of what was going to happen, and it was consistent with what they were saying. It was only until they filed this motion that real questions arise as to, number one, whether the trustee has, in fact, been formed? Based upon this discussion, I'm not sure that it has. And, secondly, whether the trust -- whether they have authority under Section 1127 to modify these terms anyway.

These provisions, in part, provide some protection to Century, it provides -- these protections relate to the ability to settle claims. It provides some form of oversight on the trustee in his actions, that I think that it's important.

I think I explained in our response the concerns that have arisen -- as time has gone on as to the inherent -- potentially inherent conflict that has arisen as a result of this particular plan and trust agreement. The trustee has

SUPP APP 0759

been given the sole right to object to the claim of Jane Doe. His compensation is based upon the percentage of recovery that can be given from the trust assets, which primarily consist of the claim against Century. The value of the claim against Century directly correlates to the value of the claim -- or the amount of claim that Jane Doe has against the trust.

It -- clearly, if Jane Doe's claim is twenty million dollars, and that results in twenty million in proceeds to the trust, the trustee gets a million dollars.

If Jane Doe's claim is zero, the trust gets zero. The trustee's compensation is zero. It is directly correlated.

And so there is -- there is a potential conflict of interest that exists under this plan and this trust agreement that is -- that is ameliorated in part by having the trust advisory board there to make -- overseeing what is going on.

I don't know ultimately what happened in the state court, we'll find out. That's a subject of issues in other courts. All I'm saying is under this document there is a concern. Was it raised at the time of confirmation, no. It became -- but it became more apparent as time has gone on. And, especially now it becomes more apparent when the trustee is seeking to -- and the parties-in-interest here, the debtor and Jane Doe, are asking that the Court eliminate the trust advisory board, the one check over the trustee's actions.

SUPP APP 0760

So in our view, Your Honor, you should deny the motion as a material modification of the plan. This is not a mess that we caused, it's a mess that they caused. And if -- and, quite candidly, if they didn't actually effectuate the formation of the trust, maybe there's a material modification to the plan that raises questions as to whether this case should be dismissed or converted. Thank you, Your Honor.

THE COURT: Thank you, Mr. Hesse.

MR. RUKAVINA: Your Honor, I think Mr. Gruber wants to address the Court.

THE COURT: Okay.

MR. GRUBER: Your Honor, I just want to address, especially that last comment, that "not the mess that they made."

Your Honor, my client, Ms. Doe, as an eighteen-year-old girl put up with four years of depositions questioning her -- everything about her, three-day very adversarial trial. We can play you depo clips where they go into everything about whether she was really raped, whether she wanted it, whether she wanted the herpes that she still has.

They initially, four years ago, indicated that their problem was coverage here. And then once they hired counsel, they pulled that counsel. And my client had four years of this because they wouldn't respond to the first demand for

SUPP APP 0761

payment, or the next three they didn't respond to us at all. The bankruptcy is because --

MR. HESSE:  Your Honor, I'm going to --

MR. GRUBER:  -- they couldn't pay the attorney's fees.

MR. HESSE:  Your Honor, I'm going to object to the relevance to this, to the matter at hand.

THE COURT:  Overruled.

MR. GRUBER:  Okay.  The reason we're here in bankruptcy court is because they quit paying counsel, and that is what led to this bankruptcy.  Your Honor, they showed no interest in this case at all, except for showing up, sending a lawyer, never to defend their insured, but they did send a lawyer to the bankruptcy hearing where this plan was approved. But aside from that, Your Honor, they didn't even answer our letters begging them to keep our client from having to go through what she had to go through.

I'm a little emotional, because this is a young lady who I was there when they brought her home from the hospital, a friend of our family, played with my kids when she was young.  And continually -- they continue to pull things like this.  It's the most ridiculous pleading that they've just filed in Judge Solis' court.  Judge, for them to say they're not responsible what has happened to my client, and what has happened in this instance, is ridiculous.  Thank you.

SUPP APP 0762

THE COURT:  Thank you.  Mr. Rukavina, I hear you on your motion for a continuance, but I'm overruling that.

Why don't you call your first witness?

MR. RUKAVINA:  Why don't I get some easy stuff out of the way first, Your Honor.  I move to admit Exhibits A through H.

MR. HESSE:  Your Honor, we will not stipulate to the admissibility of Exhibit 8, Your Honor threw that one out.

MR. RUKAVINA:  Which one?  Exhibit --

MR. HESSE:  That's the trust agreement.  The executed -- the purportedly executed --

MR. RUKAVINA:  I just didn't hear you, Exhibit A?

MR. HESSE:  8.

MR. RUKAVINA:  8.  I don't have -- I have A through H.

MR. HESSE:  I'm sorry, I was looking at mine.

THE COURT:  And yours, you just have A through F, is that right, Mr. Rukavina, because the others --

MR. RUKAVINA:  I have A through H, Your Honor, in the binder.  G and H were not on my witness and exhibit list --

THE COURT:  Oh, I see.

MR. RUKAVINA:  -- because they were just filed by Century on Friday evening.

THE COURT:  Oh, okay, right.

MR. HESSE:  C, Exhibit C, Your Honor threw that one

SUPP APP 0763

out.

THE COURT:  Do you object to C?

MR. HESSE:  I -- at this point I'm not going to stipulate to its admissibility.

THE COURT:  Okay.  A, B, and then D through H are admitted.

(Trustee's Exhibits A, B, D-H were hereby received into evidence, as of this date.)

MR. RUKAVINA:  Your Honor, I'd like to briefly proffer the testimony of Thomas Berghman.

MR. HESSE:  Your Honor, I'm going to object.

THE COURT:  All right.  Mr. Berghman, please come over here.

Mr. Berghman, you're an attorney licensed to practice in the State of Texas, is that right?

MR. BERGHMAN:  I am, Your Honor.

THE COURT:  You may take the witness stand without the administration of the oath.

MR. HESSE:  Your Honor, also, Mr. Berghman was not listed on the witness list.

MR. RUKAVINA:  Your Honor, I was -- shall I get my cell phone?

THE COURT:  Sure.

MR. HESSE:  I don't believe --

MR. RUKAVINA:  Wasn't I listed on it?

SUPP APP 0764

MR. HESSE: You listed Mr. --

MR. RUKAVINA: Your Honor, a lot of this is in response to what they filed Friday -- Friday afternoon.

THE COURT: Sustain the objection.

MR. RUKAVINA: Your Honor, I'll call Joyce Lindauer.

MR. BERGHMAN: She just went to the -- I'll call her, just a second.

MR. HESSE: I will object to Ms. Lindauer being called as a witness. She is an attorney that's been acting as an attorney. Under the Texas Disciplinary Rules an attorney cannot act as a witness on material facts. So we would object to Ms. Lindauer being called.

THE COURT: Overruled.

(Pause)

THE COURT: Now we've lost everybody?

MR. RUKAVINA: Your Honor, I apologize. It would have been fun to put my associate on the stand though.

THE COURT: We're going backwards. I'd like to see Mr. Berghman up there.

MR. RUKAVINA: We'll conduct the examination in Flemish.

MR. RUKAVINA: You want me to run out and yell at them?

THE COURT: We need a witness in.

(Pause)

SUPP APP 0765

MR. HESSE:  Your Honor, I will also reurge my request to invoke the rule.

THE COURT:  Okay.  I'm overruling it.

MS. LINDAUER:  I'm sorry, Your Honor.  I went to go move my car.  I didn't get very far, but it's all right.

MR. RUKAVINA:  I've called you as a witness.

MS. LINDAUER:  I know, that's what I heard.  You want to swear me in or --

THE COURT:  No, just I'm going to state on the record you're a lawyer licensed to practice in the State of Texas, is that right?

MS. LINDAUER:  Yes, sir.

THE COURT:  You may take the witness without the administration of the oath.

MS. LINDAUER:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. RUKAVINA:

Q.  Ms. Lindauer, for the record, please state your name and Your role in this bankruptcy case?

A.  Yeah, my name is Joyce Lindauer.  And I was approved as attorney for the debtor Pastazios Pizza, Inc.

Q.  Are you familiar with the plan that was confirmed in this case, and the accompanying trust agreement?

A.  I am.

Q.  How so?

SUPP APP 0766

A.    I drafted the plan with the involvement of a number of the creditors in the case, primarily Jane Doe's counsel, Mr. Erler, Ms. Fontaine originally.  Early on in the case there was a big move to convert the case to Chapter 7 or appoint a trustee.  We were able to work out an agreement with them to do a plan instead that included a creditor trust.

Q.    And was that creditor trust negotiated by you with anyone?

A.    Yes.

Q.    And who was it negotiated by you with?

A.    It was negotiated with me, with Laura Fontaine and Jeff Erler, primarily.  Our prior counsel, Mr. Johnson, I believe, who had been handling the litigation for Pastazios, and also Danny Deari, had a little bit of input also in the case and how things would be handled in the case.

Q.    What was the purpose during those negotiations of having a trust advisory board?

A.    A trust advisory board was really not discussed per se. It wasn't really -- I mean, it was a concept, but it wasn't really a material term that was discussed.

Q.    For whose benefit was the trust agreement negotiated?

A.    For the benefit of the creditors who would have claims that would have been greater than the claims that were allowed in the -- what we called an administrative convenience class. We had a 5,000-dollar limit on adminis -- on claims.  So it

SUPP APP 0767

was for the creditors who had claims greater than 5,000 dollars.

MR. RUKAVINA:  May I approach the witness, Your Honor?

THE COURT:  You may.

MS. LINDAUER:  Thank you.

Q.    Would you please turn to Exhibit C.

A.    I've got that.

Q.    I'll ask you if you recognize that document, and then flip to the signature page please?

A.    Yeah, this is a copy of the creditor trust agreement that was included as part of the plan that was filed in the Pastazios Pizza case.

Q.    And did Mr. Deari sign this and then you e-mail to Mr. Seidel?

A.    I did.

Q.    Mr. Seidel then signed it and e-mailed it to you?

A.    Correct.

MR. RUKAVINA:  Your Honor, I'd move to admit Exhibit C.

MR. HESSE:  Your Honor, may I take Ms. Lindauer on voir dire?

MR. RUKAVINA:  What's the point?

THE COURT:  You may.  You may.

VOIR DIRE EXAMINATION

SUPP APP 0768

BY MR. HESSE:

Q.    Ms. Lindauer, were you present in the room when Mr. Deari signed the agreement?

A.    Yeah, I believe he signed it at our office.  He signed --

Q.    No, were you in the room with him?

A.    Yes.

Q.    You were in the room?

A.    Yeah.

Q.    Okay.  So you witnessed him actually signing the agreement?

A.    Yeah, he stopped by our office to sign it.

Q.    And when you put it in front of -- when he signed this page, what was put in front of him?

A.    The entire trust agreement.

Q.    The entire trust agreement.  The -- I'll note at the -- I'll note at the top --

A.    Um-hum.

Q.    -- above the signature, it says, "Signature page follows"?

A.    Right.

Q.    Now, could you please turn to Trustee's Exhibit A, the last page?

A.    Got it.

Q.    Can you compare the two pages?

A.    Yes.

SUPP APP 0769

Q.   Now, the page that was attached to the plan does not state at the top of the signature page, "Signature page follows," correct?

A.   Correct.

Q.   And also the -- page 29 of Exhibit C --

A.   Right.

Q.   -- does not have at the top of it the court's filing stamp, correct?

A.   Correct.

Q.   Whereas on page 29 of the trust agreement attached to -- as  Exhibit A, there is at the top the court's filing stamp, correct?

A.   Correct.

Q.   Okay.  And were you in the room when Mr. Seidel signed the document?

A.   No.

Q.   And what did you e-mail to Mr. Seidel?

A.   The signature page.

Q.   Just the signature page?

A.   Just the signature page.

Q.   Okay.

MR. HESSE:  I have no further questions on voir dire. Thank you, Your Honor.

THE COURT:  All right.

MR. HESSE:  We would object to the admissibility at

SUPP APP 0770

this time.

THE COURT:  On what basis?

MR. HESSE:  The -- it does not appear to be an accurate -- it doesn't appear to be -- let me -- let's wait until Mr. Seidel -- I'd object at this point in time, she didn't see Mr. Seidel sign the document.  At this point, we'd wait to have an opportunity to talk with Mr. Seidel about what he signed as well.  I'd ask for a temporary not be admitted because she did not witness Mr. Seidel signing the document.

THE COURT:  Well, I'll carry the objection, but the witness will be examined on this document, right.

MR. HESSE:  Okay, thank you, Your Honor.

THE COURT:  So you can examine her about the trust document.

MR. RUKAVINA:  Yes.

BY MR. RUKAVINA:

Q.   Ms. Lindauer, before we look at this document, you were, again, lead debtor's counsel in this case, correct?

A.   Correct.

Q.   Did Century participate, appear, and do anything in this bankruptcy case?

A.   Not that I recall.

Q.   Was Century ever intended to be a beneficiary of this plan or the trust agreement?

A.   No.

SUPP APP 0771

Q.    Did Century ever try to negotiate anything about this trust agreement or plan with you?

A.    No.

Q.    Do you recall whether Century's attorney appeared at the confirmation?

A.    You mention that they did; I don't recall.  They may have.  I think they attended.  That may be the only hearing they actually attended.

Q.    But had they attended the hearing and tried to negotiate something with you, or clarify something, would you have remembered that?

A.    Oh, yeah, absolutely.

Q.    Okay.  Now, if we go over this trust agreement, not to burden the Court's time --

A.    Sure.

Q.    -- you'll agree with me that there are certain blanks in this agreement?

A.    Absolutely.

Q.    Explain to me, or to the Court, rather, how it is that on May 22nd, 2015 Mr. Deari signed this and it was sent to Mr. Seidel with blanks in it?

A.    Well, I think what happened with the trust agreement was that shortly following confirmation, the primary focus, because Mr. Seidel and I were on the phone a lot, was trying to get the 50,000 dollars that he needed as sort of the seed

SUPP APP 0772

money for the plan and then the trust.  The trust agreement -- the confirmation order had adjusted some of the terms of the trust agreement.  For example, it appointed Mr. Seidel as the trustee.

Q.   So that --

A.   Yeah.

Q.   -- blank was filled in by the judge, basically?

A.   Yeah, by the confirmation order.

Q.   Yeah.

A.   It also addressed that the trustee could hire counsel. It also addressed that the advisory board would be one member as opposed to multiple members.  What happened was then I know Mr. Seidel called me at some point and said we don't have a signed trust agreement, we need the trust agreement signed. And I said okay, let me get a hold of Mr. Deari.  The reason that Mr. Hesse, I think is having problems with the pagination, Your Honor, is I'm pretty certain what we did was just printed out -- because we had it in Word, printed out a copy of the trust agreement.  Mr. Deari came by, signed the trust agreement, and then we faxed or e-mail over the signature page to Mr. Seidel.  Or, and I'm not remembering exactly, we may have already had Mr. Seidel's signature, but that --

Q.   In any event, go back to, please --

A.   Sure.

SUPP APP 0773

Q.    -- why there are still blanks in this document?

A.    Okay.  So there's still blanks in the document because, honestly, after the agreement was signed by Mr. Deari and Mr. Seidel, I just assumed that Mr. Seidel, as the trustee of the trust, would fill in the missing blanks, because at that point I viewed him as the responsible person, because he was the trustee of the trust.  And the way I understand trusts work, the trustee is the responsible person.  And so I just assumed the blanks would all be filled in.  I'm not even sure I knew who his insurance counsel was until I think you may have contacted me at some point.

Q.    Did Mr. Seidel ever represent to you, or tell you that he would fill in those blanks?

A.    No.  I don't think we ever talked about.

Q.    Thank you.

          MR. RUKAVINA:  I'll pass the witness, Your Honor.

          THE COURT:  Mr. Hesse?

CROSS-EXAMINATION

BY MR. HESSE:

Q.    A couple of follow-up questions, Ms. Lindauer.

A.    Sure.

Q.    Let me make sure that I understand.  What happened when you and -- with Mr. Deari is that you printed out the -- a Word document for him to sign?

A.    Correct.

SUPP APP 0774

Q.   Is that document -- do you know where that document is?

A.   I'm sure it's still on my computer.

Q.   Well, no, I mean, the executed agreement?

A.   Oh, it's probably in our file, I would think.

Q.   Okay.  Now -- so the agreement that Mr. Deari signed did not have at the top of it the court's filing stamp?

A.   No, because I didn't go and pull the one that was attached to the plan.  We would have just printed one off of the computer.

Q.   So what is presented as Exhibit C is not a true and correct copy of the document that Mr. Deari signed?

A.   I have no reason to believe that it isn't.

Q.   But it doesn't -- but this document that's being presented as Exhibit 6 -- or C, I'm sorry, has the court's filing stamp, whereas you said that he signed a document that did not have the Court's filing stamp?

A.   Apparently, that's true, yes.

Q.   Okay.  So this is -- the document that is presented is not the document he signed?  It's not a copy of the document he signed?

A.   If the document that he signed did not have this little header writing across the top, then you would be correct.  But I have no reason to believe the one with the header is any different than the one that he would have signed.

Q.   But you don't know for sure, do you?

SUPP APP 0775

A.   No, because I didn't sit and compare them.

Q.   Okay, thank you.  And you sent to Mr. Seidel solely the signature page, correct?

A.   That's what I recall.

Q.   Okay.

A.   Now, he may have a different recollection.  That's what I recall.

Q.   Okay.  And it was your understanding that -- and the document --

MR. HESSE:  Let me rephrase the question, Your Honor.

Q.   And the document that Mr. Deari signed had the blanks in it, correct?

A.   I believe so.

Q.   And it was your understanding that the rest of the agreement would be filled in by Mr. Seidel?

A.   Correct.

Q.   So Mr. Deari didn't sign a completed document, correct?

A.   He signed a document with blanks in it, we did not fill in those blanks.

Q.   Okay.  All right.  So he did not sign the completed document?

A.   He -- well, that's -- he signed what you have right here as the creditor trust agreement.

Q.   Which was not -- which it was your understanding was not to be the final agreement?

SUPP APP 0776

A.    No, that was the final agreement.

Q.    But there were -- but the trustee was going to complete the agreement, correct?

A.    Right.  Just fill in the blanks.  Those were ministerial, those were just fill in names of his counsel, fill in -- I think there's a notice provision that needed to be filled in, those types of things.  But the material terms were all here.

Q.    Okay.  And it was Mr. Deari's understanding that there would be a trust committee, a trust advisory board?

A.    You know, I don't know, Mr. Deari's a pretty simple guy, I'm not sure he had any understanding of how that would work. Yeah.

Q.    Let me rephrase the question.

A.    Sure.

Q.    It was your understanding that there would be a trust advisory board appointed, correct?

A.    Right.  But it was my understanding that it would be a one-member board.  And I believe Ms. Doe was going to be the member.

Q.    No, I understand.

A.    Okay.

Q.    So -- no, I understand --

A.    Right.

Q.    -- that under the confirmation order it was modified.

A.    Right.

SUPP APP 0777

Q.    And I'm not trying to change anything --

A.    Sure.

Q.    -- from the confirmation order.

A.    Sure.

Q.    But you had no reason to believe that the trust advisory board would not occur --

A.    No.

Q.    -- or be appointed?

A.    No.

Q.    Okay.  Gainfully, the debtor doesn't have a dog in that particular fight, does it?

A.    The debtor has no dog in any of this fight.  Mr. Deari was able to keep his pizza restaurant.  These were claims that belonged to the creditors.  Whether there's a trust or not, somebody's got to pursue the claims for the benefit of those creditors, that was the concept.

Q.    Sure.

A.    Okay.

Q.    And was the primary claim -- the primary asset of the trust was the claim that was being asserted against Century and Century insurance policy, correct?

A.    Correct.

Q.    And the three creditors are primarily Ms. Doe, and then two trade vendors?

A.    It's either two or three trade vendors --

SUPP APP 0778

Q.   Okay.

A.   -- I'm not sure.  But, yeah, that's correct.

Q.   But those are fairly small?

A.   Correct.

        MR. HESSE:  I have no further questions, Your Honor.

        THE COURT:  Thank you.  Mr. Rukavina?

        MR. RUKAVINA:  Just one follow-up, Ms. Lindauer.

        THE WITNESS:  Sure.

REDIRECT EXAMINATION

BY MR. RUKAVINA:

Q.   Just so I understand, so you agreed to the trust advisory board in your own mind being Ms. Doe because that would benefit Ms. Doe?

A.   Right.  And the other --

Q.   And that Ms. --

A.   -- other creditors too, honestly.

Q.   And if Ms. Doe waives that benefit do you see any resulting prejudice to the debtor or anyone else?

A.   No, not really.  I think Mr. Seidel's an excellent trustee.  I don't think he needs -- I think he can do this job without an advisory board, frankly.

Q.   Thank you.

        MR. RUKAVINA:  Thank you, Your Honor.

        THE COURT:  Any other questions of Ms. Lindauer?

        You may step down, Ms. Lindauer.

SUPP APP 0779

MS. LINDAUER:  Thank you, Your Honor.

THE COURT:  How you like that witness box?

MS. LINDAUER:  I hate it.  I hate being a witness.

MR. RUKAVINA:  I was down there not too long ago, if I recall.

THE COURT:  I think I made a finding you were credible too.

MR. RUKAVINA:  You made a finding I was credible, thank you.

I'll call Trey Crawford please.

I would have rather had a finding of good-looking, but I'll take credible.

THE COURT:  Mr. Crawford, for the record, you're a lawyer licensed to practice in the State of Texas, is that correct?

MR. CRAWFORD:  Yes, Your Honor.  And just for the record, my legal name is Tom Crawford III.

THE COURT:  Okay.  You may be seated.

MR. RUKAVINA:  But I'm going to call you Trey, just because that's how I know you, is that okay?

MR. CRAWFORD:  My entire life I've been called Trey, so yes, sir.

DIRECT EXAMINATION

BY MR. RUKAVINA:

Q.   And just, quickly, you're a lawyer and you represented

SUPP APP 0780

Ms. Doe in the state court lawsuit?

A.    Yes, sir.

Q.    Okay.  And when did you start representing Ms. Doe?

A.    I believe in early 2013.

Q.    And did the case get tried?

A.    It did get tried to a verdict.

Q.    Were you there personally?

A.    Yes, I was lead trial counsel.

Q.    On or about June 8th, 2015, did I appear in the state court on a scheduling matter with you?

A.    You did.

Q.    Okay.  Was Mr. Seidel there?

A.    I believe he was there.

Q.    Okay.  Did you have an understanding that I had been retained by Mr. Seidel together with my firm as insurance counsel?

A.    Yes.

Q.    Did you or Ms. Doe have any objection to that?

A.    No.

Q.    Have you ever voiced any objection to Mr. Seidel retaining my firm as insurance counsel?

A.    No.

Q.    At that hearing did I inform the state court that Mr. Seidel had retained replacement trial counsel?

A.    Yes, you did.

SUPP APP 0781

Q.   And who was their trial counsel, do you recall?

A.   Chen Dotson.

Q.   Did Ms. Doe know that Chen Dotson would be, and was and did try the lawsuit on behalf of the trust?

A.   We knew as soon as they were appointed and moved to make an appearance in the state court case.

Q.   Did you or Ms. Doe have -- voice any objection to the trustee retaining Chen Dotson?

A.   Not at all.

Q.   Okay.  What was the result of trial?

A.   We got a twenty million-dollar verdict jointly and severably against PPI and Deari.  And the state court judge actually said it's most egregious set of facts he's seen since he's been a judge.

Q.   The brief facts I gave to the judge during my opening, you were here for those, did I generally tell the judge the truth about the evidence that was adduced?

A.   Absolutely.

Q.   Okay.  Did Ms. Doe offer to settle her claims before trial?

MR. HESSE:  Your Honor --

A.   We tri --

MR. HESSE:  -- objection for 40(h) settlement negotiations.

MR. RUKAVINA:  It's not 40(h) if it's the basis of a

SUPP APP 0782

cause of action, which in this case is Stowers.  We're not going to go into what was necessarily discussed, and it's not being used --

MR. HESSE:  But it's not relevant to this trial.

THE COURT:  Overruled on that question.  Don't go into settlement discussions.

MR. RUKAVINA:  Thank you.

Q.   Did Ms. Doe offer to settle before trial?

A.   We begged to settle before trial so she wouldn't have to go through the two and a half years that she went through.

Q.   And I think we all know as the attorneys what the Stowers doctrine is.  Was it pursuant to the Stowers doctrine that Ms. Doe made her offer?

A.   Absolutely.

MR. HESSE:  Your Honor, objection, that's a legal issue.  And it's a matter subject to -- it's not a matter that's relevant to this case.

MR. RUKAVINA:  I'll ask it this way, Your Honor.

THE COURT:  Sustained to relevance.

Q.   Did Ms. Doe offer to settle within policy limits?

A.   Absolutely.

Q.   And was that offer accepted?

A.   It was not even responded to.

Q.   Okay.  Now, you understand that Ms. Doe -- or do you understand that Ms. Doe was intended at the time of

SUPP APP 0783

confirmation in this bankruptcy case, to sit on this trust advisory board?

A.   Can you repeat the question?

Q.   Pardon me.  Do you understand that at the time of confirmation, or do you have any understanding that at the time of confirmation here in this bankruptcy case, Ms. Doe was apparently intended to sit on the trust advisory board?

A.   I honestly don't know that.  Mr. Erler and Ms. Fontaine probably would know better than I would.

Q.   Okay.  Does Ms. Doe today want to sit on the trust advisory board?

A.   Frankly, I don't think it's necessary.  I mean, the trustee's got fiduciary duties.  As long as they're following the fiduciary duties, I don't -- I really don't see a point in doing that.

Q.   Okay.  Without going into discussions you've had with your client, I take it that you have -- that Ms. Doe has made an informed decision on that point?

A.   Absolutely.

Q.   Do you believe that Ms. Doe has been prejudiced by the trustee retaining insurance counsel, retaining Chen Dotson and not seeking approval from a trust advisory board?

A.   Not a bit.

Q.   Okay.

        MR. RUKAVINA:  Your Honor, I pass the witness.  Thank

SUPP APP 0784

you.

THE COURT: Mr. Hesse? Oh, Ms. Fontaine, first.

MR. HESSE: Your Honor, I'm going to raise the same objection. They're members of the same firm that there's an ethical issue with a lawyer acting as a witness, and -- on a relevant matter, and having -- acting as counsel in the same matter.

THE COURT: Overruled.

MS. FONTAINE: I'll be real quick, Your Honor.

CROSS-EXAMINATION

BY MS. FONTAINE:

Q. Mr. Crawford, who has been primarily responsible as counsel for communications with Century Insurance Company?

A. At which firm?

Q. At our firm.

A. Most likely me.

Q. Have you ever had any communications with Century Insurance Company about the membership of the trust advisory board?

A. No. I don't --

Q. Did --

A. I've never talked to them about that.

Q. Did it come up at state court trial who was a member of the trust advisory board?

A. Not that I recall.

SUPP APP 0785

Q.   Have you had multiple communications with -- related to settlement of this lawsuit?

A.   Yeah, their lawyer called me saying that you have the attention from the highest people in the company, we really want to sit down and mediate --

MR. HESSE:  Objection, Your Honor, we're getting into settlement discussions.

THE COURT:  Sustained.

Q.   At any point in time have they informed you that they relied upon the trust agreement?

A.   No.  In fact, I read the transcript where they asserted no objection to the trust agreement.

MR. HESSE:  Objection, Your Honor, hearsay.

A.   It's --

THE COURT:  Overruled.

MS. FONTAINE:  Thank you, Your Honor.  No further questions.

THE COURT:  Mr. Hesse?

CROSS-EXAMINATION

BY MR. HESSE:

Q.   Mr. Crawford, isn't it true that Century is disputing that is -- it has coverage of the claim that is asserted by Ms. Doe against Pastazios?

A.   I really can't figure out what Century's position is, it changed.

SUPP APP 0786

Q.   Well, Mr. Crawford, isn't that one of the things that's in the state court -- excuse me, Federal District Court complaint?

A.   Which complaint are you referring to?

Q.   Any one, pick a complaint?

A.   Can you repeat the question of what you're asking?

Q.   Isn't Century disputing coverage?

A.   They are now, yes.

Q.   They are disputing coverage.  And that they don't owe a liability for this -- for this particular cause of action that your client is asserting?

A.   I wholeheartedly disagree with that.

Q.   You may disagree, but aren't they -- but Century's disputing that it has coverage?

A.   It is now.

          MR. HESSE:  I have no further comments, Your Honor.

          THE COURT:  Mr. Rukavina?

REDIRECT EXAMINATION

BY MR. RUKAVINA:

Q.   Just so that it's in the record, Mr. Crawford, are you on ECF in the Federal District Court action for Judge Solis?

A.   I am.

Q.   You get the pleadings in there?

A.   Yes.

Q.   On or about June 12th of this year, did I file a motion

SUPP APP 0787

to substitute in?

A.   You did.

Q.   And would, pursuant to ECF, Century have received a copy?

A.   They would.

Q.   So as of June 12th you have reason to believe that Century knew that the trustee had hired Munsch Hardt?

A.   There'd be no question.  I remember getting the ECF.

Q.   Also, by the way, and without going into details, were you party to any communications this summer after trial --

        MR. HESSE:  Your Honor, this is going beyond the scope of cross.

        MR. RUKAVINA:  It's okay.  I'll withdraw the question.  Thank you.

        THE COURT:  You may step down, Mr. Crawford.

        THE WITNESS:  Thank you, Judge.

        THE COURT:  You may call your next witness.

        MR. RUKAVINA:  Your Honor, I'll call the trustee.

        THE COURT:  Mr. Seidel?  Mr. Seidel, since you're testifying as capacity of trustee, I'm going to swear you in. No offense though, okay?

        MR. SEIDEL:  None taken.

    (Witness sworn)

        THE COURT:  You may be seated.

DIRECT EXAMINATION

BY MR. RUKAVINA:

SUPP APP 0788

Q.   And for the record, sir, you are the trustee in this post-confirmation trust?

A.   Yes.

Q.   Would you please turn to Exhibit C?  There's two binders. Now, do you recognize this document?

A.   Yes, sir.

Q.   And if you'll turn to the last page, the signature page? Did you -- is that your signature, did you sign this document?

A.   Yes, sir.

Q.   And you signed it -- did you sign it after Mr. Deari had signed it?

A.   Yes, sir.

Q.   So the issues with the pagination or whatever, is that how the document came to you?

A.   Yes, sir.

Q.   And did the whole document come to you, or just the signature page?

A.   It came to me in two parts from what I recall.

Q.   Okay.  What two parts, sir?

A.   First part was the creditor trust agreement that has the stamp of the court on top.  And the second e-mail had the signature line for Mr. -- the signature page of Mr. Deari.

Q.   And who sent you this, where did it come from?

A.   Ms. Lindauer.

Q.   How long have you been a lawyer, sir?

SUPP APP 0789

A.   Longer than I'd like to admit, twenty-five, thirty years.

Q.   How long have you been a trustee?

A.   Same amount of time, basically.

Q.   And how many sales contracts, 9019s would you, ballpark, you've signed in your twenty-five --

A.   Thousands.

Q.   Is there anything unusual about a signature page being separate from the contract?

A.   No.

Q.   Is that what's done frequently?

A.   Yes.

Q.   Okay.  Now when you got this document explain to the Judge what the state of the trust was?  In other words, plan is confirmed on April 2nd --

A.   Right.

Q.   -- you get this document May 22nd?

A.   Right.

Q.   What was going on with respect to you being the trustee of the trust?

A.   Well, there was some discussion about me being the trustee of the trust.  And then there was supposed to be 50,000-dollar seed money to hire lawyers to defend the cause of action.  And the 50,000 dollars wasn't there.  And so we fought, and we fought, and we had phone calls, and we had more phone calls, and we had more correspondence.  And the 50,000

SUPP APP 0790

dollars wasn't there.  And so we continued to fight.  And we had state litigation proceeding.  We had lawyers involved.

Q.   Let me stop you just there.  When was the state court going to go to trial?  Early July?

A.   Early July is my recollection.

Q.   Were you there with me on July 8th -- I'm sorry, on June 8th, 2015 before Judge Ginsberg?

A.   Yes, I was.

Q.   Did we inform the judge that we might have to seek a continuance?

A.   I did.

Q.   What did he say?

A.   He was not to receptive to any type of continuance.

Q.   Do you recall who Sam Johnson was?

A.   Yes, he was the prior lawyer in the case.

Q.   And without going into anything that's privileged, did you have multiple communications with Mr. Johnson about him representing the trust?

A.   I did.

Q.   Was an agreement reached?

A.   No.

Q.   Was it a financial reason?

A.   It was a financial reason, basically.

Q.   So at time with trial coming up, and the judge saying there's not going to be a continuance, what were you

SUPP APP 0791

doing with respect to that state court trial and getting counsel?

A. I was busily trying to get the state court counsel on board, and also trying to get the 50,000 dollars, so that we have some money.

Q. But that was my point, you couldn't get counsel without that 50,000?

A. No. No one was volunteering to go step into this.

Q. Did you in any way hide from Ms. Doe, or Mr. Deari, or anyone that you were getting trial counsel to defend the trust?

A. Absolutely not.

Q. Without the 50,000 dollars would this plan have been effectuated?

A. No.

Q. In other words that was the more pressing issue?

A. That was the issue.

Q. Okay. At some point you retained the state court trial counsel that Mr. Crawford testified was Chen Dotson, is that correct?

A. Yes.

Q. Okay. And they did defend the trust at the --

A. They did.

Q. And they lost?

A. They lost.

SUPP APP 0792

Q.   We lost?

A.   We lost.

Q.   What would have happened if you had not retained anyone to defend the trust because there's no trust advisory board for you to call -- well, first of all, was there a trust advisory board for you to call to say hey, I want to hire Chen Dotson?

A.   Never.

Q.   What would have happened if you had just raised your hand and said well, I ain't going to hire no one?

A.   We'd have had a catastrophe.  That was a -- they were steamrolling towards proceeding.  There wasn't going to be a continuance; we had to get someone in.  If there was no one in, we would have been defaulted.

Q.   Okay.  Now, as far as the retention of Munsch Hardt, you have retained Munsch Hardt as your "insurance counsel," is that correct?

A.   Correct.

Q.   Was this ever hidden from anyone?

A.   Never.  It was told to everyone, anybody who was involved or asked questions about this case.

Q.   Okay.  Now, the summer's progressing, was there a time when we mediated with Century?

A.   Yes.

Q.   And was that about October 8?

SUPP APP 0793

A.   Yes.

Q.   And did the mediation last some time thereafter, without going into any details?

A.   Yes.

Q.   And was it about October 20th that the mediation basically failed?

A.   My recollection.

Q.   Now, in that time, so after you hired Chen Dotson, after you hired me, are you having communications with anyone regarding the blanks in the trustee agreement?

A.   I think maybe with you, that would be it.

Q.   Without going into details, did you ask me to investigate?

A.   Yes.

Q.   And did I report back to you without telling the Court what I said?

A.   Yes.

Q.   Okay.  And after all that is when we filed this motion?

A.   Yes.

Q.   I guess the question is going to be why did we not file this motion much sooner?

A.   Well, we were trying to see what -- how the mediation went which would obviate all of this.

Q.   Did you have an understanding that there was a fully executed agreement that just hadn't been provided to you yet?

SUPP APP 0794

A.   That was my understanding that there was one with the firm, your firm filled in.

Q.   Has the trust in your mind been properly effectuated?

A.   Yeah.

Q.   The issues we're here on don't concern the existence of the trust, they concern the existence of what you can do without or with approval, isn't that correct?

A.   Correct.

Q.   Okay.  Is the -- is Century in any way, shape or form a beneficiary of this trust to your belief or knowledge?

A.   Not to my knowledge.

Q.   Has -- since you've been involved in this case, has Century always been an adversary to us?

A.   Yes.

Q.   Have we been engaged in active litigation with Century?

A.   Yes.

Q.   Can you think of any reason, being a trustee for twenty-five years, having had thousands of cases, why your litigation adversary would in any way, shape or form have any say on the internal governance of your trust?

A.   No.

MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the witness.

THE COURT:  Ms. Fontaine?

CROSS-EXAMINATION

SUPP APP 0795

BY MS. FONTAINE:

Q.    Mr. Seidel, when you were appointed trustee in the confirmation order, what was your understanding as to the status of Jane Doe's claim?

A.    That it's being litigated.

Q.    As trustee you're responsible for objecting to proofs of claims, are you not?

A.    Yes.

Q.    Prior to the state court trial did Ms. Doe offer to compromise and allow her claim?

A.    I'm trying to remember.  I stand to be refreshed on that.

Q.    Did she ever send you a demand letter prior to trial of the state court litigation?

A.    I'm sure she did.

Q.    Did you decide to compromise and allow her claim prior to trial?

A.    No, we litigated that claim down in trial.

Q.    Did you ever represent to anybody that Jane Doe was on the trust advisory board?

A.    I don't believe so, no.

Q.    Did you ever tell Century, in particular, that Jane Doe was on the trust advisor board?

A.    I never talked to Century.

Q.    Have you ever represented to anyone that anybody's on the trust advisory board?

SUPP APP 0796

A.    No.

MS. FONTAINE:  No further questions, Your Honor.

THE COURT:  Thank you.  Mr. Hesse?

CROSS-EXAMINATION

BY MR. HESSE:

Q.    Mr. Seidel --

A.    Yes, sir.

Q.    -- when were you first contacted to become the trustee?

A.    My memory is not what it was, but I'm going to say April, I believe.  Maybe March, April, does that make sense?

Q.    Let me -- bear with me for just one moment.

MR. HESSE:  I'll ask the Court to take judicial notice of Century's Exhibit 4, which is a copy of the order confirming the plan.

THE WITNESS:  Yes, sir.

MR. HESSE:  It's that one.  And it says that it --

Q.    I was going to ask if this might help reflect your --

A.    Sure.

Q.    -- or refresh your recollection.  It's Exhibit 4.

A.    4.  Okay.

Q.    And does the fact that it was signed on April 2 refresh your recollection as to when you were first contacted?

A.    Yes, sir, it would have been around that time frame.

Q.    Okay.  Maybe March -- maybe late March?  Obviously sometime before April 2?

SUPP APP 0797

A.    That's my recollection.

Q.    Okay.  And prior to agreeing to become the liquidating trustee or -- excuse me, the creditor trustee, did you review the debtor's plan of reorganization?

A.    Took a look at it.

Q.    So you did review it?

A.    I took a look.

Q.    Did you review the trust agreement?

A.    I took a look at it.

Q.    Okay.  And when you say you took a look at it, what does that mean?

A.    I didn't full out read the doc -- I saw the document.

Q.    And was there anything about the plan or trust agreement that seemed unusual to you?

A.    I don't swim in that water a whole lot, so it's all a little unusual to me.  I'm not an 11 guy.

Q.    Fair enough.  And then if we can -- I was going to ask you if you paid particular attention, I will ask you to look at the Trustee's Exhibit A, which is the other book, since it's already been admitted.  Paragraph Section 7.01.

        THE COURT:  In A?

        MR. HESSE:  Yes, Trustee's Exhibit A.

        THE COURT:  All right.

A.    7.01, creation of creditor trust and appointment of the trustee.

SUPP APP 0798

Q.   Yes.  And the last sentence there specifically states that the trustee and the creditor trust will be subject to the oversight of a trust advisory board, is that -- do you have a recollection of seeing that at the time?

A.   I see it.

Q.   Actually, at the time of -- let's say in early -- late March, early April, when you looked at the trust -- the plan and the trust agreement?

A.   Yes, it's there.

Q.   Okay.  Does that seem like an unusual provision?

A.   Like I said, I'm not -- I don't come into the Chapter 11 post-confirmation world that often --

Q.   Okay.

A.   -- so I'm not sure.  I apologize, I'm just not.

Q.   Now you said that you reviewed -- let me go back.  So you reviewed it to that point in time, just looked at it.  Did you -- when did you -- when was the next time you have a recollection of looking at the trust agreement?

A.   It would have been April, May, I would guess.

Q.   Okay.  And if you could turn to paragraph -- or excuse me, Exhibit C in the trustee's book.  And this is the creditor's trust agreement, and if you could turn it over to the last page.

A.   Yes, sir.

Q.   Is that your sig -- you said that was your signature,

SUPP APP 0799

correct?

A.    Yes, sir.

Q.    And when did you sign that document?

A.    It would have been when I received the e-mail from Ms. Lindauer, I would have thought right when it's dated, May 22nd.

Q.    Is that your handwriting that dates it?

A.    No, sir, that's not my handwriting.

Q.    Okay.  But it sounds about right that you would have signed it on May 22?

A.    That sounds about right, yes, sir.

Q.    Okay.  And prior to -- and you said that you got the document -- that you got two documents with that e-mail, is that -- is my understanding correct?

A.    You know, sir, it's been a while since I've looked at this, but my recollection is that I got two e-mails from Ms. Lindauer.

Q.    Okay.

A.    One was, as I indicated before, the trust agreement.  And then the second was the signature page.

Q.    And did you review the trust agreement before signing it?

A.    Yes, sir, I looked at it.

Q.    Okay.  So when you signed the trust agreement you knew that there were the blanks that were in the trust agreement, correct?

SUPP APP 0800

A.    Yes.

Q.    And you also were aware at that time that there were several provisions in the trust agreement that required approval of a trust advisory board, correct?

A.    I see that, yes.

Q.    And do you remember the -- and so, for example, in Section 4.2 of the trust advisory -- excuse me, the trust agreement, 4.2(b) --

A.    Hold on one second, 4.2(b).

Q.    There are the provisions that deal with -- that with prior approval of the trust advisory board you can enter into -- under contracts, that's (iii)?

A.    Would you mind pointing me to where you're talking about?

          MR. RUKAVINA:  I don't see a 4.2.

Q.    4.2 --

A.    Yes, sir.

Q.    -- (b) --

A.    Yes, sir.

Q.    -- (iii).

A.    Okay.  I see that now.  It says with the prior approval of the trust advisory board.

Q.    Let's go to trust advisory board 4.

          MR. RUKAVINA:  I might have coffee (ph.) in their material.

          MR. HESSE:  Well, yeah, you are missing a page.

SUPP APP 0801

MR. RUKAVINA: Okay.

Q. It's 4.2(b)(iii), that's one of the sections that requires prior approval of the trust advisory board, correct?

A. That's what it says, yes, sir.

Q. And there's (v) below that that provides that with prior approval of the trust advisory board, that you can employ attorneys, accountants, et cetera?

A. That's what it says, yes, sir.

Q. And turning over to the next page, (x), that you may compromise, adjust, settle, or abandon any causes of action with the prior approval of the advisory board, correct?

A. That's what it says, yes sir.

Q. And those causes of actions would have included the claims against Century, correct?

A. Yes.

Q. And then under (xi), slightly different language, but dealing with avoidance actions, you can compromise, adjust or settle but with consultation of the advisory board, correct?

A. That's what it says, yes, sir.

Q. So there were sev -- so you knew that all those provisions existed at the time that you signed this document, correct?

A. I'm --

Q. Pardon me?

A. They were there, they were there.

SUPP APP 0802

Q.   Okay.  And then I'm going to ask you to turn over to Section 10.1

A.   Yep.  Is there a page number?

Q.   It's page 24 of the trust agreement, or if you're look --

A.   Okay.

Q.   And I'll point you to the -- and this provides that --

A.   10.1, I see it.

Q.   10.1, this provides a mechanism for the trustee to be able to amend and -- amend the trust agreement, correct?

A.   Yes, apparently.

Q.   You want to take a look at it and read it?

A.   I'm catching up to you, go ahead.

Q.   On the fifth line from the bottom it states "Provided further that the trustee shall not be entitled to amend or modify certain sections, including 4.2(x) and 4.2(xi)," correct?

A.   I believe you've read it correctly, yes.

Q.   And if we go back to 4.2(x) and (xi), page 11 --

A.   Yes, sir.

Q.   -- those two sections specifically incorporate oversight by a trust advisory board, correct?

A.   It says what it says, yes, sir.

Q.   And so those are two sections that cannot be amended, correct?

A.   That may be.

SUPP APP 0803

Q.   Now, with regard to your motion today, you're asking the Court to basically read out all sections of the trust agreement that relate to the trust advisory board, correct?

A.   That's one alternative, yes.

Q.   Okay.  Wouldn't you consider that to be a material modification of this agreement?

A.   No.

MR. RUKAVINA:  Your Honor, object, it's a legal conclusion.

THE COURT:  Overruled.

Q.   You don't think that would be a material modification?

A.   No, sir.

Q.   Now, with regards to -- excuse me, Section 4.2(x) --

A.   I'm sorry, could you give me the page again?

Q.   It's 11, page 11 of the --

A.   Yes, sir.

Q.   That -- now you knew that you would need to have trust advisory board authority before you could settle with Century, correct?

MR. RUKAVINA:  Your Honor, I will object to that to the extent that it would have to be answered by invading the attorney-client privilege and our work product.  He is my -- although he's a lawyer, he's my client in this instance.

THE COURT:  Don't go into conversations with your lawyer, but answer the question if you can.

SUPP APP 0804

THE WITNESS:  Okay.

A.   Do you mind repeating the question?

Q.   Pursuant to the terms of Section 4.2 -- excuse me, 4.2(b)(x), you understood -- you know that you need to have trust advisory board approval to enter into any settlement with Century?

MR. RUKAVINA:  I would just, again, Your Honor, advise the witness to answer like you said, only to the extent he can without invading our privilege.

A.   Yeah, I visited with counsel about that, and we came to a conclusion.

Q.   Well, what conclusion did you and counsel come to?

MR. RUKAVINA:  And, Your Honor, that is the core of my work product and attorney-client privilege.

MR. HESSE:  He opened the door, Your Honor.

THE COURT:  If you could answer the question without invading your attorney-client privilege, which I take it to note that you know what that is, you may answer the question.

THE WITNESS:  I don't believe I can, Your Honor.

THE COURT:  Sustained.  It's sustained, the attorney-client privilege objection.

Q.   So you went into mediation with Century knowing full well that you did not have authority to settle the cause of action?

MR. RUKAVINA:  Objection, Your Honor, that misstates the prior answer.  And, again, he cannot answer that question

SUPP APP 0805

without invading the privilege.

THE COURT: I think you can get that information if you restate the question.

Q. Is it your understanding, Mr. Seidel, that you cannot settle with Century without approval of the trust advisory board?

MR. RUKAVINA: Same question as before, Your Honor.

THE COURT: Overruled on that one.

A. We believed if we could have gotten to a settlement mediation, that could have been done, a settlement could have gotten done.

Q. Who is "we"?

A. My counsel and I. Wholeheartedly.

Q. How did you think -- in light of the language in the trust agreement how could you have gotten that done?

A. That's with discussion with my lawyer.

Q. So based upon the terms of the trust agreement though, you would have to have Cent -- you'd have to have trust advisory board approval to settle with Century?

MR. RUKAVINA: Your Honor, that's a legal conclusion

THE COURT: Overruled. Overruled. He may testify as to his understanding of the trust document.

A. I'm sorry, could you repeat your question?

Q. Based on your understanding of the trust agreement, you could not settle with Century without trust advisory board

SUPP APP 0806

approval?

A. My understanding was we could have got a settlement done.

Q. Under the terms of the agreement?

A. My understanding is we could have gotten it done, yes.

Q. Under the terms of the agreement?

A. My understanding.

Q. Okay. You were here when Ms. Lindauer testified that it was her understanding that Jane Doe was going to be the member of the trust advisory board, is that correct?

A. Yes.

Q. And was it your understanding that Jane Doe was going to be the member of the trust advisory board?

A. It would make sense to me.

Q. Who did you understand to be the -- that was going to be the member of the trust advisory board?

A. I would have thought it would have been Ms. Doe, but I don't know.

Q. Did Ms. Doe ever act like she was the member of the trust advisory board?

A. I don't know what act like member of the trust advisory board would be, but, no, not that I recall.

Q. Did her counsel ever act in a manner that would be consistent with being on the trust -- a member of the trust advisory board?

A. I don't know.

SUPP APP 0807

Q.   Have you ever taken direction from Ms. Doe or her counsel?

A.   I have not taken direction from them.

Q.   Now, Mr. --

A.   I've sought their input, just as I've sought your client's input.

Q.   What kind of input did you seek?

MR. RUKAVINA:  Your Honor, that goes far beyond the relevance of this motion.

THE COURT:  Overruled.

A.   I'm sorry?

Q.   What input did you seek?

A.   When we were at the mediation all day, we listened to what everybody had to say.

Q.   Okay.  And what was her input?

MR. RUKAVINA:  Your Honor, that's a mediation privilege now.  He just said it was at a mediation, and we know that there are strict rules in Texas on mediation.

MR. HESSE:  Withdraw the question, Your Honor.

THE COURT:  Okay.

Q.   Now, Mr. Seidel, isn't it true that you'll receive five percent of any recovery that the trust obtains from causes of action?

A.   I think -- I think that term is net, after attorney's fees are paid.  But, yes, I would receive a percentage of the

SUPP APP 0808

recovery.

Q.    And that would include a percentage of the -- I'll try to use the proper term, net recoveries from Century, correct?

A.    I think that's correct, yes, sir.

Q.    So if the net proceeds that the trust collects from Century is twenty million dollars, your piece would be a million dollars, correct?

A.    In the way it's written, yes.

Q.    And, on the other hand, if the trust receives zero dollars from Century, your compensation would be zero dollars, correct?

A.    Yes, sir.

Q.    Now, isn't it true that the size of the claim the trust is asserting against Century depends upon the amount of the claim that Jane Doe has against the trust?

A.    Okay, you have to repeat that one, you went really fast for me.

Q.    Isn't it true that the size of the claim, or the amount that is being asserted against Century by the trust depends upon the amount of the claim that Jane Doe has against the trust?

A.    Yeah, that would make sense.

Q.    Once again, if Jane Doe has a claim of twenty million dollars against the trust, and the trust receives -- or let me rephrase that.  If Jane Doe has a claim in excess of twenty

SUPP APP 0809

million dollars --

A.   Okay.

Q.   -- and the trust will assert a claim of in excess of twenty million dollars against Century, correct?

A.   Yes, sir.

Q.   On the other hand, if the claim of Jane doe is zero against the trust, the trust will not have a claim against Century, correct?

          MR. RUKAVINA:  Your Honor, I just want to make sure he does -- I'm going to object to a legal conclusion.  I mean, again, he's not a lawyer, and what the legal ramifications of Jane Doe having zero claim against Century may be, he's not ready to answer.  For example, there is the duty to defend. It is different from the duty to indemnify.  So, again, I would just lodge an objection to the legal conclusion nature of these questions.

          THE COURT:  Witness may give his understanding if he has one.

A.   Okay, I'm sorry, can you repeat again?

Q.   So if Jane Doe has a claim of zero dollars against the trust, the trust will not have a claim against Century, is that correct?

A.   I'm not sure.  I -- I just don't know.  It seems like they would not, but there may be other things.

Q.   Okay.  So --

SUPP APP 0810

A.   Attorney's fees, et cetera, I don't know.

Q.   And this is the way that the plan and the trust agreement is written, that's how the economics work?

A.   Like a Chapter 7 case, in my mind.

Q.   Okay.  Now, you as the trustee, is the sole party with the authority to object to Jane Doe's claim, correct?

A.   I think that's right.

Q.   Okay.  So Century couldn't object to her claim?

A.   I don't know what Century can do.

Q.   Well, let's --

A.   I don't know.

Q.   If you were the sole -- do you have -- are you the sole person that could --

A.   I'm the only one that can object to claims.

Q.   You're the only -- so you're the only person that can object to claims.  And I think you testified before that upon confirmation of the plan -- well, let me -- let me step back.  Upon -- when did you actually become -- do you understand that your role as trustee began?

A.   I would -- I would say April, May 2015.

Q.   Would it have been the day that the plan had been confirmed, or the day that the trust agreement was signed?

A.   And your question was when I became --

Q.   When did you assume the role as trustee?

A.   One of those two days, probably the -- probably the

SUPP APP 0811

latter, but I'm not positive.

Q. Okay. So you would have assumed the responsibility as trustee on May 22? And at that time did you take control of the litigation asserted by Jane Doe against the trust?

A. Yeah. I mean, we tried to defend that litigation.

Q. And you hired counsel to defend?

A. Yes, sir.

Q. Now you were also present at the trial, correct?

A. Not for every minute of it. It went on for three days, but I was there.

Q. You were there at various times?

A. Yes, sir.

Q. Did you direct the defense of Jane Doe's claims?

MR. RUKAVINA: Your Honor, I object on the grounds of relevance. This has nothing to do with the relief we're seeking. And, moreover, this is an attempt to collaterally obtain discovery in a hot moving piece of litigation in front of Judge Solis. This is an attempt by counsel to get free discovery.

THE COURT: Relevance, Mr. Hesse?

MR. HESSE: I'll withdraw the question, Your Honor.

THE COURT: Okay.

Q. Now, isn't it true that at the conclusion of the state court hearing your lawyer advised Century of valid appeal points?

SUPP APP 0812

MR. RUKAVINA: Objection, Your Honor. Again, that is outside of anything to do with relevance here. It's subject to litigation. It is also the best evidence rule.

THE COURT: Sustained on relevance.

MR. HESSE: I beg your pardon, Your Honor?

THE COURT: Sustained on relevance.

MR. HESSE: Okay.

Q. I'll just ask though, you made the decision not to appeal the Jane Doe --

MR. RUKAVINA: Your Honor, objection to relevance. Again, this is something that is not present here, but is in front of Judge Solis.

THE COURT: You may answer that question, everybody knows the answer to that question. You may answer the question.

A. Correct. On visiting with counsel, we came up with a decision on that.

Q. After visiting with counsel?

A. Yes, sir.

Q. Okay. Now, if you -- as I understand from your response, the preferred relief that you're seeking is to eliminate the provisions relating to a trust advisory board, is that correct?

A. That is an option, yes, sir.

Q. Well, is that the prim --

SUPP APP 0813

A.    It would be great.

Q.    -- preferred relief?

A.    Sure.

Q.    That would be the preferred relief.  And so that would eliminate the trust advisory board's oversight of your actions as trustee, correct?

A.    Yes.

Q.    And that would amend Section 7.01 of the plan, correct?

A.    I -- if you say so, I don't have the plan number in front of me, I believe you.

Q.    We'll look at Exhibit A --

A.    Yep.

Q.    -- page 13, Section 7.01, last sentence.

A.    It would change that sentence, yes.

Q.    And it would also eliminate the process under which you would be removed as trustee, correct?

A.    I assume so.  But if anybody wants to remove me, they could file papers and have at it.

Q.    Well, let's look at Section 8.8 of the trust agreement?

A.    Okay.

Q.    It's Exhibit A, it's the docketed page 42?

A.    8.8(a), I have it, resignation.

Q.    Well, 8.8(b).

A.    (b), removal.

Q.    And it provides that the trustee may be removed  (1)

SUPP APP 0814

either by order of the bankruptcy court upon motion of the
trust advisory board with less than unanimous vote, or upon
unanimous vote of the trust advisory board?

A.    Yes, sir.

Q.    So if there's an elimination of the trust advisory board,
there is no mechanism to remove you as trustee, correct?

A.    No, I don't agree with that.  I think anybody can file
papers to remove me anytime they want.

Q.    Okay.  One of the blanks that's in the
trust advisory -- or excuse me, the trust agreement, is the
compensation to Munsch Hardt?

A.    Yes.

Q.    Has there ever been an agreement reached as to Munsch
Hardt's compensation for being insurance counsel?

A.    They're just billing hourly.

Q.    So they're just billing hourly.  Is that authorized by
the trust agreement?

A.    I'm trying to remember how they're billing, to be quite
honest, counsel.

      (Pause)

Q.    Section 9.2.

A.    Yes, sir.

Q.    So that -- you don't know what that blank is, filled in
is?

A.    No.

SUPP APP 0815

Q.   And just to be clear, going back to page 23, Section 9.1(a), the blank relating to Munsch -- or relating to insurance litigation counsel, that's never been filled in either, has it?

A.   It's not filled in.  Always been Munsch Hardt since day one.

Q.   I beg your pardon?

A.   I said Munsch Hardt has been involved since day one, that's not -- that's not filled in.

MR. HESSE:  I have no further questions, Your Honor.

THE COURT:  Thank you.  Mr. Rukavina?

MR. RUKAVINA:  Your Honor, I was a little bit confused by your ruling before on my Exhibit C.  To the extent it has not been admitted, I would ask that it be admitted.

THE COURT:  Response?

MR. HESSE:  I believe they've authenticated it, Your Honor.

THE COURT: C's admitted.  I just carried his objection so Mr. --

(Trust agreement was hereby received into evidence as Trustee's Exhibit C, as of this date.)

MR. HESSE:  Thank you, Your Honor.

THE COURT:  -- Seidel could testify that he had signed it.

MR. RUKAVINA:  Thank you, Your Honor.

SUPP APP 0816

REDIRECT EXAMINATION

BY MR. RUKAVINA:

Q.   Mr. Seidel, and we have to be careful, because it concerns mediation so let's not going into details.  Was Ms. Doe present?

A.   Absolutely.

Q.   Was her counsel present?

A.   Absolutely.

Q.   Did we meet with her and her counsel?

A.   Sure.

Q.   And you said that at least other people thought that Ms. Doe should have been on this trust advisory board, right?

A.   Yes.

Q.   So logically did you believe in good faith that if there was an agreement reached, all the necessary parties were there, and it could have been taken care of right then and there?

A.   Yes, sir.

Q.   In fact, without -- now, be careful, without saying anything about what was said, in fact, did Ms. Doe and you have the same answer to the mediator on his mediator proposal?

A.   Yes.

Q.   Okay.  So to the extent that any kind of conferring with Ms. Doe would have been necessary, do you believe in good faith that you satisfied that?

SUPP APP 0817

A.   Yes.

Q.   I want you to go, like Mr. Hess did, to page 10 of the creditor trust agreement, that's Exhibit C.  I want you to go to Section 4.2, please.  4.2(b), you'll recall Mr. Hesse took you through this?

A.   Yes, sir.

Q.   I'm going to try to burn through this and not to try the Court's patience.

A.   Yes, sir.

Q.   (b)(1) doesn't speak about a trust advisory board?

A.   Correct.

Q.   (b)(2) doesn't speak about a trust advisory board?

A.   Correct.

Q.   (3) does "With the prior approval of the trust advisory board to enter into, perform and exercise rights under contracts binding upon the creditor trust."  Have you, sir, entered into, performed, or exercised rights under any contract binding upon the creditor trust?

A.   Not to my knowledge.

Q.   Okay.  (4) doesn't speak about the advisory board, does it?

A.   No, sir.

Q.   (5), it does speak about the advisory board.  It says "With the prior approval of the trust advisory board" and then we read "except insofar as such duties and powers arise from,

SUPP APP 0818

relate to, or are in connection with the causes of action to employ attorneys," et cetera, et cetera. You employed Chen Dotson, correct?

A. Correct.

Q. And do you believe that that arose from, related to, or was in connection with the causes of action?

A. I do.

Q. Do you believe that you needed approval from the trust advisory board to retain Chen Dotson?

A. No.

Q. Was there a trust advisory board to seek the approval from for anything?

A. There was never one.

Q. Are you responsible for that?

A. No, I'm not responsible for that.

Q. Let's go on. (6), nothing about trust advisory board?

A. Correct.

Q. (7), nothing about trust advisory board.

A. Right.

Q. (8), nothing.

A. Correct.

Q. (9). (10), "To compromise, adjust, settle or abandon any cause of action," blah, blah, blah, "with the prior approval of the trust advisory board." Have you compromised, adjusted, settled, or abandoned any cause of action?

SUPP APP 0819

A.    No.

Q.    (11), "To compromise, adjust, settle, or abandon any avoidance action in consultation with the trust advisory board."  Have you compromised, adjusted, settled or abandoned any avoidance action?

A.    I have not, sir.

Q.    Were there any avoidance actions in this case?

A.    No, sir.

Q.    the judge could read it for himself, but (12), (13) and (14) don't speak to trust advisory board.  (15), "With the prior approval of the trust advisory board, to sue in connection with any matter arising from or related to the plan or disagreement," blah, blah, blah.  Have you sued in connection with any matter arising from or related to the plan or this agreement?

A.    No.

Q.    Okay.  Let's look at (16), that's an interesting one. "To represent the interests of the beneficiaries with respect to any matters relating to the plan, disagreement, or creditor trust, affecting the rights of such beneficiaries."  You see that, sir?

A.    I see that.

Q.    Is that what you're doing today?

A.    That is what we've been doing, yes.

Q.    Have you been doing that since you got into this case?

SUPP APP 0820

A.   That's what we've been doing since I got in this case.

Q.   (17), no trust advisory board.  (18), "With the prior approval of a trust advisory board to borrow money."  Have you borrowed money?

A.   I have not borrowed money

Q.   (19), "With the prior approval of a trust advisory board to use that cause of action."  Have you used that cause of action?

A.   No.

Q.   And (20) is also interesting.  "To do and perform all such acts, execute and deliver all such deeds, bills of sale," et cetera, et cetera, "as it may deem reasonably necessary or advisable to carry out the purposes of the creditor trust." What's your answer on that one, sir, have you been doing that?

A.   I've been doing that.

Q.   And to the best of your recollection, when was the 50,000 dollars from Mr. Deari obtained?

A.   You know, I can tell you the exact date if you'd asked me it last night, I could look at the bank account.  I don't know.  It was -- it took a lot of doing.  And I can find out the answer.

Q.   Would you say late May or early June?

A.   That makes sense.

Q.   Okay.  So it was before we hired Chen Dotson?

A.   Yes.

SUPP APP 0821

Q.   Thank you.

          MR. RUKAVINA:  I'll pass the witness, Your Honor.

          THE COURT:  Anything further, Mr. Hesse?  No.  Ms.
Fontaine, sorry?  Mr. Rukavina's so tall I can't see you.

          MS. FONTAINE:  I cower behind him when necessary.

RECROSS-EXAMINATION

BY MS. FONTAINE:

Q.   Mr. Seidel --

A.   Yes, ma'am.

Q.   -- briefly for the record.  What's your primary
occupation?

A.   I'm an attorney and bankruptcy trustee.

Q.   Generally most days are you a fiduciary to somebody?

A.   Yes, every day.

Q.   Are you capable of exercising your fiduciary duties?

A.   I am.

Q.   If the Court eliminates the trust advisory board, will
you continue to exercise your fiduciary duties to the trust?

A.   Absolutely.

Q.   If you have some question over how you could best
exercise your fiduciary duties, will you seek clarification
from the bankruptcy court?

A.   Yes, with notice to everyone.

Q.   Is that something that you typically do?

A.   That's what I always do, try to do.

SUPP APP 0822

MS. FONTAINE:  Thank you, Your Honor.

THE COURT:  Thank you.  Mr. Hesse, any other questions to the trustee?

MR. HESSE:  No, I think he's had enough.

THE COURT:  You may step down, Mr. Seidel, thank you.

THE WITNESS:  Thank you, Your Honor.

MR. RUKAVINA:  Your Honor, we have no further evidence.

THE COURT:  All right.  Mr. Hesse, you have anything?

MR. HESSE:  No, we have no further evidence.

THE COURT:  Okay.  Why don't we take a five-minute break.  How about ten minutes per side for closing.

MR. HESSE:  That'd be -- everybody on that side of the room ten minutes?

THE COURT:  You get equal to whatever the other side, so yeah.

MR. HESSE:  Whatever they get, fair enough.

THE COURT:  Okay.  Ten -- would ten be enough, Mr. Rukavina?

MR. RUKAVINA:  Oh, much less than that for me.  I'm not going to be long winded today.

THE COURT:  Say then ten.

MR. HESSE:  Okay.

THE COURT:  If they take twelve, you get twelve, though, Mr. Hesse.

SUPP APP 0823

All right.  We'll be in recess for about five minutes.

THE CLERK:  All rise.

(Recess from 11:04 a.m. until 11:15 p.m.)

THE CLERK:  All rise.

THE COURT:  Good morning again.  Please be seated. Thank you.

Please be seated, thank you.

Mr. Rukavina you get to go first and last.  And try to keep it around ten if you would.

MR. RUKAVINA:  I will, Your Honor, thank you.

Let me just point out that I hope that the irony of this hearing and of Century's position is not lost on the Court.

The irony is as follows:

If Century is to be believed, they relied on the plan, they relied on the trust agreement, they relied on a trust advisory board.

If Century is to be believed, the person that should have been on that trust advisory board was Ms. Doe.

If Century is to be believed, Ms. Doe would have basically had a serious input on how this litigation would have gone forward.

If Century is to be believed, Ms. Doe, their adversary, would have been somehow acting for their benefit.

SUPP APP 0824

That's ludicrous.

It is ludicrous for them to argue any kind of reliance, any kind of prejudice, any kind of standing, any kind of interest in how the trust is internally governed or administered. And I dare say, and I will say it, that the reason why they want Ms. Doe to be on this board today is exactly so they could go to Judge Solis and say collusion, collusion.

It's actually quite ironic that for reasons that no one really intended or knows why, Ms. Doe never sat on this board. Ms. Doe never guided, commanded in any way, shape or form, the trustee's decision making. But now they want to force Ms. Doe under threat of your writ to sit on this board, to make decisions maybe, so they can go to Judge Solis and say hah, hah, hah, look at that collusion that Judge Hale approved of and then commanded her to take a part of.

Your Honor, this is fundamentally in my humble opinion a matter of equity. Both the rule of law and the rule of equity knows a situation where there is an impossibility of contractual performance. Part of the reason why equity developed is because parties have contracted to do things that became impossible. The coronation of the king, I forget which one, suddenly he dies, there's no coronation, why did I rent the house right on the parade path.

Equity comes to help people when they are in an

SUPP APP 0825

impossible position like the trustee is here. Who is the trustee to seek input from when there's no one on this board, and no one wants to sit on this board? Who is the trustee to go to to hire Chen Dotson if you need her to when the state court judge says "we're going to trial"? Is the trustee not to hire Munsch Hardt when everyone knows that he needs counsel to prosecute this claim for everyone's benefit?

Because the matter is rooted in equity I suggest, Your Honor, that the Court look at it according to the rules of equity.

One, is there fault? I'm not saying that there's fault. Mr. Deari had many more important things to think about than some blanks in the document. Ms. Doe had many more important things to think about than some blanks in the document. They're going to proceeding on the trial of their lives, one that would make or break probably both of their lives in one way or another. So I don't think there's fault.

But if there is fault it's certainly not the trustee's. The trustee signed the agreement with the understanding that the blanks were being filled in, or that it had been done. The trustee took action to protect the assets of this estate. His first and foremost duty.

Because the action is rooted in equity he also looked at prejudice, is there prejudice? Has Century been in any way, shape or form prejudiced by Munsch Hardt being retained,

SUPP APP 0826

by Chen Dotson being retained, by there not being a member on the trust advisory board?  And the prejudice is intimate with the standing as well.  They have no standing, they have no prejudice.  How will they possibly be prejudiced if Your Honor grants us relief today?  There is no prejudice to them.  Where is the prejudice?  The prejudice is on the trustee.  Is the trustee going to go forward when the name of his counsel is blank, when how much is counsel can be paid is a blank, when his decisions before are questioned as to having been done appropriately?  Where is the prejudice here?  The prejudice is against the same people for whose benefit this plan is designed.

So if you look at the maxims of equity, Your Honor, and you look at the principles of impossibility of performance, or frustration of purpose, or just waiver, the people that matter here have said and are saying we don't need no trust advisory board, we didn't need none, we want it gone. And the only reason why we've come to you is because this is a plan, and because Mr. Seidel is not about to fill in blanks on his own in the sneak of night, or to sit down with other people and post-date or pre-date documents, and fill them in, which maybe he could have and maybe he should have.  Not expecting that Century, a stranger to this, would be forced to confess at an evidentiary hearing on something that clearly needs fixing.

SUPP APP 0827

And this is not a plan modification. Many times it happens that a plan says there's going to be a rights offering, or the debtor will deliver a financial document, or the debtor will raise funding through some issuance of debt, and it does not happen. And the question then is what to do about it? Is it a material term? Has it been waived? Are the beneficiaries of the plan agreeable to its waiving, or are they going to move to convert the case for post-confirmation default? Which no creditor here is doing. This is, Your Honor, not a plan modification, it is merely the enforcement of a plan by requiring the parties that told you they would do this, to do it. Or, far more equitably, listening to them now and saying this was never needed and it's not needed now.

THE COURT: Let me ask you a question, and don't infer from the question you're winning or losing. But in the compensation blank what goes there?

MR. RUKAVINA: Your Honor, I do not know. But if I look back at your confirmation order, which is my Exhibit B --

THE COURT: Yeah, I looked at that.

MR. RUKAVINA: -- it says, "The trustee shall identify and retain counsel." What goes there, frankly -- okay, let me give you a human answer, Judge.

THE COURT: Okay.

MR. RUKAVINA: We now have a nineteen point-something million-dollar creditor, we've got a 40,000 dollar creditor,

SUPP APP 0828

and we got two tiny creditors.  What goes in there is what Ms. Doe is comfortable providing for.  And then I will make the decision for my firm whether we're comfortable proceeding on that.  So if Ms. Doe, who is my 99.9 percent beneficiary says Davor, do it hourly, I'll say okay.  If Ms. Doe says you can get 25,000 dollars and that's it, well, then I'll say good day, ma'am, go somewhere else.  So, frankly, what goes there is whatever the parties want to put in there.  It's not a 327, or a 330 matter.

THE COURT:  Okay, thank you.  Let's hear from anyone else.  Mr. Hesse, this goes -- this ups your time.  All right.

MS. FONTAINE:  Thank you, Your Honor.  This has been a really grueling four years for my client.  She had her deposition taken twice.  She's now fought in three different courts the bankruptcy cases, because as Your Honor's aware there's a Chapter 13 still being fought.  We're hotly contested.  We came to a consensual plan, but she still couldn't get her claim approved.  That leaves her in a delicate personal position as of the effective date of this plan.

She didn't take up the seat on the trust advisory board, because she didn't have an allowed claim, and she wasn't a beneficiary of the trust.  She didn't want to do anything in connection with the trust that might prejudice some other beneficiary's rights, that they might come after

SUPP APP 0829

her. She didn't want to do anything that was going to prejudice Century's rights, so she just stayed out of it.

At this point, Your Honor, I think that you could appoint -- order her appointed, I think you could order somebody else appointed. You could order -- you could find that Scott Seidel, a Chapter 7 trustee that you're very familiar with, would probably exercise his fiduciary duties okay, without oversight by Jane Doe, the rape victim. Because that's what Century's really demanding.

They're saying no, no, no, we demand that you put the rape victim in charge of the trust, so that we will be better off somehow. I suppose that they think that they would be better off because it would be easier for them to make a collusion argument in Judge Solis' court. I don't think it's appropriate for Your Honor to order her to collude with the trustee, I think that ship may have sailed.

THE COURT: I don't think I'll order her to collude with the trustee.

MS. FONTAINE: Yeah. But I think that we -- the point of Your Honor's order should be to allow everybody to proceed as they have thus far, with nobody up till now asking who's on the TAB, who's supervising Scott Seidel, who is Scott Seidel going to take orders from. Scott Seidel knows how to be a fiduciary and I think we should trust him to go ahead and do that from here on out as he's been doing thus far.

SUPP APP 0830

THE COURT: Thank you, Ms. Fontaine.

MS. FONTAINE: Thank you, Your Honor.

THE COURT: Mr. Hesse?

MR. HESSE: Good afternoon, Your Honor. Well, it's still good morning, I'm sorry.

THE COURT: This was a twenty- or thirty-minute hearing, as I recall.

MR. HESSE: Indeed. First of all, I want to make one point; I want to clarify one thing. Century has never suggested anyone should be on the trust advisory board. Notwithstanding what the two previous speakers had indicated, Century has never said that they pick -- Ms. Doe should be on the board -- the trust advisory board, that anyone in particular should be on the trust advisory board. I just want to make it clear we never said that.

Century thought, like many other people apparently, that there was a wholly formed trust advisory board pursuant to the terms of a confirmed plan with a -- which incorporated by reference the trust agreement. It was only when the trustee filed his motion, which incidentally was after the mediation that he didn't have authority to participate in, only after he filed his motion asking you to amend the plan and the trust agreement to eliminate the trust advisory board, that we became aware that it wasn't appointed.

And I think that one of the opening statement -- one

SUPP APP 0831

of the comments that was made in opening statement really kind of highlights really what's going on here. There is litigation going on in the federal district court, but it was noted that means the trustee has to clean things up now since he's going to be in federal district court, because there's a problem here. This is a problem that was of the making of, I don't know whom, but it wasn't -- the particular problems with the trust and the trust advisory board wasn't Century.

Was it the trustee, who signed the trust agreement without having the material terms in it, and after he should have read it and realized he had to have authority from the trust advisory board to do certain things? Maybe he should have dealt with it earlier. Was it the responsibility of the debtor under their proposed plan to make sure that the holes were filled in the trust? Probably should have done it.

I guess we found out today the negotiations were done by Ms. Doe's counsel in the context of that plan. Maybe they should have made sure that all -- that everything was done. But it only became apparent to us in the last week or two that there's a problem here.

Now, I'll also reemphasize, like I did on opening, the evidence that has been presented here raises an interesting question as to whether there was a meeting of the minds, and we actually do have a trust agreement.

Ms. Lindauer had her client sign a document with

SUPP APP 0832

blanks in it, figuring that Scott Seidel would fill in the blanks, identify I guess the trust advisory board, identify his law firm, because she didn't know who the law firm was. Fill in the blank with the amount that would be paid to the trustee's law firm, because she didn't do it, because she thought it was his responsibility. Mr. Seidel didn't fill in the blanks because he didn't think it was his responsibility. And they're the two signatories to it. I think there's a question as to whether there's a meeting of minds. And going one step further, Mr. Seidel has testified, or it's been represented by Mr. Seidel, he thought there was a fully -- a fully completed document somewhere, that he just didn't have. I don't know if there's a meeting of minds. It's a real, real question, and a real, real concern that maybe they don't have -- that they have not properly formed the trust.

Now, as we've indicated in our objection, confirmed plans of reorganization are binding agreements on the parties, they're binding on the trustee too. They're binding on the debtor. They're not just binding on us. And we're not the ones here asking you to modify the plan to accommodate what should have been done. But it's also binding on the debtor and the trustee.

And as Judge Sharp indicated in the U.S. Brass case, that once you have a substantially consummated plan, which the debtor represents has occurred, you can't modify, you can't

SUPP APP 0833

amend a plan, 1127 does not allow for it. And the reason you don't amend the plan, as Judge Sharp noted, and I think it's a pretty good point, is that there's an intent to have finality, because the debtor creates a disclosure statement, he circulates a -- they circulate the plan, they attach documents. And parties rely upon those, they vote for it, they rely on it to object to it, they rely on it not to object to it if they choose. And so to now come out seven months later, and to completely change the terms of the plan, is not allowed under the Bankruptcy Code, nor applicable case law.

Now, admittedly, Century's not a creditor, and we're not a beneficiary under the trust, but there are provisions of that trust agreement that affect Century. The trustee went into mediation without settlement, without authority to settle the agreement -- settle the causes of action, based upon the plain language of the agreement. Had we known that, we may not have wasted our time going to a mediation. I don't know, I wasn't involved at that point in time. But that's something that Century should be able to rely upon, is his authority.

And so this is not the time to change the governance of the agreement. This is not the time to change it. We're well past the ability to do it. I mean, even if there was fraud, you can only revoke confirmations 180 days after the order is confirmed. I mean, we're well past the applicable deadlines. But for them to come in and try to change it so

SUPP APP 0834

that they can have things cleaned up for the federal district court litigation, smacks us as a tad bit unfair.

What happened to Ms. Doe was horrific. I don't think anybody denies that. But just because it was horrific, doesn't mean it's covered by the insurance policy we have with Pastazios. Pastazios has denied coverage, and that's the question. Is it covered?

But to change the rules and to change the governance of this thing at this point in time so that they can clean things up going into trial smacks of gamesmanship. And, consequently, just based upon clear reading of 1127, the courts that have interpreted changes to plan documents as effectively being a change -- a modification of a plan, whole host of case law, we'd ask the Court to deny the motion to -- that has been filed by the trustee.

THE COURT: Thank you, Mr. Hesse. Mr. Rukavina, you get to go last.

MR. RUKAVINA: Your Honor, three brief points.

One, I cannot wait for discovery because what happened is that Mr. Shults for Century called Mr. Crawford for Jane Doe and they arranged the mediation. We were brought in later, after the fact kicking and screaming. So for Century to suggest that they relied on anything is just flat false.

Point two, you heard that there was no meeting of the

SUPP APP 0835

minds. And you heard that these are material blanks. I'm not suggesting that Your Honor is perfect, or anyone is perfect. But you've been a judge for a long time, you're a good judge, you were a good lawyer, I don't think you would have confirmed the plan if you thought that there were material omissions or a failure of the meeting of the minds. I think it's like other -- many other plans, where there are things left that are going to be filled in later that are not material, that are ministerial.

And point three, just so that we're very clear here, Mr. Seidel has not violated any provision of this trust agreement. I went through step-by-step, he never borrowed money, never entered into contracts.

The only thing he did was he hired Chen Dotson, which you saw there was a bracket that said except you can hire lawyers like that without trust approval. What the blank on Munsch Hardt and the blank on Munsch Hardt's fees, the trustee didn't violate anything, he did not violate anything, he did not breach anything. If anyone loses here it's me, I go back to the firm and say whoops. And that's it.

THE COURT: Thank you.

This is rather messy, and I know you're in litigation upstairs, or downstairs, I'm not sure where Judge Solis is, we'll try to get you a ruling in the next few days. I'll probably just set up a CourtCall, and ask Mr. Rukavina to give

SUPP APP 0836

notice to everyone so you can participate by CourtCall.

Thank you.

MR. RUKAVINA:  Thank you, Your Honor.

THE COURT:  We'll be in recess.

MR. HESSE:  Thank you, Your Honor.

THE CLERK:  All rise.

(Whereupon these proceedings were concluded at 11:34 AM)

SUPP APP 0837

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| Joyce Lindauer | 34 | 42 | 47 | | 36 |
| Tom Crawford III | 48 | 53 | 55 | | |
| Scott Seidel | 56 | 63 | 84 | 89 | |

| EXHIBITS: | DESCRIPTION | I.D. | EVID |
|---|---|---|---|
| Trustee: | | | |
| A, B, D-H | | | 32 |
| C | Trust agreement | | 84 |

| RULINGS: | PAGE | LINE |
|---|---|---|
| Motion by trustee for continuance denied | 30 | 17 |

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

SUPP APP 0838

# C E R T I F I C A T I O N

I, Esther Accardi, the court approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

November 9, 2015

_____        _____

ESTHER ACCARDI                        DATE

AAERT Certified Electronic Transcriber CET**D 485

SUPP APP 0839

**1**

**1 (2)**
23:5;82:25
**10 (2)**
86:2;87:22
**10,000 (1)**
11:24
**10.1 (4)**
24:25;71:2,7,8
**11 (7)**
9:20;66:16;67:11;
71:18;72:15,15;88:2
**11:04 (1)**
92:4
**11:15 (1)**
92:4
**11:34 (1)**
105:7
**1127 (4)**
26:23;27:16;102:1;
103:11
**1141 (1)**
9:20
**12 (1)**
88:9
**12th (4)**
7:14,19;55:25;56:5
**13 (3)**
82:13;88:9;97:16
**14 (1)**
88:10
**15 (1)**
88:10
**16 (1)**
88:17
**17 (2)**
25:15;89:2
**18 (1)**
89:2
**180 (1)**
102:23
**19 (1)**
89:6

**2**

**2 (4)**
22:13;23:5;65:21,25
**20 (1)**
89:10
**2013 (1)**
49:4
**2015 (4)**
40:20;49:9;59:7;79:20
**20th (2)**
8:20;62:5
**22 (2)**
68:10;80:3
**22nd (5)**
5:23;6:22;40:20;
58:16;68:6

**23 (1)**
84:1
**24 (1)**
71:4
**25,000 (1)**
97:6
**29 (2)**
38:5,10
**2nd (2)**
5:10;58:14

**3**

**3 (1)**
86:14
**30 (1)**
23:9
**31 (1)**
23:21
**32 (1)**
24:11
**327 (1)**
97:8
**330 (1)**
97:9
**37 (1)**
25:15

**4**

**4 (8)**
14:14;15:1,8;65:13,
19,20;69:22;86:20
**4.2 (5)**
69:7,14,15;73:3;86:4
**4.2b (3)**
69:8,9;86:4
**4.2biii (2)**
23:10;70:2
**4.2bv (1)**
23:19
**4.2bx (2)**
23:21;73:4
**4.2x (4)**
25:2;71:15,18;72:13
**4.2xi (2)**
25:2;71:15
**40,000 (1)**
96:25
**40h (2)**
50:23,25
**42 (1)**
82:21
**42,000 (1)**
12:6

**5**

**5 (1)**
86:23
**5,000 (1)**
36:1
**5,000-dollar (1)**

**35:25**
**50,000 (12)**
5:22;15:25;16:2,6;
20:8;40:25;58:23,25;
60:4,7,13;89:16
**50,000-dollar (2)**
5:17;58:22

**6**

**6 (3)**
25:16;43:14;87:16

**7**

**7 (4)**
35:4;79:4;87:18;98:6
**7.01 (5)**
22:15;66:20,24;82:8,
13

**8**

**8 (5)**
31:8,13,14;61:25;
87:20
**8.8 (1)**
82:19
**8.8a (1)**
82:22
**8.8b (2)**
25:20;82:23
**8th (5)**
7:8;8:19;49:9;59:6,7

**9**

**9 (1)**
87:22
**9.1a (1)**
84:2
**9.2 (1)**
83:21
**9019s (1)**
58:4
**99.9 (1)**
97:4

**A**

**abandon (5)**
23:24;24:10;70:10;
87:22;88:2
**abandoned (2)**
87:25;88:4
**ability (3)**
24:22;27:19;102:22
**able (8)**
14:19,20;26:1,1;35:5;
46:13;71:9;102:19
**above (1)**
37:18
**absolutely (12)**

**9:19,20;40:12,18;**
**50:18;51:14,21;52:19;**
**60:12;85:6,8;90:19**
**accepted (1)**
51:22
**accommodate (1)**
101:20
**accompanying (1)**
34:23
**according (2)**
8:1;94:9
**account (1)**
89:19
**accountants (1)**
70:7
**accurate (1)**
39:4
**across (1)**
43:22
**act (6)**
10:20;27:5;33:11;
75:18,20,22
**acting (4)**
33:9;53:5,6;92:25
**action (24)**
7:15;12:13;23:24;
24:17;25:5;27:9;51:1;
55:10,21;58:23;70:10;
73:23;76:23;87:1,6,23,
25;88:3,5;89:7,8;94:21,
23;102:15
**actions (7)**
24:10;27:20;28:25;
70:13,17;82:5;88:7
**active (1)**
63:15
**acts (1)**
89:11
**actual (4)**
13:5;19:21;20:24;23:3
**actually (14)**
4:3;16:15;21:5,14,17;
23:6;29:4;37:9;40:8;
50:13;67:6;79:18;93:9;
100:24
**ad (1)**
18:3
**address (4)**
8:25;14:5;29:11,13
**addressed (3)**
16:15;41:10,11
**adduced (1)**
50:17
**adjust (6)**
23:23;24:9;70:10,17;
87:22;88:2
**adjusted (3)**
41:2;87:24;88:4
**adminis (1)**
35:25
**administered (1)**
93:5
**administration (2)**

**32:18;34:14**
**administrative (2)**
23:10;35:24
**admissibility (3)**
31:8;32:4;38:25
**admit (3)**
31:5;36:19;58:1
**admitted (11)**
10:16,18,18,19,21;
32:6;39:8;66:20;84:14,
14,18
**admittedly (1)**
102:11
**adversarial (1)**
29:18
**adversary (3)**
63:13,19;92:25
**advisable (1)**
89:13
**advise (1)**
73:8
**advised (1)**
80:24
**advisor (4)**
15:18;23:13;25:12;
64:22
**advisory (120)**
7:2;8:3,4;11:22;12:1,
7;13:1,21;15:2,7,9,19;
17:4;18:5,6;19:18;20:3,
5;21:10,22;22:5,9,18,22;
23:11,20,22;24:9,12,14,
16,19;25:3,8,9,17,22,23,
25;28:16,25;35:17,18;
41:11;45:9,16;46:5;
47:11,21;52:2,7,11,22;
53:18,24;61:4,6;64:19,
25;67:3;69:4,7,11,21,22;
70:3,6,11,18;71:21;72:3,
18;73:5;74:5,19,25;75:9,
12,15,19,20,24;81:22;
82:5;83:2,3,5,10;85:12;
86:10,12,14,20,23,24;
87:9,11,16,18,24;88:3,
10,11;89:2,3,6;90:17;
92:18,20;95:2,17;97:21;
99:10,13,14,17,23;
100:8,12;101:2
**affect (1)**
102:13
**affecting (1)**
88:20
**afoul (1)**
14:25
**afternoon (2)**
33:3;99:4
**again (20)**
7:4;8:3;10:4,24;11:1;
23:4,24;25:3,5;39:18;
72:14;73:7,25;77:23;
78:11,14,19;81:1,11;
92:6
**against (27)**

SUPP APP 0840

7:24;8:12,13,14;10:3;
20:22;25:11;28:4,4,6;
46:20;50:12;54:23;
70:14;77:14,15,19,20,
24;78:4,7,7,12,20,21;
80:4;95:11
**ago (2)**
29:22;48:4
**agree (5)**
8:18;14:10;21:7;
40:16;83:7
**agreeable (1)**
96:7
**agreed (2)**
11:5;47:11
**agreeing (1)**
66:2
**agreement (95)**
12:23;13:3;14:2;16:2,
12,13;22:5,8,19;23:4;
24:22,23,23,25;25:16;
26:4,14;27:25;28:14;
31:10;34:23;35:5,21;
36:11;37:3,10,14,15;
38:10;39:24;40:2,13,17,
22;41:2,3,14,14,19,20;
42:3;43:3,5;44:15,23,25;
45:1,3;54:10,12;57:20;
59:20;62:10,25;66:8,13;
67:8,18,22;68:19,21,23,
24;69:3,8;71:4,9;72:3,6;
74:15,17,24;75:3,5;79:2,
22;82:19;83:10,13,17;
84:20;85:15;86:3;88:15;
92:17;94:19;99:19,23;
100:9,24;102:13,15,16,
21;104:12
**agreements (1)**
101:17
**ahead (4)**
3:20,21;71:12;98:24
**ain't (1)**
61:10
**alcohol (1)**
10:18
**allow (5)**
14:15;64:10,15;98:20;
102:1
**allowance (1)**
18:10
**allowed (7)**
14:14,25;15:3;17:5;
35:23;97:22;102:10
**along (1)**
22:12
**alternative (1)**
72:4
**alternatively (1)**
11:25
**although (2)**
11:5;72:23
**always (4)**
8:11;63:13;84:5;90:25

**ameliorated (1)**
28:15
**amend (12)**
11:4;24:22,23,24;
25:2;71:9,9,14;82:8;
99:22;102:1,2
**amended (2)**
5:3;71:23
**amending (1)**
11:6
**amount (7)**
24:6;28:6;58:3;77:14,
18,20;101:4
**announced (1)**
7:22
**answered (1)**
72:21
**apologize (2)**
33:16;67:14
**apparent (3)**
28:21,22;100:19
**apparently (6)**
6:19;10:24;43:17;
52:7;71:10;99:16
**appeal (2)**
80:24;81:8
**appear (4)**
39:3,4,20;49:9
**appearance (2)**
9:12;50:6
**appeared (2)**
7:9;40:4
**apple (1)**
12:12
**applicable (2)**
102:10,24
**application (2)**
26:19,19
**appoint (4)**
22:2,2;35:4;98:4
**appointed (15)**
15:9;18:18;19:24;
22:3;27:5,7,7;41:3;
45:16;46:8;50:5;64:2;
98:4,5;99:24
**appointment (1)**
66:24
**approach (3)**
4:13,16;36:3
**appropriate (2)**
9:10;98:15
**appropriately (1)**
95:10
**approval (30)**
22:6;23:11,12,19,22;
24:11,14,16,19;52:22;
63:7;69:4,11,20;70:3,6,
11;73:5;74:5,19;75:1;
86:14,24;87:8,11,23;
88:11;89:3,6;104:16
**approve (1)**
25:4
**approved (5)**

19:5;30:14;34:20;
93:15;97:18
**April (9)**
5:9;58:14;65:9,10,21,
25;67:7,19;79:20
**argue (1)**
93:2
**arguing (1)**
9:25
**argument (4)**
3:20;8:25;21:3;98:14
**arguments (2)**
9:7,22
**arise (2)**
27:13;86:25
**arisen (2)**
27:23,24
**arising (2)**
88:12,14
**arose (1)**
87:5
**around (2)**
65:23;92:10
**arranged (2)**
16:6;103:21
**arrangements (1)**
16:2
**aside (1)**
30:15
**assert (1)**
78:3
**asserted (5)**
46:20;54:11,22;77:19;
80:4
**asserting (2)**
55:11;77:14
**asset (1)**
46:19
**assets (3)**
7:17;28:3;94:21
**assigned (3)**
12:23;20:23;25:9
**assignment (1)**
23:15
**associate (2)**
12:5;33:17
**assume (2)**
79:24;82:17
**assumed (3)**
42:4,8;80:2
**attach (1)**
102:5
**attached (6)**
5:12;17:22;23:5;38:1,
10;43:8
**attacking (1)**
10:3
**attempt (2)**
80:16,18
**attended (3)**
40:7,8,9
**attention (3)**
24:20;54:4;66:18

**attorney (8)**
16:18;32:14;33:9,10,
10;34:21;40:4;90:12
**attorney- (1)**
73:20
**attorney-client (3)**
72:22;73:14,17
**attorneys (4)**
23:20;51:11;70:7;87:2
**attorney's (3)**
30:4;76:24;79:1
**authenticated (1)**
84:16
**authority (13)**
24:4,7;26:16,23;27:5,
16;72:18;73:23;79:6;
99:21;100:11;102:14,19
**authorized (1)**
83:16
**avoidance (5)**
24:10;70:17;88:3,5,7
**awarded (1)**
10:15
**aware (3)**
69:2;97:15;99:24
**away (2)**
12:7;21:23

**B**

**b1 (1)**
86:10
**b2 (1)**
86:12
**back (14)**
5:9;6:21;7:22;10:21;
18:15;25:3;41:24;62:15;
67:15;71:18;79:17;84:1;
96:18;104:19
**background (1)**
4:25
**backwards (1)**
33:18
**ballpark (1)**
58:4
**bank (1)**
89:19
**bankruptcy (19)**
3:18;9:12,17;19:15,
16;25:21;30:2,10,11,14;
34:19;39:21;52:1,6;
83:1;90:12,22;97:15;
102:10
**based (10)**
10:15;24:3;27:1,10,
14;28:2;74:17,24;
102:15;103:11
**basically (12)**
9:16;10:2,9,11;11:12;
25:25;41:7;58:3;59:23;
62:6;72:2;92:22
**basis (4)**
11:9,9;39:2;50:25

**bear (2)**
24:21;65:11
**became (7)**
9:5;28:21,21;79:23;
93:22;99:24;100:19
**become (3)**
65:8;66:2;79:18
**becomes (2)**
6:21;28:22
**beforehand (1)**
8:17
**befuddled (1)**
21:2
**beg (2)**
81:5;84:7
**began (1)**
79:19
**begged (1)**
51:9
**begging (1)**
30:16
**behalf (3)**
3:11;20:14;50:4
**behind (1)**
90:5
**belief (1)**
63:10
**belonged (1)**
46:14
**belonging (1)**
23:14
**below (1)**
70:5
**bench (1)**
8:10
**beneficiaries (5)**
11:14;14:13;88:18,20;
96:7
**beneficiary (8)**
7:10;8:8;14:23;39:23;
63:10;97:4,23;102:12
**beneficiary's (1)**
97:25
**benefit (12)**
11:14;12:3;17:12;
19:23;35:21,22;46:15;
47:13,17;92:25;94:7;
95:11
**Berghman (9)**
3:7;12:4;32:10,12,14,
16,19;33:6,19
**best (3)**
81:3;89:16;90:20
**better (3)**
52:9;98:11,13
**beyond (2)**
56:10;76:8
**bidding (1)**
9:25
**big (1)**
35:4
**biggest (2)**
10:6,7

**billing (3)**
83:15,16,18
**bills (1)**
89:11
**binder (1)**
31:20
**binders (3)**
4:14,18;57:4
**binding (9)**
9:21;10:4;86:16,18;
101:17,18,18,19,21
**bit (6)**
14:17;21:2;35:14;
52:23;84:12;103:2
**bite (1)**
12:12
**blah (6)**
87:23,23,23;88:13,13,
13
**blank (15)**
6:24,25;7:4;11:22,23;
16:25;41:7;83:23;84:2;
95:8,8;96:16;101:4;
104:16,17
**blanks (37)**
5:13,14,14,24,25;6:5,
7,18,19;12:22;16:13,14,
16,16;17:22;40:16,21;
42:1,2,5,9,13;44:11,18,
19;45:4;62:10;68:24;
83:9;94:13,14,20;95:19;
101:1,2,7;104:1
**blow (1)**
19:11
**board (133)**
7:2;8:3,4;11:22;12:1,
7;13:1,21;15:2,7,9,14,
18,19;16:22,24;17:2,4,8,
16;18:5,6;19:18;21:10,
22;22:5,9,18,22;23:11,
13,20,23;24:9,12,15,16,
19;25:4,8,9,12,17,22,23,
25;28:16,25;35:17,18;
41:11;45:9,16,18;46:6;
47:12,21;52:2,7,11,22;
53:19,24;60:4;61:4,6;
64:19,22,25;67:3;69:4,
11,21,22;70:3,6,11,18;
71:21;72:3,18;73:5;
74:6,19,25;75:9,12,15,
19,21,24;81:22;83:2,3,5;
85:12;86:10,12,15,20,
23,24;87:9,11,16,18,24;
88:4,10,11;89:2,3,6;
90:17;92:18,20;93:6,11,
13;94:2,3;95:2,17;
97:22;99:10,13,13,14,
17,23;100:8,12;101:2
**board's (1)**
82:5
**book (3)**
22:12;66:19;67:21
**borrow (3)**

16:2;24:15;89:3
**borrowed (3)**
89:4,5;104:12
**both (5)**
6:3;9:8;18:17;93:18;
94:16
**bottom (1)**
71:13
**box (1)**
48:2
**bracket (1)**
104:15
**Brass (2)**
26:11;101:23
**breach (1)**
104:19
**break (2)**
91:12;94:16
**brief (2)**
50:15;103:18
**briefing (1)**
11:5
**briefly (2)**
32:9;90:10
**bring (1)**
13:21
**Brooks (1)**
3:10
**brought (3)**
20:15;30:19;103:21
**burden (1)**
40:14
**burn (1)**
86:7
**busily (1)**
60:3
**business (1)**
18:21

**C**

**call (10)**
6:12;31:3;33:5,6;
48:10,19;56:16,17;61:5,
6
**called (8)**
33:9,12;34:6;35:24;
41:13;48:21;54:3;
103:20
**calls (2)**
58:24,25
**came (7)**
5:20;41:19;57:14,18;
73:10;81:16;97:17
**can (41)**
13:11;14:5;23:20,23;
24:12,15,17;26:11,12;
28:3;29:19;37:24;39:13;
47:20;52:3;55:6;63:6,
17;66:17;69:11;70:6,17;
72:25;73:9,19;74:2;
78:19;79:9,14,15;83:7;
89:18,20;93:14;95:8;

97:5;102:23;103:1,9;
104:15;105:1
**candidly (5)**
21:3,17,19;26:8;29:4
**capable (1)**
90:15
**capacity (1)**
56:19
**car (1)**
34:5
**card (1)**
15:11
**care (3)**
7:7;19:19;85:16
**careful (2)**
85:3,19
**carried (1)**
84:18
**carry (3)**
12:18;39:10;89:13
**case (40)**
3:18;4:8,9;5:9;9:12;
10:13;13:24;17:11;
21:11;26:11,20;29:7;
30:12;34:19,23;35:2,3,4,
14,15;36:13;39:18,21;
49:5;50:6;51:1,17;52:1,
6;59:15;61:21;63:12;
79:4;88:7,25;89:1;96:8;
101:23;102:10;103:14
**cases (2)**
63:18;97:15
**catastrophe (1)**
61:11
**catching (1)**
71:12
**cause (8)**
51:1;55:10;58:22;
73:23;87:23,25;89:7,7
**caused (3)**
27:3;29:3,3
**causes (9)**
23:24;24:17;25:5;
70:10,13;76:22;87:1,6;
102:15
**cell (1)**
32:22
**Cent (1)**
74:18
**Century (92)**
3:11;4:1;5:3,4;7:18,
20;8:16;9:8,11,12,13,16,
21,22,24;10:3,3;11:4,6;
12:9,9;13:7,10,13;20:14,
17,23,23,25;23:16,17,
25;24:3,6;25:6,7,11;
27:3,18;28:4,5;31:23;
39:20,23;40:1;46:20,21;
53:13,17;54:21;55:7;
56:3,6;61:23;63:9,13,15;
64:21,23;70:14;72:18;
73:6,22;74:5,19,25;77:3,
6,10,14,19;78:4,8,12,21;

79:8,9;80:24;92:16,19,
21,24;94:24;95:23;99:9,
12,16;100:8;102:13,19;
103:20,23
**Century's (16)**
4:23;8:18,25;9:14;
10:6,7,22;22:24;40:4;
54:24;55:13;65:13;
92:13;98:2,9;102:11
**certain (6)**
5:13;9:7;40:16;41:17;
71:15;100:12
**certainly (3)**
9:2;12:18;94:18
**cetera (6)**
70:7;79:1;87:2,2;
89:12,12
**chance (1)**
4:22
**change (10)**
26:3;46:1;82:14;
102:9,20,21,25;103:8,8,
13
**changed (2)**
17:2;54:25
**changes (2)**
26:14;103:12
**Chapter (5)**
35:4;67:11;79:4;
97:16;98:6
**charge (1)**
98:11
**check (1)**
28:25
**Chen (15)**
7:23;8:3;50:2,3,8;
52:21;60:19;61:6;62:8;
87:2,9;89:24;94:4;95:1;
104:14
**choose (2)**
16:18;102:8
**chose (2)**
24:23,24
**cigar (1)**
10:20
**circular (1)**
8:5
**circulate (1)**
102:5
**circulates (1)**
102:5
**cited (1)**
26:9
**claim (44)**
10:21;14:12,16,19,20,
21;15:3;17:5,6;18:10;
20:20;24:5;25:11;28:1,
4,4,5,6,7,10;46:19,20;
54:22;64:4,10,15,17;
77:13,15,18,20,23,25;
78:3,6,7,12,20,21;79:6,
8;94:7;97:18,22
**claims (19)**

7:24;14:14,25;19:23;
20:22;25:5;27:19;35:22,
23,25;36:1;46:13,15;
50:19;64:7;70:14;79:14,
16;80:13
**clarification (2)**
11:17;90:21
**clarify (3)**
22:1;40:10;99:9
**class (4)**
14:14;15:1,8;35:24
**clean (3)**
12:25;100:4;103:9
**cleaned (3)**
8:23;11:13;103:1
**clear (5)**
9:5;84:1;99:15;
103:11;104:10
**clearly (3)**
5:11;28:7;95:24
**CLERK (3)**
92:3,5;105:6
**client (11)**
20:5;29:16,24;30:16,
24;52:17;55:11;72:23;
73:21;97:13;100:25
**client's (1)**
76:6
**clips (1)**
29:19
**close (1)**
26:20
**closing (1)**
91:12
**Code (1)**
102:10
**coffee (1)**
69:23
**collaboration (1)**
18:16
**collateral (1)**
13:7
**collaterally (2)**
10:3;80:16
**collects (1)**
77:5
**collude (2)**
98:15,17
**colluding (1)**
10:2
**collusion (5)**
10:16;93:7,8,15;98:14
**collusive (3)**
10:10,22,25
**comfortable (2)**
97:2,3
**coming (3)**
7:6;8:7;59:24
**commanded (2)**
93:11,16
**comment (1)**
29:14
**comments (4)**

SUPP APP 0842

9:16;18:14;55:16;
100:1
**committee (3)**
20:3,6;45:9
**communications (9)**
6:11;8:4,15;53:13,17;
54:1;56:9;59:17;62:9
**companies (1)**
15:11
**Company (5)**
3:11;4:1;53:13,18;
54:4
**compare (2)**
37:24;44:1
**compel (1)**
11:20
**compensation (6)**
28:2,11;77:10;83:11,
14;96:16
**complaining (1)**
19:20
**complaint (5)**
11:4,6;55:3,4,5
**complete (1)**
45:2
**completed (3)**
44:17,20;101:12
**completely (2)**
25:24;102:9
**compromise (8)**
23:23;24:9;64:10,15;
70:10,17;87:22;88:2
**compromised (2)**
87:24;88:4
**computer (2)**
43:2,9
**concept (3)**
19:24;35:19;46:16
**concern (4)**
28:20;63:5,6;101:14
**concerned (1)**
16:13
**concerns (4)**
19:14;21:6;27:22;85:4
**conclude (3)**
8:20;13:22,23
**concluded (1)**
105:7
**conclusion (7)**
72:9;73:11,12;74:20;
78:10,15;80:23
**conclusions (1)**
10:12
**conduct (1)**
33:20
**confer (1)**
8:2
**conferred (1)**
7:17
**conferring (1)**
85:23
**confess (1)**
95:24

**confirmation (32)**
5:15,18;6:22;7:3;9:15;
14:11;15:23;16:4,8,15;
17:2,3,10;19:8;20:1,2,
17;22:4,8;28:20;40:5,
23;41:2,8;45:24;46:3;
52:1,5,6;64:3;79:17;
96:18
**confirmations (1)**
102:23
**confirmed (12)**
5:10;15:23;16:1;
26:15,15;34:22;58:14;
79:22;99:18;101:16;
102:24;104:4
**confirming (1)**
65:14
**conflict (4)**
10:1;15:12;27:24;
28:13
**confused (2)**
8:11;84:13
**connection (6)**
24:12;87:1,6;88:12,
14;97:24
**consensual (1)**
97:17
**Consequently (2)**
5:23;103:11
**consider (1)**
72:5
**consist (1)**
28:3
**consistent (2)**
27:11;75:23
**consultation (3)**
24:8;70:18;88:3
**consulted (2)**
25:4,12
**consummated (4)**
26:18,21,22;101:24
**contacted (3)**
42:11;65:8,22
**contentious (1)**
11:8
**contested (1)**
97:17
**contesting (2)**
12:9,10
**context (2)**
5:1;100:17
**continually (1)**
30:21
**continuance (6)**
13:8;31:2;59:10,13,
25;61:13
**continue (3)**
4:24;30:21;90:18
**continued (1)**
59:1
**contract (5)**
6:8;23:18;25:8;58:8;
86:18

**contracted (1)**
93:21
**contracts (5)**
23:14;58:4;69:12;
86:16;104:13
**contractual (1)**
93:20
**control (1)**
80:3
**convenience (1)**
35:24
**conversations (1)**
72:24
**convert (3)**
13:24;35:4;96:8
**converted (1)**
29:7
**convincing (1)**
15:11
**copy (8)**
22:11,13;36:11;41:19;
43:11,19;56:3;65:13
**core (1)**
73:13
**coronation (2)**
93:22,23
**correctly (1)**
71:17
**correlated (1)**
28:12
**correlates (1)**
28:5
**correspondence (1)**
58:25
**counsel (57)**
3:17;6:24;7:12,13,21;
8:7;13:1;14:21;16:11;
17:8,12;18:20;19:8;
21:10;27:8;29:23,24;
30:10;35:2,12;39:18;
41:10;42:10;45:5;49:8,
16,21,24;50:1;52:21;
53:6,13;60:2,3,6,10,19;
61:16;73:10,12;74:13;
75:22;76:2;80:6,18;
81:16,18;83:14,19;84:3;
85:7,9;94:6;95:7,8;
96:21;100:17
**couple (5)**
4:14;9:4;14:9;15:24;
42:20
**course (3)**
5:13,15;8:9
**COURT (178)**
3:1,8,12,16,19;4:4,6,9,
10,15,17,19;5:8,10,25;
7:5,9,22,22;8:10;10:22;
11:18;12:13;13:18,20,
22,23,24;14:4,16,16;
15:4,5,21;16:20,22,24;
17:17,24;18:2,8,11;
19:16;20:10,12;21:19,
23;22:2;23:8;25:21;

27:2,10;28:18,24;29:9,
11,12;30:8,10,23;31:1,
17,21,24;32:2,5,12,17,
23;33:4,13,15,18,24;
34:3,9,13;36:5,24;38:24;
39:2,10,13;40:19;42:17;
47:6,24;48:2,6,13,18;
49:1,10,23;50:6,12;51:5,
19;53:2,8,23;54:8,15,18;
55:2,2,17,21;56:14,16,
18,23;57:21;59:3;60:1,3,
18;62:15;63:24;64:9,13;
65:3,12;66:21,23;72:2,
10,24;73:16,20;74:2,8,
21;76:10,20;78:17;
80:20,22,24;81:4,6,13,
83:1;84:11,15,18,23;
90:3,17,22;91:2,5,9,11,
15,18,22,24;92:6,14;
94:5,9;96:14,19,23;
97:10;98:14,17;99:1,3,6;
100:3,5;103:2,14,16;
104:21;105:4
**CourtCall (2)**
104:25;105:1
**courtroom (1)**
3:14
**courts (3)**
28:19;97:15;103:12
**Court's (9)**
13:25;19:15;38:7,11;
40:14;43:6,14,16;86:8
**coverage (7)**
27:9;29:23;54:22;
55:7,9,14;103:6
**covered (2)**
103:5,7
**cower (1)**
90:5
**Crawford (17)**
4:2,3,4,5;7:9;48:10,13,
16,17,21;53:12;54:21;
55:1,20;56:14;60:19;
103:20
**created (3)**
5:11;12:3;18:13
**creates (1)**
102:4
**creation (1)**
66:24
**credible (3)**
48:7,8,12
**credit (1)**
15:11
**creditor (30)**
3:14;5:11;12:6;14:8;
16:10;18:19;19:16;
20:19;22:17,19,23;
23:14,16;35:6,7;36:11;
44:23;57:20;66:3,24;
67:2;86:3,16,18;88:19;
89:13;96:9,25,25;102:11
**creditors (17)**

17:7,9,10;19:2,4,23;
20:9;26:5,6;35:2,22;
36:1;46:14,16,23;47:16;
97:1
**creditor's (2)**
20:22;67:22
**cross (1)**
56:11
**CROSS-EXAMINATION (5)**
42:18;53:10;54:19;
63:25;65:4
**C's (1)**
84:18

## D

**Danny (1)**
35:14
**dare (1)**
93:5
**date (5)**
14:18;32:8;84:21;
89:18;97:19
**dated (1)**
68:5
**dates (1)**
68:7
**Davor (2)**
3:6;97:5
**day (7)**
76:13;79:21,22;84:5,
8;90:14;97:7
**days (9)**
7:20;8:9,20;19:12;
79:25;80:9;90:13;
102:23;104:24
**deadlines (1)**
102:25
**deal (1)**
69:10
**dealing (4)**
23:18;25:19;27:4;
70:17
**dealt (1)**
100:13
**Deari (25)**
8:12;10:16;15:24;
16:1,11;19:1;35:14;
36:14;37:2;40:20;41:15,
19;42:3,23;43:5,11;
44:11,17;46:12;50:12;
57:10,22;60:9;89:17;
94:12
**Deari's (2)**
45:8,10
**debt (1)**
96:4
**debtor (24)**
3:18;5:16,21,23;6:1;
14:19;18:21,24;20:21;
21:9;26:19,20;28:23;
34:21;46:10,12;47:18;
96:3,4;100:14;101:19,

SUPP APP 0843

21,25;102:4
**debtors (2)**
3:2,4
**debtor's (5)**
5:10,11;15:13;39:18;
66:4
**decide (2)**
11:2;64:15
**decided (2)**
15:2,4
**decision (6)**
12:19;52:18;81:8,17;
93:12;97:3
**decisions (3)**
26:7;93:14;95:9
**declare (3)**
22:3,4,7
**decree (1)**
26:20
**deeds (1)**
89:11
**deem (1)**
89:12
**default (1)**
96:9
**defaulted (1)**
61:14
**defend (9)**
7:24;30:13;58:22;
60:10,22;61:4;78:13;
80:5,6
**defense (3)**
10:6,7;80:13
**delay (2)**
9:1,2
**delicate (1)**
97:19
**deliver (2)**
89:11;96:3
**demand (4)**
8:17;29:25;64:12;
98:10
**demanding (1)**
98:9
**denied (1)**
103:6
**denies (2)**
21:11;103:4
**deny (3)**
27:2;29:1;103:14
**depends (2)**
77:14,19
**depo (1)**
29:19
**depose (2)**
13:8,10
**deposition (1)**
97:14
**depositions (1)**
29:17
**describe (1)**
26:12
**designate (2)**

11:21;13:1
**designed (1)**
95:12
**despair (1)**
10:9
**detail (1)**
5:19
**details (4)**
56:8;62:3,12;85:4
**determined (1)**
19:9
**developed (1)**
93:21
**D-H (1)**
32:7
**dialogue (1)**
21:1
**dies (1)**
93:23
**different (7)**
15:16;16:5;43:24;
44:6;70:16;78:14;97:14
**difficult (1)**
5:21
**dire (3)**
36:22,25;38:22
**direct (5)**
24:20;34:16;48:23;
56:24;80:13
**direction (2)**
76:1,3
**directly (3)**
15:5;28:5,11
**disagree (5)**
12:18;14:9;15:15;
55:12,13
**disagreement (2)**
88:13,19
**Disciplinary (1)**
33:10
**disclosure (2)**
9:13;102:4
**discovered (1)**
21:4
**discovery (3)**
80:17,19;103:19
**discuss (1)**
13:2
**discussed (3)**
35:18,20;51:2
**discussing (1)**
6:4
**discussion (4)**
5:7;27:14;58:20;74:16
**discussions (4)**
11:11;51:6;52:16;54:7
**dismissed (1)**
29:7
**disparage (1)**
10:23
**disparagement (1)**
10:8
**disputed (2)**

14:12,21
**disputing (4)**
54:21;55:7,9,14
**district (7)**
12:13;27:9;55:2,21;
100:3,5;103:1
**distrust (1)**
14:2
**doc (2)**
25:10;66:12
**docketed (1)**
82:21
**doctrine (2)**
51:12,12
**document (63)**
5:12,24;6:2,3,13,17,
18,19;7:1;8:2;9:5;11:13,
15;12:11;16:20;21:7,8,
12,13;23:6;24:4;25:14;
28:19;36:9;38:15;39:6,
9,11,14,17;42:1,2,24;
43:1,1,11,13,15,18,19,
19,21;44:9,11,17,18,21;
57:5,8,14,16;58:12,16;
66:12;68:3,13;70:21;
74:22;94:13,15;96:3;
100:25;101:12
**documents (4)**
68:13;95:21;102:6;
103:12
**Doe (74)**
3:14;6:5;7:5,10;8:19;
11:14;12:2;13:21;14:8;
17:3,11;21:9;28:1,6,24;
29:16;45:18;46:23;
47:12,13,17;49:1,3,18;
50:3,7,19;51:8,13,20,24,
25;52:6,10,17,20;54:23;
60:9;64:9,18,21;75:8,11,
16,18;76:1;77:15,20,23,
25;78:6,12,20;80:4;
81:9;85:5,12,20,24;
92:20,21,24;93:6,10,11,
13;94:13;97:2,4,5;98:8;
99:12;103:3,21
**Doe's (10)**
7:24;14:12;21:10;
28:7,10;35:2;52;64:4;79:6;
80:13;100:17
**dog (2)**
46:10,12
**dollar (1)**
96:25
**dollars (27)**
5:22;8:14;10:15;
11:24;12:6;15:25;16:2,
6;20:8;28:8,9;36:2;
40:25;58:23;59:1;60:4,
13;77:6,7,10,10,24;78:1,
4,20;89:17;97:6
**done (17)**
11:21;13:4;14:3;
18:18;25:10;58:10;

74:10,11,15;75:2,4;
94:21;95:9;100:15,16,
18;101:21
**door (1)**
73:15
**Dotson (15)**
7:23;8:3;50:2,3,8;
52:21;60:19;61:7;62:8;
87:3,9;89:24;94:4;95:1;
104:14
**down (8)**
13:21;47:25;48:4;
54:5;56:14;64:17;91:5;
95:20
**downstairs (1)**
104:23
**drafted (1)**
35:1
**due (1)**
9:19
**during (2)**
35:16;50:15
**duties (7)**
52:13,14;86:25;90:15,
18,21;98:7
**duty (3)**
78:13,14;94:22

**E**

**earlier (2)**
7:20;100:13
**early (8)**
7:6;35:3;49:4;59:4,5;
67:6,7;89:22
**easier (1)**
98:13
**easy (1)**
31:4
**ECF (3)**
55:21;56:3,7
**economics (1)**
79:3
**effect (1)**
8:5
**effective (2)**
14:18;97:19
**effectively (2)**
26:25;103:13
**effectuate (2)**
5:18;29:4
**effectuated (3)**
12:1;60:14;63:3
**egregious (1)**
50:13
**eighteen-year- (1)**
29:16
**eighteen-year-old (1)**
10:17
**either (5)**
14:19;22:1;46:25;
83:1;84:4
**eliminate (6)**

25:24;28:24;81:21;
82:5,15;99:23
**eliminates (1)**
90:17
**elimination (1)**
83:5
**Elrod (1)**
3:15
**else (4)**
47:18;97:7,11;98:5
**e-mail (6)**
36:14;38:17;41:20;
57:21;68:4,13
**e-mailed (1)**
36:17
**e-mails (1)**
68:16
**emotional (1)**
30:18
**employ (3)**
23:20;70:6;87:2
**employed (1)**
87:2
**ended (3)**
11:11,11;16:5
**ends (1)**
26:25
**enforcement (1)**
96:10
**engaged (1)**
63:15
**engineered (1)**
10:25
**enough (4)**
66:17;91:4,17,18
**enrich (1)**
10:25
**enter (6)**
23:13;24:5;26:19;
69:11;73:5;86:15
**entered (4)**
8:10;10:23;86:17;
104:13
**entire (3)**
37:14,15;48:21
**entitled (3)**
6:25;25:2;71:14
**equal (1)**
91:15
**equitably (1)**
96:12
**equity (8)**
93:18,19,20,25;94:8,
10,23;95:13
**Erler (10)**
6:4,11,16;8:6;9:5;
17:17;18:14;35:3,12;
52:8
**Erler's (1)**
20:5
**especially (2)**
28:22;29:14
**essence (1)**

SUPP APP 0844

16:20
**establish (1)**
17:14
**established (1)**
19:22
**establishment (1)**
25:16
**estate (2)**
19:17;94:22
**et (6)**
70:7;79:1;87:2,2;
89:12,12
**ethical (1)**
53:5
**even (12)**
10:6,16,17,18,19,20;
21:7;26:23;30:15;42:9;
51:23;102:22
**evening (1)**
31:23
**event (1)**
41:24
**Everybody (6)**
21:11;33:15;76:14;
81:13;91:13;98:20
**Everyone (8)**
7:13;8:7;10:2;13:2;
61:20;90:23;94:6;105:1
**everyone's (1)**
94:7
**evidence (9)**
3:21;13:17;32:8;
50:17;81:3;84:20;91:8,
10;100:22
**evidentiary (3)**
13:6,12;95:24
**exact (1)**
89:18
**exactly (4)**
5:20;13:12;41:22;93:7
**examination (8)**
33:20;34:16;36:25;
47:9;48:23;55:18;56:24;
85:1
**examine (1)**
39:13
**examined (1)**
39:11
**example (4)**
16:17;41:3;69:6;78:13
**excellent (1)**
47:19
**except (4)**
22:16;30:12;86:25;
104:15
**exceptionally (1)**
9:9
**excess (2)**
77:25;78:3
**excluded (1)**
4:3
**Excuse (8)**
3:9;55:2;66:3;67:20;

69:7;72:13;73:3;83:10
**execute (1)**
89:11
**executed (6)**
6:13;14:24;31:11,11;
43:3;62:25
**exercise (6)**
23:12,13;86:15;90:18,
21;98:7
**exercised (1)**
86:17
**exercising (1)**
90:15
**exhibit (29)**
22:12,13;23:5,5,5;
31:8,9,12,20,25;36:7,19;
37:21;38:5,11;43:10,14;
57:4;65:13,19;66:19,22;
67:21;82:11,21;84:13,
21;86:3;96:18
**Exhibits (2)**
31:5;32:7
**exist (1)**
6:17
**existed (1)**
70:21
**existence (2)**
63:5,6
**exists (2)**
11:13;28:14
**expecting (1)**
95:23
**expedited (1)**
11:5
**expenses (1)**
24:17
**explain (3)**
6:6;40:19;58:12
**explained (1)**
27:22
**extent (5)**
17:11;72:21;73:8;
84:13;85:23

**F**

**fact (10)**
10:12;11:9;26:22;
27:6,13;54:11;65:21;
85:19,20;103:22
**facts (4)**
12:20;33:11;50:13,15
**factual (1)**
14:10
**failed (1)**
62:6
**failure (1)**
104:6
**fair (3)**
13:12;66:17;91:17
**fairly (6)**
21:15;22:19;24:18;
25:13;26:10;47:3

**faith (2)**
85:14,25
**false (2)**
10:11;103:24
**familiar (2)**
34:22;98:7
**family (1)**
30:20
**far (9)**
16:10,13;20:2;34:5;
61:15;76:8;96:12;98:21,
25
**fast (1)**
77:16
**fault (4)**
94:11,12,17,18
**favor (2)**
3:2,3
**faxed (1)**
41:20
**federal (8)**
7:15;15:5;27:9;55:2,
21;100:3,5;103:1
**fees (6)**
11:23,23;30:5;76:25;
79:1;104:17
**few (4)**
7:20;19:11;23:4;
104:24
**fiduciary (8)**
52:13,14;90:13,15,18,
21;98:7,24
**fifth (2)**
25:1;71:13
**fight (3)**
46:11,12;59:1
**figure (1)**
54:24
**figuring (1)**
101:1
**file (10)**
9:13;20:20;24:2;
26:11,19;43:4;55:25;
62:20;82:18;83:7
**filed (17)**
4:1;7:14,14;8:21;9:4,
11;21:19;25:15;27:12;
30:23;31:22;33:3;36:12;
62:18;99:20,22;103:15
**filing (6)**
23:7;38:7,11;43:6,15,
16
**fill (16)**
6:7,10;11:22,23;
16:14;42:5,13;44:18;
45:4,5,5;95:19,21;101:1,
4,6
**filled (24)**
6:19;7:1;12:25;16:18,
19;17:18,20;18:3,4,4;
20:2;21:13;41:7;42:9;
44:15;45:6;63:2;83:23;
84:3,5,9;94:20;100:15;

104:8
**filled-in (2)**
6:13,17
**final (5)**
10:4;25:18;26:20;
44:25;45:1
**finality (1)**
102:3
**finally (4)**
6:15;9:4;16:6,7
**financial (3)**
59:22,23;96:3
**find (4)**
5:17;28:18;89:20;98:5
**finding (4)**
5:21;48:6,8,11
**findings (1)**
10:11
**finds (1)**
11:16
**firm (15)**
7:23;12:6;18:14;
49:15,21;53:4,14,15;
63:2,2;97:3;101:3,5,5;
104:20
**First (15)**
10:9;12:16;17:14;
21:25;29:25;31:3,5;
53:2;57:20;61:5;65:8,
22;92:9;94:22;99:8
**five (3)**
63:18;76:21;92:1
**five-minute (1)**
91:11
**fixing (1)**
95:25
**flat (1)**
103:23
**Flemish (1)**
33:21
**flip (1)**
36:10
**focus (4)**
16:8;19:1;20:7;40:23
**follow (1)**
22:12
**followed (1)**
5:16
**following (3)**
16:8;40:23;52:13
**follows (3)**
37:19;38:3;92:15
**follow-up (2)**
42:20;47:7
**Fontaine (26)**
3:13,13;14:7,7;17:24;
18:3,6,9;35:3,11;52:8;
53:2,9,11;54:16;63:24;
64:1;65:2;90:4,5,7;91:1;
97:12;98:19;99:1,2
**force (1)**
93:13
**forced (1)**

95:23
**foremost (1)**
94:22
**forget (1)**
93:22
**forgot (1)**
21:12
**form (9)**
18:14,15,16,17;27:19;
63:9,19;93:12;94:25
**formally (1)**
9:6
**formation (1)**
29:5
**formed (6)**
21:5,15,18;27:14;
99:17;101:15
**forms (1)**
18:17
**forth (2)**
18:15;22:16
**forward (3)**
11:25;92:23;95:7
**fought (4)**
58:24,24;97:14,16
**found (1)**
100:16
**four (4)**
29:17,22,24;97:13
**frame (1)**
65:23
**frankly (7)**
8:5;19:20;21:1;47:21;
52:12;96:22;97:7
**fraud (1)**
102:23
**free (3)**
12:12;13:15;80:18
**frequently (1)**
58:10
**Friday (4)**
5:3;31:23;33:3,3
**friend (1)**
30:20
**front (8)**
7:9;9:8;12:22;37:12,
13;80:17;81:12;82:9
**frustration (1)**
95:15
**full (4)**
6:17;13:12;66:12;
73:22
**fully (7)**
6:12,12,13;21:13;
62:24;101:11,12
**fun (1)**
33:17
**fundamentally (1)**
93:17
**funding (1)**
96:4
**further (11)**
38:22;47:5;54:16;

SUPP APP 0845

55:16;65:2;71:14;84:10;
90:3;91:7,10;101:10

**G**

**Gainfully (1)**
46:10
**gaining (1)**
12:13
**game (1)**
20:16
**gamesmanship (1)**
103:10
**gave (3)**
18:14;19:2;50:15
**generally (2)**
50:16;90:13
**gentleman (1)**
16:3
**gets (2)**
28:9,10
**Ginsberg (4)**
10:9,13,15;59:7
**girl (2)**
10:17;29:17
**given (2)**
28:1,3
**goes (8)**
16:10;21:23;76:8;
96:16,21;97:1,7,11
**good (13)**
3:6,9,10;20:13;85:14,
24;92:6;97:6;99:4,5;
102:3;104:3,4
**good-looking (1)**
48:11
**governance (6)**
12:11;22:20;25:10;
63:20;102:20;103:8
**governed (1)**
93:4
**granted (2)**
7:19;11:3
**grants (1)**
95:5
**great (1)**
82:1
**greater (2)**
35:23;36:1
**Greg (2)**
3:10;20:13
**grounds (1)**
80:14
**group (1)**
19:23
**groups (1)**
18:23
**Gruber (8)**
3:15,15;4:7,8;29:10,
13;30:4,9
**grueling (1)**
97:13
**guess (4)**

62:20;67:19;100:16;
101:2
**guidance (1)**
11:17
**guided (1)**
93:11
**gun (1)**
13:17
**gutted (1)**
22:21
**gutting (1)**
25:14
**guy (2)**
45:10;66:16

**H**

**hah (3)**
93:15,15,15
**Hail (1)**
3:15
**Hale (1)**
93:15
**half (1)**
51:10
**hand (4)**
30:7;61:9;77:9;78:6
**handled (1)**
35:15
**handling (1)**
35:13
**handwriting (2)**
68:7,8
**happen (2)**
27:11;96:5
**happened (12)**
20:3,6;28:17;30:24,
25;40:22;41:12;42:22;
61:3,9;103:3,20
**happens (1)**
96:2
**Hardt (15)**
6:24;7:11,20;11:22;
13:1;18:4;56:6;61:15,
16;83:11;84:5,8;94:6,
25;104:17
**Hardt's (2)**
83:14;104:17
**hate (2)**
48:3,3
**head (1)**
17:24
**header (2)**
43:22,23
**hear (4)**
12:4;31:1,12;97:10
**heard (3)**
34:7;103:25;104:1
**hearing (11)**
4:24;13:6,12;30:14;
40:7,9;49:23;80:24;
92:13;95:24;99:7
**hearsay (1)**

54:13
**held (2)**
8:9;17:4
**help (2)**
65:17;93:25
**helping (1)**
17:14
**hereby (2)**
32:7;84:20
**herein (1)**
22:16
**herpes (1)**
29:21
**Hess (1)**
86:2
**HESSE (79)**
3:9,10,23;4:16,18;
14:4;20:12,13,13;23:9;
29:9;30:3,6;31:7,10,13,
16,25;32:3,11,19,24;
33:1,8;34:1;36:21;37:1;
38:22,25;39:3,12;41:16;
42:17,19;44:10;47:5;
50:21,23;51:4,15;53:2,3;
54:6,13,18,20;55:16;
56:10;65:3,5,12,16;
66:22;69:25;73:15;
76:19;80:20,21;81:5,7;
84:10,16,22;86:4;90:3;
91:2,4,9,10,13,17,23,25;
97:11;99:3,4,8;103:16;
105:5
**hey (1)**
61:6
**hidden (1)**
61:19
**hide (1)**
60:9
**highest (1)**
54:4
**highlights (1)**
100:2
**highly (1)**
11:8
**himself (2)**
11:16;88:9
**hire (8)**
8:7;41:10;58:22;61:6,
10;94:4,6;104:15
**hired (12)**
7:11,23;14:21;27:8,8;
29:23;56:6;62:8,9;80:6;
89:24;104:14
**hiring (1)**
18:20
**hold (3)**
19:23;41:15;69:9
**holders (1)**
14:13
**holes (1)**
100:14
**home (1)**
30:19

**honest (1)**
83:19
**honestly (4)**
18:13;42:3;47:16;52:8
**Honor (130)**
3:6,9,10,13,17,23;4:5,
7,13,16,21,25;5:13;6:6;
9:11,15;10:23;11:2,3;
12:4,14,16,22;13:6;14:7,
15;15:22;20:13;21:3;
22:10;23:7,15;24:1;
25:19;26:8,18;29:1,8,10,
13,16;30:3,6,11,15;31:5,
7,8,19,25;32:9,11,16,19,
21;33:2,5,16;34:1,4,15;
36:4,19,21;38:23;39:12;
41:17;42:16;44:10;47:5,
23;48:1,16;50:21;51:15,
18;52:25;53:3,9;54:6,13,
16;55:16;56:10,17;
63:22;65:2;72:8,20;
73:7,13,15,19,24;74:7,
20;76:8,16,19;78:9;
80:14,21;81:1,5,10;
84:10,12,17,22,25;90:2;
91:1,6,7;92:11;93:17;
94:9;95:4,13;96:10,17;
97:12;98:3,15;99:2,4;
103:18;104:2;105:3,5
**Honor's (6)**
10:4;12:17,19;24:20;
97:15;98:20
**hope (2)**
21:23;92:12
**hoped (1)**
8:23
**horrific (2)**
103:3,4
**hospital (1)**
30:19
**host (1)**
103:14
**hot (1)**
80:17
**hotel (2)**
10:19,21
**hotly (1)**
97:16
**hourly (3)**
83:15,16;97:5
**house (1)**
93:24
**huge (1)**
16:6
**human (1)**
96:22
**humble (1)**
93:17
**Hurst (1)**
3:15

**I**

**identify (3)**
96:21;101:2,2
**ignore (1)**
21:22
**III (3)**
48:17;69:12,19
**important (4)**
22:25;27:21;94:12,14
**impossibility (2)**
93:19;95:14
**impossible (2)**
93:22;94:1
**Inc (1)**
34:21
**incidentally (1)**
99:20
**include (1)**
77:2
**included (3)**
35:6;36:12;70:13
**including (1)**
71:15
**incorporate (1)**
71:20
**incorporated (2)**
26:4;99:18
**Indeed (1)**
99:8
**indemnify (1)**
78:14
**indicated (5)**
29:22;68:19;99:11;
101:16,23
**indirectly (1)**
26:24
**individually (1)**
15:13
**infer (1)**
96:15
**inform (2)**
49:23;59:9
**information (2)**
19:10;74:2
**informed (2)**
52:18;54:9
**inherent (2)**
27:23,24
**initially (1)**
29:22
**input (8)**
35:14;76:5,6,7,12,15;
92:22;94:2
**insofar (1)**
86:25
**instance (3)**
17:14;30:25;72:23
**instead (2)**
11:4;35:6
**insurance (18)**
6:23;7:11,13,21;9:23;
20:23;23:16;42:10;
46:21;49:15,21;52:21;
53:13,18;61:16;83:14;

SUPP APP 0846

84:3;103:5
**insured (1)**
30:13
**intend (1)**
5:2
**intended (4)**
39:23;51:25;52:7;
93:10
**intent (1)**
102:3
**intentionally (2)**
9:3;10:13
**interest (9)**
10:1;12:10;13:2,11;
20:25;25:7;28:14;30:12;
93:4
**interesting (3)**
88:17;89:10;100:23
**interestingly (1)**
24:1
**interests (2)**
15:7;88:18
**internal (1)**
63:20
**internally (1)**
93:4
**interpretation (2)**
26:13,13
**interpreted (1)**
103:12
**intervene (2)**
15:4;27:8
**intervention (1)**
14:1
**intimate (1)**
95:2
**into (33)**
18:23,25;19:4;23:13,
16;24:5,7;26:4;27:9;
29:19;32:7;51:2,6;
52:16;54:6;56:8;59:16;
60:8;62:3,12;67:11;
69:11;72:24;73:5,22;
84:20;85:4;86:15,17;
88:25;102:14;103:10;
104:13
**invading (4)**
72:21;73:9,17;74:1
**invalid (1)**
9:23
**invert (1)**
23:22
**investigate (1)**
62:13
**invitation (1)**
8:18
**invoke (2)**
3:24;34:2
**involved (7)**
5:9;17:14;59:2;61:20;
63:12;84:8;102:18
**involvement (1)**
35:1

**ironic (1)**
93:9
**irony (2)**
92:12,15
**irreconcilable (1)**
10:1
**issuance (1)**
96:4
**issue (11)**
7:21,25;11:19;12:17,
18;17:6;19:13;51:16;
53:5;60:16,17
**issues (11)**
5:2;11:1,1,7;13:7,15;
16:9;19:19;28:18;57:13;
63:5

**J**

**Jane (30)**
3:14;7:5;14:8,12;21:9,
10;28:1,6,7,10,24;35:2;
64:4,18,21;75:8,11;
77:15,20,23,25;78:6,12,
20;79:6;80:4,13;81:9;
98:8;103:21
**Jeff (1)**
35:11
**job (1)**
47:20
**Johansen (1)**
3:15
**Johnson (5)**
12:6;15:12;35:12;
59:14,17
**Johnson's (1)**
12:6
**jointly (1)**
50:11
**Joyce (4)**
3:17;4:2;33:5;34:20
**Judge (45)**
5:6;7:6,15,19;9:8;
10:9,13,15,22;11:2,3,6,7,
20,25;13:16;15:5;26:10;
30:23,23;41:7;50:12,14,
15,16;55:21;56:15;
58:13;59:7,9,24;80:18;
81:12;88:9;93:7,14,15;
94:5;96:22;98:14;
101:23;102:2;104:3,3,23
**judges (1)**
10:8
**judgment (3)**
8:11,17;15:4
**judicial (1)**
65:12
**July (5)**
7:6;14:17;59:4,5,6
**June (8)**
7:8,14,19;49:9;55:25;
56:5;59:6;89:22
**jurisdiction (2)**

19:15,16
**justice (1)**
10:14

**K**

**keep (3)**
30:16;46:13;92:10
**keeping (2)**
3:2;23:1
**Kevin (1)**
3:10
**kicking (1)**
103:22
**kids (1)**
30:20
**kind (16)**
3:5;4:22;18:18;19:5,6;
20:15;21:11;22:24;
26:13;76:7;85:23;93:2,
3,3,4;100:1
**king (1)**
93:22
**knew (12)**
7:10,20;8:8,8;17:6;
20:1;42:9;50:5;56:6;
68:23;70:20;72:17
**knowing (1)**
73:22
**knowledge (3)**
63:10,11;86:19
**known (1)**
102:16
**knows (5)**
81:14;93:10,19;94:6;
98:23

**L**

**lady (1)**
30:18
**language (4)**
8:1;70:16;74:14;
102:16
**largely (1)**
4:23
**larger (3)**
17:6;18:25;19:3
**largest (2)**
12:5;17:4
**last (16)**
4:21;5:13;19:11;
20:15;22:15;29:14;
37:22;57:7;62:2;67:1,
23;82:13;89:19;92:9;
100:19;103:17
**late (4)**
20:16;65:24;67:6;
89:22
**later (7)**
5:21;8:21;9:22,24;
102:9;103:22;104:8
**latter (1)**

80:1
**Laura (3)**
3:13;14:7;35:11
**law (9)**
7:23;10:12;12:6;
93:18;101:3,3,5;102:10;
103:14
**lawsuit (3)**
49:1;50:4;54:2
**lawyer (17)**
9:17;13:23;30:13,14;
34:10;48:14,25;53:5;
54:3;57:25;59:15;72:23,
25;74:16;78:11;80:24;
104:4
**lawyers (4)**
9:14;58:22;59:2;
104:16
**lead (2)**
39:18;49:8
**least (2)**
5:7;85:11
**leave (2)**
11:4,10
**leaves (2)**
11:10;97:18
**leaving (2)**
17:3,9
**led (1)**
30:11
**left (1)**
104:7
**legal (7)**
48:17;51:15;72:8;
74:20;78:10,11,15
**legitimate (1)**
12:10
**lengthy (1)**
26:10
**less (3)**
25:22;83:2;91:20
**letter (1)**
64:12
**letters (1)**
30:16
**leverage (1)**
12:13
**liability (1)**
55:10
**licensed (3)**
32:14;34:10;48:14
**life (1)**
48:21
**lifted (2)**
7:7;14:15
**light (1)**
74:14
**likely (1)**
53:16
**limit (1)**
35:25
**limits (1)**
51:20

**Lindauer (41)**
3:17,17;4:2,3;6:2,4,6;
8:5;15:22;16:23;17:1,
19;18:1,5,7,12;20:11;
33:5,8,12;34:4,7,12,15,
18,20;36:6,21;37:2;
39:17;42:20;47:7,24,25;
48:1,3;57:24;68:5,17;
75:7;100:25
**line (3)**
25:1;57:22;71:13
**liquidating (1)**
66:2
**list (3)**
4:1;31:20;32:20
**listed (3)**
32:20,25;33:1
**listened (1)**
76:13
**listening (2)**
21:1;96:12
**litigate (1)**
27:9
**litigated (2)**
64:5,17
**litigation (16)**
11:12;15:5;35:13;
59:2;63:15,18;64:13;
80:4,5,17;81:3;84:3;
92:22;100:3;103:2;
104:22
**little (6)**
21:2;30:18;35:14;
43:21;66:16;84:12
**lives (2)**
94:16,17
**loan (1)**
16:3
**lodge (1)**
78:15
**logically (1)**
85:14
**long (7)**
3:4;48:4;52:13;57:25;
58:2;91:21;104:3
**longer (4)**
15:6,19;22:22;58:1
**look (18)**
16:5;39:17;66:5,7,9,
10,18;71:4,11;82:11,19;
88:17;89:19;93:15;94:9;
95:13,14;96:18
**looked (7)**
10:13;67:7,16;68:15,
22;94:23;96:19
**looking (2)**
31:16;67:18
**loses (1)**
104:19
**losing (1)**
96:15
**lost (7)**
10:12;33:15;60:24,25;

SUPP APP 0847

61:1,2;92:13
**lot (4)**
33:2;40:24;66:15;
89:20
**luck (1)**
15:11
**ludicrous (2)**
93:1,2

**M**

**ma'am (2)**
90:9;97:7
**makes (1)**
89:23
**making (6)**
9:22;19:1,3;20:8;
93:12;100:6
**manner (1)**
75:22
**many (8)**
11:20;13:24;58:4;
94:12,13;96:1;99:16;
104:7
**March (4)**
65:10,24,24;67:7
**Marshals (1)**
13:20
**master (1)**
10:2
**material (19)**
16:21;19:21;22:20;
26:3,14,25;29:2,5;33:11;
35:20;45:7;69:24;72:5,
11;96:6;100:10;104:1,5,
8
**matter (12)**
30:7;49:10;51:16,16;
53:6,7;88:12,14;93:18;
94:8;95:16;97:9
**matters (4)**
12:21;24:13;25:17;
88:19
**maxims (1)**
95:13
**may (50)**
4:12,13,15,16,17;5:23;
6:22;9:11;23:12;25:20;
32:17;34:13;36:3,5,21,
24,24;40:6,7,20;41:22;
42:10;44:6;47:25;48:18;
55:13;56:14,16,23;
58:16;67:19;68:5,10;
70:9;71:25;73:18;74:21;
78:12,17,24;79:20;80:3;
81:13,14;82:25;89:12,
22;91:5;98:16;102:16
**maybe (12)**
19:5;29:5;62:11;
65:10,24,24;93:14;
95:22,22;100:12,17;
101:14
**meal (1)**

10:20
**mean (13)**
3:5;18:19;22:9;27:1;
35:19;43:3;52:12;66:11;
78:10;80:5;102:22,24;
103:5
**means (5)**
11:12,21;21:24;22:25;
100:4
**mechanism (2)**
71:8;83:6
**mediate (1)**
54:5
**mediated (1)**
61:23
**mediation (22)**
8:18,19,20,24;11:11;
24:3,5,7;62:2,5,22;
73:22;74:10;76:13,16,
17,18;85:4;99:21;
102:14,17;103:21
**mediator (2)**
85:21,21
**meet (1)**
85:9
**meeting (5)**
100:23;101:9,13;
103:25;104:6
**meetings (1)**
8:15
**member (15)**
17:2,4,15;20:5;21:10;
41:11;45:19;53:23;75:8,
12,15,18,20,23;95:1
**members (5)**
15:1,8;19:17;41:12;
53:4
**membership (1)**
53:18
**memory (1)**
65:9
**mention (2)**
11:8;40:6
**mentioned (3)**
5:13;20:15;24:1
**merely (2)**
26:24;96:10
**merits (1)**
5:6
**mess (4)**
16:6;29:3,3,14
**messy (1)**
104:22
**might (8)**
5:19;15:12;16:19;
59:9;65:17;69:23;97:24,
25
**Mike (2)**
3:14;4:7
**million (10)**
8:14;10:15;28:7,8,9;
77:6,7,23;78:1,4
**million-dollar (2)**

50:11;96:25
**mind (5)**
47:12;63:3;69:13;
73:2;79:4
**minds (5)**
100:24;101:9,13;
104:1,6
**mine (1)**
31:16
**ministerial (3)**
19:21;45:4;104:9
**minute (1)**
80:9
**minutes (3)**
91:12,14;92:2
**miscarriage (1)**
10:14
**missing (2)**
42:5;69:25
**misstates (1)**
73:24
**mistake (2)**
12:24;13:18
**modification (9)**
26:9,25;29:2,6;72:6,
11;96:1,10;103:13
**modified (2)**
7:2;45:24
**modify (8)**
21:20;25:2;26:16,23;
27:16;71:15;101:20,25
**moment (2)**
24:21;65:11
**money (12)**
5:17,20;16:3,7;24:15;
41:1;58:22;60:5;89:3,4,
5;104:13
**months (6)**
9:22,24;12:1;15:24;
16:8;102:8
**more (13)**
5:1,19;10:6;13:2;
19:21;28:21,22;58:24,
25;60:16;94:12,13;
96:12
**moreover (1)**
80:16
**morning (6)**
3:6,9,10;20:13;92:6;
99:5
**most (4)**
30:22;50:13;53:16;
90:13
**motion (24)**
4:23;5:4;7:15,18,19;
8:21;9:4;21:19;22:1;
24:2;25:21;26:12;27:12;
29:2;31:2;55:25;62:18,
21;72:1;76:9;83:1;
99:20,22;103:14
**move (5)**
31:5;34:5;35:4;36:19;
96:8

**moved (1)**
50:5
**Moving (2)**
23:21;80:17
**much (6)**
6:25;15:11;17:6;
62:21;91:20;95:8
**multiple (4)**
8:15;41:12;54:1;59:17
**Munsch (18)**
6:24;7:11,20;11:22;
13:1;18:4;56:6;61:15,
16;83:11,13;84:2,5,8;
94:6,25;104:17,17
**must (1)**
13:8

**N**

**name (4)**
34:18,20;48:17;95:7
**names (1)**
45:5
**narrow (1)**
13:15
**nature (1)**
78:15
**necessarily (2)**
14:1;51:2
**necessary (5)**
52:12;85:15,24;89:12;
90:5
**need (9)**
11:23;15:6;33:24;
41:14;72:17;73:4;94:4;
95:16,17
**needed (7)**
14:24;16:16;40:25;
45:6;87:8;96:13,13
**needs (4)**
21:23;47:20;94:6;
95:25
**negotiate (2)**
40:1,9
**negotiated (6)**
11:15;14:18;35:7,10,
11,21
**negotiations (3)**
35:16;50:24;100:16
**neighborhood (1)**
8:13
**net (4)**
24:17;76:24;77:3,5
**next (7)**
15:24;24:11;30:1;
56:16;67:17;70:9;
104:24
**nice (1)**
10:20
**night (2)**
89:19;95:20
**nineteen (1)**
96:24

**ninety-nine (1)**
7:10
**nobody (1)**
98:21
**nobody's (1)**
21:13
**nonappealable (1)**
10:4
**None (4)**
17:9,10;56:21;95:17
**nor (1)**
102:10
**note (4)**
26:18;37:15,16;73:18
**noted (3)**
26:11;100:4;102:2
**notice (5)**
9:11;45:6;65:13;
90:23;105:1
**Notwithstanding (1)**
99:11
**number (8)**
8:12,13;16:15;22:13;
27:13;35:1;71:3;82:9
**numbers (2)**
8:11,12

**O**

**oath (2)**
32:18;34:14
**object (18)**
28:1;30:6;32:2,11;
33:8,11;38:25;39:5;
72:8,20;78:10;79:6,8,14,
16;80:14;102:7,7
**objecting (2)**
13:9;64:6
**objection (23)**
5:3;7:21;9:14;20:17;
26:10;33:4;39:10;49:18,
20;50:7,23;51:15;53:4;
54:6,12,13;73:21,24;
78:15;81:1,10;84:19;
101:16
**objections (3)**
7:12,25;8:8
**obtain (1)**
80:17
**obtained (2)**
15:4;89:17
**obtains (1)**
76:22
**obviate (1)**
62:23
**obviously (2)**
13:18;65:24
**occupation (1)**
90:11
**occur (2)**
14:17;46:6
**occurred (1)**
101:25

SUPP APP 0848

**October (5)**
6:15;8:18,20;61:25;
62:5
**off (6)**
16:12,12;18:21;43:8;
98:12,13
**offense (1)**
56:20
**offer (6)**
50:19;51:8,13,20,22;
64:9
**offering (1)**
96:3
**office (2)**
37:4,11
**often (1)**
67:12
**old (1)**
29:17
**omissions (1)**
104:5
**once (8)**
7:6;19:5;23:4,24;25:5;
29:23;77:23;101:24
**one (66)**
7:3;11:19;12:9,14;
14:6;15:11,13;16:20;
17:2,17,17,19,20,21,21;
19:6;24:24;25:13,18;
27:13;28:25;31:8,9,25;
41:11;43:7,8,23,24;47:7;
55:1,5;60:8;61:10,13;
63:1;65:11,16;68:19;
69:9;70:2;72:4;74:8;
77:16;78:18;79:14,25;
83:9;84:6,8;87:13;
88:17;89:14;93:10,23;
94:2,3,11,16,17;99:8,9,
25,25;101:10;103:19
**one-member (1)**
45:18
**ones (1)**
101:20
**only (16)**
9:3;12:9;20:22;25:21;
27:12;40:7;73:8;79:14,
15,15;95:18;99:19,22;
100:19;102:23;104:14
**opened (1)**
73:15
**opening (4)**
50:15;99:25;100:1,21
**opinion (1)**
93:18
**opportunity (1)**
39:7
**oppose (1)**
14:22
**opposed (1)**
41:12
**opposition (1)**
7:18
**option (1)**

81:24
**options (1)**
13:25
**oral (1)**
4:23
**order (27)**
5:18;6:23;7:3;10:4;
13:20;16:15;17:2;20:2;
22:4,8;25:20;27:8;41:2,
8;45:24;46:3;64:3;
65:13;83:1;96:18;98:4,
4,5,15,17,20;102:24
**ordered (1)**
11:5
**orders (1)**
98:23
**originally (2)**
17:22;35:3
**others (1)**
31:18
**otherwise (2)**
13:14;22:16
**out (25)**
6:13;17:18,20;19:4;
21:13;25:13;28:18;31:4,
8;32:1;33:22;35:5;
41:18,18;42:23;54:24;
66:12;72:2;89:13,20;
92:12;98:2,25;100:16;
102:8
**outside (1)**
81:2
**over (18)**
8:9;16:7;18:14,19;
19:11,16;21:7;23:21;
24:11,25;28:25;32:13;
40:13;41:20;67:22;70:9;
71:1;90:20
**overruled (11)**
4:10;30:8;33:13;51:5;
53:8;54:15;72:10;74:8,
21,21;76:10
**overruling (2)**
31:2;34:3
**overseeing (2)**
22:23;28:16
**oversight (7)**
22:18;26:1;27:19;
67:3;71:20;82:5;98:8
**owe (1)**
55:9
**own (4)**
15:7;16:18;47:12;
95:20
**owned (1)**
7:17

**P**

**page (39)**
23:7,9,21;24:11,11;
25:15,15;36:10;37:13,
18,22;38:1,2,2,5,10,18,

19,20;41:21;44:3;57:7,7,
17,22;58:7;67:23;68:20;
69:25;70:9;71:3,4,18;
72:14,15;82:13,21;84:1;
86:2
**pages (1)**
37:24
**pagination (2)**
41:17;57:13
**paid (8)**
6:25;19:1,4;20:9;
66:18;76:25;95:8;101:4
**palatable (1)**
13:25
**papers (3)**
19:12;82:18;83:8
**parade (1)**
93:24
**Paragraph (2)**
66:20;67:20
**Pardon (4)**
52:4;70:24;81:5;84:7
**part (6)**
27:17;28:15;36:12;
57:20;93:16,20
**participant (2)**
15:20;17:8
**participate (4)**
8:19;39:20;99:21;
105:1
**participated (1)**
17:11
**particular (7)**
27:25;46:11;55:10;
64:21;66:18;99:14;
100:7
**parties (13)**
3:25;11:20;12:22,23;
14:1,5;21:7;85:15;
93:21;96:11;97:8;
101:17;102:6
**parties-in-interest (2)**
4:11;28:23
**parties-of-interest (2)**
26:6,6
**partner (2)**
4:7,8
**parts (2)**
57:18,19
**party (2)**
56:9;79:5
**pass (4)**
42:16;52:25;63:22;
90:2
**past (2)**
102:22,24
**Pastazios (10)**
3:1;7:16;8:13,14;
34:21;35:13;36:13;
54:23;103:6,6
**path (1)**
93:24
**patience (1)**

86:8
**Pause (3)**
33:14,25;83:20
**pay (3)**
19:2;24:17;30:4
**paying (2)**
18:24;30:10
**payment (1)**
30:1
**payments (1)**
19:3
**people (8)**
21:21;54:4;85:11;
93:25;95:11,16,21;99:16
**per (2)**
35:18;91:12
**percent (3)**
7:10;76:22;97:4
**percentage (3)**
28:2;76:25;77:2
**perfect (2)**
104:2,2
**perform (3)**
23:13;86:15;89:10
**performance (2)**
93:20;95:15
**performed (1)**
86:17
**permission (1)**
22:6
**person (10)**
7:3,4;16:4;22:2,3;
42:6,8;79:13,15;92:19
**personal (1)**
97:19
**personally (3)**
7:9;16:3;49:7
**persons (2)**
17:12,13
**perspective (1)**
22:24
**ph (1)**
69:23
**phone (4)**
32:22;40:24;58:24,25
**phrased (1)**
11:19
**pick (2)**
55:5;99:12
**piece (2)**
77:6;80:17
**Pizza (6)**
3:1;7:16;18:21;34:21;
36:13;46:13
**plain (1)**
102:16
**plan (93)**
5:10,11,12,18;6:23;
7:1;9:13,14,21,25;10:24,
24;12:11;13:9,23;14:11,
13;15:23;16:1;17:22;
18:22;19:2,5;20:17,21,
25;21:20;22:4,7,13,20;

23:5,6;25:15;26:4,5,9,
13,15,17,21,22;27:25;
28:14;29:2,6;30:14;
34:22;35:1,6;36:12;
38:1;39:24;40:2;41:1;
43:8;58:13;60:13;65:14;
66:4,13;67:7;79:2,17,21;
82:8,9;88:12,14,19;
92:17;95:11,19;96:1,2,7,
10,11;97:17,20;99:18,
22;100:14,17;101:20,24;
102:1,2,5,9;103:12,13;
104:5
**plans (3)**
11:20;101:17;104:7
**play (1)**
29:19
**played (1)**
30:20
**pleading (1)**
30:22
**pleadings (1)**
55:23
**please (12)**
11:20;32:12;34:18;
36:7,10;37:21;41:24;
48:10;57:4;86:4;92:6,8
**pm (1)**
92:4
**point (29)**
15:6,10,13,19;25:13,
18;32:3;36:23;39:5,6;
41:13;42:5,11;52:14,18;
54:9;60:6,18;67:16;
71:6;92:12;98:3,20;
99:9;102:3,18;103:9,25;
104:10
**pointing (1)**
69:13
**points (3)**
14:10;80:25;103:18
**point-something (1)**
96:24
**policy (8)**
9:23;10:24;20:23,24;
23:16;46:21;51:20;
103:5
**position (5)**
14:11;54:24;92:13;
94:1;97:19
**positive (1)**
80:1
**possibly (1)**
95:4
**post-confirmation (4)**
20:7;57:2;67:12;96:8
**post-date (1)**
95:21
**posture (1)**
9:10
**potential (1)**
28:13
**potentially (3)**

14:25;15:9;27:24
**power (1)**
23:12
**powers (2)**
23:10;86:25
**PPI (1)**
50:12
**practice (3)**
32:14;34:10;48:14
**preclusion (1)**
3:24
**pre-date (1)**
95:21
**predating (1)**
6:9
**pre-engineered (1)**
10:11
**preferred (3)**
81:21;82:2,4
**prejudice (15)**
13:10;15:1;47:18;
93:3;94:24,24;95:2,4,5,
6,6,10,10;97:24;98:2
**prejudiced (3)**
52:20;94:25;95:4
**present (6)**
3:7;37:2;80:8;81:11;
85:5,7
**presented (4)**
43:10,14,18;100:22
**pressing (1)**
60:16
**pretty (3)**
41:17;45:10;102:3
**previous (1)**
99:11
**previously (1)**
14:15
**prim (1)**
81:25
**primarily (7)**
18:17;20:7;28:3;35:2,
12;46:23;53:12
**primary (7)**
17:12,13;18:15;40:23;
46:19,19;90:10
**principal (1)**
15:13
**principles (1)**
95:14
**printed (4)**
41:18,18;42:23;43:8
**prior (26)**
23:11,12,19,22;24:11,
14,16;35:12;59:15;64:9,
12,15;66:2;68:12;69:11,
20;70:3,5,11;73:25;
86:14,24;87:23;88:11;
89:2,6
**private (1)**
4:8
**privilege (7)**
72:22;73:9,14,17,21;

74:1;76:17
**privileged (1)**
59:16
**probably (10)**
16:8;24:24;43:4;52:9;
79:25,25;94:16;98:7;
100:15;104:25
**problem (6)**
7:21;27:3;29:23;
100:6,6,20
**problems (5)**
7:12;8:8;19:19;41:16;
100:7
**procedurally (1)**
9:10
**proceed (3)**
3:21;4:12;98:21
**proceeding (5)**
12:15;59:2;61:12;
94:15;97:3
**proceedings (2)**
7:7;105:7
**proceeds (2)**
28:8;77:5
**process (2)**
9:19;82:15
**product (2)**
72:22;73:14
**proffer (1)**
32:10
**progressing (1)**
61:22
**proof (1)**
20:20
**proofs (1)**
64:6
**proper (1)**
77:3
**properly (5)**
21:18;27:5,8;63:3;
101:15
**proposal (2)**
22:21;85:21
**proposed (1)**
100:14
**prosecute (1)**
94:7
**protect (2)**
15:7;94:21
**protection (2)**
23:17;27:17
**protections (1)**
27:18
**provide (5)**
6:23;7:1;20:24;23:17;
27:17
**provided (7)**
6:14;18:13;22:11,16,
18;62:25;71:13
**provides (11)**
17:21;22:15;24:8,22;
25:11;27:18,19;70:5;
71:6,8;82:25

**providing (1)**
97:2
**provision (4)**
24:21;45:6;67:10;
104:11
**provisions (13)**
3:4;12:2;22:4,7;24:18;
26:16,24;27:17;69:3,10;
70:21;81:22;102:12
**public (1)**
12:21
**pull (2)**
30:21;43:7
**pulled (1)**
29:24
**purportedly (1)**
31:11
**purpose (3)**
15:20;35:16;95:15
**purposes (1)**
89:13
**pursuant (5)**
7:3;51:12;56:3;73:3;
99:17
**pursue (1)**
46:15
**Put (7)**
13:14;29:17;33:17;
37:12,13;97:8;98:10

**Q**

**quandary (1)**
14:17
**quest (1)**
21:21
**quick (1)**
53:9
**quickly (2)**
19:9;48:25
**quit (1)**
30:10
**quite (9)**
5:20;21:1,3,17,19;
26:8;29:4;83:18;93:9
**quote (1)**
26:10
**quoting (1)**
22:3

**R**

**raise (2)**
53:3;96:4
**raised (6)**
5:3,5;9:8;13:7;28:20;
61:9
**raises (4)**
21:15;26:17;29:6;
100:22
**ramifications (1)**
78:11
**rape (2)**

98:8,11
**raped (1)**
29:20
**rather (3)**
40:19;48:11;104:22
**reached (4)**
8:25;59:20;83:13;
85:15
**read (9)**
22:1;54:11;66:12;
71:11,17;72:2;86:25;
88:9;100:11
**reading (2)**
19:12;103:11
**ready (1)**
78:13
**real (6)**
27:12;53:9;101:13,13,
14,14
**realized (1)**
100:11
**really (31)**
3:25,25;4:22;6:15;
9:17;10:6;11:16;13:16;
16:5;17:5,11;18:16;
19:5,12,13;20:3;21:14;
29:20;35:18,19,20;
47:19;52:14;54:4,24;
77:16;93:10;97:13;98:9;
100:1,2
**reason (14)**
8:22;30:9;41:15;
43:12,23;46:5;56:5;
59:22,23;63:17;93:6,20;
95:18;102:1
**reasonably (1)**
89:12
**reasons (2)**
24:24;93:9
**recall (15)**
9:11;15:23;39:22;
40:4,6;44:4,7;48:5;50:1;
53:25;57:18;59:14;
75:21;86:4;99:7
**receive (2)**
76:21,25
**received (4)**
32:7;56:3;68:4;84:20
**receives (2)**
77:9,24
**recently (1)**
15:17
**receptive (1)**
59:13
**recess (3)**
92:1,4;105:4
**recitation (1)**
14:9
**recognize (2)**
36:9;57:5
**recollection (10)**
44:6;59:5;62:7;65:19,
22;66:1;67:4,18;68:16;

89:16
**record (9)**
12:21,21;34:9,18;
48:13,17;55:20;57:1;
90:10
**recoveries (1)**
77:3
**recovery (3)**
28:2;76:22;77:1
**RECROSS-EXAMINATION (1)**
90:6
**REDIRECT (3)**
47:9;55:18;85:1
**reemphasize (1)**
100:21
**reference (3)**
21:25;26:4;99:19
**references (1)**
25:24
**referring (1)**
55:4
**reflect (1)**
65:17
**refresh (2)**
65:19,21
**refreshed (1)**
64:11
**refused (1)**
9:24
**regard (1)**
72:1
**regarding (2)**
8:16;62:10
**regards (3)**
23:3;25:11;72:13
**relate (3)**
27:18;72:3;87:1
**related (6)**
22:5;25:17;54:1;87:5;
88:12,14
**relates (1)**
23:24
**relating (6)**
22:8;25:5;81:22;84:2,
2;88:19
**relations (1)**
10:17
**relevance (11)**
5:5;8:22;30:7;51:19;
76:9;80:15,20;81:2,4,6,
10
**relevant (3)**
51:4,17;53:6
**reliance (1)**
93:3
**relied (6)**
26:7;54:10;92:16,17,
17;103:23
**relief (8)**
5:4;14:10;15:15;
80:15;81:21;82:2,4;95:5
**rely (5)**
24:4;102:6,7,7,19

SUPP APP 0850

**remember (9)**
5:19,20;17:1;18:22;
23:15;56:7;64:11;69:6;
83:18
**remembered (1)**
40:11
**remembering (1)**
41:21
**removal (2)**
25:19;82:24
**remove (3)**
82:17;83:6,8
**removed (3)**
25:20;82:16,25
**rent (1)**
93:23
**renting (1)**
3:3
**reorganization (6)**
20:25;22:14;26:5,9;
66:4;101:17
**repeat (5)**
52:3;55:6;74:23;
77:16;78:19
**repeating (1)**
73:2
**rephrase (3)**
44:10;45:13;77:25
**replacement (1)**
49:24
**report (1)**
62:15
**represent (4)**
9:3;42:12;64:18;88:18
**represented (7)**
6:5;15:12;26:21;27:6;
48:25;64:24;101:11
**representing (2)**
49:3;59:18
**represents (1)**
101:25
**request (1)**
34:1
**require (1)**
24:19
**required (3)**
5:17;14:1;69:3
**requires (1)**
70:3
**requiring (1)**
96:11
**resignation (1)**
82:22
**resolve (2)**
14:19,20
**resort (1)**
11:17
**respect (4)**
5:5;58:18;60:1;88:18
**respectively (1)**
6:5
**respond (2)**
29:25;30:1

**responded (1)**
51:23
**response (5)**
24:2;27:22;33:3;
81:20;84:15
**responsibility (4)**
80:2;100:13;101:6,7
**responsible (10)**
18:20,24;19:7;30:24;
42:6,8;53:12;64:6;
87:14,15
**rest (1)**
44:14
**restate (1)**
74:3
**restaurant (1)**
46:13
**result (2)**
27:24;50:10
**resulting (1)**
47:18
**results (2)**
26:14;28:8
**retain (5)**
6:23;19:8,16;87:9;
96:21
**retained (7)**
49:15,24;60:18;61:3,
16;94:25;95:1
**retaining (4)**
49:21;50:8;52:21,21
**retention (2)**
8:3;61:15
**reurge (1)**
34:1
**review (4)**
66:3,6,8;68:21
**reviewed (2)**
67:15,16
**revoke (1)**
102:23
**rid (1)**
12:25
**ridiculous (2)**
30:22,25
**right (41)**
4:10,19;9:14;13:8,10;
15:17;17:25;18:1;19:5;
28:1;31:18,24;32:12,15;
34:5,11;37:20;38:6,24;
39:11;44:20,22;45:4,17,
23,25;47:14;58:15,17;
66:23;68:5,9,11;79:7;
85:12,16;87:19;91:9;
92:1;93:24;97:11
**rights (8)**
15:1;23:14;86:15,17;
88:20;96:2;97:25;98:2
**rise (3)**
92:3,5;105:6
**role (4)**
15:2;34:19;79:19,24
**room (5)**

37:2,5,7;38:14;91:14
**rooted (2)**
94:8,23
**rubberstamped (1)**
10:10
**Rukavina (82)**
3:1,3,6;4:13,21;6:1;
29:10;31:1,4,9,12,14,18,
19,22;32:9,21,25;33:2,5,
16,20,22;34:6,17;36:3,
19,23;39:15,16;42:16;
47:6,7,10,23;48:4,8,19,
24;50:25;51:7,18;52:25;
55:17,19;56:12,17,25;
63:22;69:14,23;70:1;
72:8,20;73:7,13,24;74:7,
20;76:8,16;78:9;80:14;
81:1,10;84:11,12,25;
85:2;90:2;91:7,19,20;
92:9,11;96:17,20,24;
103:16,18;104:25;105:3
**Rukavina's (1)**
90:4
**rule (5)**
3:24;34:2;81:3;93:18,
18
**Rules (4)**
33:10;76:18;94:9;
103:8
**ruling (2)**
84:13;104:24
**run (3)**
14:24;18:19;33:22
**running (1)**
18:21
**runs (1)**
17:18

**S**

**sailed (1)**
98:16
**sale (1)**
89:11
**sales (1)**
58:4
**Sam (3)**
12:6;15:12;59:14
**same (9)**
4:19;22:6;53:3,4,6;
58:3;74:7;85:21;95:11
**sat (1)**
93:10
**satisfied (1)**
85:25
**saw (3)**
17:21;66:12;104:15
**saying (11)**
10:10;12:24;27:11;
28:19;54:3;59:25;85:19;
94:11;95:16;96:13;
98:10
**schedule (1)**

20:19
**scheduled (2)**
14:12;20:18
**scheduling (1)**
49:10
**scope (1)**
56:11
**Scott (7)**
3:7;4:2;98:6,22,22,23;
101:1
**screaming (1)**
103:22
**se (1)**
35:18
**seat (1)**
97:21
**seated (4)**
48:18;56:23;92:6,8
**second (6)**
12:5,20;33:7;57:21;
68:20;69:9
**secondly (2)**
25:9;27:15
**Section (18)**
22:15;23:10;24:25;
25:16,20;26:23;27:16;
66:20;69:7;71:2;72:13;
73:3;82:8,13,19;83:21;
84:1;86:4
**Sections (6)**
25:2;70:2;71:15,20,
23;72:2
**seed (3)**
5:17;40:25;58:22
**seeing (1)**
67:4
**seek (7)**
13:8;59:9;76:7,12;
87:11;90:21;94:2
**seeking (8)**
5:4;11:17;26:24;27:2;
28:23;52:22;80:16;
81:21
**seeks (2)**
14:10;15:16
**seem (1)**
67:10
**seemed (2)**
19:18;66:14
**seems (1)**
78:23
**sees (1)**
26:2
**Seidel (65)**
3:7,7;4:2;5:19;6:2,2,3;
7:11;8:2;10:1;11:14,16,
19;13:14,22;16:7,11,12,
17,17;18:18;19:24;
36:15,17;38:14,17;39:5,
6,7,9;40:21,24;41:4,13,
21;42:4,4,12;44:2,15;
49:12,15,20,24;56:18,
18,21;64:2;65:6;74:4;

76:21;84:23;85:3;90:8;
91:5;95:19;98:6,22,23,
23;101:1,6,10,11;104:11
**Seidel's (2)**
41:22;47:19
**send (2)**
30:13;64:12
**sending (1)**
30:12
**sense (4)**
65:10;75:13;77:22;
89:23
**sent (7)**
6:1,2;8:17;26:5;40:20;
44:2;57:23
**sentence (4)**
22:15;67:1;82:13,14
**separate (1)**
58:8
**serious (1)**
92:22
**seriously (1)**
9:9
**serve (1)**
15:6
**served (1)**
9:12
**serving (1)**
10:18
**set (5)**
18:22;22:16;26:12;
50:13;104:25
**settle (19)**
23:23;24:5,9;27:19;
50:19;51:8,9,20;70:10,
18;72:18;73:23;74:5,19,
25;87:22;88:2;102:14,
15
**settled (2)**
87:25;88:4
**settlement (12)**
8:24;11:11;25:4;
50:23;51:6;54:2,7;73:5;
74:9,10;75:2;102:14
**sev (1)**
70:20
**seven (1)**
102:8
**severably (1)**
50:12
**several (2)**
5:16;69:3
**sexual (1)**
10:16
**shaking (1)**
17:24
**shall (5)**
19:16;22:17;32:21;
71:14;96:20
**sham (3)**
9:25;10:24;13:24
**Shank (1)**
3:15

SUPP APP 0851

**shape (4)**
63:9,19;93:11;94:25
**Sharp (3)**
26:10;101:23;102:2
**ship (1)**
98:16
**shocking (1)**
10:7
**shortly (2)**
16:4;40:23
**shot (2)**
12:12,12
**showed (1)**
30:11
**showing (1)**
30:12
**Shults (4)**
7:17,18;13:9;103:20
**side (3)**
91:12,13,15
**sig (1)**
67:25
**sign (11)**
16:12;36:14;37:11;
39:6;42:24;44:17,20;
57:8,10;68:3;100:25
**signatories (1)**
101:8
**signature (19)**
36:10;37:18,18;38:2,
2,18,19,20;41:21,22;
44:3;57:7,8,17,22,22;
58:7;67:25;68:20
**signed (41)**
5:24,25;6:2,16,17,18;
9:6;16:12;36:17;37:3,4,
4,12;38:14;39:8;40:20;
41:14,14,19;42:3;43:5,
11,15,19,20,21,24;44:11,
18,22;57:10,11;58:5;
65:21;68:10,23;70:21;
79:22;84:24;94:19;
100:9
**significant (7)**
17:6;21:6,16;24:6,18;
25:14;26:8
**signing (3)**
37:9;39:9;68:21
**simple (1)**
45:10
**sit (9)**
13:21;44:1;52:1,7,10;
54:5;93:13;94:3;95:20
**situation (2)**
11:16;93:19
**size (2)**
77:13,18
**slightly (1)**
70:16
**smacks (2)**
103:2,10
**small (1)**
47:3

**smaller (2)**
18:23;19:2
**smoking (1)**
13:17
**sneak (1)**
95:20
**sole (5)**
21:10;28:1;79:5,12,12
**solely (1)**
44:2
**Solis (17)**
5:6;7:6,16,19;9:8;
11:2,3,6,7;13:16;15:5;
55:21;80:18;81:12;93:7,
14;104:23
**Solis' (2)**
30:23;98:14
**somebody (2)**
90:13;98:5
**somebody's (1)**
46:15
**somehow (10)**
9:25;10:2,12,13,14,15,
25;12:13;92:25;98:12
**someone (3)**
22:25;27:4;61:13
**sometime (1)**
65:25
**somewhere (3)**
21:13;97:7;101:12
**soon (1)**
50:5
**sooner (1)**
62:21
**sorry (11)**
16:23;31:16;34:4;
43:14;59:6;72:14;74:23;
76:11;78:19;90:4;99:5
**sort (2)**
19:6;40:25
**sought (2)**
76:5,5
**sounds (3)**
12:17;68:9,11
**speak (5)**
86:10,12,20,23;88:10
**speakers (1)**
99:11
**specifically (2)**
67:1;71:20
**spent (1)**
15:24
**split (1)**
18:23
**spoke (1)**
12:5
**stamp (6)**
38:8,12;43:6,15,16;
57:21
**stand (4)**
13:14;32:17;33:17;
64:11
**standing (5)**

3:20;12:17;93:3;95:3,
3
**start (1)**
49:3
**started (3)**
3:23;19:11,12
**starting (2)**
24:25;25:16
**state (34)**
4:9;7:5,9,22,22;8:10;
10:22;14:16,16;15:4;
28:17;32:15;34:9,10,18;
38:2;48:14;49:1,9,23;
50:6,12;53:23;55:2;
58:13;59:2,3;60:1,3,18;
64:9,13;80:23;94:4
**statement (4)**
9:13;99:25;100:1;
102:4
**states (2)**
67:1;71:13
**status (1)**
64:4
**stay (2)**
7:7;14:15
**stayed (1)**
98:2
**steamrolling (1)**
61:12
**step (6)**
47:25;56:14;60:8;
79:17;91:5;101:10
**step-by-step (1)**
104:12
**still (8)**
5:25;29:21;42:1,2;
43:2;97:16,17;99:5
**stipulate (2)**
31:7;32:4
**stocked (1)**
3:4
**stood (1)**
9:14
**stop (1)**
59:3
**stopped (1)**
37:11
**Stowers (4)**
8:17;51:1,11,12
**straightforward (1)**
19:22
**stranger (1)**
95:23
**strict (1)**
76:18
**stuff (1)**
31:4
**subject (8)**
3:21;14:2;19:15;
22:17;28:18;51:16;67:2;
81:2
**subsequent (1)**
13:15

**subsequently (2)**
7:2;15:3
**substantially (5)**
26:15,18,21,22;101:24
**substitute (4)**
7:15,16,19;56:1
**suddenly (1)**
93:23
**sue (2)**
24:12;88:11
**sued (1)**
88:13
**suggest (5)**
12:14,16;21:5;94:8;
103:23
**suggested (1)**
99:10
**suggesting (2)**
21:21;104:2
**summer (1)**
56:9
**summer's (1)**
61:22
**supervising (1)**
98:22
**suppose (1)**
98:12
**supposed (3)**
8:2;23:2;58:21
**sure (30)**
19:1;20:8;21:14;23:1;
27:14;32:23;40:15;
41:25;42:9,21,22;43:2,
25;45:11,14;46:2,4,17;
47:2,8;64:14;65:18;
67:14;78:9,23;82:3;
85:10;100:14,18;104:23
**Surety (3)**
3:11;4:1;20:14
**surprised (1)**
19:12
**Sustain (1)**
33:4
**Sustained (6)**
51:19;54:8;73:20,20;
81:4,6
**swear (2)**
34:8;56:19
**swim (1)**
66:15
**sworn (1)**
56:22

---

**T**

**TAB (1)**
98:22
**tad (1)**
103:2
**talk (2)**
16:10;39:7
**talked (4)**
16:11;42:14;53:22;

64:23
**talking (1)**
69:13
**talks (1)**
23:9
**tall (1)**
90:4
**targeted (1)**
5:4
**Technically (1)**
8:1
**telling (1)**
62:15
**temporary (1)**
39:8
**ten (6)**
91:12,14,18,18,22;
92:10
**term (7)**
22:19,20,25;35:20;
76:24;77:3;96:6
**terms (19)**
16:5,21;19:21;20:21;
21:6,8,20;23:3,4;27:16;
41:3;45:7;73:3;74:17;
75:3,5;99:18;100:10;
102:9
**testified (4)**
60:19;75:7;79:16;
101:10
**testify (2)**
74:21;84:23
**testifying (1)**
56:19
**testimony (2)**
13:15;32:10
**Texas (5)**
32:15;33:10;34:10;
48:14;76:18
**thanks (1)**
20:11
**That'd (1)**
91:13
**thereafter (4)**
8:16;14:20;19:9;62:2
**There'd (1)**
56:7
**third (1)**
13:5
**thirty (1)**
58:1
**thirty-minute (1)**
99:6
**Thomas (2)**
3:6;32:10
**though (10)**
10:16,17,18,19,20;
33:17;56:20;74:17;81:8;
91:25
**thought (12)**
17:7;19:20;21:9,12;
27:4;68:5;75:16;85:11;
99:16;101:6,11;104:5

SUPP APP 0852

**Thousands (2)**
58:6;63:18
**threat (1)**
93:13
**three (9)**
8:9;12:14;30:1;46:23,
25;80:9;97:14;103:18;
104:10
**three-day (1)**
29:18
**threw (2)**
31:8,25
**thus (2)**
98:21,25
**till (2)**
14:17;98:21
**times (2)**
80:11;96:1
**tiny (1)**
97:1
**today (14)**
3:14;4:24;5:2;11:1,10;
12:15;13:12;52:10;72:1;
88:23;91:21;93:6;95:5;
100:16
**together (1)**
49:15
**told (3)**
16:19;61:20;96:11
**Tom (1)**
48:17
**Took (7)**
66:5,7,9,10;86:4;
89:20;94:21
**top (9)**
23:7;25:1;37:16;38:2,
7,11;43:6,22;57:21
**tort (1)**
7:24
**towards (1)**
61:12
**track (1)**
23:1
**trade (2)**
46:24,25
**transcript (1)**
54:11
**transfer (1)**
9:23
**transferred (1)**
20:22
**Trey (4)**
4:2;48:10,19,21
**tri (1)**
50:22
**trial (29)**
7:5;8:7,9,10;14:16;
29:18;49:8,24;50:1,10,
20;51:4,8,9;53:23;56:9;
59:4,24;60:1,10,18;64:9,
12,16,17;80:8;94:5,15;
103:10
**trick (1)**

10:2
**tried (5)**
14:16;40:9;49:5,6;
80:5
**true (7)**
43:10,17;54:21;76:21;
77:13,18;80:23
**trust (294)**
5:11,12,24;7:1,2,16,
24;8:1,2;9:23;11:13,15,
22,25;12:3,7,11,23;13:1,
3,11,21;14:13,18,23,24,
25;15:2,7,9,18,19;16:10,
12,13,20,22;17:13,14;
18:3,4,5,13,15,16,20,25;
19:4,4,14,15,17,17,17,
21,22;20:22;21:4,10,15,
18,22;22:5,5,8,9,17,18,
19,21,22,23;23:3,11,13,
14,16,19,22;24:12,14,16,
19,22,23,23,25;25:3,8,9,
11,12,16,17,21,23,25;
26:3,3,14;27:6,15,25;
28:3,6,9,10,14,15,24;
29:5;31:10;34:23;35:6,
7,17,18,21;36:11;37:14,
15;38:10;39:13,24;40:2,
13,22;41:1,1,3,14,14,19,
20;42:5,7;44:23;45:9,9,
15;46:5,14,20;47:11;
50:4;52:1,7,10,22;53:18,
24;54:10,12;57:2,20;
58:13,19,21;59:18;
60:11,22;61:4,4,5;63:3,
6,10,20;64:19,22,25;
66:8,13,24;67:2,3,7,8,18,
22;68:19,21,23,24;69:3,
4,7,7,11,21,22;70:3,6;
71:4,9,21;72:2,3,17;
73:5;74:5,15,17,18,22,
24,25;75:9,12,15,18,20,
23,23;76:22;77:5,9,13,
15,19,21,24,24;78:3,7,7,
21,21;79:2,22;80:4;
81:22;82:5,19;83:2,3,5,
10,10,17;84:20;85:12;
86:3,10,12,14,16,18,24;
87:8,11,16,18,24;88:3,
10,11,20;89:2,3,6,13;
90:17,18;92:17,18,20;
93:4;95:2,17;97:21,23,
24;98:11,24;99:10,13,
14,17,19,23,23;100:8,8,
9,12,15,24;101:2,15;
102:12,13;104:11,16
**trustee (104)**
3:25;4:1;5:15;6:7,9,9,
21,22,23;7:8,23;9:2,24;
10:12,25;14:21,21;
15:15;16:14,17;18:19;
19:6,17,25;20:1;21:18,
25;22:17,21,23;23:1,10,
12,20,23;25:1,19,20,25;

27:6,7,13,20,25;28:9,22;
35:5;41:4,10;42:4,7,8;
45:2;47:20;50:8;52:21;
56:6,17,19;57:1;58:2,18,
21;62:10;63:17;64:2,6;
65:8;66:3,3,25;67:2;
71:8,14;79:5,19,24;80:3;
82:6,16,25;83:6;90:12;
91:3;94:1,2,3,5,19,21;
95:6,7;96:20;98:6,16,18;
99:20;100:4,9;101:18,
22;102:13;103:15;
104:17
**trustee's (15)**
6:8;14:9;24:2;28:11,
25;32:7;37:21;52:13;
66:19,22;67:21;84:21;
93:12;94:19;101:5
**trusts (1)**
42:7
**truth (1)**
50:17
**try (14)**
5:2;11:1;13:15;24:5;
27:8;40:1;50:4;77:2;
86:7,7;90:25;92:9;
102:25;104:24
**trying (10)**
5:16;20:8;26:12;
40:24;46:1;60:3,4;
62:22;64:11;83:18
**turn (7)**
36:7;37:21;57:4,7;
67:20,22;71:1
**turning (1)**
70:9
**twelve (2)**
91:24,24
**twenty (9)**
8:14;10:15;28:7,8;
50:11;77:6,23,25;78:4
**twenty- (2)**
63:17;99:6
**twenty-five (2)**
58:1,5
**twice (1)**
97:14
**two (25)**
3:25;8:9,20;10:8;
11:19;16:8;18:23;19:13;
37:24;46:24,25;51:10;
57:4,18,19;68:13,16;
71:20,23;79:25;97:1;
99:11;100:19;101:8;
103:25
**type (1)**
59:13
**types (1)**
45:7
**typically (1)**
90:24

**U**

**ultimately (4)**
8:10,17;26:7;28:17
**Um-hum (2)**
4:10;37:17
**unanimous (4)**
25:22,23;83:2,3
**uncertainty (1)**
18:9
**under (21)**
14:13;20:21;23:14;
26:1,23;27:16;28:14,19;
33:10;45:24;69:12;
70:16;75:3,5;82:15;
86:15,17;93:13;100:14;
102:10,12
**underlying (2)**
3:18;4:8
**underpinning (1)**
9:7
**understood (2)**
6:12;73:4
**underwear (1)**
10:21
**unfair (1)**
103:2
**unfortunately (1)**
8:24
**unsecured (3)**
12:5;19:2;20:9
**unsecureds (3)**
18:23,24,25
**unsigned (1)**
6:19
**unusual (4)**
58:7;66:14,16;67:10
**up (30)**
4:19;7:6;8:7,23;11:7,
13;12:16,20,25;13:6;
15:2;16:5;18:22;19:11;
21:18;26:12,25;29:17;
30:12;33:19;53:23;
59:24;71:12;81:16;
97:21;98:21;100:4;
103:1,10;104:25
**update (1)**
4:22
**upon (24)**
21:8;24:3,4;25:21,22;
26:7;27:1,10,14;28:2;
54:10;74:17;77:14,20;
79:16,18;83:1,2;86:16,
18;102:6,15,19;103:11
**ups (1)**
97:11
**upstairs (1)**
104:23
**USC (1)**
9:20
**use (5)**
10:10;13:16;24:17;

77:3;89:7
**used (2)**
51:3;89:7
**utterly (2)**
11:8,9

**V**

**valid (1)**
80:24
**value (2)**
28:4,5
**various (1)**
80:11
**vendors (2)**
46:24,25
**verdict (2)**
49:6;50:11
**version (1)**
10:22
**victim (2)**
98:8,11
**view (1)**
29:1
**viewed (2)**
19:6;42:6
**violate (2)**
104:18,18
**violated (1)**
104:11
**visited (1)**
73:10
**visiting (2)**
81:16,18
**voice (1)**
50:7
**voiced (1)**
49:20
**void (2)**
22:6,9
**voids (1)**
10:24
**voir (3)**
36:22,25;38:22
**volunteering (1)**
60:8
**vote (5)**
25:22,23;83:2,3;102:6

**W**

**wait (4)**
9:5;39:5,7;103:19
**waive (1)**
26:24
**waived (4)**
12:2,8;15:17;96:6
**waiver (1)**
95:15
**waives (1)**
47:17
**waiving (2)**
3:22;96:7

SUPP APP 0853

**wants (5)**
13:13;15:14;29:10;
82:17;94:3
**war (2)**
11:12,12
**wasted (2)**
24:6;102:17
**water (1)**
66:15
**way (20)**
10:14;12:20;13:5;
15:16;18:13,22;22:1;
25:10;31:5;42:7;51:18;
56:8;60:9;63:9,19;77:8;
79:2;93:11;94:17,25
**ways (2)**
11:19;12:15
**week (2)**
20:15;100:19
**weeks (3)**
5:16;8:15;9:4
**Welcome (4)**
3:8,12,16,19
**weren't (2)**
14:20,23
**what's (8)**
5:6;21:4;25:7;36:23;
58:10;89:14;90:10;
100:2
**Whereas (2)**
38:10;43:15
**Whereupon (1)**
105:7
**whole (5)**
13:23;19:24;57:16;
66:15;103:13
**wholeheartedly (2)**
55:12;74:13
**wholesale (1)**
25:14
**wholly (1)**
99:17
**whoops (2)**
6:16;104:20
**who's (2)**
98:22,22
**whose (3)**
12:2;35:21;95:11
**willing (1)**
15:20
**winded (1)**
91:21
**winning (1)**
96:15
**wish (1)**
11:1
**wishes (1)**
12:7
**withdraw (3)**
56:12;76:19;80:21
**within (1)**
51:20
**without (25)**

11:9;32:17;34:13;
47:21;52:16;56:8;59:16;
60:6,13;62:2,12,15;63:7;
73:9,16;74:1,5,25;85:19,
19;98:8;100:10;102:14,
14;104:16
**witness (31)**
3:24;4:1;31:3,20;
32:17,20;33:9,11,24;
34:6,13;36:3;39:9,11;
42:16;47:8;48:2,3;
52:25;53:5;56:15,16,22;
63:23;65:15;73:1,8,19;
78:17;90:2;91:6
**witnessed (1)**
37:9
**word (3)**
10:11;41:18;42:24
**words (3)**
6:16;58:13;60:16
**work (6)**
35:5;42:7;45:11;
72:22;73:14;79:3
**working (3)**
8:6;15:24;16:9
**world (1)**
67:12
**writ (1)**
93:13
**writing (1)**
43:22
**written (2)**
77:8;79:3
**wrong (1)**
19:6

## X

**xi (3)**
24:8;70:16;71:18
**xix (1)**
24:16
**xviii (1)**
24:14

## Y

**yachts (2)**
3:2,3
**year (6)**
5:10,23;6:22;7:8,14;
55:25
**years (7)**
29:17,22,24;51:10;
58:1;63:18;97:13
**yell (1)**
33:22
**Yep (2)**
71:3;82:12
**young (2)**
30:18,21

## Z

**zero (10)**
9:19,20;28:10,10,11;
77:9,10;78:6,12,20

SUPP APP 0854

# Exhibit 3

SUPP APP 0855



U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 19, 2015**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | CASE NO. 14-34324-hdh-11 |
| PASTAZIOS PIZZA, INC. | § | |
| | § | (Chapter 1) |
| Debtor. | § | |
| | § | |

### <u>ORDER ON TRUSTEE'S MOTION TO CLARIFY</u>

CAME ON FOR HEARING on the 3rd day of November, 2015 the *Trustee's Expedited Motion to Clarify Trust Agreement* (the "<u>Motion</u>"), filed on October 22, 2015 by Scott M. Seidel, Trustee (the "<u>Trustee</u>"), the trustee of the Pastazios Pizza, Inc. Creditors Trust (the "<u>Trust</u>"), whereby the Trustee seeks clarification of certain issues arising under the *First Amended Plan of Reorganization Dated February 11, 2015*, (the "<u>Plan</u>"), the *Order Confirming Debtor's First Amended Plan of Reorganization Dated February 11, 2015* (the "<u>Confirmation Order</u>"), and under the *Creditor Trust Agreement for the Pastazios Pizza, Inc. Creditors Trust* (the "<u>Trust Agreement</u>"). By the Motion, the Trustee sought clarification of three terms of the Trust Agreement; specifically three blanks in the Trust Agreement at the time of confirmation:

ORDER ON TRUSTEE'S MOTION TO CLARIFY—Page 1

(i) the identification of the Trust Advisory Board; (ii) the identification of the insurance counsel; and (iii) compensation available to insurance counsel.

Century Surety Company ("Century") objected to the Motion. The Trustee objected to Century participating in the hearing for lack of standing. At the hearing, the Court carried the issue of Century's standing and proceeded to consider the evidence and Century's arguments as though Century had standing to contest the Motion. The Court took the Motion under advisement and issued its oral findings of fact and conclusions of law on November 10, 2015, which the Court incorporates into this Order.

Therefore, finding that the Court has jurisdiction over this matter, that all creditors and parties-in-interest had due and sufficient notice of the Motion, and based on the evidence at said hearing, the arguments of counsel, and the Court's findings of fact and conclusions of law as set forth on the record on November 10, 2015, it is hereby:

ORDERED that Century's objection to the Motion is OVERRULED for Century's lack of standing; it is further

ORDERED that the Motion is GRANTED IN PART to the extent provided for herein, and is denied to the extent not provided for herein; it is further

ORDERED that, insofar as the single member "Trust Advisory Board" (as defined in the Trust Agreement) has not been identified to-date, the Trustee may appoint a member to the Trust Advisory Board pursuant to section 6.4(d) of the Trust Agreement; it is further

ORDERED that the Court hereby denies the Trustee's request that the Court determine that the provisions of the Plan and the Trust Agreement relating to the Trust Advisory Board have been waived and that the Trust Advisory Board no longer exists; it is further

ORDER ON TRUSTEE'S MOTION TO CLARIFY—Page 2

SUPP APP 0857

ORDERED that, pursuant to the Plan, the Confirmation Order, and the terms of the Trust Agreement, the Trustee has selected Munsch Hardt Kopf & Harr, P.C. ("Munsch Hardt") to act as the Trust's "Insurance Counsel"; it is further

ORDERED that the Court denies the Trustee's request for the Court to fill in the blank in Section 9.2 of the Trust Agreement to determine the compensation of the Trust's Insurance Counsel, but pursuant to section 10.1 of the Trust Agreement, the blank in section 9.2 of the Trust Agreement may be filled in by the Trustee and the Trust Advisory Board promptly after naming the member of the Trust Advisory Board; it is further

ORDERED that the Court reserves jurisdiction concerning this matter and all other matters concerning the Plan and the Trust that the Court has jurisdiction over, to the maximum extent possible, and that nothing in this Order shall prevent the Trustee or any other appropriate party from seeking additional or further clarification or relief as may be appropriate; and it is further

ORDERED that to the extent any relief requested in the Motion is not expressly granted in this Order, it is denied.

### ### END OF ORDER ###

SUPP APP 0858

# Exhibit 4

SUPP APP 0859

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **CENTURY SURETY COMPANY** | § | |
| | § | |
| **Plaintiff/Counter Defendant,** | § | |
| | § | |
| v. | § | **CIVIL ACTION NO. 3:13-cv-2553** |
| | § | |
| **PASTAZIOS PIZZA, INC.** | § | |
| **CREDITOR TRUST;** | § | |
| **AJREDIN "DANNY" DEARI; and** | § | |
| **POST PROPERTIES, INC.** | § | |
| | § | |
| | § | **JURY TRIAL DEMANDED** |
| **Defendants.** | § | |

## JANE DOE'S UNOPPOSED MOTION TO INTERVENE

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Jane Doe[1] ("Doe") moves this Court to intervene as a right and be included as a necessary party in the above cause pursuant to FED. R. CIV. P. 24(a)(2). In the alternative, Doe seeks permissive intervention pursuant to FED. R. CIV. P. 24(b)(1)(B) ("Unopposed Motion"). The grounds for this motion to intervene are as follows and counsel for the other parties are unopposed to the relief sought:

**I.**
**INTRODUCTION AND THE UNDERLYING LITIGATION**

Doe is a necessary party to this action as a result of obtaining a Final Judgment on July 25, 2015 in an underlying lawsuit directly related to this declaratory judgment action and Defendant Pastazios Pizza Inc. Creditor Trust's counterclaims against its insurer for breach of contract, bad faith insurance practices, and violations of the Texas Deceptive Trade Practices Act. As such, this Unopposed Motion to intervene should be granted.

---

[1] Due to the extremely personal and sensitive nature of the Underlying Litigation as defined herein, Doe is proceeding under the pseudonym of "Jane Doe."

---

**JANE DOE'S MOTION TO INTERVENE**                                                    **PAGE 1**

On April 24, 2013, Doe filed a lawsuit against Pastazios Pizza, Inc. ("Pastazios") and Adjredin Deari ("Deari"), amongst other parties, in the 193rd Judicial District Court, Dallas County, Texas, Cause No. DC-13-04564 alleging causes of action against Pastazios for negligence, premises liability, false imprisonment, and dram shop ("Underlying Litigation"). After properly *Stowerizing* Defendant Pastazios and its insurance carrier in May of 2011, Plaintiff Century Surety Company ("Century")[2], Century initially recognized there was coverage for Doe's claims against Pastazios in the Underlying Litigation but two months later inexplicably denied coverage, denied Pastazios a defense, and brought this declaratory judgment action seeking a determination that there is no insurance coverage for the causes of action asserted by Doe against Pastazios in the Underlying Litigation.

The Underlying Litigation was then fully litigated for the next two years and the Underlying Litigation was tried to the bench on July 7, 2015. On July 25, 2015, after a fully adversarial three day trial in which all parties were represented by counsel, Honorable Carl Ginsberg entered a final judgment on the evidence in Doe's favor in the amount of $21,911,141.42 against Defendants Pastazios and Deari, jointly and severally ("Final Judgment").[3] On August 7, 2015, Honorable Carl Ginsberg entered Findings of Fact and Conclusions of Law in support of the Final Judgment.[4]

The Final Judgment, as well as the Findings of Fact and Conclusions of Law make clear that Doe's claims in the Underlying Litigation are covered under the liability insurance policy issued by Century that forms the basis of the claims and counterclaims made in this case. Doe

---

[2] It is also worth noting that Doe *stowerized* Pastazios and its insurance carrier Century on three additional occasions as the Underlying Litigation progressed and even invited Century to participate in the mediation of the Underlying Litigation. Century refused to participate and ignored the last *Stower's* demand Doe sent shortly before trial.

[3] The Final Judgment is attached as **Exhibit A** (APP001-APP003) and is incorporated by reference for all purposes.

[4] The August 7, 2015 Findings of Fact and Conclusions of Law are attached as **Exhibit B** (APP004-APP019) and are incorporated by reference for all purposes.

---

SUPP APP 0861

now seeks to intervene in this declaratory judgment action to protect her direct rights against Century for breach of contract; defend her rights and interests as a judgment creditor; and to protect and pursue her legal rights as the 99% beneficiary of any and all proceeds awarded in connection with Defendant Pastazios Pizza Inc. Creditor Trust's counterclaims against Century for breach of contract, bad faith insurance practices, and deceptive trade practices.[5]

Through this Unopposed Motion Doe hereby seeks to join in Defendant Pastazios Pizza, Inc. Creditor Trust's pleadings in defense of Century's declaratory judgment action, as well as join in Defendant Pastazios Pizza, Inc. Creditor Trust's counterclaims against Century.

Doe is a necessary party, has the most significant stake in the outcome of this matter, and has a legal right to intervene in this action at this time. After conferring with all counsel of record, none of the other parties are opposed to Doe's intervention.

## II.
### ARGUMENTS AND AUTHORITIES

### A.   DOE IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT.

Federal Rule of Civil Procedure 24(a) provides that the court must grant a timely motion to intervene if the movant "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."   FED. R. CIV. P. 24(a)(2).   As the language of the rule directs, "intervention of right must be measured by a practical rather than technical yardstick," and the

---

[5] Pastazios filed for Chapter 11 bankruptcy protection on September 2, 2014, mainly as a result of Century's breach of its obligation to defend Pastazios against Doe's claims in the Underlying Litigation. *See In re Pastazios Pizza, Inc.,* United States Bankruptcy Court for the Northern District of Texas, Dallas Division, *Cause No. 14-34324.* Pursuant to Pastazios First Amended Plan of Reorganization in the bankruptcy, Pastazios' claims and causes of action against Century in this action, as well as all of Pastazios' interests in the liability insurance policy issued by Century (including the *Stowers* claim) were assigned to the Pastazios Pizza, Inc. Creditor Trust who has now substituted in as a party for Pastazios. Due to the size of the Final Judgment Doe obtained against Pastazios, Doe is the 99% beneficiary of any and all proceeds of the Creditor's Trust, including all of the proceeds awarded against Century in this litigation.

---

SUPP APP 0862

analysis "is a flexible one, which focuses on the particular facts and circumstances surrounding each application." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (internal quotation marks and citations omitted).  In general, intervention should be allowed when "no one would be hurt and great justice can be attained." *Sierra Club v. Espy,* 18 F.3d 1202, 1205 (5th Cir. 1994) (internal quotation marks and citations omitted).

In deciding a motion to intervene as of right, courts focus on the following four factors: (1) whether the motion to intervene is timely; (2) whether the intervener asserts an interest related to the property or transaction that forms the basis of the controversy into which she seeks to intervene; (3) whether the disposition of that case may impair or impede the potential intervener's ability to protect her legal interests; and (4) whether the existing parties adequately represent the intervener's interest. *Saldano v. Roach,* 363 F.3d 545, 551 (5th Cir. 2004).   Each of these considerations support Doe's right to intervene.

### 1.      Doe's Motion for Intervention is Timely.

The Fifth Circuit has identified four factors to be considered in determining whether a motion to intervene as of right is timely: (1) the length of time between the movant's learning of her interest and the petition to intervene, (2) the extent of prejudice to existing parties from allowing the intervention, (3) the extent of prejudice to the movant if not allowed to intervene, and (4) any unusual circumstances. *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247-48 (5th Cir. 2009). Each of these factors support the conclusion that Doe's Unopposed Motion to intervene is timely.

First, this Motion to intervene is being filed less than one month after Final Judgment was entered in Doe's favor in the Underlying Litigation.  Doe could not have moved to intervene prior to the Final Judgment being entered because, as a third-party beneficiary to the insurance policy, she did not have standing until she had a monetary judgment against Defendant Pastazios.

---

SUPP APP 0863

*See State Farm Mut. Ins. Co. of Tex. v. Ollis,* 768 S.W.2d 722, 723 (Tex. 1989) (per curiam) ("a party injured by the insured is a third party beneficiary of a liability insurance policy, ... [but] he cannot enforce the policy directly against the insurer until it has been established, by judgment or agreement, that the insured has a legal obligation to pay damages to the injured party."); *In re Essex Ins. Co.*, 450 S.W.3d 524, 527-28 (Tex. 2014). Once Doe obtained the Final Judgment in the Underlying Litigation, her interests in this action became ripe, and Doe timely moved to intervene. Any attempted intervention before the Final Judgment was entered would have been premature and a waste of judicial resources. *See id.; see also Sierra Club*, 18 F.3d at 1206.

Second, none of the existing parties to this action are prejudiced by the timing of Doe's intervention. *See Lease Oil*, 570 F.3d at 248; *see also Sierra Club*, 18 F.3d at 1206 ("prejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation."). There is no prejudice to the existing parties because dispositive motions have not yet been heard and no additional discovery or delay should take place if Doe is rightfully permitted to intervene.

Third, Doe will suffer incredible prejudice if she is denied her right to intervention.  If Doe is denied intervention and Century succeeds in avoiding or excluding coverage under the policy it issued to Pastazios, Doe is unlikely to recover any of the money damages awarded to her in the Final Judgment. The Fifth Circuit has found prejudice under such circumstances. *Gaines v. Dixie Carriers, Inc.*, 434 F.2d 52, 54 (5th Cir.1970); *see also United States v. Eastern Transmission Corp.*, 923 F.2d 410 (5th Cir.1991). Doe has the highest stake in the outcome of the claims and counterclaims asserted in this action and a legal right to protect those interests by directly participating in this case. Failure to grant intervention would relegate Doe's status to sitting on the sidelines while other parties litigate their own interests which will necessarily

---

impact Doe's interests. Finally, there are no "unusual circumstances" which suggest that this Unopposed Motion is untimely. Upon the Final Judgment being entered, Doe promptly moved to intervene without delay or prejudice to the existing parties.  As such, Doe's intervention is timely and should be granted.

**2.     Doe Has a Significant Legally Protectable Interest in the Subject of this Litigation.**

A party seeking to intervene in an existing lawsuit must demonstrate a direct, substantial and legally protectable interest in the litigation. *In re Lease Oil*, 570 F.3d at 250-51; *Ross*, 426 F.3d at 757. The interest asserted must "be one that the substantive law recognizes as belonging to or being owned by the applicant." *Edwards*, 78 F.3d at 1004.

Doe now has a direct breach of contract claim against Century, Doe is a judgment creditor of Pastazios, and is also the 99% beneficiary of any and all proceeds awarded against Century for Defendant Pastazios Pizza, Inc. Creditor Trust's counterclaims against Century for breach of contract, bad faith insurance practices, and violations of the Texas Deceptive Trade Practices Act.

Under Texas law, once an injured party obtains a judgment against an insured and the insured has a legal obligation to pay damages to the injured party, the injured party can enforce the insurance policy directly against the insurer.  *Ollis,* 768 S.W.2d at 723 (citing *Murray,* 437 S.W.2d at 265); *see also Rotella v. Mid-Continent Cas. Co.*, 2008 WL 5272787, at *3 (N.D. Tex. Dec. 17, 2008) ("a third party who has obtained a judgment against an insured is an intended third party beneficiary of the insurance contract and is entitled to enforce the contract."); *Certain Underwriters at Lloyds, London v. Four J's Cmty. Living Ctr., Inc.*, 2011 WL 6026689, at *1 (S.D. Tex. Dec. 2, 2011); *Puente v. Chicago Ins. Co.*, 2010 WL 3463253, at *4 (S.D. Tex. Sept. 3, 2010).  Doe now has the legal right to recover the damages awarded in the Final Judgment in

_____

SUPP APP 0865

the Underlying Litigation from Century directly through this action. Thus, Doe has a significant threat of economic injury from the outcome of this action, giving her the requisite interest under Rule 24(a). *Symetra Life Ins. Co. v. Rapid Settlements Ltd.*, 2006 WL 2382250, at *4 (S.D. Tex. Aug. 16, 2006). Because Doe has a direct, substantial, and legally protectable interest in this action, she has the legal right to intervene.

For the avoidance of doubt, Doe is not at this time seeking to recover directly against Century, instead relying on her right to be paid as a creditor of the Pastazios Pizza, Inc. Creditor Trust. Doe reserves her right to seek additional relief, including direct relief against Century, by separate motion or complaint.

### 3.   An Adverse Decision Would Impair Doe's Interests.

Rule 24(a) requires that an applicant for intervention of right be "so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest." FED. R. CIV. P. 24(a). The Fifth Circuit has consistently held that if a court's ruling *may* adversely impact an intervenor's interest, the third requirement is satisfied. *Edwards,* 78 F.3d at 1004–05; *Espy,* 18 F.3d at 1207; *Ceres Gulf v. Cooper,* 957 F.2d 1199, 1204 (5th Cir. 1992). Rule 24(a) does not require that the intervenor's interests be legally impaired; it is enough that the applicant's ability to protect its interests *may* be impaired as a practical matter. *One Beacon Ins. Co. v. T. Wade Welch & Associates*, 2012 WL 1231750, at *5 (S.D. Tex. 2012).

If Doe is denied her right to intervene, Doe would be denied the right to protect her legally recognized interests and/or forced to file a separate lawsuit against Century for breach of contract. Without the ability to legally protect her own interests, Doe would effectively be denied of her due process rights and would be relegated to having to sit back and watch as other parties control the outcome of her legally protected interests. Precluding Doe from intervening in this case *will* severely impair and impact her legal interests. Thus, this Motion should be granted.

_____

SUPP APP 0866

### 4.       Doe's Interests May Not Be Adequately Represented by Defendants.

Doe satisfies the final element for intervention because Defendants may not adequately represent her interests depending on the future conduct of this litigation and any negotiations related thereto.   "The requirement of the Rule is satisfied if the applicant shows that representation of his [or her] interest 'may be' inadequate; and the burden of making that showing should be treated as minimal." *Trbovich v. United Mine Workers of Am.,* 404 U.S. 528, 538 n. 10, (1972) (citing 3B J. Moore, Federal Practice 24.09–1(4) (1969)). Doe's interests in this action are far superior to Defendants.  Although all of the Defendants seek a finding that Doe's Final Judgment is covered by the liability policy issued by Century, Doe has much more at stake in this action, at least $21,911,141 more.  Doe also has far superior knowledge of the relevant facts and evidence that support the Final Judgment and Findings of Fact and Conclusions of Law than does counsel for Defendants in this action.  Counsel for Doe handled the Underlying Litigation for over two years, developed all of the evidence, and tried the case to final judgment. Doe is entitled to have counsel of her choosing, and the ones most knowledgeable about the underlying facts participate in this litigation to protect her legally recognized interests in the outcome of this litigation. Notably, none of the other parties to this case disagree. Thus, Doe should be permitted to intervene as a matter of right.

## B.       IN THE ALTERNATIVE, DOE SHOULD BE PERMITTED TO INTERVENE PERMISSIVELY.

Rule 24(b)(2) permits intervention upon a timely motion when an applicant "has a claim or defense that shares with the main action a common question of law or fact."  FED. R. CIV. P. 24(b)(2). "[P]ermissive intervention is within a district court's discretion," *Newby v. Enron Corp.,* 443 F.3d 416, 424 (5th Cir. 2006), and is "only subject to reversal if extraordinary circumstances so require," *Trans Chem. Ltd. v. China Nat'l Mach. Import and Export Corp.,* 332

---

SUPP APP 0867

F.3d 815, 822 (5th Cir. 2003).  Permission intervention should be allowed "where no one would be hurt and greater justice could be attained."  *Sierra Club,* 18 F.3d at 1205 (quoting *McDonald v. E.J. Lavino Co.,* 430 F.2d 1065, 1074 (5th Cir. 1970).

It is also proper to consider whether the intervenor will significantly contribute to the full development of the underlying factual issues in the suit. *First Mercury Ins. Co. v. Rosenboom Welding & Fabrication, L.L.C.*, 2013 WL 4804494, at *2 (N.D. Tex. Sept. 9, 2013).

In *Lincoln Gen. Ins. Co. v. Aisha's Learning Ctr.*, the court examined whether an intervenor's claim or defense shared common questions of law or fact with the main action. 2004 WL 2533575, at *4 (N.D. Tex. Nov. 9, 2004).  The main action centered around whether the insurance company was obligated to provide coverage under its insurance policy to its insured.  *Id.*  In the complaint to intervene, the movant sought a declaration that the insurance company was "solely responsible for providing a defense and indemnification" for its insured, and that any loss by the insured at the expense of the movant is covered under the insurance policy.  *Id.*  The court found that both the intervenor's claims shared nearly identical questions of law or fact to the main action, and granted permissive intervention.  *Id.* The Court should likewise do so here.

### III.
#### CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Jane Doe respectfully requests that the Court grant her Unopposed Motion to intervene as of right pursuant to Rule 24(a), or in the alternative, permissively intervene pursuant to Rule 24(b), whereby Jane Doe seeks to join in Defendant Pastazios Pizza, Inc. Creditor Trust's pleadings in defense of Century's declaratory judgment action, as well as join in Defendant Pastazios Pizza, Inc. Creditor Trust's counterclaims against Century. Upon the granting of this Unopposed Motion, Doe will file its

---

SUPP APP 0868

direct claim against Century for breach of contract within ten (10) days of the Order being signed by this Court. Jane Doe also seeks any and all other and further relief, both at law or in equity, to which she may show herself to be justly entitled.

Respectfully submitted,

 /s/ *Trey H. Crawford*

| | |
|---|---|
| **ROYCE WEST** | **G. MICHAEL GRUBER** |
| State Bar No. 21206800 | State Bar No. 08555400 |
| royce.w@westllp.com | mgruber@ghetrial.com |
| **VERETTA FRAZIER** | **TREY CRAWFORD** |
| State Bar No. 00793264 | State Bar No. 24059623 |
| veretta.f@westllp.com | tcrawford@ghetrial.com |
| **WEST & ASSOCIATES, L.L.P.** | **BRIAN E. MASON** |
| P.O. Box 3960 | State Bar No. 24079906 |
| Dallas, Texas 75208-1260 | bmason@ghetrial.com |
| Ofc.:   (214) 941-1881 | **GRUBER HURST ELROD JOHANSEN HAIL** |
| Fax:    (214) 941-1399 | **SHANK LLP** |
| | 1445 Ross Avenue, Suite 2500 |
| | Dallas, Texas 75202 |
| | 214.855.6800 (main) |
| | 214.855.6808 (facsimile) |

**ATTORNEYS FOR INTERVENOR JANE DOE**

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that he has conferred with all parties of record concerning the relief sought in this motion and that no parties are opposed to the relief requested.

 /s/ *Trey H. Crawford*
**TREY H. CRAWFORD**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all counsel of record through ECF in accordance with the Federal Rules of Civil Procedure on this the 25th day of August, 2015.

 /s/ *Trey H. Crawford*
**TREY H. CRAWFORD**

---

**JANE DOE'S MOTION TO INTERVENE** **PAGE 10**

# Exhibit 5

SUPP APP 0870

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CENTURY SURETY COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| AJREDIN "DANNY" DEARI; | § | |
| DRITAN KREKA; PASTAZIOS | § | |
| PIZZA, INC. CREDITOR TRUST; and | § | |
| POST PROPERTIES, INC. | § | CASE NO. 3:13-cv-2553 |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| JANE DOE, | § | |
| | § | |
| Intervenor. | § | |

## PASTAZIOS PIZZA, INC. CREDITOR TRUST'S AMENDED COUNTERCLAIMS

TO THE HONORABLE JORGE A. SOLIS, UNITED STATES DISTRICT COURT JUDGE:

COMES NOW, Scott M. Seidel, as trustee (the "Trustee") for the Pastazios Pizza, Inc. Creditor Trust (the "Trust"), and files this the *Pastazios Pizza, Inc. Creditor Trust's Amended Counterclaims*, and in support thereof respectfully states as follows:

### I.    PARTIES

1.    Plaintiff Century Surety Company ("Century") filed this lawsuit and has appeared through counsel of record.  Century is a corporation organized under the laws of the State of Ohio with its principal place of business in the State of Michigan.

2.    The Trust is the successor in interest to Pastazios Pizza, Inc. ("PPI") in all respects to this litigation and the insurance policy at issue herein pursuant to that certain *First Amended Plan of Reorganization Dated February 2015* and the *Order Confirming Debtor's First Amended Plan of Reorganization Dated February 11, 2015*, as filed and entered in the

SUPP APP 0871

Bankruptcy Case (defined below). Pursuant to the same, the trustee for the Trust is Scott M. Seidel. Pursuant to this Court's June 15, 2015 Order,[1] the Trust is substituted for PPI in all respects. PPI is a Texas corporation.

3.  On August 25, 2015, Jane Doe filed an *Unopposed Motion to Intervene* [Doc. 50] in this lawsuit and has appeared through counsel. The Court granted Jane Doe's *Unopposed Motion to Intervene* on August 26, 2015 [Doc. 52]. Jane Doe is a citizen of the State of Texas.

## II.  JURISDICTION AND VENUE

4.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity and the amount in controversy exceeds the jurisdictional minimum. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2).

## III.  FACTUAL BACKGROUND

### A.  JANE DOE SUES PPI, ALLEGING GENERAL NEGLIGENCE, DRAM SHOP, PREMISES LIABILITY, AND FALSE IMPRISONMENT CAUSES OF ACTION

5.  This liability insurance dispute concerns a lawsuit (the "Doe Suit") filed by Jane Doe, an eighteen year old recent high-school valedictorian when the events made the basis of the underlying liability suit occurred.

6.  In the Doe Suit, Doe alleged that, on the afternoon of April 26, 2011, after working the lunch shift at the Fox Sports Grill, she met Dritan Kreka at Back Nine Bar and Grill to discuss potential job opportunities at his restaurant and bar. When she arrived at Back Nine, Doe was introduced to Danny Deari ("Deari"), who was the owner of another restaurant—PPI—located in Post Addison Circle. At the time, Deari was 49 years old and Kreka was 33 years old. Deari and Kreka started consuming alcohol at Back Nine bar, and attempted to

---

[1] *See* docket entry 39.

order Doe an alcoholic drink. After the Back Nine server asked Doe for identification, Doe informed the server she did have not her identification and asked for a Dr. Pepper. Deari and Kreka convinced Doe that the three of them should move the conversation to the pizza restaurant operated by PPI in Addison Circle. At no point in time on April 26, 2011 was Doe interviewing for or seeking a job at PPI.

7.      Deari and Kreka convinced Doe to drive to PPI. Deari, on his drive to PPI, stopped at a liquor store to purchase a bottle of 80-proof Crown Royal Black and took it with him and brought it into PPI.

8.      Shortly thereafter, Doe entered onto PPI's premises in Addison Circle as an invitee of PPI. Upon arriving at PPI at approximately 4:30 p.m., and without Doe asking, Deari walked inside of PPI, grabbed three beers and three shots of Crown Royal Black that had been placed into 2-ounce plastic salad dressing cups owned by PPI, placed one of the beers and one of the 2-ounce shots in front of Doe, and encouraged her to drink it. There were no customers present that afternoon other than Kreka, Doe and Deari. PPI's manager was on duty.

9.      Prior to that day, Doe had very little experience concerning the effects of alcohol. At no point in time did anyone at PPI ask to see Doe's identification prior to providing her with PPI's alcoholic products. Throughout the course of approximately the next two hours, PPI continued to provide Doe with more alcoholic products from PPI.  After serving Doe with her second beer from PPI and third 2-ounce shot of Crown Royal Black, Doe became obviously intoxicated to the point where she had trouble standing. As her condition visibly deteriorated, PPI failed to "cut off" service. In total, Doe was provided with at least five 2-ounce shots of Crown Royal Black and three beers.

10.     While still at PPI, Doe expressed concerns about her growing level of intoxication and her inability to function normally. Prior to leaving PPI, Doe was intoxicated to the point where she was incapable of caring for or defending herself. Deari then retrieved his vehicle from PPI's parking lot and pulled it out in front of PPI. Kreka moved into the driver's seat and the two men put Doe in the back seat of the vehicle. While this was taking place, and even though Doe's level of intoxication was open and obvious, PPI's employees did nothing to protect Doe from unreasonable and foreseeable risks of harm. Doe lost consciousness shortly thereafter.

11.     When Doe regained consciousness she was in a hotel room located at 4900 Edwin Lewis Drive, Addison, Texas 75001 (less than a mile from PPI) wherein she had been involuntarily disrobed and was actively being sexually assaulted by Deari. Doe repeatedly insisted that Deari stop the attack and get off of her, but he did not.  Deari stopped the sexual assault after multiple demands made by Doe.  Doe locked herself in the bathroom. Deari then left the hotel, leaving his underwear behind at the scene.

12.     On April 24, 2013, and based on the facts above, Doe initiated the Doe Suit by filing her petition in the 193rd Judicial District Court for Dallas County, Texas (the "State Court"), alleging that PPI breached its legal duties toward Doe as an invitee, that PPI falsely imprisoned Doe, and that PPI served alcohol to Doe in violation of the Dram Shop Act when Doe was visibly and obviously intoxicated to the point where she was a danger to herself or others, causing her serious bodily injury. Doe further alleged that PPI was negligent in various respects recognized under Texas law. Doe alleged that PPI's acts and omissions were a proximate cause of her bodily injuries.

SUPP APP 0874

**B.**       **THE POLICY, TENDERS OF DOE'S PETITIONS, AND STOWERS SETTLEMENT OFFERS**

13.       At all relevant times to this action, "Pastazios Pizza, Inc." was the named insured under a surplus lines policy of liability insurance issued by Century and assigned number CCP 672836, effective from September 21, 2010 to September 21, 2011 (the "Policy").

14.       A true and correct copy of the Policy is attached hereto and incorporated herein as Exhibit "A".

15.       Throughout the pendency of the Doe Suit, at least three of Doe's petitions (the *Original, First Amended,* and *Fourth Amended* petitions) were tendered to Century with a request for defense under the Policy.  Said original, first amended, and fourth amended petitions are attached hereto and incorporated herein as Exhibits "B" through "D," respectively.

16.       On May 24, 2013, Century acknowledged PPI's claim regarding the Doe Suit and Doe's *Original Petition*.  A true and correct copy of the May 24, 2013 letter is attached hereto and incorporated herein as Exhibit "E".

17.       On May 24, 2013, by letter, Century informed PPI that, pursuant to a full reservation of rights, the Dallas law firm of Stacy & Condor, LLP would be defending PPI in the Doe Suit.  Despite the fact that the reservation revealed a disqualifying conflict of interest, Century did not offer a defense through independent counsel or reveal that the insured had a right to such a defense.  Upon information and belief, Century violated the *Tilley*[2] rights of PPI and the Trust because Century unduly influenced and guided the firm retained to defend PPI under the Policy to make discovery responses that were beneficial to Century's position concerning coverage and detrimental to the defense of PPI.  Specifically, said prior counsel responded to a

---

[2] *See Employers Cas. Co. v. Tilley*, 496 S.W.2d 552 (Tex. 1973).

PASTAZIOS PIZZA, INC. CREDITOR TRUST'S AMENDED COUNTERCLAIMS —Page 5

discovery request from Doe seeking the legal theories of PPI's defense by stating only that PPI denies that the incident and/or injuries in question was the result of any negligence by PPI.

18.     On July 2, 2013, thirty-nine days later, Century filed this lawsuit against PPI, seeking a declaration that Century owed no duty to defend or indemnify PPI.

19.     On July 8, 2013, six days after suing its insured, Century wrote to PPI. There, Century asserted that it had no duty to defend or indemnify PPI in the Doe Suit which was still pending and had not yet been tried in State Court.

20.     On July 29, 2013, Doe sent Century a settlement offer pursuant to *Stowers*.[3]

21.     On August 15, 2013, Century rejected the offer.

22.     On February 27, 2014, Doe sent Century a second settlement offer pursuant to *Stowers*.

23.     Century failed to respond to this offer and it expired according to its terms.

24.     On June 11, 2015, Doe sent the Trust a settlement offer pursuant to *Stowers*, which the Trust forwarded to Century on June 17, 2015, with a demand that Century accept the offer. A true and correct copy of the June 11, 2015 settlement offer is attached hereto and incorporated herein as Exhibit "F".

25.     Century rejected the settlement offer on June 23, 2015.

C.     **CENTURY FORCES PPI INTO BANKRUPTCY**

26.     Following Century's July 8, 2013 letter stating that Century has no duty to provide PPI with a defense or indemnity for the Doe Suit pursuant to the issues raised in Century's recently filed declaratory judgment action and in Century's May 24, 2013 letter, PPI hired counsel in the Doe Suit and in this lawsuit.

---

[3]     "*Stowers*" referring to *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 544 (Tex. Com. App. 1929), and the doctrine recognized therein.

---

PASTAZIOS PIZZA, INC. CREDITOR TRUST'S AMENDED COUNTERCLAIMS —Page 6

27.     PPI's counsel defended PPI at each stage of the Doe Suit until the involvement of the Trust.  PPI's counsel served and responded to written discovery, attended depositions, filed motions and responses on PPI's behalf, designated experts, and participated in hearings all throughout the pendency of the Doe Suit, at PPI's own expense.

28.     On September 2, 2014, with the mounting burden of financing its own defense—in light of Century's refusal to provide a defense to PPI in the Doe Suit—and with the prospect of a large judgment against PPI in the near future for which Century prematurely announced it would refuse to indemnify PPI—PPI filed a voluntary petition for relief pursuant to Chapter 11 of Title 11, United States Code. That filing was assigned Case No. 13-32423 (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Northern District of Texas before the Honorable United States Bankruptcy Judge Harlin D. Hale (the "Bankruptcy Court").

29.     As a corporation, PPI filed and prosecuted its bankruptcy case through counsel, adding another layer of legal expenses.

**D.     CENTURY PARTICIPATES IN THE BANKRUPTCY CASE**

30.     On January 28, 2015, Century filed its *Notice of Appearance and Request for Notices* in the Bankruptcy Case.

31.     On February 11, 2015, PPI filed its *First Amended Plan of Reorganization Dated February 11, 2015* (the "Plan") and its *First Amended Disclosure Statement Dated February 11, 2015* in the Bankruptcy Case.

32.     Century did not object to the Plan.

33.     On March 5, 2015, Century filed its *Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d)* in the Bankruptcy Case, seeking relief from the automatic stay to permit the continuation of this litigation.  In its motion, Century stated that "all parties to this proceeding will benefit from an expedient determination as to the applicability of coverage,

SUPP APP 0877

which the Debtor presupposes as part of its First Amended Disclosure Statement Dated February 11, 2015" and that ". . . the determination of applicability of coverage under the Policy is in the best interest of the Debtor and its creditors to obtain clarity as to its potential sources of funds…"

34.     On March 30, 2015, the Bankruptcy Court held a hearing on Century's motion for relief from the stay and on confirmation of PPI's Plan.  Century appeared at, and participated in, the hearings.  After being given an opportunity to object and be heard, Century asserted no objections to the Plan.

35.     On March 31, 2015, the Bankruptcy Court entered its *Agreed Order* on Century's motion for relief from the stay, ordering that the automatic stay be modified as to the earlier of thirty days following the entry of an order confirming the Plan or May 14, 2015.

36.     On April 2, 2015, the Bankruptcy Court entered its *Order Confirming Debtor's First Amended Plan of Reorganization Dated February 11, 2015* (the "Confirmation Order"), whereby the Plan was confirmed.

37.     Pursuant to the Plan and the Confirmation Order, the Trust was created and the Trustee was appointed as the trustee of the Trust.

38.     Article IX of the Plan provided that all causes of action, including any of PPI's rights and causes of action related to the Policy, are preserved and retained for enforcement by the Trustee for the benefit of creditors.  Therefore, the Trust owns all rights under or related to the Policy, all rights related to this litigation, and the Counterclaims asserted herein and all rights related thereto.

E.     **TRIAL OF THE DOE SUIT**

39.     Following his appointment, the Trustee promptly retained counsel in the Doe Suit to defend PPI.

SUPP APP 0878

40.     On June 17, 2015 the Trustee forwarded to Century the above described settlement offer pursuant to *Stowers* received by the Trustee from Doe, and urged Century to accept the offer.

41.     The Trust also requested a defense and indemnity in light of Doe's *Fourth Amended Petition* dated June 5, 2015.

42.     Century denied the settlement offer.

43.     Century denied that it had a duty to defend or indemnify.

44.     On July 7, 2015, the State Court called the Doe Suit to trial to the bench.  All parties to the Doe Suit, including PPI, appeared through their respective attorneys of record.  On July 7, 2010, Doe began her case in chief, introduced and admitted evidence to the Court, and called various witnesses to testify.

45.     PPI and Deari vigorously defended the claims brought by Doe against each defendant, respectively, presented counter-evidence, and cross examined witnesses.  On July 9, 2015, after a three-day adversarial trial, all parties rested, the evidence was closed, and closing arguments were presented by all parties.  At the close of the evidence and after closing arguments, Doe's claims against PPI and Deari, respectively, as well as PPI and Deari's affirmative defenses were submitted to the Court for final determination based on the evidence.

46.     On July 9, 2015, after a three-day adversarial trial, the State Court rendered judgment in favor of Doe against PPI and Deari on all causes of action.

47.     The State Court awarded Doe actual damages and prejudgment interest totaling $16,911,350.42, plus post-judgment interest and court costs, jointly and severally against PPI and Deari for each and every cause of action alleged by Doe (general negligence, dram shop liability, and premises liability against PPI).  The State Court also rendered judgment against PPI

for $2,500,000 as exemplary damages. A true and correct copy of the *Final Judgment* is attached hereto and incorporated herein as Exhibit "G".

48. On August 7, 2015, the State Court entered its *Findings of Fact and Conclusions of Law*, a true and correct copy of which is attached hereto and incorporated herein as Exhibit "H".

49. The State Court's judgment and findings of fact and conclusions of law constitute collateral estoppel and *res judicata* as to the underlying facts that occurred with respect to the injuries and damages suffered by Doe, the negligence of PPI, proximate cause between that negligence and Doe's injuries, new and superseding cause, and all other underlying facts necessary to determine the scope of the Policy with respect to the Doe Suit.

## IV.   CAUSES OF ACTION

### COUNT 1 - BREACH OF CONTRACT

50. The foregoing allegations are incorporated herein by reference.

51. The Trust seeks damages based on Century's breach of the Policy.

52. Century agreed to insure PPI against loss or damage caused by a covered peril arising out of PPI's business.

53. The plain language of the Policy provides coverage for the Doe Suit and the judgment.

54. In the alternative, the Policy is ambiguous and must be construed in the light most favorable to the insured and finding a duty to defend and/or to indemnify.

55. Accordingly, Century has breached the contract by repeatedly denying a duty to defend and/or indemnify.

56. The facts asserted in the Doe Suit were alleged to have transpired while the Policy was in effect.

SUPP APP 0880

57.     The facts alleged in the Doe Suit fell within Century's duty to defend PPI and the Trust.  Among other things Doe alleged that she suffered bodily injury because (i) PPI continued to serve Doe alcohol when she was obviously intoxicated; (ii) PPI did nothing to ensure Doe's safety; and (iii) Doe was not free to leave of her own volition due to being intoxicated.

58.     The facts as conclusively determined by the State Court confirm that the Doe Suit at all times fell within Century's duty to defend PPI and the Trust.

59.     The facts as conclusively determined by the State Court fell within Century's duty to indemnify PPI and the Trust, including for the amounts awarded to Doe by the State Court.  Among other things, the State Court found that:

    (i)     Doe was an invitee of PPI;

    (ii)    PPI did not ask to see Doe's identification;

    (iii)   PPI provided Doe with alcoholic beverages;

    (iv)    Doe became obviously intoxicated;

    (v)     Prior to leaving PPI, Doe was intoxicated to the point where she was incapable of caring for or defending herself;

    (vi)    Doe was raped shortly after leaving PPI's premises; and

    (vii)   Deari's acts did not act as a new and superseding cause.

60.     The State Court held PPI liable for general negligence, dram shop liability, premises liability, and false imprisonment as further described in its findings of fact and conclusions of law.

61.     As to each of these theories of liability, the State Court judicially determined that PPI's actions and/or inactions were a proximate cause of Doe's bodily injuries and that, but-for PPI's actions and/or inactions, Doe never would have suffered the resulting serious bodily injury.  The State Court judicially determined that PPI's actions, inactions, or omissions were a

substantial factor in causing Plaintiff's damages and bodily injuries, without which Doe would not have suffered any damage. The State Court judicially determined that PPI was independently liable for all damages awarded to Doe for each cause of action Doe asserted against PPI. The State Court judicially determined that any alleged intentional or negligent acts of any other person that may have caused or contributed to Doe's injuries did not act to extinguish PPI's liability, did not constitute "outside agency", and are not a new and independent cause that would extinguish PPI's liability to Doe. The State Court also judicially determined that any purported acts or intervening forces PPI alleged to have been a "new and independent cause" were foreseeable to PPI.

62.     Century is estopped from challenging the State Court's findings of fact and conclusions of law.

63.     PPI timely notified Century of the claims asserted against it.

64.     The Trust timely notified Century of the claims asserted against it.

65.     PPI and the Trust suffered monetary damages as a result of Century's breach. Among other things, the failure by Century to honor its duty to defend PPI forced PPI to incur substantial attorney's fees and, when it could no longer pay the same, to file for bankruptcy. All of the fees and costs thereof are damages caused by Century. Both PPI and the Trust have had to incur substantial attorney's fees as a result of Century's failure to defend, and then additionally to defend against this litigation. Finally, both PPI and the Trust are now liable to Doe for the amount of the State Court judgment, for which Century is liable and which, but for Century's wrongful actions and breaches in refusing reasonable settlement offers, would not have been nearly as large as it now is.

SUPP APP 0882

66.     At all relevant times, PPI and the Trust performed all  obligations and conditions under the Policy, the performance of all such obligations and conditions has been excused, or Century is estopped to assert the performance of such obligations and conditions due to, among other things, its breach of the Policy and breach of duties owed to PPI and the Trust as its insureds.

67.     Because of Century's ineffective and wrongful reservation of rights letter and/or its violations of the Texas Insurance Code regarding the timely denial of claims, Century is estopped from asserting its policy defenses.

68.     The Trust seeks its reasonably attorney's fees pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq*.

69.     Accordingly, the Trustee seeks judgment against Century for its breaches of contract in an amount to be proven at trial, but including all of PPI's and the Trust's reasonable attorney's fees incurred in this litigation, the State Court litigation, and the Bankruptcy Case, and further including the amount of the Doe judgment, and further including the amount that is owing to creditors in the Bankruptcy Case.

**COUNT 2 -  VIOLATION OF THE PROMPT PAYMENT OF CLAIMS PROVISION IN CHAPTER 542 OF THE TEXAS INSURANCE CODE**

70.     The foregoing allegations are incorporated herein by reference.

71.     Defense costs are a "first-party" insurance claim.

72.     Century's failure to fund PPI and the Trust for their defense costs in the Doe Suit violates the Prompt Payment of Claims provisions in Chapter 542 of the Texas Insurance Code. *See* TEX. INS. CODE § 542.051 et seq.

73.     As a consequence of its statutory violation, Century is liable to pay the Trust, in addition to the amount of the defense costs asserted, interest on the amount of said claim at the

SUPP APP 0883

rate of 18 percent per annum, together with reasonable attorney fees, for which amounts the Trust hereby sues. *See* TEX. INS. CODE § 542.060.

74.     Because of Century's ineffective and wrongful reservation of rights letter and/or its violations of the Texas Insurance Code regarding the timely denial of claims, Century is estopped from asserting its policy defenses.

**COUNT 3 - VIOLATIONS OF CHAPTER 542 OF THE TEXAS INSURANCE CODE**

75.     The foregoing allegations are incorporated herein by reference.

76.     Century violated TEX. INS. CODE § 542.055 which provides that, not later than the 30th business day after the date an insurer receives notice of a claim, the insurer shall acknowledge receipt of the claim; commence any investigation of the claim; and request from the claimant all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant.

77.     Century failed to investigate the claim related to, or acknowledge receipt of, Doe's *Fourth Amended Petition* or the final judgment in the Doe Suit and/or failed to request from the Trust within a reasonable and timely fashion items, statements, or forms. Century never engaged in a full and unbiased investigation which would have made coverage reasonably clear. Rather, after its initial reservation of rights letter, Century thereafter relied only on its original complaint filed herein, which asserts coverage positions that are directly in opposition to the May 24, 2013 reservation of rights letter. Any investigation Century conducted was outcome-oriented and self-serving.

78.     Century violated TEX. INS. CODE § 542.056 which provides that an insurer shall notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss, and that if the insurer rejects the claim, the notice must state

PASTAZIOS PIZZA, INC. CREDITOR TRUST'S AMENDED COUNTERCLAIMS —Page 14

SUPP APP 0884

the reasons for the rejection.  Century never engaged in a full and unbiased investigation which would have made coverage reasonably clear.  Rather, after its initial reservation of rights letter, Century thereafter relied only on its original complaint filed herein, which asserts coverage positions that are directly in opposition to the May 24, 2013 reservation of rights letter.  Any investigation Century conducted was outcome-oriented and self-serving.

79.      Century failed to accept or reject the Trust's claim in relation to the Doe Suit within 15 business days after the Trust provided Century with the *Fourth Amended Petition*.

80.      Century failed to accept or reject the Trust's claim in relation to the Doe Suit judgment within 15 business days after the Trust provided Century with the final judgment in the Doe Suit.

81.      Century violated TEX. INS. CODE § 542.056 which provides that an insurer, after receiving all items, statements, and forms reasonably requested and required delays payment of the claim for a period exceeding the period specified by other applicable statutes, or, if other statutes do not specify a period, for more than 60 days, the insurer shall pay damages and other items as provided by Section 542.060.

82.      Century failed to make any payments due under the Policy and, moreover, anticipatorily breached all duties under the Policy and announced that it would make no payments under the Policy.  As a result of Century's failure to make payments in a timely manner, PPI and the Trust were prejudiced and damaged.  PPI and the Trust were left to defend the Doe Suit.  Century's withdrawal of the defense, refusal to settle the Doe Suit, and its refusal to indemnify PPI forced PPI to file its bankruptcy case.

83.      Century delayed payment of the claim for a period exceeding 60 days after receiving all items, statements, and forms reasonably requested and required.

---

SUPP APP 0885

84. The wrongful denial of PPI and the Trust's request for a defense in the Doe Suit is a delay in payment.

85. The wrongful refusal to indemnify the Trust for the Doe judgment is a delay in payment.

86. As a consequence of its statutory violations, Century is liable to pay the Trust, in addition to the amount of the defense costs asserted, interest on the amount of said claim at the rate of 18 percent per annum, together with reasonable attorney's fees, for which amounts the Trust hereby sues. *See* TEX. INS. CODE § 542.060.

87. Because of Century's ineffective and wrongful reservation of rights letter and/or its violations of the Texas Insurance Code regarding the timely denial of claims, Century is estopped from asserting its policy defenses.

**COUNT 4 - VIOLATIONS OF CHAPTER 541 OF THE TEXAS INSURANCE CODE**

88. The foregoing allegations are incorporated herein by reference.

89. PPI, the Trust, and Century are "persons" as defined by TEX. INS. CODE § 541.002(2).

90. Century violated TEX. INS. CODE § 541.051(1)(a)–(b), (4) which provides that it is an unfair or deceptive act or practice in the business of insurance to make, issue, or circulate a statement misrepresenting with respect to a policy issued the terms of the policy; the benefits or advantages promised by the policy; to use a name or title of a policy that misrepresents the true nature of the policy; and to make a misrepresentation to a policyholder for the purpose of inducing or that tends to induce the policyholder to allow an existing policy to lapse or to forfeit or surrender the policy.

91. Century has made statements misrepresenting the terms of the Policy and the coverage it provides related to the separation-of-insureds clause. In its May 24, 2013 letter,

Century stated that "Century will pay those sums the Insured is held liable for as a result of 'bodily injury' resulting from the Insured's causing or contributing to the intoxication of any person so long as your liquor license was in effect on the date of loss." Each subsequent denial of PPI's and/or the Trust's demands referred to Century's July 2, 2013 declaratory judgment action complaint, where Century stated, "to the extent the Original Petition alleges bodily injury that result from the provision of liquor to the underage Plaintiff . . . the following policy language . . . excludes coverage," and cited the liquor liability coverage form which Century previously stated provided coverage for liquor liability. Century further stated, "the Policy also contains a liquor liability coverage endorsement, Form CLL 1902 0306, that provides that there is no duty to defend or indemnify if the bodily injury is expected or intended from the standpoint of any insured, or if any proximate or contributing cause of an 'occurrence' arises out of 'liquor liability.'" Accordingly Century misrepresented the terms of the Policy and both admitted and denied, without justification, that the Policy was a policy covering liquor liability.

92. The Policy unambiguously covers liquor liability.

93. In its May 24, 2013 letter, Century also misrepresented the terms of the Policy because it stated that, "The Petition alleges that a number of crimes were committed by Mr. Deari and Mr. Kreka and we understand that criminal charges are currently pending against both. As such, Century reserves the right to limit or deny coverage pursuant to this exclusion as well." Century misrepresented the Policy because the Policy contains a separation-of-insureds clause which requires that Century treat PPI and Deari as separate "insureds," Texas law holds that an insurer may not impute intent onto PPI, and that, if Deari was not an "insured" under the Policy, coverage for PPI remained available.

SUPP APP 0887

94.     Lastly, Century misrepresented the Policy because it failed to properly or correctly analyze the coverage provided by the liquor liability endorsement, which provides that if a claim falls within the products-completed operations hazard coverage, then the liquor liability "exclusion" does not apply.

95.     Century made these statements to induce, or these statements tended to induce PPI to forego or forfeit its rights under the Policy.  Century failed to inform PPI that it had a right to independent counsel, that PPI could obtain coverage if Deari were not found to be an "insured," and that PPI had the option to retain its own counsel, among other things.

96.     These violations were a producing cause of actual damages, including but not limited to PPI's costs for counsel to defend it in the Doe Suit, PPI's costs for counsel to defend it in this suit, the Trust's costs for counsel to defend it in the Doe Suit, and all damages, expenses, fees, and costs associated with PPI's bankruptcy case.

97.     Century violated TEX. INS. CODE § 541.060(a)(1), (2), (3), (4), and (7) which provides that it is an unfair or deceptive act or practice in the business of insurance to engage in the following unfair settlement practices with respect to a claim by an insured: misrepresenting to a claimant a material fact or policy provision relating to coverage at issue; failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear; failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement of a claim; and failing within a reasonable time to affirm or deny coverage of a claim to a policyholder or submit a reservation of rights to a policyholder.

SUPP APP 0888

98.     As stated above, Century misrepresented to PPI and the Trust the policy provisions relating to the Doe Suit, including representations and statements related to the separation-of-insureds clause, liquor liability coverage, and the products-completed operations hazard coverage and the law related to the same.  Century has failed to attempt in good faith to settle the Doe Suit when PPI's liability became reasonably clear, has failed to provide a reasonable explanation of the basis of its denial, and has failed within a reasonable time to affirm or deny coverage of the Doe Suit in relation to the *Fourth Amended Petition* and the Doe judgment.

99.     These violations were a producing cause of actual damages including but not limited to PPI's costs for counsel to defend it in the Doe Suit, PPI's costs for counsel to defend it in this suit, the Trust's costs for counsel to defend it in the Doe Suit, and all damages, expenses, fees, and costs associated with PPI's bankruptcy case.

100.    Century violated TEX. INS. CODE § 541.061 which provides that it is an unfair or deceptive act or practice in the business of insurance to misrepresent an insurance policy by making an untrue statement of material fact; failing to state a material fact necessary to make other statements made not misleading, considering the circumstances under which the statements were made; making a statement in a manner that would mislead a reasonably prudent person to a false conclusion of a material fact; making a material misstatement of law; and failing to disclose a matter required by law to be disclosed.

101.    Among other things, and as stated above, Century misstated the coverage provided by the Policy as described above, misstated the law applicable to the coverage provided by the Policy as it relates to the Doe Suit, including but not limited to the law in Texas regarding

SUPP APP 0889

separation-of-insureds, and failed to disclose connections between counsel appointed to defend PPI in the Doe Suit and Century.

102.   These violations were a producing cause of actual damages including but not limited to PPI's costs for counsel to defend it in the Doe Suit, PPI's costs for counsel to defend it in this suit, the Trust's costs for counsel to defend it in the Doe Suit, and all damages, expenses, fees, and costs associated with PPI's bankruptcy case.

103.   As a result of said violations, PPI and the Trust are entitled to recover actual damages including the policy limits, all damages associated with the Bankruptcy Case, court costs and reasonable attorney's fees and, because Century knowingly committed these acts complained of, a trebling of the amount of actual damages pursuant to TEX. INS. CODE §§ 541.151–152.

104.   Because of Century's ineffective and wrongful reservation of rights letter and/or its violations of the Texas Insurance Code regarding the timely denial of claims Century is estopped from asserting its policy defenses.

## COUNT 5 – VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES ACT

105.   The foregoing allegations are incorporated herein by reference.

106.   PPI is a consumer under the Texas Business and Commerce Code.

107.   The Trust is a consumer under the Texas Business and Commerce Code.

108.   Century violated TEX. BUS. COMM. CODE §17.46(b) because it engaged in one or more acts or practices which violate TEX. INS. CODE §§ 541.001, *et seq.*, as stated above.  PPI and the Trust's claims against Century under TEX. INS. CODE §§ 541.001, *et seq.*, as set out above are actionable under TEX. BUS. COMM. CODE §17.50(a)(4).

SUPP APP 0890

109.    PPI and the Trust relied on Century's acts and practices to their detriment because each relied on the Policy to provide a defense and indemnity in relation to the Doe Suit. Additionally, Century's acts and practices caused PPI not to tender amended petition in the Doe Suit.

110.    Century's acts and practices were a producing cause of damages to PPI and the Trust, and the Trust is entitled to economic damages, including but not limited to PPI's and the Trust's benefit of the bargain, lost profits, and costs of mitigation, and actual damages including but not limited to the policy limits, and all damages associated with the Bankruptcy Case, together with court costs and reasonable attorney's fees incurred herein.

111.    Because Century acted knowingly, PPI and the Trust are entitled to additional damages pursuant to TEX. BUS. COMM. CODE § 17.50(b)(1).

112.    Because Century acted knowingly, PPI and the Trust are entitled to an additional three times their economic damages.  TEX. BUS. COMM. CODE § 17.50(b)(1).

113.    The Trust seeks its court costs and pre- and post-judgment interest hereon.  TEX. BUS. COMM. CODE § 17.50(d), (f).

114.    Because of Century's ineffective and wrongful reservation of rights letter and/or its violations of the Texas Insurance Code regarding the timely denial of claims, Century is estopped from asserting its policy defenses.

**COUNT 6 – VIOLATIONS OF CHAPTER 981 OF THE TEXAS INSURANCE CODE**

115.    The foregoing allegations are incorporated herein by reference.

116.    Chapter 981 of the Texas Insurance Code regulates surplus lines insurers and surplus lines agents.

117.    The Policy is a surplus lines insurance policy.

SUPP APP 0891

118.    Pursuant to TEX. INS. CODE § 101.201, an insurance contract effective in this state and entered into by an unauthorized insurer is unenforceable by the insurer. Any person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss.

119.    Pursuant to TEX. INS. CODE § 981.004, an eligible surplus lines insurer may provide surplus lines insurance only if the full amount of required insurance cannot be obtained, after a diligent effort, from an insurer authorized to write and actually writing that kind and class of insurance in this state, the insurance is placed through a surplus lines agent, and the insurer meets the eligibility requirements of subchapter B of chapter 981 as of the inception date and annual anniversary date of each insurance contract. An eligible surplus lines insurer may provide surplus lines insurance only in the amount that exceeds the amount of insurance obtainable form authorized insurers.

120.    Pursuant to TEX. INS. CODE § 981.005, unless a material and intentional violation of chapter 981 or 225 exists, an insurance contract obtained from an eligible surplus lines insurer is valid and enforceable as to all parties and recognized in the same manner as a comparable contract issued by an authorized insurer. A material and intentional violation of chapter 981 or chapter 225 does not preclude the insured from enforcing the insured's right under the contract.

121.    Upon information and belief, PPI hired, retained, and/or used the Hutson Group and/or RISC, Inc. to produce insurance for PPI. Upon information and belief, the Hutson Group and/or RISC, Inc. failed to use diligent efforts to obtain the full amount of insurance from an insurer authorized to write, and actually writing, that kind and class of insurance in the State of Texas.

SUPP APP 0892

122.    Upon information and belief, as inducement to PPI purchasing the Policy and paying premiums, including a premium for liquor liability, the Policy was represented to include liquor liability coverage for PPI.  Upon information and belief, PPI completed application forms specifically requesting liquor liability coverage.

123.    Because, upon information and belief, the Hutson Group and/or RISC, Inc. failed to use diligent efforts as described above, which is a material and intentional violation of Chapter 981 of the Texas Insurance Code, Century is prohibited from alleging a defense under the Policy to the claims asserted by the Trust herein.

124.    Century violated TEX. INS. CODE § 981.102 which provides that a surplus lines insurance policy or contract form may not be used unless use of the form is reasonably necessary for the principal purposes of the insurance coverage.

125.    Century's reservation of rights letter provides that bodily injury arising out of liquor liability is covered by the Policy.  Century's letter revoking the defense it was providing PPI and denying any indemnity does not change that position.  However, Century's declaratory judgment action, which Century subsequently relied on to justify the refusal to defend PPI, states that the Policy does not provide liquor liability.

126.    Upon information and belief, pursuant to Tex. Ins. Code § 981.001 *et seq.*, Century is not an "authorized insurer."

127.    Because of these material and intentional violation of Chapter 981 of the Texas Insurance Code, Century is prohibited from alleging a defense under the Policy to the claims asserted by the Trust herein.

128.    Pursuant to TEX. INS. CODE § 101.202, in an action against an unauthorized insurer or unauthorized person on a contract of insurance issued or delivered in this state to a

SUPP APP 0893

resident of this state or to a corporation authorized to do business in this state, the court may award to the plaintiff a reasonable attorney's fee if the insurer or person failed, for at least 30 days after a demand made before the commencement of the action, to make payment under the contract's terms; and the failure to make the payment was vexatious and without reasonable cause. An insurer's or person's failure to defend an action described is prima facie evidence that the failure to make payment was vexatious and without reasonable cause.

129.    The Trust made demands on Century to make payment under the Policy's terms. Century refused to make such payments. These actions took place more than thirty days before the filing of these counterclaims. Century has failed to defend the Doe Suit, which is prima facie evidence that its failure to make the payments demanded was vexatious and without reasonable cause.

130.    The Trust therefore makes demand for its reasonable attorney's fees in this action against an unauthorized insurer.

## COUNT 7 – BAD FAITH & BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING

131.    The foregoing allegations are incorporated herein by reference.

132.    There was an insurance contract between PPI and Century which created a duty of good faith and fair dealing.

133.    There was an insurance contract between the Trust and Century which created a duty of good faith and fair dealing.

134.    Century breached its duty when it denied payment when liability was reasonably clear. Without investigating, and relying only on its reservation-of-rights letter, Century denied defense and indemnity.

135.    Century violated the *Tilley* rights of PPI and the Trust because Century unduly influenced and guided the firm retained to defend PPI under the Policy to make discovery

SUPP APP 0894

responses that were beneficial to Century's position concerning coverage and detrimental to the defense of PPI.

136.    Century's breach of the duty of good faith and fair dealing proximately caused damages to PPI.  These breaches caused PPI damage as Century withdrew its defense of PPI, leaving PPI and the Trust to defend the case.  Century's withdrawal of the defense, refusal to settle the Doe Suit, and its refusal to indemnify PPI forced PPI to file its bankruptcy case.

137.    Century's  breach of the duty of good faith and fair dealing was grossly negligent. Century briefly defended PPI and, without further investigation or explanation, withdrew the defense and denied indemnity.  Subsequently, Century relied on its complaint filed herein as its reasons for denying a defense and indemnity, wherein Century misrepresents the coverage provided by the Policy. Additionally, Century was grossly negligent in accepting premium in exchange for liquor liability coverage and subsequently denying coverage on the basis that the Policy does not include liquor liability.

138.    Century acted  maliciously.  Century refused to defend or indemnify PPI or the Trust, gambling on any liability as to PPI being outside of the scope of coverage and on pushing PPI into bankruptcy/insolvency to compromise PPI's ability to fight the coverage suit. Additionally, counsel provided by Century to defend PPI provided discovery responses that asserted that PPI only engaged in conduct for which liability in the Doe Suit would not be covered under the Policy.

139.    The Trust is entitled to recover punitive damages.

140.    The Trust also seeks pre-and post-judgment interest and court costs and its attorney's fees incurred herein.

141.    Even if the liability in the Doe Suit had not been covered under the Policy, Century's conduct was extreme and produced damages unrelated to and independent from the claim on the Policy because Century's acts and omissions forced PPI into bankruptcy.

142.    Because of Century's ineffective and wrongful reservation of rights letter and/or its violations of the Texas Insurance Code regarding the timely denial of claims, Century is estopped from asserting its policy defenses.

### COUNT 8 – BREACH OF STOWERS DUTY

143.    The foregoing allegations are incorporated herein by reference.

144.    PPI was an insured under a contract of insurance issued by Century.

145.    Jane Doe asserted a liability claim against PPI that was covered by the Policy.

146.    On or about September 13, 2013, Jane Doe offered to settle the claim against PPI within the limits of the Policy.

147.    On or about February 27, 2014, Jane Doe offered to settle the claim against PPI within the limits of the Policy.

148.    On or about June 11, 2015, Jane Doe offered to settle the claim against the Trust within the limits of the Policy. On June 17, 2015, the Trust forwarded the offer to Century.

149.    Century owed PPI and the Trust a duty to accept reasonable settlement offers within the policy limits. Pursuant to *Stowers*, Doe's offers were reasonable settlement offers within the Policy limits. Among other things, Doe's pleadings alleged claims within the Policy and it was reasonable to foresee that a judgment in the Doe Suit would exceed Policy limits.

150.    Century breached the duty of care to PPI and the Trust by not reasonably evaluating and/or timely accepting the *Stowers* offers.

151.    Century's breach of duty proximately caused the Trust damages.

SUPP APP 0896

152. As a matter of law, the Trust's damages include the amount of the judgment. The judgment amount as to PPI and the Trust is $19,411,141.42 plus pre-judgment interest on the date the Judgment was entered, which judgment amount continues to accrue post-judgment interest, for which the Trust also seeks recovery.

153. Century's breach of duty proximately caused PPI and the Trust damages. Among other things, had Century complied with its obligations by accepting one of these *Stowers* demands, PPI would not have had to file bankruptcy, its creditors would have been paid, and PPI and the Trust would not now be liable for the judgment rendered in the Doe Suit. The liability in the Doe Suit could have been settled for much, much less, and within Policy limits, had Century defended and/or had it acted reasonably in investigating the Doe Suit and reasonably evaluating each and every settlement offer therein.

154. Because of Century's ineffective and wrongful reservation of rights letter and/or its violations of the Texas Insurance Code regarding the timely denial of claims, Century is estopped from asserting its policy defenses.

COUNT 9 – GROSS NEGLIGENCE

155. The foregoing allegations are incorporated herein by reference.

156. The acts and/or omissions complained of above against Century constitute gross negligence, malice, or actual fraud, which conduct proximately caused PPI and the Trust's injuries herein.

157. The Trust is entitled to exemplary damages under TEX. CIV. PRAC. & REM. CODE § 41.003(a).

V. JURY DEMAND

158. The Trust demands a trial by jury on all issues of fact.

SUPP APP 0897

## VI.   SPECIAL DAMAGES

159.   The Trust seeks additional special damages because Century's actions caused PPI's insolvency and bankruptcy.   Century's wrongful refusal to defend and indemnify PPI, and/or Century's continual refusal to settle the Doe Suit within policy limits when liability was reasonably clear, caused PPI to incur significant attorney's fees and exposed PPI to a large judgment which it would not be able to satisfy without indemnity from Century.   Century took PPI's money in exchange for a promise to defend and indemnify PPI for covered suits.   When PPI looked to Century to honor its obligations, Century declined and instead sued PPI. Such malicious actions warrant special damages- instead of providing a defense and indemnity upon which PPI relied, Century is the sole reason for PPI's bankruptcy.

## VII.   CONDITIONS PRECEDENT

160.   All conditions precedent have occurred or have been performed.

## VIII.  PRAYER

WHEREFORE, PREMISES CONSIDERED, Scott M. Seidel, as trustee for Defendant Pastazios Pizza, Inc. Creditors Trust, prays this Honorable Court:

   a.  Enter judgment in favor of the Trust;

   b.  Award the Trust actual damages;

   c.  Award the Trust economic damages;

   d.  Award the Trust special damages;

   e.  Award the Trust exemplary damages;

   f.  Award the Trust treble damages pursuant to TEX. INS. CODE § 541.152(b);

   g.  Award the Trust treble damages pursuant to TEX. BUS. & COM. CODE § 17.50(b)(1);

   h.  Award the Trust its costs;

   i.  Grant the Trust its reasonable attorneys' fees and costs pursuant to TEX. INS. CODE § 541.152(a)(1);

SUPP APP 0898

j. Grant the Trust its reasonable attorney's fees and costs pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(8);

k. Grant the Trust its reasonable attorney's fees and costs pursuant to TEX. INS. CODE § 542.060;

l. Grant the Trust its reasonable attorney's fees and costs pursuant to TEX. BUS. & COM. CODE § 17.50(d);

m. Grant the Trust its reasonable attorney's fees and costs pursuant to TEX. INS. CODE § 101.201; and

n. Grant the Trust such other and further legal and/or equitable relief to which it has shown itself justly entitled.

RESPECTFULLY SUBMITTED this 30th day of October, 2015.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Michael W. Huddleston
Michael W. Huddleston, Esq.
Texas Bar No. 10148415
Davor Rukavina, Esq.
Texas Bar No. 24030781
J. Stephen Gibson, Esq.
Texas Bar No. 07866000
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75201
Telephone: (214) 855-7500
Facsimile: (214) 855-4346

**COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE OF THE PASTAZIOS PIZZA, INC. CREDITOR TRUST**

# EXHIBIT A

SUPP APP 0900

# Century Surety Company

**465 Cleveland Avenue**
**Westerville, Ohio 43082**
**614-895-2000**
www.centurysurety.com
**COMMERCIAL LINES POLICY**
**COMMON POLICY DECLARATIONS**

POLICY NO.: CCP        672836
NAMED INSURED AND ADDRESS:
PASTAZIOS PIZZA, INC.
5026 ADDISON CIRCLE

ADDISON        TX     75001- 3332

New
CODE  NO.:5645A
INSUREDS AGENT:
THE HUTSON GROUP, INC.
710 EAST PARK BLVD, #200

PLANO        TX   75074-

POLICY PERIOD:  From:09-21-2010 To:09-21-2011 at 12:01 A.M. Standard time at your mailing address shown above.

Business Description:  PIZZA RESTAURANT

○ Individual   ○ Joint Venture    ○ Partnership     ○ Limited Liability Company (LLC)    ◉ Organization (Other than Partnership, LLC or Joint Venture)

**IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.**
**THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED.  THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.**

|  | PREMIUM |
|---|---|
| Commercial General Liability Coverage Part | $3,336.00 |
| Commercial Property Coverage Part | $4,364.00 |
| Inspection Fee | $150.00 |
| Policy Fee | $175.00 |
| State Tax | $389.21 |
| S.O. Fee | $4.82 |

25  % of the Policy Premium is fully earned as of the effective        TOTAL        $8,419.03
date of this policy and is not subject to return or refund.

Service of Suit (if form CCP 20 10 is attached) may be made upon:

RISC, Inc.
2001 Bryan St., Bryan Tower, Suite 2900        Dallas        TX  75201

Form(s) and Endorsement(s) made a part of this policy at time of issue*:
See Attached Schedule of Forms, CIL 15  00b 02 02

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations.
Any person who, with intent to defraud or knowing that he is facilitating a fraud against an insurer, submits an application or files a claim containing false or deceptive statement is guilty of insurance fraud.

COMPANY REPRESENTATIVE:
RISC, Inc.
2001 Bryan St.                Countersigned By
Bryan Tower, Suite 2900
Dallas        TX   75201                        Authorized Representative

10/20/2010        BSI

IN WITNESS WHEREOF, this Company has executed and attested these presents; but this policy shall not be valid unless countersigned by the duly Authorized Agent of this Company at the Agency hereinbefore mentioned.

Secretary                        President

CSCP 10 01 05 09                                Page 1 of 1

SENT TO: AGT/SO
11/01/10//LE

SUPP APP 0901

TXPN 0003 0409

## TEXAS POLICYHOLDER NOTICE

This insurance contract is with an insurer not licensed to transact insurance in this state and is issued and delivered as surplus line coverage under the Texas insurance statutes. The Texas Department of Insurance does not audit the finances or review the solvency of the surplus lines insurer providing this coverage, and the insurer is not a member of the property and casualty insurance guaranty association created under Chapter 462 Insurance Code. Chapter 225, Insurance Code, requires payment of a 4.85 percent tax on gross premium.

SUPP APP 0902

TXPN 0001 0507

# TEXAS COMPLAINT NOTICE

| IMPORTANT NOTICE | AVISO IMPORTANTE |
|---|---|
| 1. To obtain information or make a complaint: | Para obtener informacion o para someter una queja: |
| 2. You may contact your agent at telephone number 972-398-9001 | Puede comunicarse con su agente al 972-398-9001 |
| 3. You may call Century Surety Company's toll- free telephone number for information or to make a complaint at:<br><br>**1-800-878-7389** | Usted puede llamar a numero de telefono gratis de Century Surety Company's para informacion o para someter uns queja al:<br><br>**1-800-878-7389** |
| 4. You may also write to Century Surety Co. at:<br><br>Century Surety Co.<br>465 Cleveland Ave.<br>Westerville, OH 43082 | Usted tambien puede escribir a Century Surety Co.<br><br>Century Surety Co.<br>465 Cleveland Ave.<br>Westerville, OH 43082 |
| 5. You may contact the Texas Department of Insurance to obtain information on companies, coverages, rights or complaints at:<br><br>**1-800-252-3439** | Puede comunicarse con el Departmento de Seguros de Texas para obtener informacion acerda de companieas, coberturas, derechos o quejas al:<br><br>**1-800-252-3439** |
| 6. You may write the Texas Department of Insurance:<br><br>P.O. Box 149104<br>Austin, Texas 78714-9104<br>FAX #(512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us | Puede escribir al Departmento de Seguros de Texas:<br><br>P.O. Box 149104<br>Austin, Texas 78714-9104<br>FAX# (512) 475-1771<br>Web: http://www.tdi.state.tx.us<br>E-mail: ConsumerProtection@tdi.state.tx.us |

## 7. PREMIUM OR CLAIM DISPUTES:

Should you have a dispute concerning your premium or about a claim you should contact the (agent) (company) (agent or the company) first. If the dispute is not resolved, you may contact the Texas Department of Insurance (TDI).

## DISPUTAS SOMBRE PRIMAS O RECLAMOS:

Si tiene una disputa concerniente a su prima o a un reclamo, debe comunicarse con el (agente) (la compania) (agente o la compania) primero. Si no resulve la disputa, puede entonces comunicarse con el departmento (TDI).

## 8. ATTACH THIS NOTICE TO YOUR POLICY:

This notice is for information only and does not become a part or condition of the attached document.

## UNA ESTE AVISO A SU POLIZA:

Este aviso es solo para proposito de informacion y no se conviete en parte o condicion del documento adjunto.

TXPN 0001 0507



# Century Surety Company

465 CLEVELAND AVENUE
WESTERVILLE, OH 43082

**A STOCK COMPANY**

# COMMERCIAL
# LINES
# POLICY

THIS POLICY JACKET WITH COMMON POLICY CONDITIONS, THE DECLARATIONS PAGE, COVERAGE PART(S), COVERAGE FORM(S) AND APPLICABLE FORMS AND ENDORSEMENTS COMPLETE THIS POLICY.

CSCP1000 (02/04)

SUPP APP 0904

**Policy Number:** CCP 672836

CIL 15 00b 02 02

# SCHEDULE OF FORMS AND ENDORSEMENTS

(other than applicable forms and endorsements shown elsewhere in the policy)

Forms and Endorsements applying to the Coverage Parts listed below and made a part of this policy at time of issue:

| Form/ Endt. # | Edition Date | Title | |
|---|---|---|---|
| | | | Total # of Forms Selected:   47 |

Forms Applicable to this Coverage part - INTERLINE-ALL COVERAGE PARTS

| Form/ Endt. # | | Edition Date | Title |
|---|---|---|---|
| CCP | 2010 | 05 08 | Service of Suit Clause |
| CIL | 1500B | 02 02 | Schedule of Forms and Endorsements |
| CSCP | 1000 | 02 04 | Century Insurance Group Policy Jacket |
| CSCP | 1001 | 05 09 | Century Insurance Group Common Policy Declaration |
| IL | 0003 | 09 08 | Calculation of Premium |
| IL | 0017 | 11 98 | Common Policy Conditions |
| PRIV | 0001 | 11 09 | Privacy Statement |
| TRIA | 0001 | 10 08 | Policyholder Disclosure Notice of Terrorism |
| TXPN | 0001 | 05 07 | Texas Complaint Notice |
| TXPN | 0003 | 04 09 | Texas Policyholder Notice |

10 Forms

CIL 15 00b 02 02

Page 1 of 3

SUPP APP 0905

Forms Applicable to this Coverage part - GENERAL LIABILITY

| CG | 0001 | 12 07 | Commercial General Liability Coverage Form |
|---|---|---|---|
| CG | 0068 | 05 09 | Recording and Distribution of Material or Information In Violation of Law Exclusion |
| CG | 0300 | 01 96 | Deductible Liability Insurance |
| CG | 2011 | 01 96 | Additional Insured-Managers or Lessors of Premises |
| CG | 2026 | 07 04 | Additional Insured-Designated Person or Organization |
| CG | 2146 | 07 98 | Abuse or Molestation Exclusion |
| CG | 2147 | 12 07 | Employment-Related Practices Exclusion |
| CG | 2165 | 12 04 | Total Pollution Exclusion With A Building Heating , Cooling and Dehumidifying Equipment Exception and A Hostile Fire Exception |
| CG | 2175 | 06 08 | Exclusion of Certified Acts of Terrorism and Exclusion of Other Acts of Terrorism Committed Outside the United States |
| CG | 2176 | 01 08 | Exclusion of Punitive Damages Related to Certified Act of of Terrorism |
| CG | 2184 | 01 08 | Exclusion of Certified Nuclear, Biological, Chemical or Radiological Acts of Terrorism; Cap on Losses from Certified Acts of Terrorism |
| CG | 2196 | 03 05 | Silica or Silica-Related Dust Exclusion |
| CG | 2404 | 05 09 | Waiver Of Transfer Of Rights Of Recovery Against Others To Us |
| CG | 2407 | 01 96 | Products/Completed Operations Hazard Redefined |
| CGL | 1500 | 04 07 | Century Insurance Group Commercial General Liability Declarations |
| CGL | 1701a | 05 10 | Special Exclusions And Limitations Endorsement |
| CGL | 1702 | 11 00 | Action Over Exclusion |
| CGL | 1711 | 04 06 | Limitation of Coverage To Specified Classifications, Operations, Premises or Projects |
| CGL | 1742 | 03 10 | Restaurant, Bar, Tavern & Grocery Store Food Poisoning & Food Contamination Coverage Endorsement |
| CLL | 1902 | 03 06 | Liquor Liability Coverage Endorsement |
| IL | 0021 | 09 08 | Nuclear Energy Liability Exclusion Endorsement (Broad Form) |

21 Forms

SUPP APP 0906

Forms Applicable to this Coverage part - PROPERTY

| | | | |
|---|---|---|---|
| CCF | 1500 | 09 07 | Commercial Property Coverage Part Declarations |
| CCF | 1503 | 10 01 | Exclusion - "Vacant or Unoccupied" Property |
| CCF | 1504 | 07 94 | Theft Exclusion - Outside of Building |
| CCF | 1512 | 05 06 | Multiple Deductible Form |
| CCF | 1514 | 04 10 | Limited Property Extentions |
| CCF | 1515 | 04 10 | Equipment Breakdown Enhancement Endt |
| CP | 0010 | 06 07 | Building and Personal Property Coverage Form |
| CP | 0090 | 07 88 | Commercial Property Conditions |
| CP | 0140 | 07 06 | Exclusion of Loss Due to Virus or Bacteria |
| CP | 1030 | 06 07 | Cause of Loss - Special Form |
| CP | 1211 | 10 00 | Burglary and Robbery Protective Systems |
| CP | 1440 | 10 00 | Outside Signs |
| CP | 1470 | 06 07 | Building Glass - Tenant'S Policy |
| IL | 0415 | 04 98 | Protective Safeguards |
| IL | 0935 | 07 02 | Exclusion of Certain Computer-Related Losses |
| IL | 0986 | 03 08 | Exclusion of Certified Acts of Terrorism Involving Nuclear, Biological, Chemical or Radiological Terrorism; Cap on Covered Certified Acts Losses |

16 Forms

CIL 15 00b 02 02

SUPP APP 0907

CCP 2010 0508

# SERVICE OF SUIT CLAUSE

This endorsement modifies insurance provided by the policy to which this form is attached.

It is agreed that in the event of the failure by us to pay any amount claimed to be due hereunder, we will, at your request, submit to the jurisdiction of a court of competent jurisdiction within the United States of America.  Nothing in this clause constitutes or should be understood to constitute a waiver of our rights to commence an action in a court of competent jurisdiction in the United States of America, to remove an action to a United States District Court, or to seek a transfer of a case to another court as permitted by the laws of the United States of America or of any state in the United States of America.  In any such suit against us, we will abide by the final decision of such court or of any Appellate Court in the event of an appeal.

It is further agreed that service of process in such suit may be made upon the person or organization shown in the Policy Declarations or upon us at the address shown in the policy jacket.

The above named are authorized and directed to accept service of process on behalf of us in any such suit and/or upon your request to give a written undertaking to you that we will enter a general appearance upon our behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory, or district of the United States of America, which makes provision therefore, we hereby designate the Superintendent, Commissioner, or Directors of Insurance or other officer specified for that purpose in the statute or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on your behalf or any beneficiary hereunder arising out of this contract of insurance, and hereby designates the above named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

SUPP APP 0908

COMMERCIAL GENERAL LIABILITY
CG 21 75 06 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM AND EXCLUSION OF OTHER ACTS OF TERRORISM COMMITTED OUTSIDE THE UNITED STATES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism", or out of an "other act of terrorism" that is committed outside of the United States (including its territories and possessions and Puerto Rico), but within the "coverage territory". However, with respect to an "other act of terrorism", this exclusion applies only when one or more of the following are attributed to such act:

1. The total of insured damage to all types of property exceeds $25,000,000 (valued in US dollars). In determining whether the $25,000,000 threshold is exceeded, we will include all insured damage sustained by property of all persons and entities affected by the terrorism and business interruption losses sustained by owners or occupants of the damaged property. For the purpose of this provision, insured damage means damage that is covered by any insurance plus damage that would be covered by any insurance but for the application of any terrorism exclusions; or

2. Fifty or more persons sustain death or serious physical injury. For the purposes of this provision, serious physical injury means:

   a. Physical injury that involves a substantial risk of death; or

   b. Protracted and obvious physical disfigurement; or

   c. Protracted loss of or impairment of the function of a bodily member or organ; or

3. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

4. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

5. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

With respect to this exclusion, Paragraphs 1. and 2. describe the thresholds used to measure the magnitude of an incident of an "other act of terrorism" and the circumstances in which the threshold will apply for the purpose of determining whether this exclusion will apply to that incident.

**B.** The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

 © Insurance Services Office, Inc., 2008 □

SUPP APP 0909

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act;

b. The act resulted in damage:

(1) Within the United States (including its territories and possessions and Puerto Rico); or

(2) Outside of the United States in the case of:

(a) An air carrier (as defined in Section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), regardless of where the loss occurs; or

(b) The premises of any United States mission; and

c. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

3. "Other act of terrorism" means a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion, and the act is not a "certified act of terrorism".

Multiple incidents of an "other act of terrorism" which occur within a seventy-two hour period and appear to be carried out in concert or to have a related purpose or common leadership shall be considered to be one incident.

C. In the event of any incident of a "certified act of terrorism" or an "other act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

© Insurance Services Office, Inc., 2008
CG 21 75 06 08

SUPP APP 0910

COMMERCIAL GENERAL LIABILITY
CG 21 76 01 08

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF PUNITIVE DAMAGES RELATED TO A CERTIFIED ACT OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

**A.** The following exclusion is added:

This insurance does not apply to:

**TERRORISM PUNITIVE DAMAGES**

Damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**B.** The following definition is added:

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

CG 21 76 01 08                © ISO Properties, Inc., 2007                **Page 1 of 1**     □

SUPP APP 0911

COMMERCIAL GENERAL LIABILITY
CG 21 84 01 08

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# EXCLUSION OF CERTIFIED NUCLEAR, BIOLOGICAL, CHEMICAL OR RADIOLOGICAL ACTS OF TERRORISM; CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

A. The following exclusion is added:

This insurance does not apply to:

**TERRORISM**

"Any injury or damage" arising, directly or indirectly, out of a "certified act of terrorism". However, this exclusion applies only when one or more of the following are attributed to such act:

1. The terrorism involves the use, release or escape of nuclear materials, or directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

2. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3. Pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials.

B. The following definitions are added:

1. For the purposes of this endorsement, "any injury or damage" means any injury or damage covered under any Coverage Part to which this endorsement is applicable, and includes but is not limited to "bodily injury", "property damage", "personal and advertising injury", "injury" or "environmental damage" as may be defined in any applicable Coverage Part.

2. "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

   a. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

   b. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

C. In the event of any incident of a "certified act of terrorism" that is not subject to this exclusion, coverage does not apply to any loss or damage that is otherwise excluded under this Coverage Part.

 © ISO Properties, Inc., 2007 □

SUPP APP 0912

**D.** If aggregate insured losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

SUPP APP 0913

IL 00 03 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALCULATION OF PREMIUM

This endorsement modifies insurance provided under the following:

    CAPITAL ASSETS PROGRAM (OUTPUT POLICY) COVERAGE PART
    COMMERCIAL AUTOMOBILE COVERAGE PART
    COMMERCIAL GENERAL LIABILITY COVERAGE PART
    COMMERCIAL INLAND MARINE COVERAGE PART
    COMMERCIAL PROPERTY COVERAGE PART
    CRIME AND FIDELITY COVERAGE PART
    EMPLOYMENT-RELATED PRACTICES LIABILITY COVERAGE PART
    EQUIPMENT BREAKDOWN COVERAGE PART
    FARM COVERAGE PART
    LIQUOR LIABILITY COVERAGE PART
    MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
    OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
    POLLUTION LIABILITY COVERAGE PART
    PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
    RAILROAD PROTECTIVE LIABILITY COVERAGE PART

The following is added:

The premium shown in the Declarations was computed based on rates in effect at the time the policy was issued. On each renewal, continuation, or anniversary of the effective date of this policy, we will compute the premium in accordance with our rates and rules then in effect.

IL 00 03 09 08         © ISO Properties, Inc., 2007         **Page 1 of 1**    □

SUPP APP 0914

# COMMON POLICY CONDITIONS

All Coverage parts included in this policy are subject to the following conditions.

## A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advanced written notice of cancellation.

2. We may cancel this policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   a. 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

## B. Changes

This policy contains all the agreements between you and us concerning the insurance afforded. The first named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

## C. Examination Of Your Books And Records

We may examine and audit your books and records as they relate to this policy at any time during the policy period and up to three years afterward.

## D. Inspections And Surveys

1. We have the right to:

   a. Make inspections and surveys at any time;

   b. Give you reports on the conditions we find; and

   c. Recommend changes.

2. We are not obligated to make any inspections, surveys, reports or recommendations and any such actions we do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And we do not warrant that conditions:

   a. Are safe or healthful; or

   b. Comply with laws, regulations, codes or standards.

3. Paragraphs 1. and 2. of this condition apply not only to us, but also to any rating, advisory, rate services or similar organization which makes insurance inspections, surveys, reports or recommendations.

4. Paragraph 2. of this condition does not apply to any inspections, surveys, reports or recommendations we may make relative to certification, under state or municipal statutes, ordinances or regulations, of boilers, pressure vessels or elevators.

## E. Premiums

The first Named Insured shown in the Declarations:

1. Is responsible for the payment of all premiums; and

2. Will be the payee for any return premiums we pay.

## F. Transfer Of Your Rights And Duties Under This Policy

Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured.

If you die, your rights and duties will be transferred to your legal representative but only while acting within the scope of duties as your legal representative. Until your legal representative is appointed, anyone having proper temporary custody of your property will have your rights and duties but only with respect to that property.

IL 00 17 11 98                 Copyright, Insurance Services Office, Inc., 1998                 Page 1 of 1

SUPP APP 0915

IL 00 21 09 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
(Broad Form)

This endorsement modifies insurance provided under the following:

COMMERCIAL AUTOMOBILE COVERAGE PART
COMMERCIAL GENERAL LIABILITY COVERAGE PART
FARM COVERAGE PART
LIQUOR LIABILITY COVERAGE PART
MEDICAL PROFESSIONAL LIABILITY COVERAGE PART
OWNERS AND CONTRACTORS PROTECTIVE LIABILITY COVERAGE PART
POLLUTION LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART
RAILROAD PROTECTIVE LIABILITY COVERAGE PART
UNDERGROUND STORAGE TANK POLICY

1. The insurance does not apply:

   A. Under any Liability Coverage, to "bodily injury" or "property damage":

      (1) With respect to which an "insured" under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

      (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which (a) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (b) the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. Under any Medical Payments coverage, to expenses incurred with respect to "bodily injury" resulting from the "hazardous properties" of "nuclear material" and arising out of the operation of a "nuclear facility" by any person or organization.

   C. Under any Liability Coverage, to "bodily injury" or "property damage" resulting from "hazardous properties" of "nuclear material", if:

      (1) The "nuclear material" (a) is at any "nuclear facility" owned by, or operated by or on behalf of, an "insured" or (b) has been discharged or dispersed therefrom;

      (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

      (3) The "bodily injury" or "property damage" arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2. As used in this endorsement:

   "Hazardous properties" includes radioactive, toxic or explosive properties.

   "Nuclear material" means "source material", "special nuclear material" or "by-product material".

IL 00 21 09 08 | © ISO Properties, Inc., 2007 | Page 1 of 2 | □

SUPP APP 0916

"Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

"Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

"Waste" means any waste material (a) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (b) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

"Nuclear facility" means:

(a) Any "nuclear reactor";

(b) Any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing "spent fuel", or (3) handling, processing or packaging "waste";

(c) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

(d) Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste";

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

"Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

"Property damage" includes all forms of radioactive contamination of property.

       © ISO Properties, Inc., 2007       IL 00 21 09 08   □

SUPP APP 0917

## Privacy Statement

In applying for insurance products and services with Meadowbrook Insurance Group, Inc.'s subsidiaries, you may have provided us with non-public personal information. Additionally, we may seek additional information, such as your creditworthiness or credit history, from third party reporting agencies. This information allows us to provide you with the best products and customer service. Keeping your personal information private and secure, whether learned directly from you or a third party reporting agency, is our priority.

The categories of non-public personal and financial information that we collect may include your name, address, social security or employer identification number, assets, income, date of birth, motor vehicle driving information and other information that is appropriate or necessary to provide you with the insurance products and services that you request.

We do not disclose any non-public personal or financial information about you, unless permitted or required by law or with your consent.

We may have shared this information with affiliated parties as permitted by law. We refer to and use that information to issue and service your insurance policies, provide insurance services or administer claims. We restrict access to your non-public personal and financial information to those employees who need the information to provide you with products or services.

We maintain physical, electronic and procedural safeguards to protect your non-public personal and financial information. These safeguards comply with federal and state regulations.

If you contact us at our website, "www. Meadowbrook.com" we do not use "cookies", which many organizations use to track visitors' actions on their websites. Cookies are a general mechanism that can store and retrieve information on your computer.

We value the relationship that we have established with current and former customers. Should you have any comments or questions regarding our Privacy Policy, please contact us at 800-482-2726.

This Privacy Policy applies to the following companies: (1) Meadowbrook Insurance Group, Inc.'s insurance company subsidiaries (Star Insurance Company, Ameritrust Insurance Corporation, Savers Property & Casualty Insurance Company, Williamsburg National Insurance Company, ProCentury Insurance Company, and Century Surety Company); (2) Crest Financial Corporation's subsidiaries; and (3) Meadowbrook, Inc.'s subsidiaries.

SUPP APP 0918

**NOTE TO AGENT:**

**It is required by federal law that you provide this document to the insured.**

# POLICYHOLDER DISCLOSURE NOTICE OF TERRORISM INSURANCE COVERAGE

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2007, the definition of act of terrorism has changed. As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in concurrence with the Secretary of State, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

THIS IS NOTIFICATION THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER THE POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT, MAY BE SUBJECT TO A $100 BILLION CAP THAT MAY REDUCE THE COVERAGE AND THE POLICYHOLDER HAS BEEN NOTIFIED OF THE PORTION OF THE PREMIUM ATTRIBUTABLE TO SUCH COVERAGE

The portion of your annual premium that is attributable to coverage for acts of terrorism is:

| | | |
|---|---|---|
| Property | $ | 0 |
| Inland Marine | $ | |
| Crime | | Excluded |
| General Liability | $ | 0 |
| Garage | | Excluded |
| | $ | |
| **Total** | **$** | **0** |

Name of Insurer:   Century Surety Company

Policy Number:   CCP 672836

Page 1 of 1

TRIA 0001 1008

SUPP APP 0919

# Century Surety Company
## COMMERCIAL GENERAL LIABILITY COVERAGE PART DECLARATIONS

**Policy No:** CCP        672836

**Effective Date:** 09/21/2010      **
**12:01 A.M. Standard Time**

**NAMED INSURED:** PASTAZIOS PIZZA, INC.

**LIMITS OF INSURANCE:**

| | | |
|---|---|---|
| General Aggregate Limit (Other than Product-Completed Operations) | $ 2,000,000 | |
| Products-Completed Operations Aggregate Limit | $ 2,000,000 | |
| Personal and Advertising Injury Limit | $ 1,000,000 | |
| Each Occurrence Limit | $ 1,000,000 | |
| Damage to Premises Rented to You | $ 100,000 | **Any one Fire/ Occurrence** |
| Medical Expense Limit | $ 5,000 | **Any one Person** |

**RETROACTIVE DATE: (CG 00 02, CGL 0002, CGL 1551 or CGL 1553)**

Coverage A and B of this insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", "personal injury" or "advertising injury" which occurs before the retroactive date shown here:   N/A

**DEDUCTIBLE:  PER CLAIM**
$        500                            Bodily Injury Liability & Property Damage Liability Combined
(this deductible also applies to Personal and Advertising Injury Liability.)

Deductible also applies to Supplementary Payments – Coverages A and B;
Defense Expenses Coverages A and B (form CGL 0002 only)        ☒ Yes      ☐ No

**LOCATION OF ALL PREMISES YOU OWN, RENT OR OCCUPY:**

5026 ADDISON CIRCLE
ADDISON, TX 75001-3332

| PREMIUM State Terr | Code | Classification | | Prem. Basis | RATE: Prem. Ops. | Pr/Co | ADVANCED PREMIUM Pr/Co | All Other |
|---|---|---|---|---|---|---|---|---|
| TX  001 | 16910 | Restaurants-with sale of alcoholic beverages that are less than 30% of the annual receipts of the restaurants-with table service | s) | 527,461 | 3.430 | 0.373 | $197 | 1,809 |
| TX  001 | 58161 | Liquor Liability – Restaurants with alcohol less than 50% of the total sales Rated As: Restaurants, Taverns, Hotels, Motels, including package sales | s) | 69,000 | 9.683 | | | 668 |
| TX  001 | 11039 | CATERERS | S) | 152,821 | 4.075 | 0.258 | INCL | 662 |
| TX  001 | 49950 | ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES – PER CG2011 | T) | FLAT | | | | INCL |
| TX  001 | 49950 | ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION – PER CG2026 | T) | FLAT | | | | INCL |
| | | WAIVER OF TRANSFER OR RIGHTS OF RECEOVERY AGAINST US | | Flat | | | | INCL |

CGL 1500 04/07                                                                                      Page 1 of 2

SUPP APP 0920

**Policy No:** CCP 672836

**NAMED INSURED:** PASTAZIOS PIZZA, INC.

| PREMIUM | | | | RATE: | | ADVANCED PREMIUM | |
|---|---|---|---|---|---|---|---|
| State Terr Code | Classification | Prem. Basis | Prem. Ops. | Pr/Co | Pr/Co | All Other | |

Audit period is Annual Unless Otherwise Stated

|  |  |
|---|---|
| Total Advance Premium $ | 3,336 |
| TRIA Coverage $ | 0 |
| Minimum Premium for This Coverage Part $ | 3,336 |

FORMS AND ENDORSEMENTS (other than applicable Forms and Endorsements shown elsewhere in the policy):
Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue:
See Attached Forms, CIL 15 00B 02 02

*Inclusion of Date Optional

## THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE
## NAME OF THIS INSURED AND THE POLICY PERIOD

SUPP APP 0921

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy. The words "we", "us" and "our" refer to the company providing this insurance.

The word "insured" means any person or organization qualifying as such under Section II – Who Is An Insured.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

**1. Insuring Agreement**

**a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

**(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

**(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

**b.** This insurance applies to "bodily injury" and "property damage" only if:

**(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(2)** The "bodily injury" or "property damage" occurs during the policy period; and

**(3)** Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

**c.** "Bodily injury" or "property damage" which occurs during the policy period and was not, prior to the policy period, known to have occurred by any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim, includes any continuation, change or resumption of that "bodily injury" or "property damage" after the end of the policy period.

**d.** "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1. of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:

**(1)** Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

**(2)** Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

**(3)** Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

 © ISO Properties, Inc., 2006 □

SUPP APP 0922

e. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. **Exclusions**

This insurance does not apply to:

a. **Expected Or Intended Injury**

"Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

b. **Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) That the insured would have in the absence of the contract or agreement; or

(2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

(a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

c. **Liquor Liability**

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.

d. **Workers' Compensation And Similar Laws**

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. **Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies whether the insured may be liable as an employer or in any other capacity and to any obligation to share damages with or repay someone else who must pay damages because of the injury.

This exclusion does not apply to liability assumed by the insured under an "insured contract".

   © ISO Properties, Inc., 2006   CG 00 01 12 07   □

SUPP APP 0923

**f. Pollution**

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

(i) Any insured; or

(ii) Any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants".

 © ISO Properties, Inc., 2006 □

SUPP APP 0924

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

**g. Aircraft, Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion applies even if the claims against any insured allege negligence or other wrongdoing in the supervision, hiring, employment, training or monitoring of others by that insured, if the "occurrence" which caused the "bodily injury" or "property damage" involved the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft that is owned or operated by or rented or loaned to any insured.

This exclusion does not apply to:

**(1)** A watercraft while ashore on premises you own or rent;

**(2)** A watercraft you do not own that is:

**(a)** Less than 26 feet long; and

**(b)** Not being used to carry persons or property for a charge;

**(3)** Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

**(4)** Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

**(5)** "Bodily injury" or "property damage" arising out of:

**(a)** The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

**(b)** the operation of any of the machinery or equipment listed in Paragraph **f.(2)** or **f.(3)** of the definition of "mobile equipment".

**h. Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

**(1)** The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

**(2)** The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity.

**i. War**

"Bodily injury" or "property damage", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**j. Damage To Property**

"Property damage" to:

**(1)** Property you own, rent, or occupy, including any costs or expenses incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;

**(2)** Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

**(3)** Property loaned to you;

**(4)** Personal property in the care, custody or control of the insured;

© ISO Properties, Inc., 2006

SUPP APP 0925

**(5)** That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs **(1)**, **(3)** and **(4)** of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section **III – Limits Of Insurance**.

Paragraph **(2)** of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs **(3)**, **(4)**, **(5)** and **(6)** of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

**k. Damage To Your Product**

"Property damage" to "your product" arising out of it or any part of it.

**l. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**m. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

**n. Recall Of Products, Work Or Impaired Property**

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

**(1)** "Your product";

**(2)** "Your work"; or

**(3)** "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

**o. Personal And Advertising Injury**

"Bodily injury" arising out of "personal and advertising injury".

**p. Electronic Data**

Damages arising out of the loss of, loss of use of, damage to, corruption of, inability to access, or inability to manipulate electronic data.

As used in this exclusion, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

**q. Distribution Of Material In Violation Of Statutes**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

SUPP APP 0926

Exclusions **c.** through **n.** do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance.

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

   **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

   **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

### 2. Exclusions

This insurance does not apply to:

a. **Knowing Violation Of Rights Of Another**

   "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

b. **Material Published With Knowledge Of Falsity**

   "Personal and advertising injury" arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

c. **Material Published Prior To Policy Period**

   "Personal and advertising injury" arising out of oral or written publication of material whose first publication took place before the beginning of the policy period.

d. **Criminal Acts**

   "Personal and advertising injury" arising out of a criminal act committed by or at the direction of the insured.

e. **Contractual Liability**

   "Personal and advertising injury" for which the insured has assumed liability in a contract or agreement. This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement.

f. **Breach Of Contract**

   "Personal and advertising injury" arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement".

g. **Quality Or Performance Of Goods – Failure To Conform To Statements**

   "Personal and advertising injury" arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement".

h. **Wrong Description Of Prices**

   "Personal and advertising injury" arising out of the wrong description of the price of goods, products or services stated in your "advertisement".

i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

   "Personal and advertising injury" arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion, such other intellectual property rights do not include the use of another's advertising idea in your "advertisement".

   However, this exclusion does not apply to infringement, in your "advertisement", of copyright, trade dress or slogan.

j. **Insureds In Media And Internet Type Businesses**

   "Personal and advertising injury" committed by an insured whose business is:

   **(1)** Advertising, broadcasting, publishing or telecasting;

   **(2)** Designing or determining content of websites for others; or

 © ISO Properties, Inc., 2006

SUPP APP 0927

**(3)** An Internet search, access, content or service provider.

However, this exclusion does not apply to Paragraphs **14.a., b.** and **c.** of "personal and advertising injury" under the Definitions Section.

For the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting.

**k. Electronic Chatrooms Or Bulletin Boards**

"Personal and advertising injury" arising out of an electronic chatroom or bulletin board the insured hosts, owns, or over which the insured exercises control.

**l. Unauthorized Use Of Another's Name Or Product**

"Personal and advertising injury" arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers.

**m. Pollution**

"Personal and advertising injury" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

**n. Pollution-Related**

Any loss, cost or expense arising out of any:

**(1)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(2)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

**o. War**

"Personal and advertising injury", however caused, arising, directly or indirectly, out of:

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**p. Distribution Of Material In Violation Of Statutes**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law; or

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law; or

**(3)** Any statute, ordinance or regulation, other than the TCPA or CAN-SPAM Act of 2003, that prohibits or limits the sending, transmitting, communicating or distribution of material or information.

**COVERAGE C MEDICAL PAYMENTS**

**1. Insuring Agreement**

**a.** We will pay medical expenses as described below for "bodily injury" caused by an accident:

**(1)** On premises you own or rent;

**(2)** On ways next to premises you own or rent; or

**(3)** Because of your operations;

provided that:

**(a)** The accident takes place in the "coverage territory" and during the policy period;

**(b)** The expenses are incurred and reported to us within one year of the date of the accident; and

**(c)** The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require.

**b.** We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

**(1)** First aid administered at the time of an accident;

**(2)** Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

**(3)** Necessary ambulance, hospital, professional nursing and funeral services.

SUPP APP 0928

## 2. Exclusions

We will not pay expenses for "bodily injury":

### a. Any Insured

To any insured, except "volunteer workers".

### b. Hired Person

To a person hired to do work for or on behalf of any insured or a tenant of any insured.

### c. Injury On Normally Occupied Premises

To a person injured on that part of premises you own or rent that the person normally occupies.

### d. Workers Compensation And Similar Laws

To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

### e. Athletics Activities

To a person injured while practicing, instructing or participating in any physical exercises or games, sports, or athletic contests.

### f. Products-Completed Operations Hazard

Included within the "products-completed operations hazard".

### g. Coverage A Exclusions

Excluded under Coverage A.

## SUPPLEMENTARY PAYMENTS – COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

   a. All expenses we incur.

   b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

   c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

   d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

   e. All court costs taxed against the insured in the "suit". However, these payments do not include attorneys' fees or attorneys' expenses taxed against the insured.

   f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

   g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

   These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

   a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

   b. This insurance applies to such liability assumed by the insured;

   c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

   d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

   e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

   f. The indemnitee:

      (1) Agrees in writing to:

         (a) Cooperate with us in the investigation, settlement or defense of the "suit";

         (b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

         (c) Notify any other insurer whose coverage is available to the indemnitee; and

         (d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

      (2) Provides us with written authorization to:

         (a) Obtain records and other information related to the "suit"; and

 © ISO Properties, Inc., 2006 CG 00 01 12 07 ☐

SUPP APP 0929

**(b)** Conduct and control the defense of the indemnitee in such "suit".

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph **2.b.(2)** of Section I – Coverage **A** – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance.

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when we have used up the applicable limit of insurance in the payment of judgments or settlements or the conditions set forth above, or the terms of the agreement described in Paragraph **f.** above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

   **a.** An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

   **b.** A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

   **c.** A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers.

   **d.** An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   **e.** A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   **a.** Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

   **(1)** "Bodily injury" or "personal and advertising injury":

   **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

   **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

   **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

   **(d)** Arising out of his or her providing or failing to provide professional health care services.

   **(2)** "Property damage" to property:

   **(a)** Owned, occupied or used by,

   **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

   you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

SUPP APP 0930

b. Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

c. Any person or organization having proper temporary custody of your property if you die, but only:

(1) With respect to liability arising out of the maintenance or use of that property; and

(2) Until your legal representative has been appointed.

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

3. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

**SECTION III – LIMITS OF INSURANCE**

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of:

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits".

2. The General Aggregate Limit is the most we will pay for the sum of:

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard".

4. Subject to Paragraph 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization.

5. Subject to Paragraph 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of:

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence".

6. Subject to Paragraph 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner.

7. Subject to Paragraph 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person.

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance.

**SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

1. **Bankruptcy**

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

2. **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

SUPP APP 0931

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense.

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with.

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when Paragraph b. below applies. If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in Paragraph c. below.

b. Excess Insurance

(1) This insurance is excess over:

(a) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(i) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(ii) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(iii) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(iv) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability.

(b) Any other primary insurance available to you covering liability for damages arising out of the premises or operations, or the products and completed operations, for which you have been added as an additional insured by attachment of an endorsement.

(2) When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

SUPP APP 0932

**(3)** When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all that other insurance.

**(4)** We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c. Method Of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

**5. Premium Audit**

**a.** We will compute all premiums for this Coverage Part in accordance with our rules and rates.

**b.** Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

**c.** The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

**6. Representations**

By accepting this policy, you agree:

**a.** The statements in the Declarations are accurate and complete;

**b.** Those statements are based upon representations you made to us; and

**c.** We have issued this policy in reliance upon your representations.

**7. Separation Of Insureds**

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies:

**a.** As if each Named Insured were the only Named Insured; and

**b.** Separately to each insured against whom claim is made or "suit" is brought.

**8. Transfer Of Rights Of Recovery Against Others To Us**

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

**9. When We Do Not Renew**

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

**SECTION V – DEFINITIONS**

**1.** "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters. For the purposes of this definition:

**a.** Notices that are published include material placed on the Internet or on similar electronic means of communication; and

**b.** Regarding web-sites, only that part of a web-site that is about your goods, products or services for the purposes of attracting customers or supporters is considered an advertisement.

**2.** "Auto" means:

**a.** A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

**b.** Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

However, "auto" does not include "mobile equipment".

 © ISO Properties, Inc., 2006 CG 00 01 12 07 □

SUPP APP 0933

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

4. "Coverage territory" means:

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

b. International waters or airspace, but only if the injury or damage occurs in the course of travel or transportation between any places included in Paragraph a. above; or

c. All other parts of the world if the injury or damage arises out of:

(1) Goods or products made or sold by you in the territory described in Paragraph a. above;

(2) The activities of a person whose home is in the territory described in Paragraph a. above, but is away for a short time on your business; or

(3) "Personal and advertising injury" offenses that take place through the Internet or similar electronic means of communication

provided the insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in Paragraph a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" or "your work" or your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, roadbeds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

© ISO Properties, Inc., 2006

SUPP APP 0934

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in Paragraph a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in Paragraph a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos".

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement".

 © ISO Properties, Inc., 2006 ❑

SUPP APP 0935

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

   (1) Products that are still in your physical possession; or

   (2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

      (a) When all of the work called for in your contract has been completed.

      (b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

      (c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

   Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

b. Does not include "bodily injury" or "property damage" arising out of:

   (1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

   (2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

   (3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means:

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

20. "Volunteer worker" means a person who is not your "employee", and who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

21. "Your product":

a. Means:

   (1) Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

      (a) You;

      (b) Others trading under your name; or

      (c) A person or organization whose business or assets you have acquired; and

   (2) Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

b. Includes:

   (1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

SUPP APP 0936

  **(2)** The providing of or failure to provide warnings or instructions.

 **c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

 **a.** Means:

  **(1)** Work or operations performed by you or on your behalf; and

  **(2)** Materials, parts or equipment furnished in connection with such work or operations.

 **b.** Includes:

  **(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

  **(2)** The providing of or failure to provide warnings or instructions.

© ISO Properties, Inc., 2006
**CG 00 01 12 07** ☐

SUPP APP 0937

COMMERCIAL GENERAL LIABILITY
CG 00 68 05 09

# RECORDING AND DISTRIBUTION OF MATERIAL OR INFORMATION IN VIOLATION OF LAW EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** Exclusion **q.** of Paragraph **2. Exclusions** of Section **I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**q. Recording And Distribution Of Material Or Information In Violation Of Law**

"Bodily injury" or "property damage" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

**B.** Exclusion **p.** of Paragraph **2. Exclusions** of Section **I – Coverage B – Personal And Advertising Injury Liability** is replaced by the following:

**2. Exclusions**

This insurance does not apply to:

**p. Recording And Distribution Of Material Or Information In Violation Of Law**

"Personal and advertising injury" arising directly or indirectly out of any action or omission that violates or is alleged to violate:

**(1)** The Telephone Consumer Protection Act (TCPA), including any amendment of or addition to such law;

**(2)** The CAN-SPAM Act of 2003, including any amendment of or addition to such law;

**(3)** The Fair Credit Reporting Act (FCRA), and any amendment of or addition to such law, including the Fair and Accurate Credit Transaction Act (FACTA); or

**(4)** Any federal, state or local statute, ordinance or regulation, other than the TCPA, CAN-SPAM Act of 2003 or FCRA and their amendments and additions, that addresses, prohibits, or limits the printing, dissemination, disposal, collecting, recording, sending, transmitting, communicating or distribution of material or information.

CG 00 68 05 09                  © Insurance Services Office, Inc., 2008                  Page 1 of 1

SUPP APP 0938

POLICY NUMBER: CCP 672836

COMMERCIAL GENERAL LIABILITY
CG 03 00 01 96

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# DEDUCTIBLE LIABILITY INSURANCE

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

**SCHEDULE**

| Coverage | Amount and Basis of Deductible | | |
|---|---|---|---|
| | PER CLAIM | or | PER OCCURRENCE |
| Bodily Injury Liability | $ | | $ |
| OR | | | |
| Property Damage Liability | $ | | $ |
| OR | | | |
| Bodily Injury Liability and/or Property Damage Liability Combined | $ | 500 | $ |

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

**APPLICATION OF ENDORSEMENT** Enter below any limitations on the application of this endorsement. If no limitation is entered, the deductibles apply to damages for all "bodily injury" and "property damage", however caused):

A. Our obligation under the Bodily Injury Liability and Property Damage Liability Coverages to pay damages on your behalf applies only to the amount of damages in excess of any deductible amounts stated in the Schedule above as applicable to such coverages.

B. You may select a deductible amount on either a per claim or a per "occurrence" basis. Your selected deductible applies to the coverage option and to the basis of the deductible indicated by the placement of the deductible amount in the Schedule above. The deductible amount stated in the Schedule above applies as follows:

1. **PER CLAIM BASIS.** If the deductible amount indicated in the Schedule above is on a per claim basis, that deductible applies as follows:

   a. Under Bodily Injury Liability Coverage, to all damages sustained by any one person because of "bodily injury";

   b. Under Property Damage Liability Coverage, to all damages sustained by any one person because of "property damage"; or

   c. Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages sustained by any one person because of:

      (1) "Bodily injury";

      (2) "Property damage"; or

      (3) "Bodily injury" and "property damage" combined

   as the result of any one "occurrence".  If damages are claimed for care, loss of services or death resulting at any time from "bodily injury", a separate deductible amount will be applied to each person making a claim for such damages.  With respect to "property damage", person includes an organization.

CG 03 00 01 96

Copyright, Insurance Services Office, Inc., 1994

Page 1 of 2

SUPP APP 0939

**2. PER OCCURRENCE BASIS.** If the deductible amount indicated in the Schedule above is on a "per occurrence" basis, that deductible amount applies as follows:

   **a.** Under Bodily Injury Liability Coverage, to all damages because of "bodily injury";

   **b.** Under Property Damage Liability Coverage, to all damages because of "property damage"; or

   **c.** Under Bodily Injury Liability and/or Property Damage Liability Coverage Combined, to all damages because of:

     **(1)** "Bodily injury";

     **(2)** "Property damage"; or

     **(3)** "Bodily injury" and "property damage" combined

as the result of any one "occurrence", regardless of the number of persons or organizations who sustain damages because of that "occurrence".

**C.** The terms of this insurance, including those with respect to:

   **1.** Our right and duty to defend the insured against any "suits" seeking those damages; and

   **2.** Your duties in the event of an "occurrence", claim, or "suit"

apply irrespective of the application of the deductible amount.

**D.** We may pay any part or all of the deductible amount to effect settlement of any claim or "suit" and, upon notification of the action taken, you shall promptly reimburse us for such part of the deductible amount as has been paid by us.

SUPP APP 0940

POLICY NUMBER:  CCP 672836                                COMMERCIAL GENERAL LIABILITY

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – MANAGERS OR LESSORS OF PREMISES

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

1.  Designation of Premises (Part Leased to You):

    5026 ADDISON CIRCLE
    ADDISON, TX 75001-3332

2.  Name of Person or Organization (Additional Insured):

    POST PROPERTIES INC
    5040 ADDISON CIRCLE, SUITE 200
    ADDISON, TX 75001

3.  Additional Premium:  $ INCLUDED

(If no entry appears above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions:

This insurance does not apply to:

1.  Any "occurrence" which takes place after you cease to be a tenant in that premises.

2.  Structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule.

CG 20 11 01 96              Copyright, Insurance Services Office, Inc., 1994              Page 1 of 1

COMMERCIAL GENERAL LIABILITY
CG 20 26 07 04

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ADDITIONAL INSURED – DESIGNATED PERSON OR ORGANIZATION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**SCHEDULE**

| Name Of Additional Insured Person(s) Or Organization(s) |
|---|
| TOWN OF ADDISON<br>PO BOX 9010<br>ADDISON, TX 5001· |

**Section II – Who Is An Insured** is amended to include as an additional insured the person(s) or organization(s) shown in the Schedule, but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:

A. In the performance of your ongoing operations; or

B. In connection with your premises owned by or rented to you.

CG 20 26 07 04                     © ISO Properties, Inc., 2004                     Page 1 of 1

SUPP APP 0942

COMMERCIAL GENERAL LIABILITY
CG 21 46 07 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ABUSE OR MOLESTATION EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph 2., **Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph 2., **Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1. The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

2. The negligent:

   a. Employment;

   b. Investigation;

   c. Supervision;

   d. Reporting to the proper authorities, or failure to so report; or

   e. Retention;

   of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 1. above.

           Copyright, Insurance Services Office, Inc., 1997               ☐

SUPP APP 0943

COMMERCIAL GENERAL LIABILITY
CG 21 47 12 07

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYMENT-RELATED PRACTICES EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – **Coverage A – Bodily Injury And Property Damage Liability:**

This insurance does not apply to:

"Bodily injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "bodily injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**B.** The following exclusion is added to Paragraph **2., Exclusions** of Section I – **Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to:

"Personal and advertising injury" to:

(1) A person arising out of any:

(a) Refusal to employ that person;

(b) Termination of that person's employment; or

(c) Employment-related practices, policies, acts or omissions, such as coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution directed at that person; or

(2) The spouse, child, parent, brother or sister of that person as a consequence of "personal and advertising injury" to that person at whom any of the employment-related practices described in Paragraphs **(a)**, **(b)**, or **(c)** above is directed.

This exclusion applies:

(1) Whether the injury-causing event described in Paragraphs **(a)**, **(b)** or **(c)** above occurs before employment, during employment or after employment of that person;

(2) Whether the insured may be liable as an employer or in any other capacity; and

(3) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

 © ISO Properties, Inc., 2006 □

SUPP APP 0944

COMMERCIAL GENERAL LIABILITY
CG 21 65 12 04

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TOTAL POLLUTION EXCLUSION WITH A BUILDING HEATING, COOLING AND DEHUMIDIFYING EQUIPMENT EXCEPTION AND A HOSTILE FIRE EXCEPTION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

Exclusion **f.** under Paragraph **2. Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** is replaced by the following:

This insurance does not apply to:

**f. Pollution**

**(1)** "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time.

This exclusion does not apply to:

**(a)** "Bodily injury" if sustained within a building which is or was at any time owned or occupied by, or rented or loaned to, any insured and caused by smoke, fumes, vapor or soot produced by or originating from equipment that is used to heat, cool or dehumidify the building, or equipment that is used to heat water for personal use, by the building's occupants or their guests; or

**(b)** "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire" unless that "hostile fire" occurred or originated:

**(i)** At any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste; or

**(ii)** At any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations to test for, monitor, clean up, remove, contain, treat, detoxify, neutralize or in any way respond to, or assess the effects of, "pollutants".

**(2)** Any loss, cost or expense arising out of any:

**(a)** Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

**(b)** Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

CG 21 65 12 04 © ISO Properties, Inc., 2003 Page 1 of 1

SUPP APP 0945

COMMERCIAL GENERAL LIABILITY
CG 21 96 03 05

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# SILICA OR SILICA-RELATED DUST EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

**A.** The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Bodily injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, or ingestion of, "silica" or "silica-related dust".

b. "Property damage" arising, in whole or in part, out of the actual, alleged, threatened or suspected contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

c. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**B.** The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage B – Personal And Advertising Injury Liability:

**2. Exclusions**

This insurance does not apply to:

**Silica Or Silica-Related Dust**

a. "Personal and advertising injury" arising, in whole or in part, out of the actual, alleged, threatened or suspected inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, "silica" or "silica-related dust".

b. Any loss, cost or expense arising, in whole or in part, out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to or assessing the effects of, "silica" or "silica-related dust", by any insured or by any other person or entity.

**C.** The following definitions are added to the **Definitions** Section:

1. "Silica" means silicon dioxide (occurring in crystalline, amorphous and impure forms), silica particles, silica dust or silica compounds.

2. "Silica-related dust" means a mixture or combination of silica and other dust or particles.

© ISO Properties, Inc., 2004                       □

SUPP APP 0946

COMMERCIAL GENERAL LIABILITY
CG 24 04 05 09

# WAIVER OF TRANSFER RIGHTS OF RECOVERY AGAINST OTHERS TO US

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

## SCHEDULE

| Name of Person or Organization: |
| --- |
| TOWN OF ADDISON<br>PO BOX 9010<br>ADDISON, TX 75001 |

The following is added to Paragraph **8. Transfer Of Rights Of Recovery Against Others To Us** of **Section IV - Conditions:**

We waive any right of recovery we may have against the person or organization shown in the Schedule above because of payments we make for injury or damage arising out of your ongoing operations or "your work" done under a contract with that person or organization and included in the "products-completed operations hazard". This waiver applies only to the person or organization shown in the Schedule above.

    © Insurance Services Office, Inc., 2008

SUPP APP 0947

POLICY NUMBER: CCP 672836                                        COMMERCIAL GENERAL LIABILITY

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# PRODUCTS/COMPLETED OPERATIONS HAZARD
# REDEFINED

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART
PRODUCTS/COMPLETED OPERATIONS LIABILITY COVERAGE PART

### SCHEDULE

**Description of Premises and Operations :**

PIZZA RESTAURANT
5026 ADDISON CIRCLE
ADDISON, TX 75001-3332

(If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed:

1. On, from or in connection with the use of any premises described in the Schedule, or

2. In connection with the conduct of any operation described in the Schedule, when conducted by you or on your behalf.

Paragraph **a** . of the definition of "Products - completed operations hazard" in the DEFINITIONS Section is replaced by the following: "Products - completed operations hazard":

**a** Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

CG 24 07 01 96                    Copyright, Insurance Services Office, Inc., 1994                    **Page 1 of 1**

SUPP APP 0948

CGL 1701a 0510

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# SPECIAL EXCLUSIONS AND LIMITATIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.  **In consideration of the premium charged this policy has been issued subject to the following exclusions being added to Coverages A & B:**

This insurance does not apply to:

1.  **Asbestos or Lead**

    "Bodily injury", "property damage", or "personal and advertising injury" arising out of or resulting from the disposal, existence, handling, ingestion, inhalation, removal, sale, storage, transportation or use of:
    a.  Asbestos or any material containing asbestos; or
    b.  Lead, lead based paint, lead compounds or any material containing lead.

2.  **Athletic or Sports Participants**

    "Bodily injury" to any person while practicing for, participating in or officiating at any sports or athletic contest or exhibition that you sponsor or in which you or your employees or guests participate.

3.  **Communicable Disease or Diseases**

    "Bodily injury" or "personal and advertising injury" arising out of or resulting from the transmission or alleged transmission of any sexually transmitted disease or any other disease transmitted by bodily fluids or excretions.

4.  **Criminal Acts**
    a.  "Bodily injury" or "property damage" arising out of or resulting from a criminal act committed by any insured, including any additional insureds or
    b.  "Bodily injury" or "property damage" arising out of or resulting from a criminal act at the direction of any insured, including any additional insureds.

SUPP APP 0949

5. **Mold, Fungi, Virus, Bacteria, Air Quality, Contaminants, Minerals or Other Harmful Materials**

   a. "Bodily injury", "property damage", or "personal and advertising injury" arising out of, caused by, or contributed to in any way by the existence, growth, spread, dispersal, release, or escape of any mold, fungi, lichen, virus, bacteria or other growing organism that has toxic, hazardous, noxious, pathogenic, irritating or allergen qualities or characteristics. This exclusion applies to all such claims or causes of action, including allegations that any insured caused or contributed to conditions that encouraged the growth, depositing or establishment of such colonies of mold, lichen, fungi, virus, bacteria or other living or dead organism or

   b. "Bodily injury", "property damage", or "personal and advertising injury" arising out of, caused by, or alleging to be contributed to in any way by any toxic, hazardous, noxious, irritating, pathogenic or allergen qualities or characteristics of indoor air regardless of cause or

   c. "Bodily injury", "property damage", or "personal and advertising injury" arising out of, caused by, or alleging to be contributed to in any way by any insured's use, sale, installation or removal of any substance, material, or other product that is either alleged or deemed to be hazardous, toxic, irritating, pathogenic or noxious in any way, or contributes in any way to an allergic reaction.

   d. "Bodily injury", "property damage", or "personal and advertising injury" arising out of, caused by, or alleging to be contributed to in any way by toxic or hazardous properties of minerals or other substances.

6. **Work or Premises Specifically Insured Elsewhere**

   Claims, demands, requests for defense, payment, or any other cost arising out of, caused by, or occurring at premises or "your work" covered under any insurance purchased by you or others on your behalf specifically for that premises or project under a Consolidated Insurance Program (CIP), Owner Controlled Insurance Program (OCIP), Contractor Controlled Insurance Program (CCIP), Wrap-Up or similar insurance program.

7. **Failure To Complete "Your Work"**

   "Bodily injury", or "property damage" arising out of, caused by, resulting from, or alleged to be related to any insured's failure to complete "your work".

8. **Loss, Cost or Damages Prior To Tendered Claim**

   Any claim, loss, cost or damages that are projected, estimated, or otherwise assessed or adjudicated to be likely before such claims are actually made against the insured by the claimant, or their representatives, actually suffering the alleged "bodily injury" or "property damage".

SUPP APP 0950

B. **It is agreed that the following exclusions from Section I Coverages are changed as shown below:**

1. **Liquor Liability**

   Exclusion c., Liquor Liability of Section I Coverages, Coverage A 2. Exclusions, is deleted and entirely replaced with the following:

   c. **Liquor Liability**

      "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

      a. Causing or contributing to the intoxication of any person;

      b. Furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

      c. Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

      This exclusion applies only if you:

      a. Are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages; or

      b. Sell, otherwise provide, or make available alcoholic beverages as a regular part of your business or operations otherwise covered by this policy.

2. **Infringement Of Copyright, Patent, Trademark or Trade Secret**

   Exclusion i., Infringement of Copyright, Patent, Trademark or Trade Secret, of Section I Coverages, Coverage B. 2. Exclusions, is deleted and entirely replaced with the following:

   i. **Infringement Of Copyright, Patent, Trademark or Trade Secret**

      Claims arising out of the infringement of copyright, patent, trademark, trade name, trade dress, trade secret or other intellectual property rights.

C. **It is agreed that SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS is changed as follows:**

   1. **Item 4. Other Insurance** is deleted and entirely replaced by the following:

      **4. Other Insurance**

      If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

      a. This insurance is excess over any other insurance whether the other insurance is stated to be primary, pro rata, contributory, excess, contingent, umbrella, or on any other basis; unless the other insurance is issued to the named insured shown in the Declarations of this Coverage Part and is written explicitly to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

      b. When this insurance is excess, we will have no duty under Coverage A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers.

SUPP APP 0951

    c.   When this insurance is excess over other insurance, we will pay only our share of the amount of loss, if any, that exceeds the sum of:

        (1)  The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

        (2)  The total of all deductible and self insured amounts under all that other insurance.

2. **Item 5. Premium Audit** is deleted and entirely replaced by the following:

**5. Premium Audit**

    a.   We will compute all premiums for this Coverage Part in accordance with our rules and rates.

    b.   Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

    c.   The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

    d.   Any premium to be returned under b. above is subject to the minimum premium shown in the Declarations page as applicable to this Coverage Part.

3. **Item 9. When We Do Not Renew** is deleted in its entirety and is *not replaced*.

**D.**   **It is agreed that the following changes are made to SECTION V – DEFINITIONS:**

The following definitions are deleted and entirely replaced:

1.   Item 5. "Employee" is deleted in its entirety and replaced by the following:

    5. "Employee" includes a "leased worker", a "temporary worker" and a "volunteer worker".

2.   Item 9. "Insured contract" is deleted in its entirety and replaced by the following:

    9. "Insured contract" means:

        a.   A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

        b.   A sidetrack agreement;

        c.   Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

        d.   An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

        e.   An elevator maintenance agreement;

        f.   That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

        Paragraph f. does not include that part of any contract or agreement:

        (1)  That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

       

SUPP APP 0952

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

    (a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

    (b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

(4) That indemnifies another for the sole negligence of such other person or organization.

3.  Item 13. "Occurrence" is deleted in its entirety and replaced with the following:

    13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All "bodily injury" or "property damage" arising out of an "occurrence" or series of related "occurrences" is deemed to take place at the time of the first such damage or injury even though the nature and extent of such damage or injury may change; and even though the damage may be continuous, progressive, cumulative, changing or evolving; and even though the "occurrence" causing such "bodily injury" or "property damage" may be continuous or repeated exposure to substantially the same general harmful conditions.

4.  Item 14. "Personal and advertising injury" is deleted in its entirety and replaced with the following:

    14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    a. False arrest, detention or imprisonment;

    b. Malicious prosecution;

    c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; or

    d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

5.  Item 17. "Property Damage" is deleted in its entirety and replaced with the following.

    17. "Property damage" means:

    a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

    For the purposes of this insurance, electronic data is not tangible property.

    As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

    For the purposes of this insurance, "property damage" is not physical injury to tangible property, any resultant loss of use of tangible property, nor loss of use of tangible property that is not physically injured that arises out of failure to complete or abandonment of "your work".

6.  Item 20. "Volunteer worker" is deleted in its entirety and replaced with the following:

    20. "Volunteer worker" means a person who donates his or her work and acts at the direction of and within the scope of duties determined by you, and is not paid a fee, salary or other compensation by you or anyone else for their work performed for you.

SUPP APP 0953

CGL 1702 11/00

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# ACTION OVER EXCLUSION

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

It is agreed that the following change is made to Coverage A. 2. Exclusions:

Exclusion  **e. Employer's Liability** is deleted in its entirety and replaced with the following:

**e. Employer's Liability**

"Bodily injury" to:

(1) An "employee" of the named insured arising out of and in the course of:
   (a) Employment by the named insured; or
   (b) Performing duties related to the conduct of the named insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above.

This exclusion applies:

(1) Whether the named insured may be liable as an employer or in any other capacity; and
(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury.

**CGL 1702  11/00**                                                                 **Page 1 of 1**

SUPP APP 0954

CGL 1711 0406

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIMITATION OF COVERAGE TO SPECIFIED CLASSIFICATIONS, OPERATIONS, PREMISES, OR PROJECTS

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

### SCHEDULE

| Classification: | Description |
|---|---|
| | |
| **Premises:**<br>5026 ADDISON CIRCLE<br>ADDISON, TX 75001-3332 | |
| **Project:** | |
| | |

The following new part is added to      **Section I – Coverages, Coverage A. Bodily Injury and Property Damage Liability, 1. Insuring Agreement.**

**1. b. (4)** The "bodily injury" or "property damage" arise from:

   **(a)** The classifications or operations shown above; or any operations necessary or incidental to those classifications or operations shown above;

   **(b)** The ownership, maintenance or use of the premises shown above and operations necessary or incidental to those premises; or

   **(c)** The projects shown above.

The following new part is added to   **Section I – Coverages, Coverage B. Personal And Advertising Injury   Liability, 1. Insuring Agreement.**

**1. c.**      This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense arises from:

   **(1)** The classifications or operations shown above; or any operations necessary or incidental to those classifications or operations shown above;

   **(2)** The ownership, maintenance or use of the premises shown above and operations necessary or incidental to those premises; or

   **(3)** The projects shown above.

**Part 3 . of Section II - WHO IS AN INSURED**   - is deleted in its entirety and does not apply to this insurance. **Coverage for classifications, operations, or projects _not_ shown above can only be covered if agreed to, in writing, by us as evidenced by endorsement to this policy.**

CGL 1711 0406

**Page 1 of 1**

SUPP APP 0955

CGL 1742 0310

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RESTAURANT, BAR, TAVERN & GROCERY STORE
# FOOD POISONING & FOOD CONTAMINATION
# COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

It is understood and agreed that CGL 1701, **Special Exclusions and Limitations Endorsement,** Exclusion **A. 6., Mold, Fungi, Virus, Bacteria, Air Quality, Contaminants, Minerals or Other Harmful Materials,** is amended as follows:

**Exclusion A. 6.** does not apply if:

1.  the "bodily injury", "property damage" or "personal and advertising injury" is caused by food or drink poisoning or contamination; and
2.  the insured is a restaurant, bar, tavern, grocery store, or other entity that sells or serves food or drink directly to consumers; and
3.  the poisoned or contaminated food or drink was sold or served by the insured.

CGL 1742 0310                                                                                    Page 1 of 1

SUPP APP 0956

CLL 1902 0306

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# LIQUOR LIABILITY COVERAGE ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

In consideration of the premium charged this policy has been issued subject to the following changes, additional conditions and exclusions:

1.  It is agreed that **Section I – Coverages, Coverage A Bodily Injury and Property Damage Liability, 2. Exclusions** is changed as follows:

    a.  **Expected or Intended Injury** is deleted and entirely replaced by the following:
        a.  **Expected or Intended Injury**
            "Bodily injury" or "property damage" expected or intended from the standpoint of any insured.

    c.  **Liquor Liability** as stated in the Commercial General Liability Coverage Part and as amended in CGL 1701 is deleted in its entirety and replaced by the following:

    **Liquor Liability Exclusion**

        c.  **Liquor Liability**

            "Liquor Liability" is defined as "Bodily injury" or "property damage" for which any insured may be held liable by reason of:

            a.  Causing or contributing to the intoxication of any person;

            b.  Furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

            c.  Violation of any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

            We have neither a duty to defend nor a duty to indemnify any insured for any claim or suit, and this insurance does not apply, if any proximate or contributing cause of an "occurrence" arises out of "liquor liability". This exclusion applies to all insureds regardless of whether you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.
            **However this exclusion does not apply to claims within the "products-completed operations hazard".**

2.  Additional exclusions:
    This insurance does not apply to:

    **Liquor License Not In Effect**
    "Bodily injury" or "property damage" arising out of any alcoholic beverage sold, served or furnished while any required license is suspended or after such license expires, is cancelled or revoked.

CLL 1902 0306

Page 1 of 2

SUPP APP 0957

**Alcohol Related Disease**
Mental anguish, sickness, disease or any other condition arising out of, caused by or in any way related to the use or consumption over time of alcohol, liquor or any other product containing alcohol.

3. It is agreed that **Section I – Coverages, Coverage C. Medical Payments** is deleted in its entirety.

4. The following is added to **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

   In the event this policy is filed with any governmental entity instead of or as a replacement for a statutory or other legally required Liquor Bond, this policy will not be construed to cover or insure any requirements or obligations of such bond.

5. LIMITS of INSURANCE

   It is a condition precedent to coverage under this endorsement that all such claims arising out of coverage granted here under are covered within and will reduce the products-completed operations aggregate limit shown in the Declarations.

All other terms and conditions of this policy remain in force.

SUPP APP 0958

# Century Surety Company
## COMMERCIAL PROPERTY COVERAGE PART DECLARATIONS

**Policy No.:**   CCP  672836

**NAMED INSURED:** PASTAZIOS PIZZA, INC.

**Effective Date:**  09-21-2010 **

**12:01 A.M. Standard Time**

---

**DESCRIPTION OF PREMISES:**

| PREM | BLDG NO | LOCATION ADDRESS | CITY | ST | ZIP | CONST | OCCUPANCY | P/C |
|------|---------|------------------|------|----|----|-------|-----------|-----|
| 1 | 1 | 5026 Addison Circle | Addison | TX | 75001 | Frame | PIZZA RESTAURANT | PC - 3 |

**COVERAGES PROVIDED** - Insurance at the described premises applies only for which a limit of insurance is shown

| PREM | BLDG NO | OCC CODE | COVERAGE | LIMIT INSURED | VALUATION | COVERED CAUSES OF LOSS | COINS | RATE |
|------|---------|----------|----------|---------------|-----------|------------------------|-------|------|
| 1 | 1 | 0542 | Business Personal Property | $ 457,600 | RC | Special Form including theft | 90% | 0.82300 |
| 1 | 1 | 1190 | Signs | $ 8,500 | RC | Special Form including theft | 90% | 3.08800 |
| 1 | 1 | 0542 | GLASS | $ 5,000 | RC | Special Form including theft | 90% | 2.00000 |

RC means Replacement Cost, ACV means Actual Cash Value; MP means Minimum Premium

**OPTIONAL COVERAGES** - Applicable only when entries are made in the schedule below

| PREM | BLDG NO | CODE | COVERAGE | LIMIT INSURED | COVERED CAUSES OF LOSS | COINS | RATE |
|------|---------|------|----------|---------------|------------------------|-------|------|
| 1 | 1 | 0542 | EQUIPMENT BREAKDOWN - PREMIUM - $86 | $ INCLUDED | EQUIPMENT BREAKDOWN | N/A | 0.01890 |
| 1 | 1 | 0542 | LIMITED PROPERTY EXT - FLAT FEE - $150 | $ SEE CCF1514 | | | |

EB means Equipment Breakdown, BI means Business Income, EE means Extra Expense

| PREM | BLDG NO | MONTHLY LIMIT OF INDEMNITY | MAXIMUM PERIOD OF INDEMNITY | EXTENDED PERIOD OF INDEMNITY |
|------|---------|----------------------------|-----------------------------|------------------------------|
| | | | | |

**MORTGAGE HOLDERS**

| PREM | BLDG NO | MORTGAGE HOLDER NAME AND MAILING ADDRESS |
|------|---------|------------------------------------------|
| | | |

**DEDUCTIBLE**

See Attached Form CCF 1512

**FORMS AND ENDORSEMENTS** (other than applicable Forms and Endorsements shown elsewhere in the policy):

Forms and Endorsements applying  to this Coverage Part and made part of this policy at time of issue:

See Attached Schedule of Forms CIL 15 00B 02 02

**PREMIUM**

| | | | |
|---|---|---|---|
| Subtotal for this Coverage Part | $ 4,364 | Minimum Premium for this Coverage Part:$ | 300 |
| TRIA Coverage | $ 0 | | |
| Premium for this Coverage Part | $ 4,364 | | |

---

## THESE DECLARATIONS ARE PART OF THE POLICY DECLARATIONS CONTAINING THE NAME OF THIS INSURED AND THE POLICY PERIOD

SUPP APP 0959

# BUILDING AND PERSONAL PROPERTY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations. The words "we", "us" and "our" refer to the Company providing this insurance.

Other words and phrases that appear in quotation marks have special meaning. Refer to Section H., Definitions.

## A. Coverage

We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.

### 1. Covered Property

Covered Property, as used in this Coverage Part, means the type of property described in this section, A.1., and limited in A.2., Property Not Covered, if a Limit of Insurance is shown in the Declarations for that type of property.

a. **Building,** meaning the building or structure described in the Declarations, including:

(1) Completed additions;

(2) Fixtures, including outdoor fixtures;

(3) Permanently installed:

(a) Machinery and

(b) Equipment;

(4) Personal property owned by you that is used to maintain or service the building or structure or its premises, including:

(a) Fire-extinguishing equipment;

(b) Outdoor furniture;

(c) Floor coverings; and

(d) Appliances used for refrigerating, ventilating, cooking, dishwashing or laundering;

(5) If not covered by other insurance:

(a) Additions under construction, alterations and repairs to the building or structure;

(b) Materials, equipment, supplies and temporary structures, on or within 100 feet of the described premises, used for making additions, alterations or repairs to the building or structure.

b. **Your Business Personal Property** located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises, consisting of the following unless otherwise specified in the Declarations or on the Your Business Personal Property – Separation Of Coverage form:

(1) Furniture and fixtures;

(2) Machinery and equipment;

(3) "Stock";

(4) All other personal property owned by you and used in your business;

(5) Labor, materials or services furnished or arranged by you on personal property of others;

(6) Your use interest as tenant in improvements and betterments. Improvements and betterments are fixtures, alterations, installations or additions:

(a) Made a part of the building or structure you occupy but do not own; and

(b) You acquired or made at your expense but cannot legally remove;

(7) Leased personal property for which you have a contractual responsibility to insure, unless otherwise provided for under Personal Property Of Others.

© ISO Properties, Inc., 2007

SUPP APP 0960

c. **Personal Property Of Others** that is:

   (1) In your care, custody or control; and

   (2) Located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

   However, our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

2. **Property Not Covered**

   Covered Property does not include:

   a. Accounts, bills, currency, food stamps or other evidences of debt, money, notes or securities. Lottery tickets held for sale are not securities;

   b. Animals, unless owned by others and boarded by you, or if owned by you, only as "stock" while inside of buildings;

   c. Automobiles held for sale;

   d. Bridges, roadways, walks, patios or other paved surfaces;

   e. Contraband, or property in the course of illegal transportation or trade;

   f. The cost of excavations, grading, backfilling or filling;

   g. Foundations of buildings, structures, machinery or boilers if their foundations are below:

      (1) The lowest basement floor; or

      (2) The surface of the ground, if there is no basement;

   h. Land (including land on which the property is located), water, growing crops or lawns;

   i. Personal property while airborne or waterborne;

   j. Bulkheads, pilings, piers, wharves or docks;

   k. Property that is covered under another coverage form of this or any other policy in which it is more specifically described, except for the excess of the amount due (whether you can collect on it or not) from that other insurance;

   l. Retaining walls that are not part of a building;

   m. Underground pipes, flues or drains;

   n. Electronic data, except as provided under the Additional Coverage, Electronic Data. Electronic data means information, facts or computer programs stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software), on hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other repositories of computer software which are used with electronically controlled equipment. The term computer programs, referred to in the foregoing description of electronic data, means a set of related electronic instructions which direct the operations and functions of a computer or device connected to it, which enable the computer or device to receive, process, store, retrieve or send data. This paragraph, **n.**, does not apply to your "stock" of prepackaged software;

   o. The cost to replace or restore the information on valuable papers and records, including those which exist as electronic data. Valuable papers and records include but are not limited to proprietary information, books of account, deeds, manuscripts, abstracts, drawings and card index systems. Refer to the Coverage Extension for Valuable Papers And Records (Other Than Electronic Data) for limited coverage for valuable papers and records other than those which exist as electronic data;

   p. Vehicles or self-propelled machines (including aircraft or watercraft) that:

      (1) Are licensed for use on public roads; or

      (2) Are operated principally away from the described premises.

      This paragraph does not apply to:

      (a) Vehicles or self-propelled machines or autos you manufacture, process or warehouse;

      (b) Vehicles or self-propelled machines, other than autos, you hold for sale;

      (c) Rowboats or canoes out of water at the described premises; or

      (d) Trailers, but only to the extent provided for in the Coverage Extension for Non-owned Detached Trailers;

© ISO Properties, Inc., 2007

CP 00 10 06 07     ☐

SUPP APP 0961

q. The following property while outside of buildings:

(1) Grain, hay, straw or other crops;

(2) Fences, radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers, trees, shrubs or plants (other than "stock" of trees, shrubs or plants), all except as provided in the Coverage Extensions.

## 3. Covered Causes Of Loss

See applicable Causes Of Loss Form as shown in the Declarations.

## 4. Additional Coverages

### a. Debris Removal

(1) Subject to Paragraphs (3) and (4), we will pay your expense to remove debris of Covered Property caused by or resulting from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date of direct physical loss or damage.

(2) Debris Removal does not apply to costs to:

(a) Extract "pollutants" from land or water; or

(b) Remove, restore or replace polluted land or water.

(3) Subject to the exceptions in Paragraph (4), the following provisions apply:

(a) The most we will pay for the total of direct physical loss or damage plus debris removal expense is the Limit of Insurance applicable to the Covered Property that has sustained loss or damage.

(b) Subject to (a) above, the amount we will pay for debris removal expense is limited to 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

(4) We will pay up to an additional $10,000 for debris removal expense, for each location, in any one occurrence of physical loss or damage to Covered Property, if one or both of the following circumstances apply:

(a) The total of the actual debris removal expense plus the amount we pay for direct physical loss or damage exceeds the Limit of Insurance on the Covered Property that has sustained loss or damage.

(b) The actual debris removal expense exceeds 25% of the sum of the deductible plus the amount that we pay for direct physical loss or damage to the Covered Property that has sustained loss or damage.

Therefore, if (4)(a) and/or (4)(b) apply, our total payment for direct physical loss or damage and debris removal expense may reach but will never exceed the Limit of Insurance on the Covered Property that has sustained loss or damage, plus $10,000.

(5) Examples

The following examples assume that there is no Coinsurance penalty.

EXAMPLE #1

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 50,000 |
| Amount of Loss Payable: | $ 49,500 |
| | ($50,000 – $500) |
| Debris Removal Expense: | $ 10,000 |
| Debris Removal Expense Payable: | $ 10,000 |

($10,000 is 20% of $50,000.)

The debris removal expense is less than 25% of the sum of the loss payable plus the deductible. The sum of the loss payable and the debris removal expense ($49,500 + $10,000 = $59,500) is less than the Limit of Insurance. Therefore the full amount of debris removal expense is payable in accordance with the terms of Paragraph (3).

EXAMPLE #2

| | |
|---|---|
| Limit of Insurance: | $ 90,000 |
| Amount of Deductible: | $ 500 |
| Amount of Loss: | $ 80,000 |
| Amount of Loss Payable: | $ 79,500 |
| | ($80,000 – $500) |
| Debris Removal Expense: | $ 30,000 |
| Debris Removal Expense Payable | |
| Basic Amount: | $ 10,500 |
| Additional Amount: | $ 10,000 |

SUPP APP 0962

The basic amount payable for debris removal expense under the terms of Paragraph (3) is calculated as follows: $80,000 ($79,500 + $500) x .25 = $20,000; capped at $10,500. The cap applies because the sum of the loss payable ($79,500) and the basic amount payable for debris removal expense ($10,500) cannot exceed the Limit of Insurance ($90,000).

The additional amount payable for debris removal expense is provided in accordance with the terms of Paragraph (4), because the debris removal expense ($30,000) exceeds 25% of the loss payable plus the deductible ($30,000 is 37.5% of $80,000), and because the sum of the loss payable and debris removal expense ($79,500 + $30,000 = $109,500) would exceed the Limit of Insurance ($90,000). The additional amount of covered debris removal expense is $10,000, the maximum payable under Paragraph (4). Thus the total payable for debris removal expense in this example is $20,500; $9,500 of the debris removal expense is not covered.

### b. Preservation Of Property

If it is necessary to move Covered Property from the described premises to preserve it from loss or damage by a Covered Cause of Loss, we will pay for any direct physical loss or damage to that property:

**(1)** While it is being moved or while temporarily stored at another location; and

**(2)** Only if the loss or damage occurs within 30 days after the property is first moved.

### c. Fire Department Service Charge

When the fire department is called to save or protect Covered Property from a Covered Cause of Loss, we will pay up to $1,000, unless a higher limit is shown in the Declarations, for your liability for fire department service charges:

**(1)** Assumed by contract or agreement prior to loss; or

**(2)** Required by local ordinance.

No Deductible applies to this Additional Coverage.

### d. Pollutant Clean-up And Removal

We will pay your expense to extract "pollutants" from land or water at the described premises if the discharge, dispersal, seepage, migration, release or escape of the "pollutants" is caused by or results from a Covered Cause of Loss that occurs during the policy period. The expenses will be paid only if they are reported to us in writing within 180 days of the date on which the Covered Cause of Loss occurs.

This Additional Coverage does not apply to costs to test for, monitor or assess the existence, concentration or effects of "pollutants". But we will pay for testing which is performed in the course of extracting the "pollutants" from the land or water.

The most we will pay under this Additional Coverage for each described premises is $10,000 for the sum of all covered expenses arising out of Covered Causes of Loss occurring during each separate 12-month period of this policy.

### e. Increased Cost Of Construction

**(1)** This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

**(2)** In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with enforcement of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in e.(3) through e.(9) of this Additional Coverage.

**(3)** The ordinance or law referred to in e.(2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises, and is in force at the time of loss.

SUPP APP 0963

**(4)** Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

    **(a)** You were required to comply with before the loss, even when the building was undamaged; and

    **(b)** You failed to comply with.

**(5)** Under this Additional Coverage, we will not pay for:

    **(a)** The enforcement of any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

    **(b)** Any costs associated with the enforcement of an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

**(6)** The most we will pay under this Additional Coverage, for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of: $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7)** With respect to this Additional Coverage:

    **(a)** We will not pay for the Increased Cost of Construction:

        **(i)** Until the property is actually repaired or replaced, at the same or another premises; and

        **(ii)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.

    **(b)** If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the increased cost of construction at the same premises.

    **(c)** If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e.(6) of this Additional Coverage, is the increased cost of construction at the new premises.

**(8)** This Additional Coverage is not subject to the terms of the Ordinance Or Law Exclusion, to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

**(9)** The costs addressed in the Loss Payment and Valuation Conditions, and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of an ordinance or law. The amount payable under this Additional Coverage, as stated in e.(6) of this Additional Coverage, is not subject to such limitation.

**f. Electronic Data**

**(1)** Under this Additional Coverage, electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** Subject to the provisions of this Additional Coverage, we will pay for the cost to replace or restore electronic data which has been destroyed or corrupted by a Covered Cause of Loss. To the extent that electronic data is not replaced or restored, the loss will be valued at the cost of replacement of the media on which the electronic data was stored, with blank media of substantially identical type.

SUPP APP 0964

(3) The Covered Causes of Loss applicable to Your Business Personal Property apply to this Additional Coverage, Electronic Data, subject to the following:

(a) If the Causes Of Loss – Special Form applies, coverage under this Additional Coverage, Electronic Data, is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

(b) If the Causes Of Loss – Broad Form applies, coverage under this Additional Coverage, Electronic Data, includes Collapse as set forth in that form.

(c) If the Causes Of Loss Form is endorsed to add a Covered Cause of Loss, the additional Covered Cause of Loss does not apply to the coverage provided under this Additional Coverage, Electronic Data.

(d) The Covered Causes of Loss include a virus, harmful code or similar instruction introduced into or enacted on a computer system (including electronic data) or a network to which it is connected, designed to damage or destroy any part of the system or disrupt its normal operation. But there is no coverage for loss or damage caused by or resulting from manipulation of a computer system (including electronic data) by any employee, including a temporary or leased employee, or by an entity retained by you or for you to inspect, design, install, modify, maintain, repair or replace that system.

(4) The most we will pay under this Additional Coverage, Electronic Data, is $2,500 for all loss or damage sustained in any one policy year, regardless of the number of occurrences of loss or damage or the number of premises, locations or computer systems involved. If loss payment on the first occurrence does not exhaust this amount, then the balance is available for subsequent loss or damage sustained in but not after that policy year. With respect to an occurrence which begins in one policy year and continues or results in additional loss or damage in a subsequent policy year(s), all loss or damage is deemed to be sustained in the policy year in which the occurrence began.

5. **Coverage Extensions**

Except as otherwise provided, the following Extensions apply to property located in or on the building described in the Declarations or in the open (or in a vehicle) within 100 feet of the described premises.

If a Coinsurance percentage of 80% or more, or a Value Reporting period symbol, is shown in the Declarations, you may extend the insurance provided by this Coverage Part as follows:

a. **Newly Acquired Or Constructed Property**

(1) **Buildings**

If this policy covers Building, you may extend that insurance to apply to:

(a) Your new buildings while being built on the described premises; and

(b) Buildings you acquire at locations, other than the described premises, intended for:

(i) Similar use as the building described in the Declarations; or

(ii) Use as a warehouse.

The most we will pay for loss or damage under this Extension is $250,000 at each building.

(2) **Your Business Personal Property**

(a) If this policy covers Your Business Personal Property, you may extend that insurance to apply to:

(i) Business personal property, including such property that you newly acquire, at any location you acquire other than at fairs, trade shows or exhibitions;

(ii) Business personal property, including such property that you newly acquire, located at your newly constructed or acquired buildings at the location described in the Declarations; or

(iii) Business personal property that you newly acquire, located at the described premises.

The most we will pay for loss or damage under this Extension is $100,000 at each building.

© ISO Properties, Inc., 2007 CP 00 10 06 07 ☐

SUPP APP 0965

**(b)** This Extension does not apply to:

**(i)** Personal property of others that is temporarily in your possession in the course of installing or performing work on such property; or

**(ii)** Personal property of others that is temporarily in your possession in the course of your manufacturing or wholesaling activities.

**(3) Period Of Coverage**

With respect to insurance on or at each newly acquired or constructed property, coverage will end when any of the following first occurs:

**(a)** This policy expires;

**(b)** 30 days expire after you acquire the property or begin construction of that part of the building that would qualify as covered property; or

**(c)** You report values to us.

We will charge you additional premium for values reported from the date you acquire the property or begin construction of that part of the building that would qualify as covered property.

**b. Personal Effects And Property Of Others**

You may extend the insurance that applies to Your Business Personal Property to apply to:

**(1)** Personal effects owned by you, your officers, your partners or members, your managers or your employees. This Extension does not apply to loss or damage by theft.

**(2)** Personal property of others in your care, custody or control.

The most we will pay for loss or damage under this Extension is $2,500 at each described premises. Our payment for loss of or damage to personal property of others will only be for the account of the owner of the property.

**c. Valuable Papers And Records (Other Than Electronic Data)**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to the cost to replace or restore the lost information on valuable papers and records for which duplicates do not exist. But this Extension does not apply to valuable papers and records which exist as electronic data. Electronic data has the meaning described under Property Not Covered, Electronic Data.

**(2)** If the Causes Of Loss – Special Form applies, coverage under this Extension is limited to the "specified causes of loss" as defined in that form, and Collapse as set forth in that form.

**(3)** If the Causes Of Loss – Broad Form applies, coverage under this Extension includes Collapse as set forth in that form.

**(4)** Under this Extension, the most we will pay to replace or restore the lost information is $2,500 at each described premises, unless a higher limit is shown in the Declarations. Such amount is additional insurance. We will also pay for the cost of blank material for reproducing the records (whether or not duplicates exist), and (when there is a duplicate) for the cost of labor to transcribe or copy the records. The costs of blank material and labor are subject to the applicable Limit of Insurance on Your Business Personal Property and therefore coverage of such costs is not additional insurance.

**d. Property Off-premises**

**(1)** You may extend the insurance provided by this Coverage Form to apply to your Covered Property while it is away from the described premises, if it is:

**(a)** Temporarily at a location you do not own, lease or operate;

**(b)** In storage at a location you lease, provided the lease was executed after the beginning of the current policy term; or

**(c)** At any fair, trade show or exhibition.

SUPP APP 0966

**(2)** This Extension does not apply to property:

   **(a)** In or on a vehicle; or

   **(b)** In the care, custody or control of your salespersons, unless the property is in such care, custody or control at a fair, trade show or exhibition.

**(3)** The most we will pay for loss or damage under this Extension is $10,000.

**e. Outdoor Property**

You may extend the insurance provided by this Coverage Form to apply to your outdoor fences, radio and television antennas (including satellite dishes), trees, shrubs and plants (other than "stock" of trees, shrubs or plants), including debris removal expense, caused by or resulting from any of the following causes of loss if they are Covered Causes of Loss:

**(1)** Fire;

**(2)** Lightning;

**(3)** Explosion;

**(4)** Riot or Civil Commotion; or

**(5)** Aircraft.

The most we will pay for loss or damage under this Extension is $1,000, but not more than $250 for any one tree, shrub or plant. These limits apply to any one occurrence, regardless of the types or number of items lost or damaged in that occurrence.

**f. Non-owned Detached Trailers**

**(1)** You may extend the insurance that applies to Your Business Personal Property to apply to loss or damage to trailers that you do not own, provided that:

   **(a)** The trailer is used in your business;

   **(b)** The trailer is in your care, custody or control at the premises described in the Declarations; and

   **(c)** You have a contractual responsibility to pay for loss or damage to the trailer.

**(2)** We will not pay for any loss or damage that occurs:

   **(a)** While the trailer is attached to any motor vehicle or motorized conveyance, whether or not the motor vehicle or motorized conveyance is in motion;

   **(b)** During hitching or unhitching operations, or when a trailer becomes accidentally unhitched from a motor vehicle or motorized conveyance.

**(3)** The most we will pay for loss or damage under this Extension is $5,000, unless a higher limit is shown in the Declarations.

**(4)** This insurance is excess over the amount due (whether you can collect on it or not) from any other insurance covering such property.

Each of these Extensions is additional insurance unless otherwise indicated. The Additional Condition, Coinsurance, does not apply to these Extensions.

**B. Exclusions And Limitations**

See applicable Causes Of Loss Form as shown in the Declarations.

**C. Limits Of Insurance**

The most we will pay for loss or damage in any one occurrence is the applicable Limit of Insurance shown in the Declarations.

The most we will pay for loss or damage to outdoor signs, whether or not the sign is attached to a building, is $2,500 per sign in any one occurrence.

The amounts of insurance stated in the following Additional Coverages apply in accordance with the terms of such coverages and are separate from the Limit(s) of Insurance shown in the Declarations for any other coverage:

**1.** Fire Department Service Charge;

**2.** Pollutant Clean-up And Removal;

**3.** Increased Cost Of Construction; and

**4.** Electronic Data.

Payments under the Preservation Of Property Additional Coverage will not increase the applicable Limit of Insurance.

© ISO Properties, Inc., 2007 CP 00 10 06 07 ☐

SUPP APP 0967

## D. Deductible

In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence.

### EXAMPLE #1

(This example assumes there is no Coinsurance penalty.)

| | |
|---|---|
| Deductible: | $ 250 |
| Limit of Insurance – Building #1: | $ 60,000 |
| Limit of Insurance – Building #2: | $ 80,000 |
| Loss to Building #1: | $ 60,100 |
| Loss to Building #2: | $ 90,000 |

The amount of loss to Building #1 ($60,100) is less than the sum ($60,250) of the Limit of Insurance applicable to Building #1 plus the Deductible.

The Deductible will be subtracted from the amount of loss in calculating the loss payable for Building #1:

$ 60,100
– 250
$ 59,850 Loss Payable – Building #1

The Deductible applies once per occurrence and therefore is not subtracted in determining the amount of loss payable for Building #2. Loss payable for Building #2 is the Limit of Insurance of $80,000.

Total amount of loss payable:
$59,850 + $80,000 = $139,850

### EXAMPLE #2

(This example, too, assumes there is no Coinsurance penalty.)

The Deductible and Limits of Insurance are the same as those in Example #1.

| | |
|---|---|
| Loss to Building #1: | $ 70,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss to Building #2: | $ 90,000 |
| (Exceeds Limit of Insurance plus Deductible) | |
| Loss Payable – Building #1: | $ 60,000 |
| (Limit of Insurance) | |
| Loss Payable – Building #2: | $ 80,000 |
| (Limit of Insurance) | |
| Total amount of loss payable: | $ 140,000 |

## E. Loss Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Abandonment

There can be no abandonment of any property to us.

### 2. Appraisal

If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and

b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

SUPP APP 0968

3. **Duties In The Event Of Loss Or Damage**

  a. You must see that the following are done in the event of loss or damage to Covered Property:

  (1) Notify the police if a law may have been broken.

  (2) Give us prompt notice of the loss or damage. Include a description of the property involved.

  (3) As soon as possible, give us a description of how, when and where the loss or damage occurred.

  (4) Take all reasonable steps to protect the Covered Property from further damage, and keep a record of your expenses necessary to protect the Covered Property, for consideration in the settlement of the claim. This will not increase the Limit of Insurance. However, we will not pay for any subsequent loss or damage resulting from a cause of loss that is not a Covered Cause of Loss. Also, if feasible, set the damaged property aside and in the best possible order for examination.

  (5) At our request, give us complete inventories of the damaged and undamaged property. Include quantities, costs, values and amount of loss claimed.

  (6) As often as may be reasonably required, permit us to inspect the property proving the loss or damage and examine your books and records.

  Also permit us to take samples of damaged and undamaged property for inspection, testing and analysis, and permit us to make copies from your books and records.

  (7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

  (8) Cooperate with us in the investigation or settlement of the claim.

  b. We may examine any insured under oath, while not in the presence of any other insured and at such times as may be reasonably required, about any matter relating to this insurance or the claim, including an insured's books and records. In the event of an examination, an insured's answers must be signed.

4. **Loss Payment**

  a. In the event of loss or damage covered by this Coverage Form, at our option, we will either:

  (1) Pay the value of lost or damaged property;

  (2) Pay the cost of repairing or replacing the lost or damaged property, subject to **b.** below;

  (3) Take all or any part of the property at an agreed or appraised value; or

  (4) Repair, rebuild or replace the property with other property of like kind and quality, subject to **b.** below.

  We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

  b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

  c. We will give notice of our intentions within 30 days after we receive the sworn proof of loss.

  d. We will not pay you more than your financial interest in the Covered Property.

  e. We may adjust losses with the owners of lost or damaged property if other than you. If we pay the owners, such payments will satisfy your claims against us for the owners' property. We will not pay the owners more than their financial interest in the Covered Property.

  f. We may elect to defend you against suits arising from claims of owners of property. We will do this at our expense.

  g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:

  (1) We have reached agreement with you on the amount of loss; or

  (2) An appraisal award has been made.

 © ISO Properties, Inc., 2007 CP 00 10 06 07  ☐

SUPP APP 0969

h. A party wall is a wall that separates and is common to adjoining buildings that are owned by different parties. In settling covered losses involving a party wall, we will pay a proportion of the loss to the party wall based on your interest in the wall in proportion to the interest of the owner of the adjoining building. However, if you elect to repair or replace your building and the owner of the adjoining building elects not to repair or replace that building, we will pay you the full value of the loss to the party wall, subject to all applicable policy provisions including Limits of Insurance, the Valuation and Coinsurance Conditions and all other provisions of this Loss Payment Condition. Our payment under the provisions of this paragraph does not alter any right of subrogation we may have against any entity, including the owner or insurer of the adjoining building, and does not alter the terms of the Transfer Of Rights Of Recovery Against Others To Us Condition in this policy.

5. **Recovered Property**

If either you or we recover any property after loss settlement, that party must give the other prompt notice. At your option, the property will be returned to you. You must then return to us the amount we paid to you for the property. We will pay recovery expenses and the expenses to repair the recovered property, subject to the Limit of Insurance.

6. **Vacancy**

a. **Description Of Terms**

(1) As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in (1)(a) and (1)(b) below:

(a) When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant. Such building is vacant when it does not contain enough business personal property to conduct customary operations.

(b) When this policy is issued to the owner or general lessee of a building, building means the entire building. Such building is vacant unless at least 31% of its total square footage is:

(i) Rented to a lessee or sub-lessee and used by the lessee or sub-lessee to conduct its customary operations; and/or

(ii) Used by the building owner to conduct customary operations.

(2) Buildings under construction or renovation are not considered vacant.

b. **Vacancy Provisions**

If the building where loss or damage occurs has been vacant for more than 60 consecutive days before that loss or damage occurs:

(1) We will not pay for any loss or damage caused by any of the following even if they are Covered Causes of Loss:

(a) Vandalism;

(b) Sprinkler leakage, unless you have protected the system against freezing;

(c) Building glass breakage;

(d) Water damage;

(e) Theft; or

(f) Attempted theft.

(2) With respect to Covered Causes of Loss other than those listed in b.(1)(a) through b.(1)(f) above, we will reduce the amount we would otherwise pay for the loss or damage by 15%.

7. **Valuation**

We will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b., c., d. and e. below.

b. If the Limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damaged building property is $2,500 or less, we will pay the cost of building repairs or replacement.

© ISO Properties, Inc., 2007

SUPP APP 0970

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

However, the following property will be valued at the actual cash value even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliances for refrigerating, ventilating, cooking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. "Stock" you have sold but not delivered at the selling price less discounts and expenses you otherwise would have had.

d. Glass at the cost of replacement with safety-glazing material if required by law.

e. Tenants' Improvements and Betterments at:

(1) Actual cash value of the lost or damaged property if you make repairs promptly.

(2) A proportion of your original cost if you do not make repairs promptly. We will determine the proportionate value as follows:

(a) Multiply the original cost by the number of days from the loss or damage to the expiration of the lease; and

(b) Divide the amount determined in (a) above by the number of days from the installation of improvements to the expiration of the lease.

If your lease contains a renewal option, the expiration of the renewal option period will replace the expiration of the lease in this procedure.

(3) Nothing if others pay for repairs or replacement.

### F. Additional Conditions

The following conditions apply in addition to the Common Policy Conditions and the Commercial Property Conditions.

### 1. Coinsurance

If a Coinsurance percentage is shown in the Declarations, the following condition applies.

a. We will not pay the full amount of any loss if the value of Covered Property at the time of loss times the Coinsurance percentage shown for it in the Declarations is greater than the Limit of Insurance for the property.

Instead, we will determine the most we will pay using the following steps:

(1) Multiply the value of Covered Property at the time of loss by the Coinsurance percentage;

(2) Divide the Limit of Insurance of the property by the figure determined in Step (1);

(3) Multiply the total amount of loss, before the application of any deductible, by the figure determined in Step (2); and

(4) Subtract the deductible from the figure determined in Step (3).

We will pay the amount determined in Step (4) or the limit of insurance, whichever is less. For the remainder, you will either have to rely on other insurance or absorb the loss yourself.

### EXAMPLE #1 (UNDERINSURANCE)

| When: | | |
|---|---|---|
| The value of the property is: | $ 250,000 | |
| The Coinsurance percentage for it is: | 80% | |
| The Limit of Insurance for it is: | $ 100,000 | |
| The Deductible is: | $ 250 | |
| The amount of loss is: | $ 40,000 | |

**Step (1):** $250,000 x 80% = $200,000

(the minimum amount of insurance to meet your Coinsurance requirements)

**Step (2):** $100,000 ÷ $200,000 = .50

**Step (3):** $40,000 x .50 = $20,000

**Step (4):** $20,000 − $250 = $19,750

We will pay no more than $19,750. The remaining $20,250 is not covered.

© ISO Properties, Inc., 2007

SUPP APP 0971

**EXAMPLE #2 (ADEQUATE INSURANCE)**

When:  The value of the property is:    $ 250,000

The Coinsurance percentage
for it is:    80%

The Limit of Insurance for it is:    $ 200,000

The Deductible is:    $ 250

The amount of loss is:    $ 40,000

The minimum amount of insurance to meet your Coinsurance requirement is $200,000 ($250,000 x 80%). Therefore, the Limit of Insurance in this example is adequate and no penalty applies. We will pay no more than $39,750 ($40,000 amount of loss minus the deductible of $250).

    **b.** If one Limit of Insurance applies to two or more separate items, this condition will apply to the total of all property to which the limit applies.

**EXAMPLE #3**

When:  The value of the property is:

Building at Location #1:    $ 75,000

Building at Location #2:    $ 100,000

Personal Property
at Location #2:    $ 75,000

     $ 250,000

The Coinsurance percentage
for it is:    90%

The Limit of Insurance for
Buildings and Personal Property
at Locations #1 and #2 is:    $ 180,000

The Deductible is:    $ 1,000

The amount of loss is:

Building at Location #2:    $ 30,000

Personal Property
at Location #2:    $ 20,000

     $ 50,000

**Step (1):** $250,000 x 90% = $225,000

(the minimum amount of insurance to meet your Coinsurance requirements and to avoid the penalty shown below)

**Step (2):** $180,000 ÷ $225,000 = .80

**Step (3):** $50,000 x .80 = $40,000

**Step (4):** $40,000 – $1,000 = $39,000

We will pay no more than $39,000. The remaining $11,000 is not covered.

**2. Mortgageholders**

    **a.** The term mortgageholder includes trustee.

    **b.** We will pay for covered loss of or damage to buildings or structures to each mortgageholder shown in the Declarations in their order of precedence, as interests may appear.

    **c.** The mortgageholder has the right to receive loss payment even if the mortgageholder has started foreclosure or similar action on the building or structure.

    **d.** If we deny your claim because of your acts or because you have failed to comply with the terms of this Coverage Part, the mortgageholder will still have the right to receive loss payment if the mortgageholder:

      **(1)** Pays any premium due under this Coverage Part at our request if you have failed to do so;

      **(2)** Submits a signed, sworn proof of loss within 60 days after receiving notice from us of your failure to do so; and

      **(3)** Has notified us of any change in ownership, occupancy or substantial change in risk known to the mortgageholder.

All of the terms of this Coverage Part will then apply directly to the mortgageholder.

    **e.** If we pay the mortgageholder for any loss or damage and deny payment to you because of your acts or because you have failed to comply with the terms of this Coverage Part:

      **(1)** The mortgageholder's rights under the mortgage will be transferred to us to the extent of the amount we pay; and

      **(2)** The mortgageholder's right to recover the full amount of the mortgageholder's claim will not be impaired.

At our option, we may pay to the mortgageholder the whole principal on the mortgage plus any accrued interest. In this event, your mortgage and note will be transferred to us and you will pay your remaining mortgage debt to us.

    **f.** If we cancel this policy, we will give written notice to the mortgageholder at least:

      **(1)** 10 days before the effective date of cancellation if we cancel for your non-payment of premium; or

      **(2)** 30 days before the effective date of cancellation if we cancel for any other reason.

SUPP APP 0972

**g.** If we elect not to renew this policy, we will give written notice to the mortgageholder at least 10 days before the expiration date of this policy.

## G. Optional Coverages

If shown as applicable in the Declarations, the following Optional Coverages apply separately to each item.

### 1. Agreed Value

**a.** The Additional Condition, Coinsurance, does not apply to Covered Property to which this Optional Coverage applies. We will pay no more for loss of or damage to that property than the proportion that the Limit of Insurance under this Coverage Part for the property bears to the Agreed Value shown for it in the Declarations.

**b.** If the expiration date for this Optional Coverage shown in the Declarations is not extended, the Additional Condition, Coinsurance, is reinstated and this Optional Coverage expires.

**c.** The terms of this Optional Coverage apply only to loss or damage that occurs:

**(1)** On or after the effective date of this Optional Coverage; and

**(2)** Before the Agreed Value expiration date shown in the Declarations or the policy expiration date, whichever occurs first.

### 2. Inflation Guard

**a.** The Limit of Insurance for property to which this Optional Coverage applied will automatically increase by the annual percentage shown in the Declarations.

**b.** The amount of increase will be:

**(1)** The Limit of Insurance that applied on the most recent of the policy inception date, the policy anniversary date, or any other policy change amending the Limit of Insurance, times

**(2)** The percentage of annual increase shown in the Declarations, expressed as a decimal (example: 8% is .08), times

**(3)** The number of days since the beginning of the current policy year or the effective date of the most recent policy change amending the Limit of Insurance, divided by 365.

**EXAMPLE**

If: 
| | |
|---|---|
| The applicable Limit of Insurance is: | $ 100,000 |
| The annual percentage increase is: | 8% |
| The number of days since the beginning of the policy year (or last policy change) is: | 146 |
| The amount of increase is: $100,000 x .08 x 146 ÷ 365 = | $ 3,200 |

### 3. Replacement Cost

**a.** Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form.

**b.** This Optional Coverage does not apply to:

**(1)** Personal property of others;

**(2)** Contents of a residence;

**(3)** Works of art, antiques or rare articles, including etchings, pictures, statuary, marbles, bronzes, porcelains and bric-a-brac; or

**(4)** "Stock", unless the Including "Stock" option is shown in the Declarations.

Under the terms of this Replacement Cost Optional Coverage, tenants' improvements and betterments are not considered to be the personal property of others.

**c.** You may make a claim for loss or damage covered by this insurance on an actual cash value basis instead of on a replacement cost basis. In the event you elect to have loss or damage settled on an actual cash value basis, you may still make a claim for the additional coverage this Optional Coverage provides if you notify us of your intent to do so within 180 days after the loss or damage.

**d.** We will not pay on a replacement cost basis for any loss or damage:

**(1)** Until the lost or damaged property is actually repaired or replaced; and

**(2)** Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage.

© ISO Properties, Inc., 2007 CP 00 10 06 07

SUPP APP 0973

With respect to tenants' improvements and betterments, the following also apply:

(3) If the conditions in **d.(1)** and **d.(2)** above are not met, the value of tenants' improvements and betterments will be determined as a proportion of your original cost, as set forth in the Valuation Loss Condition of this Coverage Form; and

(4) We will not pay for loss or damage to tenants' improvements and betterments if others pay for repairs or replacement.

e. We will not pay more for loss or damage on a replacement cost basis than the least of (1), (2) or (3), subject to f. below:

(1) The Limit of Insurance applicable to the lost or damaged property;

(2) The cost to replace the lost or damaged property with other property:

(a) Of comparable material and quality; and

(b) Used for the same purpose; or

(3) The amount actually spent that is necessary to repair or replace the lost or damaged property.

If a building is rebuilt at a new premises, the cost described in **e.(2)** above is limited to the cost which would have been incurred if the building had been rebuilt at the original premises.

f. The cost of repair or replacement does not include the increased cost attributable to enforcement of any ordinance or law regulating the construction, use or repair of any property.

4. **Extension Of Replacement Cost To Personal Property Of Others**

a. If the Replacement Cost Optional Coverage is shown as applicable in the Declarations, then this Extension may also be shown as applicable. If the Declarations show this Extension as applicable, then Paragraph **3.b.(1)** of the Replacement Cost Optional Coverage is deleted and all other provisions of the Replacement Cost Optional Coverage apply to replacement cost on personal property of others.

b. With respect to replacement cost on the personal property of others, the following limitation applies:

If an item(s) of personal property of others is subject to a written contract which governs your liability for loss or damage to that item(s), then valuation of that item(s) will be based on the amount for which you are liable under such contract, but not to exceed the lesser of the replacement cost of the property or the applicable Limit of Insurance.

H. **Definitions**

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

3. "Stock" means merchandise held in storage or for sale, raw materials and in-process or finished goods, including supplies used in their packing or shipping.

SUPP APP 0974

# COMMERCIAL PROPERTY CONDITIONS

This Coverage Part is subject to the following conditions, the Common Policy Conditions and applicable Loss Conditions and Additional Conditions in Commercial Property Coverage Forms.

**A. CONCEALMENT, MISREPRESENTATION OR FRAUD**

This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact concerning:

1. This Coverage Part;

2. The Covered Property;

3. Your interest in the Covered Property; or

4. A claim under this Coverage Part.

**B. CONTROL OF PROPERTY**

Any act or neglect of any person other than you beyond your direction or control will not affect this insurance.

The breach of any condition of this Coverage Part at any one or more locations will not affect coverage at any location where, at the time of loss or damage, the breach of condition does not exist.

**C. INSURANCE UNDER TWO OR MORE COVERAGES**

If two or more of this policy's coverages apply to the same loss or damage. we will not pay more than the actual amount of the loss or damage.

**D. LEGAL ACTION AGAINST US**

No one may bring a legal action against us under this Coverage Part unless:

1. There has been full compliance with all of the terms of this Coverage Part; and

2. The action is brought within 2 years after the date on which the direct physical loss or damage occurred.

**E. LIBERALIZATION**

If we adopt any revision that would broaden the coverage under this Coverage Part without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply to this Coverage Part.

**F. NO BENEFIT TO BAILEE**

No person or organization, other than you, having custody of Covered Property will benefit from this insurance.

**G. OTHER INSURANCE**

1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered loss or damage. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.

2. If there is other insurance covering the same loss or damage, other than that described in 1. above, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance.

**H. POLICY PERIOD, COVERAGE TERRITORY**

Under this Coverage Part:

1. We cover loss or damage commencing:

a. During the policy period shown in the Declarations; and

b. Within the coverage territory.

2. The coverage territory is:

a. The United States of America (including its territories and possessions);

b. Puerto Rico; and

c. Canada.

**I. TRANSFER OF RIGHTS OF RECOVERY AGAINST OTHERS TO US**

If any person or organization to or for whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your rights against another party in writing:

1. Prior to a loss to your Covered Property or Covered Income.

2. After a loss to your Covered Property or Covered Income only if, at time of loss, that party is one of the following:

a. Someone insured by this insurance;

b. A business firm:

(1) Owned or controlled by you; or

(2) That owns or controls you; or

c. Your tenant.

This will not restrict your insurance.

CP 00 90 07 88      Copyright, ISO Commercial Risk Services, Inc., 1983, 1987      Page 1 of 1

SUPP APP 0975

CCF 1503 10/01

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION - "VACANT" OR "UNOCCUPIED" PROPERTY

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

It is agreed that subpart **6.  VACANCY** of part **E.  Loss Conditions** of ISO form CP0010 is deleted and replaced by the following:

**6.   VACANCY**

    **a.**    **Description of Terms**

        **(1)**    As used in this Vacancy Condition, the term building and the term vacant have the meanings set forth in **(1)(a)** and **(1)(b)** below;

            **(a)**    When this policy is issued to a tenant, and with respect to that tenant's interest in Covered Property, building means the unit or suite rented or leased to the tenant.  Such building is vacant when it does not contain enough business personal property to conduct customary operations.

            **(b)**    When this policy is issued to the owner of a building, building means the entire building.  Such building is vacant when 70% or more of its square footage:

                **(i)**    Is not rented; or

                **(ii)**    Is not used to conduct customary operations.

        **(2)**    Buildings under construction or renovation are not considered vacant.

    **b.**    **Vacancy Provisions**

We will not pay for any loss or damage if the building where loss or damage occurs has been vacant or unoccupied for more than:

    **(1)**    30 consecutive days before that loss or damage if caused by Vandalism (if it is Covered Cause of Loss); or

    **(2)**    60 consecutive days before that loss or damage if caused by any other Covered Cause of Loss;

whether or not such vacancy or unoccupancy begins before the inception of this policy.

But we will pay if the building is unoccupied due to circumstances that are usual or incidental to the described occupancy.

This condition does not apply if the Vacancy Permit endorsement is attached.

CCF 1503 10/01

SUPP APP 0976

CCF 1504 07 94

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# THEFT EXCLUSION - OUTSIDE OF BUILDING

This endorsement modifies insurance provided under the following:

CAUSES OF LOSS - SPECIAL FORM

The following is added to the **EXCLUSIONS** Section:

We will not pay for loss or damage caused by or resulting from theft of personal property while located in the open (or in a vehicle) or anytime it is located outside of the confines of the building described in the Commercial Property Declarations.

CCF 1504 07 94

SUPP APP 0977

CCF 1512 0506

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# MANDATORY PROPERTY DEDUCTIBLE FORM

### (FIXED DOLLAR DEDUCTIBLES)

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
BUILDERS' RISK COVERAGE FORM

### SCHEDULE

The Deductibles applicable to any one occurrence are shown below and the Deductibles apply as indicated by checking one of the boxes below:

Each Building (regardless of the number of premises)          ☐

Each Premises (regardless of the number of buildings on the premises)          ☒

| Prem. No. | Bldg. No. | Coverage Type | Deductible | Covered Causes of Loss ** |
|-----------|-----------|---------------|------------|---------------------------|
| 1 | 1 | BPP, SIGNS, GLASS | 1000 | 2 |
| 1 | 1 | BPP, SIGNS, GLASS | 2500 | 6 |

** For each deductible listed in this Schedule, enter the number corresponding to the Covered Cause(s) of Loss to which that deductible applies (or enter the description):

**(1)**   All Covered Causes of Loss

**(2)**   All Covered Causes of Loss **except** Windstorm or Hail

**(3)**   All Covered Causes of Loss **except** Theft

**(4)**   All Covered Causes of Loss **except** Windstorm or Hail and Theft

**(5)**   All Covered Causes of Loss **except** Water Damage

**(6)**   Windstorm or Hail

**(7)**   Theft

**(8)**   Water Damage

Section D. Deductible is deleted in its entirety including the Examples and replaced with the following:

**A.**   In any one occurrence of loss or damage (hereinafter referred to as loss), we will first reduce the amount of loss if required by the Coinsurance Condition or the Agreed Value Optional Coverage. If the adjusted amount of loss is less than or equal to the Deductible, we will not pay for that loss. If the adjusted amount of loss exceeds the Deductible, we will then subtract the Deductible from the adjusted amount of loss, and will pay the resulting amount or the Limit of Insurance, whichever is less.

**B.**   In the event that loss or damage occurs to Covered Property at more than one building location as a result of one occurrence, the schedule above will determine how the deductible will apply, either to each premises or to each building.

**C.**   When the occurrence involves loss to more than one item of Covered Property and separate Limits of Insurance apply, the losses will not be combined in determining application of the Deductible. But the Deductible will be applied only once per occurrence for that Covered Property.

**D.**   The terms of this endorsement do not apply to any Earthquake Deductible or to any Windstorm or Hail Percentage Deductible provided elsewhere in this policy.

CCF 1512 0506                                                                 **Page 1 of 1**

Includes copyrighted material of Insurance Services Office, Inc. with its permission.
Copyright, Insurance Services Office, Inc., 1998

SUPP APP 0978

CCF 1514 0410

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# LIMITED PROPERTY EXTENSIONS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM, CP 0010
CONDOMINIUM ASSOCIATION COVERAGE FORM, CP 0017
CONDOMINIUM UNIT-OWNERS COVERAGE FORM, CP 0018
CAUSES OF LOSS – SPECIAL FORM, CP 1030

**Schedule of Coverage Extensions and Limits**

| Coverage | Limit of Insurance | |
|---|---|---|
| Accounts Receivable | $25,000 | per occurrence |
| Arson Reward | $5,000 | per occurrence |
| Electronic Data Processing Equipment – Off Premises | $5,000 | per occurrence |
| Electronic Data Processing Equipment – On Premises | $10,000 | per occurrence |
| Employee Theft | $5,000 | per occurrence |
| Fine Arts | $5,000 | per occurrence |
| Fire Department Service Charge | $5,000 | per occurrence |
| Fire Protection Device Recharge | $1,000 | per occurrence |
| Money and Securities | $5,000 | per occurrence |
| Personal Effects and Property of Others | $7,500 | per occurrence |
| Property in Transit | $10,000 | per occurrence |
| Sewer, Drain, or Sump Backup or Overflow | $5,000 | per occurrence |
| Spoilage or Contamination | $5,000 | per occurrence |
| Valuable Papers and Records other than Electronic Data | $25,000 | per occurrence |

The Coverage Extensions identified in the Schedule above are granted by the Company as additions to your insurance policy.  The Limit of Insurance for each Coverage Extension applies separately for each of your premises described in the Declarations. Unless otherwise noted these Limits of Insurance apply per occurrence.

If you purchase additional Limits of Insurance for any Coverage already provided by this form, the Limits of Insurance stated in the Declarations will be in addition to what the Company has granted in the Schedule shown above.

CCF 1514 0410                                                                                          **Page 1 of 9**

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0979

1. **Deductible**

   For the purposes of this endorsement, the deductible per occurrence is $500 per coverage, subject to a maximum of $1,000 any one occurrence.

   If this deductible, and one or more of the deductibles listed in the policy Declarations apply on the same occurrence, this deductible will apply separately.

2. **Coinsurance**

   For the purposes of this endorsement, the Additional Condition, Coinsurance does not apply when a loss is evaluated under any of these property Coverage Extensions.

   The insurance provided by this form is only applicable to the premises described in the Declarations.

3. The following revision is made to **CP 0010, CP 0017** or **CP 0018**, Section **A,** Coverage, paragraph **4, Additional Coverages:**

   c. **Fire Department Service Charge**

   The limit of $1,000 is deleted and replaced with the amount shown in the Schedule above.

4. The following revisions are made to **CP 0010, CP 0017,** or **CP 0018**, Section **A.,** Coverage; paragraph **5.,** Coverage Extensions shown below:

   b. **Personal Effects and Property of Others**

   The amount of $2,500 is deleted and replaced with the amount shown in the Schedule above for Personal Effects and Property of Others.

   c. **Valuable Papers and Records other than Electronic Data**

   The amount of $2,500 is deleted and replaced by the amount shown in the Schedule above for Valuable Papers and Records other than Electronic Data.

5. The following Extended Coverages are added to **CP 0010, CP 0017** or **CP 0018**, Section **A.,** Coverage; paragraph **5.,** Coverage Extensions:

**Accounts Receivable**

(1) You may extend the insurance provided by this endorsement to apply to direct physical damage resulting from a Covered Cause of Loss to your records of accounts receivable at the described "premises".

(2) We will pay:

   (a) All amounts due from your customers that you are unable to collect;

   (b) Interest charges on any loan required to offset amounts you are unable to collect pending our payment of these amounts;

   (c) Collection expenses in excess of normal collection expenses and that are made necessary because of the loss or damage; and

   (d) Other reasonable expenses that you incur to reestablishing records of accounts receivable;

   that result from Covered Causes of Loss to your records of accounts receivable.

(3) If you give us written notice within 10 days of removal of your records of accounts receivable because of imminent danger of loss or damage, we will pay for loss or damage while they are:

   (a) At a safe place away from your "premises" or

   (b) Being taken to and returned from that place,

   for a period of not more than 30 days.

(4) We will not pay for loss or damage caused by or resulting from:

   (a) Delay, loss of use, loss of market or any other consequential loss;

   (b) Alteration, falsification, concealment or destruction of records of accounts receivable done to conceal the wrongful giving, taking or withholding of money, securities or other property;

   (c) Bookkeeping, accounting or billing errors or omissions;

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0980

(d) Electrical or magnetic injury, disturbance or erasure of electronic recordings that is caused by or results from:

    (i)    Programming errors or faulty machine instructions

    (ii)    Faulty installation or maintenance of data processing equipment or component parts;

    (iii)    An occurrence that took place more than 100 feet from your "premises" or

    (iv)    Interruption of electrical power supply, power surge, blackout or brownout if the cause of such occurrence took place more than 100 feet from your "premises";

(e) Unauthorized instructions to transfer property to any person or place;

(f) Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

(5) We will not pay for loss or damage that requires any audit of records or any inventory computation to prove its factual existence.

(6) Determination of Receivables:

(a) When there is proof that a covered loss has occurred but you cannot accurately establish the amount of accounts receivable outstanding as of the date of the loss, the amount shall be based on your latest statement of monthly receivables and shall be computed as follows:

    (i)    Determine the amount of all outstanding accounts receivable at the end of the same fiscal month in the year immediately preceding the year in which the loss occurs;

    (ii)    Calculate the percentage of increases or decrease in your gross sales of goods and services for the 12 fiscal months immediately preceding the month in which the loss occurred against the 12 fiscal months prior to the above period;

    (iii)    The amount determined under i., above, increased or decreased by the percentage calculated in ii., above, shall be the agreed total amount of accounts receivable as of the last day of the fiscal month in which the loss occurs;

    (iv)    The monthly amount of accounts receivable thus established shall be further adjusted in accordance with the normal fluctuations in the amount of accounts receivable within the fiscal month involved.

(b) We will deduct an amount to allow for probable bad debts which you would normally have been unable to collect from the amount of accounts receivable as destroyed or lost.

(7) The most we will pay for loss or damage under this Extension is the amount shown in the Schedule above.

## Arson Reward

We will provide a reward for information which leads to the arrest and conviction of any person(s) responsible for an act of arson.

The most we will pay under this Coverage Extension for all rewards for information in any one arson, is the amount shown in the Schedule above.

## Electronic Data Processing Equipment and Media

(1) You may extend the insurance provided by this Coverage Form to your "electronic data processing equipment" and "electronic data processing media" which you own, lease, or rent from others or for which you are legally responsible.

(2) We will pay for loss or damage resulting from or caused by:

(a) Mechanical breakdown, or machinery malfunction:

(b) Short circuit, blowout or other electrical damage or disturbance;

(c) Faulty construction, error in design, or actual work upon property covered. (This coverage does not apply to electronic data processing media).

(3) We will not pay for loss or damage resulting from:

(a) Loss to property loaned, leased or rented to others while away from the premises listed in the Declarations.

(b) Media which cannot be replaced with others of the same kind and quality.

(c) Accounts, bills, evidences of debt, valuable papers, records, abstracts, deeds, manuscripts or other documents.

    

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0981

(d) Error or omission in machine programming or incorrect instruction to a machine.

(4) The Causes of Loss – Special Form, Section **B.**, Exclusions, applies to this coverage with the exception of exclusions **B.2a.** and **B.2.d. (6)**.

(5) The most we will pay for loss in any one occurrence is the amount shown in the Schedule above, but if the "electronic data processing equipment" or "electronic data processing media" is lost or damaged while in transit, off premises, or on a vehicle the most we will pay is the amount shown in the Schedule above for Property in Transit.

### Fine Arts

You may extend the coverage that applies to Your Business Personal Property to Fine Arts. Fine Arts means paintings, etchings, pictures, tapestries, rare or art glass, art glass windows, valuable rugs, statuary, sculptures, "antique" furniture, "antique" jewelry, bric-a-brac, porcelains; and similar property of rarity, historical value or artistic merit.

"Antique" means an object having value because its

(a) Craftsmanship is in the style or fashion of former times; and

(b) Age is 100 years old or older.

The most we will pay from a Covered Cause of Loss as a result of direct loss or damage to Fine Arts is the amount shown in the Schedule above.

### Fire Protection Device Recharge

We will pay to cover the expenses incurred to recharge a fire protection device when it has been used to combat a covered fire.

The most that we will pay under this Coverage Extension is the amount shown in the Schedule above.

### Food Spoilage

(1) We will pay for loss or damage to "perishable stock" caused by or resulting from adulteration, spoilage or change in temperature.

However, this Coverage Extension will not apply if the loss or damage is caused by Wind or Hail **and** Wind or Hail is excluded as a Covered Cause of Loss.

(2) The most we will pay in any one occurrence is the amount shown in the Schedule above.

6. The following Crime Coverages are added to **CP 0010, CP 0017,** or **CP 0018**, Section **A.**, paragraph **4.**, Additional Coverages:

a. **Employee Theft**

We will pay for loss or damage to "money, "securities" and "other property" resulting directly from "theft" committed by an "employee" whether identified or not, acting alone or in collusion with other persons.

For the purposes of this Extension "theft" shall also include "forgery".

b. **Money and Securities**

(1) Inside the Premises

(a) We will pay for loss of "money" and "securities" inside the "premises" or "banking premises":

i. Resulting directly from "theft" committed by a person present inside such "premises" or "banking premises"; or

ii. Resulting directly from disappearance or destruction.

(b) We will pay for loss from damage to the "premises" or its exterior resulting directly from an actual or attempted "theft" of "money" and "securities" if you are the owner of the "premises" or are liable for damage to the "premises".

(c) We will pay for loss of or damage to a locked safe, vault, cash register, cash box, or cash drawer, located inside the "premises", resulting directly from an actual or attempted "theft" of or unlawful entry into those containers.

(2) Outside the Premises

(a) We will pay for loss of "money" and "securities" outside the "premises", in the care and custody of a "messenger" or an armored motor vehicle company, resulting directly from "theft", disappearance or destruction.

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0982

    **(b)** We will pay for loss of or damage to "other property" outside the "premises", in the care and custody of a "messenger" or an armored motor vehicle company, resulting directly from an actual or attempted "robbery".

However, these Additional Coverages, **6.a.** and **6.b.**, above do not apply to:

**a.** Loss resulting from "theft" or any other dishonest act committed by:

    **(1)** You; or

    **(2)** Any of your partners or "members"

    whether acting alone or in collusion with other persons.

**b.** Loss caused by an "employee" if the "employee" had also committed "theft" or any other dishonest act prior to the effective date of this endorsement and you or any of your partners, "members", "managers", officers, directors or trustees, not in collusion with the "employee", learned of that "theft" or dishonest act prior to the effective date of this endorsement.

**c.** Loss resulting from:

    **(1)** The unauthorized disclosure of your confidential information including but not limited to, patents, trade secrets, processing methods or customer lists; or

    **(2)** The unauthorized use or disclosure of confidential information of another person or entity which is held by your including, but not limited to, financial information, personal information, credit card information or similar non-public information.

**d.** Loss that is an indirect result of an "occurrence" covered by this policy including, but not limited to, loss resulting from:

    **(1)** Your inability to realize income that you would have realized had there been no loss of or damage to "money", "securities" or "other property".

    **(2)** Payment of damages of any type for which you are legally liable. But, we will pay compensatory damages arising directly from a loss covered under this policy.

    **(3)** Payment of costs, fees, or other expenses you incur in establishing either the existence or the amount of loss under this policy.

**e.** Fees costs and expenses incurred by you which are related to any legal action.

The following exclusions apply only to Employee Theft:

**a.** Loss or that part of any loss, the proof of which as to its existence or amount is dependent upon:

    **(1)** An inventory computation; or

    **(2)** A profit and loss computation.

    However, where you establish wholly apart from such computations that you have sustained a loss, then you may offer your inventory records and actual physical count of inventory in support of the amount of loss claimed.

**b.** Loss resulting from trading, whether in your name or in a genuine or fictitious account.

**c.** Loss resulting from the fraudulent or dishonest signing, issuing, cancelling or failing to cancel, a warehouse receipt or any papers connected with it.

The following exclusions apply only to Money and Securities:

**a.** Loss resulting from "theft" or any other dishonest act committed by any of your "employees", "managers", directors, trustees, or authorized representatives:

    **(1)** Whether acting alone or in collusion with other persons; or

    **(2)** While performing services for you or otherwise.

**b.** Loss resulting from accounting or arithmetical errors or omissions.

**c.** Loss resulting from the giving or surrendering of property in any exchange or purchase.

**d.** Loss or damage resulting from fire, however caused, except:

    **(1)** Loss of or damage to "money" and "securities"; and

    **(2)** Loss from damage to a safe or vault.

**e.** Loss of property contained in any money operated device unless the amount of "money" deposited in it is recorded by a continuous recording instrument in the device.

**f.** Loss of or damage to motor vehicles, trailers or semi-trailers or equipment and accessories attached to them.

**CCF 1514 0410**                                                                                            **Page 5 of 9**

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0983

g.  Loss of or damage to property after it has been transferred or surrendered to a person or place outside the "premises" or "banking premises":

(1)  On the basis of unauthorized instructions;

(2)  As a result of a threat to do bodily harm to any person;

(3)  As a result of a threat to do damage to any property;

(4)  As a result of a threat to introduce a denial of service attack to your computer system;

(5)  As a result of a threat to introduce a virus or other malicious instruction into your computer system which is designed to damage, destroy or corrupt data or computer programs stored within your computer system;

(6)  As a result of a threat to contaminate, pollute or render substandard your products or goods; or

(7)  As a result of a threat to disseminate, divulge, or utilize

(a)  Your confidential information; or

(b)  Weaknesses in the source code within your computer system.

But, this exclusion does not apply to loss of "money", "securities", or "other property" while outside the "premises" in the care and custody of a "messenger" if you:

(a)  Had no knowledge of any threat at the time the conveyance began; or

(b)  Had knowledge of a threat at the time the conveyance began, but the loss was not related to the threat.

h.  Loss from damage to the "premises" or its exterior, or to any safe, vault, cash register, cash box, cash drawer or "other property" by vandalism or malicious mischief.

i.  Loss resulting from your, or any one acting on your express or implied authority, being induced by any dishonest act to voluntarily part with title to or possession of any property.

The most that we will pay for loss or direct physical damage to "money", "securities" or "other property" resulting from Employee Theft or Money and Securities is the limit shown for each in the Schedule above.

7.  Causes of Loss – Special Form, **CP 1030**; Section **F.**, Additional Coverage Extensions, paragraph **1.** of Property in Transit, is deleted in its entirety and replaced with the following:

**Property in Transit**

1.  This Extension applies only to your personal property to which this form applies.

a.  You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody, or control of your sales person) in transit more than 100 feet from the described premises:

(1)  This Extension only applies to property in transit in the coverage territory;

(2)  Property in transit includes property in the custody of:

(a)  Any railroad (including while on ferries or in cars, transfers or lighters);

(b)  Public truck-men, private truck-men or land transportation companies;

(c)  You or anyone else while in or on vehicles you own, lease or hire;

(d)  Any air transportation company;

(e)  Any water transportation company while on inland waters of the continental United States, the Great Lakes or the St. Lawrence Seaway; or

(f)  Any other person authorized by you to have the care and custody of your property outside your premises (including your salespeople);

(3)  This Extension does not include:

(a)  Shipments through the US Postal Service;

(b)  Property covered under import or export Ocean Cargo policies;

(c)  Inter-coastal water shipments via the Panama Canal; or

(d)  Coastwise water shipments to Alaska.

b.  Loss or damage must be caused by or result from a Covered Cause of Loss.

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0984

However, the following limitation will apply to all theft losses:

Coverage for theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle requires that there must be visible marks of the forced entry.

c. The most that we will pay for direct physical loss or damage for Personal Property in Transit is the amount shown in the Schedule above.

8. Exclusion **g.**, Water, of **CP 1030**, Causes of Loss – Special Form, is deleted in its entirety and replaced with the following:

**g. Water**

(1) Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

(2) Mudslide or mudflow;

But if Water as described in **g.(1)** or **g.(2)** above results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

9. The following is added to the Causes of Loss - Special Form, **CP 1030,** item **F.,** Additional Coverage Extensions:

**Sewer, Drain, or Sump Backup or Overflow**

You may extend the insurance provided by this Coverage Part to include loss, whether it originates on or off the described premises caused by:

(1) Water that backs up or overflows from a sewer, drain or sump; or

(2) Water under the ground surface pressing on, or flowing or seeping through:

(a) Foundations, walls, floor, or paved surfaces;

(b) Basements whether paved or not; or

(c) Doors, windows, or other openings.

However, we will not pay for direct physical loss or damage to Covered Property caused by or resulting from continued or repeated back up or overflow of water over a period 14 days.

The most we will pay under this Coverage Extension is shown in the Schedule above.

10. For the purposes of this endorsement, the following Definitions are added to **CP 0010, CP 0017,** or **CP 0018,** Section **H:**

**Electronic Data Processing Equipment**

"Electronic Data Processing Equipment" means data processing systems, components parts and related peripheral equipment including air conditioning and fire protection equipment used solely for data processing operations. But electronic data processing equipment does not include electronic systems that control production machinery nor the production machinery itself.

**Electronic Data Processing Media**

"Electronic Data Processing Media" means punch cards, tapes, discs, drums, cells or other magnetic recording or storage devices, including the information recorded on the media. It also included the original source material used to enter data and/or programs.

**Banking Premises**

"Banking premises" means the interior of that portion of any building occupied by a banking institution or similar safe depository.

**Employee**

"Employee" means:

a. Any natural person:

(1) While in your service and for the first 30 days immediately after termination of service, unless such termination is due to "theft" or any other dishonest act committed by the "employee";

(2) Who you compensate directly by salary, wages or commissions; and

(3) Who you have the right to direct and control while performing services for you;

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0985

   **b.**   Any natural person who is furnished temporarily to you:

       **(1)**   To substitute for a permanent "employee" as defined in **a.** above who is on leave; or

       **(2)**   To meet seasonal or short-term work load conditions;

       while that person is subject to your direction and control and performing services for you , excluding, however, any such person while having care and custody of property outside the "premises"

   **c.**   Any natural person who is leased to you under a written agreement between you and a labor leasing firm, to perform duties related to the conduct of your business, but does not mean a temporary employee as defined in **b.** above.

   **d.**   A natural person who is:

       **(1)**   A trustee, officer, employee, administrator or manager, except an administrator or manager who is an independent contractor, of any "employee benefit plan"; and

       **(2)**   A director or trustee of yours while that person is engaged in handling "funds" or "other property" of any "employee benefit plan";

   **e.**   Any natural person who is a former "employee", partner, "member", "manager" director or trustee retained as a consultant while performing services for you;

   **f.**   Any natural person who is a guest student or intern pursuing studies or duties excluding, however, any such person while having care and custody of property outside the "premises";

   **g.**   Any "employee" of an entity merged or consolidated with you prior to the effective date of this policy; or

   **h.**   Any of your "managers", directors or trustees while:

       **(1)**   Performing acts within the scope of the usual duties of an "employee"; or

       **(2)**   Acting as a member of any committee duly elected or appointed by resolution of your board of directors or board of trustees to perform specific, as distinguished from general directorial acts on your behalf.

However, "employee" does not mean any agent, broker, factor, commission merchant, consignee, independent contractor or representative of the same general character not specified in **a.** above.

**Employee Benefit Plan**

"Employee benefit plan" means any welfare or pension benefit plan shown in the Declarations that you sponsor and which is subject to the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments thereto.

**Forgery**

"Forgery" means the signing of the name of another person or organization with intent to deceive, it does not mean a signature on which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.

**Funds**

"Funds" means "money" and "securities".

**Manager**

"Manager" means a person serving in a directorial capacity for a limited liability company.

**Member**

"Member" means an owner of a limited liability company represented by its membership interest, who also may serve as a "manager".

**Messenger**

"Messenger" means you, or a relative of yours or any of your partners or "members", or any "employee" while having care and custody of property outside of the premises.

**Money**

"Money" means:

   **a.**   Currency, coins and bank notes in current use and having a face value; and

   **b.**   Travelers checks, register checks and money orders held for sale to the public.

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0986

**Occurrence**

"Occurrence" means:

a.   An individual act;

b.   The combined total of all separate acts whether or not related; or

c.   A series of acts whether or not related;

committed by an "employee" acting alone or in collusion with other persons, during the Policy Period shown in the Declarations, before such Policy Period or both.

**Other Property**

"Other property" means any tangible property other than "money" and "securities" that has intrinsic value. "Other property" does not include computer programs, electronic data or any property specifically excluded under this policy.

**Perishable Stock**

"Perishable stock" means personal property:

a.   Maintained under controlled conditions for its preservation; and

b.   Susceptible to loss or damage if the controlled conditions change.

**Premises**

"Premises" means the interior of that portion of any building you occupy in conducting your business.

**Robbery**

"Robbery" means the unlawful taking of property from the care and custody of a person by one who has:

a.   Caused or threatened to cause that person bodily harm; or

b.   Committed an obviously unlawful act witnessed by that person.

**Securities**

"Securities" mean negotiable and nonnegotiable instruments or contracts representing either "money" or property and includes:

a.   Tokens, tickets, revenue and other stamps (whether represented by actual stamps or unused value in a meter) in current use and

b.   Evidences of debt issued in connection with credit or charge cards, which cards are not issued by you;

but does not include "money".

**Theft**

"Theft" means the unlawful taking of property to the deprivation of the insured.


All other terms and conditions of this policy remain unchanged.

Includes copyrighted material of Insurance Services Office, Inc. and AAIS with its permission.
Copyright, Insurance Services Office, Inc., 1998, 2004

SUPP APP 0987

CCF 1515 0410

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EQUIPMENT BREAKDOWN ENHANCEMENT ENDORSEMENT

## COMMERCIAL PROPERTY COVERAGE PART

This endorsement modifies insurance provided under the following:

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM – CP 0010**
**CONDOMINIUM ASSOCIATION COVERAGE FORM – CP 0017**
**CONDOMINIUM UNIT-OWNERS COVERAGE FORM – CP 0018**
**CAUSES OF LOSS - BASIC FORM – CP 1010**
**CAUSES OF LOSS – BROAD FORM – CP 1020**
**CAUSES OF LOSS – SPECIAL FORM – CP 1030**
**COMMON POLICY CONDITIONS – IL 0017**

A.  The following changes apply to **CP 0010, CP 0017, or CP 0018**, Section **A** – Coverage:

1.  The following sub-paragraphs under paragraph **4.**, Additional Coverages, are revised as follows:

    a.  The following is added to item **d., Pollutant Clean-up and Removal:**

    We will pay for the pollutant clean up and removal for loss resulting from an "equipment breakdown". The most we will pay for loss or damage under this coverage is $25,000 unless a higher limit for Pollutant Clean Up and Removal is provided by an endorsement to this policy.  If this policy is endorsed with a higher Pollutant Clean Up and Removal limit then we will pay the higher limit.

    b.  The following is added to item **f., Electronic Data**, of **CP 0010** or **CP 0017:**

    We will pay for your reasonable and necessary cost to research, replace, and restore the lost information on electronic media and records as a result of an "equipment breakdown".

    c.  The following is added to item **e., Electronic Data**, of **CP 0018:**

    We will pay for your reasonable and necessary cost to research, replace, and restore the lost information on electronic media and records as a result of an "equipment breakdown".

2.  The following coverages are added to paragraph **4.**, Additional Coverages:

**Expediting Expenses**

We will pay for the expediting expense loss resulting from an "equipment breakdown" with respect to your damaged Covered Property. We will pay the reasonable extra cost to:

a.  Make temporary repairs;

b.  Expedite permanent repairs;

c.  Expedite permanent replacement

Reasonable extra cost shall mean the extra cost of temporary repair and of expediting the repair of the damaged Covered Property, including overtime and the extra cost of express or other rapid means of transportation which will be a part of and not an addition to the limit per loss.

**Refrigerant Contamination**

We will pay for the loss of Covered Property including "perishable stock" and loss to refrigerating, cooling or humidity control equipment due to contamination by a refrigerant resulting from an "equipment breakdown".

The most we will pay for loss or damage under this coverage is $25,000 unless a higher limit for Refrigerant Contamination is provided by an endorsement to this policy.  If this policy is endorsed with a higher Refrigerant Contamination limit then we will pay the higher limit.

CCF 1515 0410                                                                                                   Page 1 of 6

SUPP APP 0988

**Spoilage Coverage**

We will pay for loss of "perishable stock" due to spoilage that results from lack of power, light, heat, steam or refrigeration caused by an "equipment breakdown" that is:

a.   Located on or within 100 feet of your described premises,

b.   owned by the building owner at your described premises, or owned by a public utility

However, we will not pay for any loss, damage, cost or expense directly caused by, contributed to by, resulting from or arising out of the following causes of loss:

Fire, lightning, combustion explosion, windstorm or hail, weight of snow, ice or sleet, falling objects, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sinkhole collapse, volcanic action, leakage from fire extinguishing equipment, water damage, earth movement and flood.

The most we will pay for loss or damage under this coverage is $25,000 unless a higher limit for Spoilage Coverage is provided by an endorsement to this policy.  If this policy is endorsed with a higher Spoilage Coverage limit then we will pay the higher limit.

"perishable stock" means personal property:

a.   Maintained under controlled conditions for its preservation; and

b.   Susceptible to loss or damage if the controlled conditions change.

**Computer Equipment**

We will pay for direct physical loss or damage to your computers as a result of an "equipment breakdown".

3.   The following coverage extensions are added to paragraph 5., Coverage Extensions:

**Environmental, Safety and Efficiency Improvements**

If the Covered Property requires replacement due to an "equipment breakdown," we will pay your additional cost to replace with equipment that is better for the environment, safer or more efficient than the equipment being replaced.

However, we will not pay more than 125% of what the cost would have been to repair or replace with like kind and quality.  This condition does not increase any of the applicable limits.  This condition does not apply to any property to which Actual Cash Value applies.

**Green Environmental and Efficiency Improvements**

If Covered Property requires repair or replacement due to an "equipment breakdown", we will pay:

a.   The lesser of the reasonable and necessary additional cost incurred by the insured to repair or replace physically damaged Covered Property with equipment of like kind and quality which qualifies as "green". Like, kind and quality includes similar size and capacity.

b.   The additional reasonable and necessary fees incurred by the Insured for an accredited professional certified by a "green authority" to participate in the repair or replacement of physically damaged Covered Property as "green".

c.   The additional reasonable and necessary cost incurred by the insured for certification or recertification of the repaired or replaced Covered Property as "green".

d.   The additional reasonable and necessary cost incurred by the Insured for "green" in the removal, disposal or recycling of damaged Covered Property.

e.   The business interruption (if covered within the Policy to which this Equipment Breakdown Enhancement Endorsement is attached) loss during the additional time required for repair or replacement of Covered Property, consistent with "green", in the coverages above.

We will not pay more than 125%, to a maximum limit of $100,000, of what the cost would have been to repair or replace with equipment of like kind and quality inclusive of fees, costs, and any business interruption loss incurred as stated above. These limits will be a part of, and not an addition to, the limit of liability per loss or any other sub-limits of liability of this Policy.

SUPP APP 0989

**Green Environmental and Efficiency Improvements** does not cover any of the following:

a.   Stock, raw materials, finished goods,

b.   "production machinery",

c.   merchandise,

d.   electronic data processing equipment not used in the functional support of the real property,

e.   process water, molds and dies,

f.   property in the open, property of others for which the Insured is legally liable, or personal property of others;

g.   Any loss adjusted on any valuation basis other than a repair or replacement basis as per the Valuation section of this policy.

h.   Any loss covered under any other section of this policy.

i.   Any cost incurred due to any law or ordinance with which the Insured was legally obligated to comply prior to the time of the "equipment breakdown".

B.   The following is added to **IL 0017**, Common Policy Conditions:

**Suspension**

Whenever Covered Property is found to be in, or exposed to, a dangerous condition, any of our representatives may immediately suspend the insurance against loss to that Covered Property for the Cause of Loss covered by this endorsement. Coverage can be suspended by delivering or mailing a written notice of coverage suspension to:

a.   Your last known address; or

b.   The address where the property is located.

If we suspend your insurance under this endorsement, you will get a pro rata refund of the "equipment breakdown" premium. But the suspension will be effective even if we have not yet made or offered a refund.

Coverage may be reinstated, by any of our representatives, once the dangerous condition to the Covered Property has been corrected and inspected, by delivering or mailing a written notice of reinstatement to:

a.   Your last known address; or

b.   The address where the property is located.

C.   **CP 1010**, Causes of Loss - Basic Form; **CP 1020**. Causes of Loss – Broad Form, and **CP 1030**, Causes of Loss – Special Form, are revised as follows:

1.   Section **A** – Covered Causes of Loss is revised to included "equipment breakdown"

2.   Section **B** – Exclusions, are revised as follows:

a.   The following exclusions are removed from **CP 1010**, Causes of Loss – Basic Form, and not replaced:

2.a.   Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

(1)   Electrical or electronic wire, device, appliance, system or network; or

(2)   Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

(a)   Electrical current, including arcing;

(b)   Electrical charge produced or conducted by a magnetic or electromagnetic field;

(c)   Pulse of electromagnetic energy; or

(d)   Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

SUPP APP 0990

CCF 1515 0410

**2.d.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.

**2.e.** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

But if mechanical breakdown results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**b.** The following exclusions are removed from **CP 1020**, Causes of Loss - Broad Form and not replaced:

**2.a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**2.b.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.

**2.c.** Mechanical breakdown, including rupture or bursting caused by centrifugal force.

But if mechanical breakdown results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

**c.** The following exclusions are removed from **CP 1030**, Causes of Loss - Special Form, and not replaced:

**2.a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

**(a)** Electrical current, including arcing;

**(b)** Electrical charge produced or conducted by a magnetic or electromagnetic field;

**(c)** Pulse of electromagnetic energy; or

**(d)** Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

**2. d. (6)** Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

SUPP APP 0991

CCF 1515 0410

**2. e.** Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control.

But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion.

We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**D.** The following are deleted from Section **C.,** Limitations of **CP 1030,** Covered Causes of Loss – Special Form and not replaced:

**1. a.** Steam boilers, steam pipes, steam engines, or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

**1. b.** Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than any explosion.

**E.** For the purposes of this endorsement the following definitions are added:

**1.** The following definition is added to **CP 1010,** Section **E,** Definitions; **CP 1020,** Section **F,** Definitions and **CP 1030,** Section **G.,** Definitions:

"Equipment breakdown" as used herein means:

**a.** Physical loss or damage both originating within:

**(1)** Boilers, fired or unfired pressure vessels, vacuum vessels, and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

**(a)** Waste disposal piping;

**(b)** Any piping forming part of a fire protective system;

**(c)** Furnaces; and

**(d)** Any water piping other than:

**i.** Boiler feed water piping between the feed pump and the boiler;

**ii.** Boiler condensate return piping; or

**iii.** Water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes.

**(2)** Mechanical, electrical, electronic or fiber optic equipment; and

**b.** Caused by, resulting from, or consisting of:

**(1)** Mechanical breakdown;

**(2)** Electrical or electronic breakdown; or

**(3)** Rupture, bursting, bulging, implosion, or steam explosion.

However, "Equipment Breakdown" will not mean:

Physical loss or damage caused by or resulting from any of the following; however if loss or damage not otherwise excluded results, then we will pay for such resulting damage:

**a.** Wear and Tear;

**b.** Rust or other corrosion, decay, deterioration, hidden or latent defect, mold or any other quality in property that causes it to damage or destroy itself;

**c.** Smog;

**d.** Settling, cracking, shrinking or expansion

**e.** Nesting or infestation, or discharge or release of waste products or secretions, by birds, rodents or other animals;

SUPP APP 0992

CCF 1515 0410

f. Any accident, loss, damage, cost, claim, or expense, whether preventative, remedial, or otherwise, directly or indirectly arising out of or relating to the recognition, interpretation, calculation, comparison, differentiation, sequencing or processing of data by any computer system including any hardware, programs or software;

g. Scratching or marring;

h. Any loss, damage, cost or expense directly caused by, contributed to by, resulting from or arising out of the following causes of loss:

> Fire, lightning, combustion explosion, windstorm or hail, weight of snow, ice or sleet, freezing, falling objects, smoke, aircraft or vehicles, riot or civil commotion, vandalism, sinkhole collapse, volcanic action, leakage from fire extinguishing equipment, water damage, earth movement and flood;

i. The following Causes of Loss to Personal Property:

(1) Dampness or dryness of atmosphere,

(2) Marring or scratching.

2. The following definitions are added to **CP 0010, CP 0017, CP 0018**, Section **H** – Definitions:

"Green" means products, materials, methods and processes certified by a "green authority" that conserve natural resources, reduce energy or water consumption, avoid toxic or other polluting emissions or otherwise minimize environmental impact.

"Green authority" means an authority on "green" buildings, products, materials, methods or processes certified and accepted by Leadership in Energy and Environmental Design (LEED®), "Green" Building Initiative Green Globes®, Energy Star Rating System or any other recognized "green" rating system.

"Production machinery" means any machine which processes, forms, shapes, or transports raw materials, materials in process, waste materials or finished products.

All other terms and conditions of this policy remain unchanged.

SUPP APP 0993

COMMERCIAL PROPERTY
CP 01 40 07 06

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

**1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

**2.** Additional Coverage – Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

© ISO Properties, Inc., 2006

SUPP APP 0994

# CAUSES OF LOSS – SPECIAL FORM

Words and phrases that appear in quotation marks have special meaning. Refer to Section **G.**, Definitions.

## A. Covered Causes Of Loss

When Special is shown in the Declarations, Covered Causes of Loss means Risks Of Direct Physical Loss unless the loss is:

1. Excluded in Section **B.**, Exclusions; or

2. Limited in Section **C.**, Limitations;

that follow.

## B. Exclusions

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

   **a. Ordinance Or Law**

   The enforcement of any ordinance or law:

   (1) Regulating the construction, use or repair of any property; or

   (2) Requiring the tearing down of any property, including the cost of removing its debris.

   This exclusion, Ordinance Or Law, applies whether the loss results from:

   (a) An ordinance or law that is enforced even if the property has not been damaged; or

   (b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property.

   **b. Earth Movement**

   (1) Earthquake, including any earth sinking, rising or shifting related to such event;

   (2) Landslide, including any earth sinking, rising or shifting related to such event;

   (3) Mine subsidence, meaning subsidence of a man-made mine, whether or not mining activity has ceased;

   (4) Earth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking or other disarrangement of foundations or other parts of realty. Soil conditions include contraction, expansion, freezing, thawing, erosion, improperly compacted soil and the action of water under the ground surface.

   But if Earth Movement, as described in b.(1) through (4) above, results in fire or explosion, we will pay for the loss or damage caused by that fire or explosion.

   (5) Volcanic eruption, explosion or effusion. But if volcanic eruption, explosion or effusion results in fire, building glass breakage or Volcanic Action, we will pay for the loss or damage caused by that fire, building glass breakage or Volcanic Action.

   Volcanic Action means direct loss or damage resulting from the eruption of a volcano when the loss or damage is caused by:

   (a) Airborne volcanic blast or airborne shock waves;

   (b) Ash, dust or particulate matter; or

   (c) Lava flow.

   All volcanic eruptions that occur within any 168-hour period will constitute a single occurrence.

   Volcanic Action does not include the cost to remove ash, dust or particulate matter that does not cause direct physical loss or damage to the described property.

   **c. Governmental Action**

   Seizure or destruction of property by order of governmental authority.

   But we will pay for loss or damage caused by or resulting from acts of destruction ordered by governmental authority and taken at the time of a fire to prevent its spread, if the fire would be covered under this Coverage Part.

 © ISO Properties, Inc., 2007   □

SUPP APP 0995

**d. Nuclear Hazard**

Nuclear reaction or radiation, or radioactive contamination, however caused.

But if nuclear reaction or radiation, or radioactive contamination, results in fire, we will pay for the loss or damage caused by that fire.

**e. Utility Services**

The failure of power, communication, water or other utility service supplied to the described premises, however caused, if the failure:

**(1)** Originates away from the described premises; or

**(2)** Originates at the described premises, but only if such failure involves equipment used to supply the utility service to the described premises from a source away from the described premises.

Failure of any utility service includes lack of sufficient capacity and reduction in supply.

Loss or damage caused by a surge of power is also excluded, if the surge would not have occurred but for an event causing a failure of power.

But if the failure or surge of power, or the failure of communication, water or other utility service, results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

Communication services include but are not limited to service relating to Internet access or access to any electronic, cellular or satellite network.

**f. War And Military Action**

**(1)** War, including undeclared or civil war;

**(2)** Warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

**(3)** Insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

**g. Water**

**(1)** Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

**(2)** Mudslide or mudflow;

**(3)** Water that backs up or overflows from a sewer, drain or sump; or

**(4)** Water under the ground surface pressing on, or flowing or seeping through:

**(a)** Foundations, walls, floors or paved surfaces;

**(b)** Basements, whether paved or not; or

**(c)** Doors, windows or other openings.

But if Water, as described in **g.(1)** through **g.(4)** above, results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage.

**h. "Fungus", Wet Rot, Dry Rot And Bacteria**

Presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria.

But if "fungus", wet or dry rot or bacteria results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion does not apply:

**1.** When "fungus", wet or dry rot or bacteria results from fire or lightning; or

**2.** To the extent that coverage is provided in the Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria with respect to loss or damage by a cause of loss other than fire or lightning.

Exclusions **B.1.a.** through **B.1.h.** apply whether or not the loss event results in widespread damage or affects a substantial area.

**2.** We will not pay for loss or damage caused by or resulting from any of the following:

**a.** Artificially generated electrical, magnetic or electromagnetic energy that damages, disturbs, disrupts or otherwise interferes with any:

**(1)** Electrical or electronic wire, device, appliance, system or network; or

**(2)** Device, appliance, system or network utilizing cellular or satellite technology.

                    © ISO Properties, Inc., 2007                    CP 10 30 06 07     □

SUPP APP 0996

For the purpose of this exclusion, electrical, magnetic or electromagnetic energy includes but is not limited to:

(a) Electrical current, including arcing;

(b) Electrical charge produced or conducted by a magnetic or electromagnetic field;

(c) Pulse of electromagnetic energy; or

(d) Electromagnetic waves or microwaves.

But if fire results, we will pay for the loss or damage caused by that fire.

b. Delay, loss of use or loss of market.

c. Smoke, vapor or gas from agricultural smudging or industrial operations.

d. (1) Wear and tear;

(2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself;

(3) Smog;

(4) Settling, cracking, shrinking or expansion;

(5) Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals.

(6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. But if mechanical breakdown results in elevator collision, we will pay for the loss or damage caused by that elevator collision.

(7) The following causes of loss to personal property:

(a) Dampness or dryness of atmosphere;

(b) Changes in or extremes of temperature; or

(c) Marring or scratching.

But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a "specified cause of loss" or building glass breakage, we will pay for the loss or damage caused by that "specified cause of loss" or building glass breakage.

e. Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you, or operated under your control. But if explosion of steam boilers, steam pipes, steam engines or steam turbines results in fire or combustion explosion, we will pay for the loss or damage caused by that fire or combustion explosion. We will also pay for loss or damage caused by or resulting from the explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

f. Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.

g. Water, other liquids, powder or molten material that leaks or flows from plumbing, heating, air conditioning or other equipment (except fire protective systems) caused by or resulting from freezing, unless:

(1) You do your best to maintain heat in the building or structure; or

(2) You drain the equipment and shut off the supply if the heat is not maintained.

h. Dishonest or criminal act by you, any of your partners, members, officers, managers, employees (including leased employees), directors, trustees, authorized representatives or anyone to whom you entrust the property for any purpose:

(1) Acting alone or in collusion with others; or

(2) Whether or not occurring during the hours of employment.

This exclusion does not apply to acts of destruction by your employees (including leased employees); but theft by employees (including leased employees) is not covered.

i. Voluntary parting with any property by you or anyone else to whom you have entrusted the property if induced to do so by any fraudulent scheme, trick, device or false pretense.

j. Rain, snow, ice or sleet to personal property in the open.

SUPP APP 0997

k. Collapse, including any of the following conditions of property or any part of the property:

(1) An abrupt falling down or caving in;

(2) Loss of structural integrity, including separation of parts of the property or property in danger of falling down or caving in; or

(3) Any cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion as such condition relates to (1) or (2) above.

But if collapse results in a Covered Cause of Loss at the described premises, we will pay for the loss or damage caused by that Covered Cause of Loss.

This exclusion, k., does not apply:

(a) To the extent that coverage is provided under the Additional Coverage – Collapse; or

(b) To collapse caused by one or more of the following:

(i) The "specified causes of loss";

(ii) Breakage of building glass;

(iii) Weight of rain that collects on a roof; or

(iv) Weight of people or personal property.

l. Discharge, dispersal, seepage, migration, release or escape of "pollutants" unless the discharge, dispersal, seepage, migration, release or escape is itself caused by any of the "specified causes of loss". But if the discharge, dispersal, seepage, migration, release or escape of "pollutants" results in a "specified cause of loss", we will pay for the loss or damage caused by that "specified cause of loss".

This exclusion, l., does not apply to damage to glass caused by chemicals applied to the glass.

m. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.

3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in Paragraph 1. above to produce the loss or damage.

b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

c. Faulty, inadequate or defective:

(1) Planning, zoning, development, surveying, siting;

(2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3) Materials used in repair, construction, renovation or remodeling; or

(4) Maintenance;

of part or all of any property on or off the described premises.

4. **Special Exclusions**

The following provisions apply only to the specified Coverage Forms.

a. **Business Income (And Extra Expense) Coverage Form, Business Income (Without Extra Expense) Coverage Form, Or Extra Expense Coverage Form**

We will not pay for:

(1) Any loss caused by or resulting from:

(a) Damage or destruction of "finished stock"; or

(b) The time required to reproduce "finished stock".

This exclusion does not apply to Extra Expense.

(2) Any loss caused by or resulting from direct physical loss or damage to radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers.

(3) Any increase of loss caused by or resulting from:

(a) Delay in rebuilding, repairing or replacing the property or resuming "operations", due to interference at the location of the rebuilding, repair or replacement by strikers or other persons; or

SUPP APP 0998

**(b)** Suspension, lapse or cancellation of any license, lease or contract. But if the suspension, lapse or cancellation is directly caused by the "suspension" of "operations", we will cover such loss that affects your Business Income during the "period of restoration" and any extension of the "period of restoration" in accordance with the terms of the Extended Business Income Additional Coverage and the Extended Period Of Indemnity Optional Coverage or any variation of these.

**(4)** Any Extra Expense caused by or resulting from suspension, lapse or cancellation of any license, lease or contract beyond the "period of restoration".

**(5)** Any other consequential loss.

**b. Leasehold Interest Coverage Form**

**(1)** Paragraph **B.1.a.**, Ordinance Or Law, does not apply to insurance under this Coverage Form.

**(2)** We will not pay for any loss caused by:

**(a)** Your cancelling the lease;

**(b)** The suspension, lapse or cancellation of any license; or

**(c)** Any other consequential loss.

**c. Legal Liability Coverage Form**

**(1)** The following exclusions do not apply to insurance under this Coverage Form:

**(a)** Paragraph **B.1.a.**, Ordinance Or Law;

**(b)** Paragraph **B.1.c.**, Governmental Action;

**(c)** Paragraph **B.1.d.**, Nuclear Hazard;

**(d)** Paragraph **B.1.e.**, Utility Services; and

**(e)** Paragraph **B.1.f.**, War And Military Action.

**(2)** The following additional exclusions apply to insurance under this Coverage Form:

**(a) Contractual Liability**

We will not defend any claim or "suit", or pay damages that you are legally liable to pay, solely by reason of your assumption of liability in a contract or agreement. But this exclusion does not apply to a written lease agreement in which you have assumed liability for building damage resulting from an actual or attempted burglary or robbery, provided that:

**(i)** Your assumption of liability was executed prior to the accident; and

**(ii)** The building is Covered Property under this Coverage Form.

**(b) Nuclear Hazard**

We will not defend any claim or "suit", or pay any damages, loss, expense or obligation, resulting from nuclear reaction or radiation, or radioactive contamination, however caused.

**5. Additional Exclusion**

The following provisions apply only to the specified property.

**LOSS OR DAMAGE TO PRODUCTS**

We will not pay for loss or damage to any merchandise, goods or other product caused by or resulting from error or omission by any person or entity (including those having possession under an arrangement where work or a portion of the work is outsourced) in any stage of the development, production or use of the product, including planning, testing, processing, packaging, installation, maintenance or repair. This exclusion applies to any effect that compromises the form, substance or quality of the product. But if such error or omission results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

SUPP APP 0999

## C. Limitations

The following limitations apply to all policy forms and endorsements, unless otherwise stated.

1. We will not pay for loss of or damage to property, as described and limited in this section. In addition, we will not pay for any loss that is a consequence of loss or damage as described and limited in this section.

   a. Steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment. But we will pay for loss of or damage to such equipment caused by or resulting from an explosion of gases or fuel within the furnace of any fired vessel or within the flues or passages through which the gases of combustion pass.

   b. Hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment, other than an explosion.

   c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand or dust, whether driven by wind or not, unless:

      (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters; or

      (2) The loss or damage is caused by or results from thawing of snow, sleet or ice on the building or structure.

   d. Building materials and supplies not attached as part of the building or structure, caused by or resulting from theft.

      However, this limitation does not apply to:

      (1) Building materials and supplies held for sale by you, unless they are insured under the Builders Risk Coverage Form; or

      (2) Business Income Coverage or Extra Expense Coverage.

   e. Property that is missing, where the only evidence of the loss or damage is a shortage disclosed on taking inventory, or other instances where there is no physical evidence to show what happened to the property.

   f. Property that has been transferred to a person or to a place outside the described premises on the basis of unauthorized instructions.

2. We will not pay for loss of or damage to the following types of property unless caused by the "specified causes of loss" or building glass breakage:

   a. Animals, and then only if they are killed or their destruction is made necessary.

   b. Fragile articles such as statuary, marbles, chinaware and porcelains, if broken. This restriction does not apply to:

      (1) Glass; or

      (2) Containers of property held for sale.

   c. Builders' machinery, tools and equipment owned by you or entrusted to you, provided such property is Covered Property.

      However, this limitation does not apply:

      (1) If the property is located on or within 100 feet of the described premises, unless the premises is insured under the Builders Risk Coverage Form; or

      (2) To Business Income Coverage or to Extra Expense Coverage.

3. The special limit shown for each category, a. through d., is the total limit for loss of or damage to all property in that category. The special limit applies to any one occurrence of theft, regardless of the types or number of articles that are lost or damaged in that occurrence. The special limits are:

   a. $2,500 for furs, fur garments and garments trimmed with fur.

   b. $2,500 for jewelry, watches, watch movements, jewels, pearls, precious and semiprecious stones, bullion, gold, silver, platinum and other precious alloys or metals. This limit does not apply to jewelry and watches worth $100 or less per item.

   c. $2,500 for patterns, dies, molds and forms.

   d. $250 for stamps, tickets, including lottery tickets held for sale, and letters of credit.

   These special limits are part of, not in addition to, the Limit of Insurance applicable to the Covered Property.

   This limitation, C.3., does not apply to Business Income Coverage or to Extra Expense Coverage.

 © ISO Properties, Inc., 2007 CP 10 30 06 07 □

SUPP APP 1000

4. We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage:

   a. Results in discharge of any substance from an automatic fire protection system; or

   b. Is directly caused by freezing.

   However, this limitation does not apply to Business Income Coverage or to Extra Expense Coverage.

**D. Additional Coverage – Collapse**

The coverage provided under this Additional Coverage – Collapse applies only to an abrupt collapse as described and limited in **D.1.** through **D.7.**

1. For the purpose of this Additional Coverage – Collapse, abrupt collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.

2. We will pay for direct physical loss or damage to Covered Property, caused by abrupt collapse of a building or any part of a building that is insured under this Coverage Form or that contains Covered Property insured under this Coverage Form, if such collapse is caused by one or more of the following:

   a. Building decay that is hidden from view, unless the presence of such decay is known to an insured prior to collapse;

   b. Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an insured prior to collapse;

   c. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs during the course of the construction, remodeling or renovation.

   d. Use of defective material or methods in construction, remodeling or renovation if the abrupt collapse occurs after the construction, remodeling or renovation is complete, but only if the collapse is caused in part by:

      (1) A cause of loss listed in **2.a.** or **2.b.**;

      (2) One or more of the "specified causes of loss";

      (3) Breakage of building glass;

      (4) Weight of people or personal property; or

      (5) Weight of rain that collects on a roof.

3. This **Additional Coverage – Collapse** does not apply to:

   a. A building or any part of a building that is in danger of falling down or caving in;

   b. A part of a building that is standing, even if it has separated from another part of the building; or

   c. A building that is standing or any part of a building that is standing, even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

4. With respect to the following property:

   a. Outdoor radio or television antennas (including satellite dishes) and their lead-in wiring, masts or towers;

   b. Awnings, gutters and downspouts;

   c. Yard fixtures;

   d. Outdoor swimming pools;

   e. Fences;

   f. Piers, wharves and docks;

   g. Beach or diving platforms or appurtenances;

   h. Retaining walls; and

   i. Walks, roadways and other paved surfaces;

   if an abrupt collapse is caused by a cause of loss listed in **2.a.** through **2.d.**, we will pay for loss or damage to that property only if:

      (1) Such loss or damage is a direct result of the abrupt collapse of a building insured under this Coverage Form; and

      (2) The property is Covered Property under this Coverage Form.

5. If personal property abruptly falls down or caves in and such collapse is **not** the result of abrupt collapse of a building, we will pay for loss or damage to Covered Property caused by such collapse of personal property only if:

   a. The collapse of personal property was caused by a cause of loss listed in **2.a.** through **2.d.**;

   b. The personal property which collapses is inside a building; and

   c. The property which collapses is not of a kind listed in **4.**, regardless of whether that kind of property is considered to be personal property or real property.

   The coverage stated in this Paragraph **5.** does not apply to personal property if marring and/or scratching is the only damage to that personal property caused by the collapse.

CP 10 30 06 07                    © ISO Properties, Inc., 2007                    **Page 7 of 10**                    ☐

6. This Additional Coverage – Collapse does not apply to personal property that has not abruptly fallen down or caved in, even if the personal property shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

7. This Additional Coverage – Collapse will not increase the Limits of Insurance provided in this Coverage Part.

8. The term Covered Cause of Loss includes the Additional Coverage – Collapse as described and limited in **D.1.** through **D.7.**

E. **Additional Coverage – Limited Coverage For "Fungus", Wet Rot, Dry Rot And Bacteria**

1. The coverage described in **E.2.** and **E.6.** only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.

   a. A "specified cause of loss" other than fire or lightning; or

   b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:

   a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;

   b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

   c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungus", wet or dry rot or bacteria are present.

3. The coverage described under **E.2.** of this Limited Coverage is limited to $15,000. Regardless of the number of claims, this limit is the most we will pay for the total of all loss or damage arising out of all occurrences of "specified causes of loss" (other than fire or lightning) and Flood which take place in a 12-month period (starting with the beginning of the present annual policy period). With respect to a particular occurrence of loss which results in "fungus", wet or dry rot or bacteria, we will not pay more than a total of $15,000 even if the "fungus", wet or dry rot or bacteria continues to be present or active, or recurs, in a later policy period.

4. The coverage provided under this Limited Coverage does not increase the applicable Limit of Insurance on any Covered Property. If a particular occurrence results in loss or damage by "fungus", wet or dry rot or bacteria, and other loss or damage, we will not pay more, for the total of all loss or damage, than the applicable Limit of Insurance on the affected Covered Property.

   If there is covered loss or damage to Covered Property, not caused by "fungus", wet or dry rot or bacteria, loss payment will not be limited by the terms of this Limited Coverage, except to the extent that "fungus", wet or dry rot or bacteria causes an increase in the loss. Any such increase in the loss will be subject to the terms of this Limited Coverage.

5. The terms of this Limited Coverage do not increase or reduce the coverage provided under Paragraph **F.2.** (Water Damage, Other Liquids, Powder Or Molten Material Damage) of this Causes Of Loss Form or under the Additional Coverage – Collapse.

6. The following, **6.a.** or **6.b.**, applies only if Business Income and/or Extra Expense Coverage applies to the described premises and only if the "suspension" of "operations" satisfies all terms and conditions of the applicable Business Income and/or Extra Expense Coverage Form.

SUPP APP 1002

a. If the loss which resulted in "fungus", wet or dry rot or bacteria does not in itself necessitate a "suspension" of "operations", but such "suspension" is necessary due to loss or damage to property caused by "fungus", wet or dry rot or bacteria, then our payment under Business Income and/or Extra Expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

b. If a covered "suspension" of "operations" was caused by loss or damage other than "fungus", wet or dry rot or bacteria but remediation of "fungus", wet or dry rot or bacteria prolongs the "period of restoration", we will pay for loss and/or expense sustained during the delay (regardless of when such a delay occurs during the "period of restoration"), but such coverage is limited to 30 days. The days need not be consecutive.

## F. Additional Coverage Extensions

### 1. Property In Transit

This Extension applies only to your personal property to which this form applies.

a. You may extend the insurance provided by this Coverage Part to apply to your personal property (other than property in the care, custody or control of your salespersons) in transit more than 100 feet from the described premises. Property must be in or on a motor vehicle you own, lease or operate while between points in the coverage territory.

b. Loss or damage must be caused by or result from one of the following causes of loss:

(1) Fire, lightning, explosion, windstorm or hail, riot or civil commotion, or vandalism.

(2) Vehicle collision, upset or overturn. Collision means accidental contact of your vehicle with another vehicle or object. It does not mean your vehicle's contact with the roadbed.

(3) Theft of an entire bale, case or package by forced entry into a securely locked body or compartment of the vehicle. There must be visible marks of the forced entry.

c. The most we will pay for loss or damage under this Extension is $5,000.

This Coverage Extension is additional insurance. The Additional Condition, Coinsurance, does not apply to this Extension.

### 2. Water Damage, Other Liquids, Powder Or Molten Material Damage

If loss or damage caused by or resulting from covered water or other liquid, powder or molten material damage loss occurs, we will also pay the cost to tear out and replace any part of the building or structure to repair damage to the system or appliance from which the water or other substance escapes. This Coverage Extension does not increase the Limit of Insurance.

### 3. Glass

a. We will pay for expenses incurred to put up temporary plates or board up openings if repair or replacement of damaged glass is delayed.

b. We will pay for expenses incurred to remove or replace obstructions when repairing or replacing glass that is part of a building. This does not include removing or replacing window displays.

This Coverage Extension, F.3., does not increase the Limit of Insurance.

## G. Definitions

1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

a. Sinkhole collapse means the sudden sinking or collapse of land into underground empty spaces created by the action of water on limestone or dolomite. This cause of loss does not include:

(1) The cost of filling sinkholes; or

(2) Sinking or collapse of land into man-made underground cavities.

SUPP APP 1003

b. Falling objects does not include loss or damage to:

   (1) Personal property in the open; or

   (2) The interior of a building or structure, or property inside a building or structure, unless the roof or an outside wall of the building or structure is first damaged by a falling object.

c. Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of a plumbing, heating, air conditioning or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

 © ISO Properties, Inc., 2007 CP 10 30 06 07 □

SUPP APP 1004

POLICY NUMBER: CCP 672836

**COMMERCIAL PROPERTY**
CP 12 11 10 00

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

# BURGLARY AND ROBBERY PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART

### SCHEDULE*

| Premises No. | Building No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| 1 | 1 | BR-4 |
| Description | | |
| Fully functional, actively engaged Burglar Alarm System with interior Motion Detection Devices protecting the entire building that signals directly to an outside Central Station or Police Department. | | |

*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

**A.** The following is added to the **Commercial Property Conditions:**

**BURGLARY AND ROBBERY PROTECTIVE SAFEGUARDS**

1. As a condition of this insurance, you are required to maintain the protective devices and/or services listed in the Schedule above.

2. The protective safeguard(s) to which this endorsement applies are identified by the following symbols:

   a. "BR-1" Automatic Burglary Alarm, protecting the entire building, that signals to:

      (1) An outside central station; or

      (2) A police station.

   b. "BR-2" Automatic Burglary Alarm, protecting the entire building, that has a loud sounding gong or siren on the outside of the building.

   c. "BR-3" Security Service, with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

   d. "BR-4" The protective safeguard described in the Schedule.

**B.** The following is added to the **Exclusions** section of the Causes Of Loss – Special Form:

**BURGLARY AND ROBBERY PROTECTIVE SAFEGUARDS**

We will not pay for loss or damage caused by or resulting from theft if, prior to the theft, you:

1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

Copyright, Insurance Services Office, Inc., 1999

SUPP APP 1005

POLICY NUMBER: CCP 672836

COMMERCIAL PROPERTY
CP 14 40 10 00

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# OUTSIDE SIGNS

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
CONDOMINIUM ASSOCIATION COVERAGE FORM
CONDOMINIUM COMMERCIAL UNIT-OWNERS COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE\***

| Prem. No. | Bldg. No. | Construction Of Sign | | Limit of Insurance | Causes Of Loss Form Applicable | Coinsurance Percentage | Additional Premium |
|---|---|---|---|---|---|---|---|
| | | Entirely Metal | Other | | | | |
| 1 | 1 | ☐ | ☒ | $8,500 | Special Form including theft | 90% | $ 262 |

\*Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations.

With respect to outside signs described in the Schedule:

A. "Signs (other than signs attached to buildings)" is deleted from **Property Not Covered.**

B. In the Limits Of Insurance section, the provision which pertains to signs attached to buildings does not apply. The limit applicable to each sign is shown in the Schedule.

C. Outside signs are subject to all applicable provisions of the Causes Of Loss Form indicated in the Schedule. In addition, we will not pay for loss or damage caused by or resulting from any of the following:

1. Dampness or dryness of atmosphere;
2. Changes in or extremes of temperature;
3. Marring or scratching; or
4. Rain, snow, ice or sleet.

However, if the sign is attached to the building and is covered under the Causes Of Loss — Special Form, then Exclusions **C.1.** through **C.4.** do not apply.

CP 14 40 10 00                Copyright, Insurance Services Office, Inc., 1999                Page 1 of 1

SUPP APP 1006

POLICY NUMBER:   CCP 672836

**COMMERCIAL PROPERTY**
**CP 14 70 06 07**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BUILDING GLASS – TENANT'S POLICY

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM
STANDARD PROPERTY POLICY

**SCHEDULE**

| | |
|---|---|
| **Location Of Building:** | 5026 ADDISON CIRCLE<br>ADDISON, TX 75001 |
| **Description Of Building Glass:** | STORE FRONT, DOUBLE DOORS AND SINGLE DOOR |
| **Causes Of Loss Form:**<br>**(And Related Endorsements, If Any)** | Special Form including theft |
| **Limit Of Insurance:** | $ 5,000 |

Information required to complete this Schedule,  if not shown above , will be shown in the Declarations.

**A.** Under this endorsement, building glass means the building glass described in the Schedule.

**B.** We will pay for direct physical loss of or damage to building glass at the building shown in the Schedule caused by or resulting from a Covered Cause of Loss shown in the Schedule, provided that:

**1.** You are a tenant of the building shown in the Schedule; and

**2.** You have a contractual responsibility to insure the building glass, or a contractual responsibility to pay for loss or damage to that property.

**C.** The value of property covered under this endorsement will be determined in accordance with the Valuation Condition applicable under this Coverage Form or Policy, or at the amount for which you are liable under contract, whichever is less. If required by law, glass is covered at the cost of replacement with safety glazing material. However, the most we will pay for the coverage provided under this endorsement is the Limit of Insurance shown in the Schedule.

**CP 14 70 06 07**     © IS O Properties, Inc., 2007     **Page 1 of 1**

SUPP APP 1007

INTERLINE
IL 04 15 04 98

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

## SCHEDULE

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|-----------|-----------|------------------------------------------|
| 1 | 1 | P-9 |

**Describe any "P-9":**
Fully functional and actively engaged fire Extinguishing System over the entire cooking area with an automatic shut off for the heat source with a semi-annual service contract.

**A.** The following is added to the:
Commercial Property Conditions
General Conditions in the
Farm Property – Other Farm
Provisions Form – Additional Coverages,
Conditions, Definitions
General Conditions in the Mobile Agricultural
Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage
Form

**PROTECTIVE SAFEGUARDS**

**1.** As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

**2.** The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1" Automatic Sprinkler System,** including related supervisory services.
Automatic Sprinkler System means:

**a.** Any automatic fire protective or extinguishing system, including connected:

**(1)** Sprinklers and discharge nozzles;

**(2)** Ducts, pipes, valves and fittings;

**(3)** Tanks, their component parts and supports; and

**(4)** Pumps and private fire protection mains.

**b.** When supplied from an automatic fire protective system:

**(1)** Non-automatic fire protective systems; and

**(2)** Hydrants, standpipes and outlets.

**"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

**a.** Connected to a central station; or

**b.** Reporting to a public or private fire alarm station.

**"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-9"** The protective system described in the Schedule.

    Copyright, Insurance Services Office, Inc., 1997

SUPP APP 1008

B. The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS – BASIC FORM
CAUSES OF LOSS – BROAD FORM
CAUSES OF LOSS – SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
CAUSES OF LOSS FORM – FARM PROPERTY
MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

SUPP APP 1009

INTERLINE
IL 04 15 04 98

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROTECTIVE SAFEGUARDS

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
FARM COVERAGE PART

## SCHEDULE

| Prem. No. | Bldg. No. | Protective Safeguards Symbols Applicable |
|---|---|---|
| 1 | 1 | P-1 |

**Describe any "P-9":**
Automatic Sprinkler System

**A.** The following is added to the:
Commercial Property Conditions
General Conditions in the
Farm Property – Other Farm
Provisions Form – Additional Coverages,
Conditions, Definitions
General Conditions in the Mobile Agricultural
Machinery and Equipment Coverage Form
General Conditions in the Livestock Coverage
Form

**PROTECTIVE SAFEGUARDS**

1. As a condition of this insurance, you are required to maintain the protective devices or services listed in the Schedule above.

2. The protective safeguards to which this endorsement applies are identified by the following symbols:

**"P-1" Automatic Sprinkler System,** including related supervisory services.
Automatic Sprinkler System means:

a. Any automatic fire protective or extinguishing system, including connected:

(1) Sprinklers and discharge nozzles;

(2) Ducts, pipes, valves and fittings;

(3) Tanks, their component parts and supports; and

(4) Pumps and private fire protection mains.

b. When supplied from an automatic fire protective system:

(1) Non-automatic fire protective systems; and

(2) Hydrants, standpipes and outlets.

**"P-2" Automatic Fire Alarm,** protecting the entire building, that is:

a. Connected to a central station; or

b. Reporting to a public or private fire alarm station.

**"P-3" Security Service,** with a recording system or watch clock, making hourly rounds covering the entire building, when the premises are not in actual operation.

**"P-4" Service Contract** with a privately owned fire department providing fire protection service to the described premises.

**"P-9"** The protective system described in the Schedule.

   Copyright, Insurance Services Office, Inc., 1997

SUPP APP 1010

B. The following is added to the EXCLUSIONS section of:

CAUSES OF LOSS – BASIC FORM
CAUSES OF LOSS – BROAD FORM
CAUSES OF LOSS – SPECIAL FORM
MORTGAGE HOLDERS ERRORS AND OMISSIONS COVERAGE FORM
STANDARD PROPERTY POLICY
CAUSES OF LOSS FORM – FARM PROPERTY
MOBILE AGRICULTURAL MACHINERY AND EQUIPMENT COVERAGE FORM
LIVESTOCK COVERAGE FORM

We will not pay for loss or damage caused by or resulting from fire if, prior to the fire, you:

1. Knew of any suspension or impairment in any protective safeguard listed in the Schedule above and failed to notify us of that fact; or

2. Failed to maintain any protective safeguard listed in the Schedule above, and over which you had control, in complete working order.

If part of an Automatic Sprinkler System is shut off due to breakage, leakage, freezing conditions or opening of sprinkler heads, notification to us will not be necessary if you can restore full protection within 48 hours.

Copyright, Insurance Services Office, Inc., 1997

SUPP APP 1011

IL 09 35 07 02

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTAIN COMPUTER-RELATED LOSSES

This endorsement modifies insurance provided under the following:

COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
STANDARD PROPERTY POLICY

A. We will not pay for loss ("loss") or damage caused directly or indirectly by the following.  Such loss ("loss") or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss ("loss") or damage.

  1. The failure, malfunction or inadequacy of:

    a. Any of the following, whether belonging to any insured or to others:

      (1) Computer hardware, including microprocessors;

      (2) Computer application software;

      (3) Computer operating systems and related software;

      (4) Computer networks;

      (5) Microprocessors (computer chips) not part of any computer system; or

      (6) Any other computerized or electronic equipment or components; or

    b. Any other products, and any services, data or functions that directly or indirectly use or rely upon, in any manner, any of the items listed in Paragraph A.1.a. of this endorsement;

  due to the inability to correctly recognize, process, distinguish, interpret or accept one or more dates or times. An example is the inability of computer software to recognize the year 2000.

  2. Any advice, consultation, design, evaluation, inspection, installation, maintenance, repair, replacement or supervision provided or done by you or for you to determine, rectify or test for, any potential or actual problems described in Paragraph A.1. of this endorsement.

B. If an excluded Cause of Loss as described in Paragraph A. of this endorsement results:

  1. In a Covered Cause of Loss under the Crime and Fidelity Coverage Part, the Commercial Inland Marine Coverage Part or the Standard Property Policy; or

  2. Under the Commercial Property Coverage Part:

    a. In a "Specified Cause of Loss", or in elevator collision resulting from mechanical breakdown, under the Causes of Loss – Special Form; or

    b. In a Covered Cause of Loss under the Causes Of Loss – Basic Form or the Causes Of Loss – Broad Form;

  we will pay only for the loss ("loss") or damage caused by such "Specified Cause of Loss", elevator collision, or Covered Cause of Loss.

C. We will not pay for repair, replacement or modification of any items in Paragraphs A.1.a. and A.1.b. of this endorsement to correct any deficiencies or change any features.

© ISO Properties, Inc., 2001

SUPP APP 1012

POLICY NUMBER: CCP 672836                                                    IL 09 86 03 08

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EXCLUSION OF CERTIFIED ACTS OF TERRORISM INVOLVING NUCLEAR, BIOLOGICAL, CHEMICAL OR RADIOLOGICAL TERRORISM; CAP ON COVERED CERTIFIED ACTS LOSSES

This endorsement modifies insurance provided under the following:

BOILER AND MACHINERY COVERAGE PART
COMMERCIAL INLAND MARINE COVERAGE PART
COMMERCIAL PROPERTY COVERAGE PART
CRIME AND FIDELITY COVERAGE PART
EQUIPMENT BREAKDOWN COVERAGE PART
FARM COVERAGE PART
STANDARD PROPERTY POLICY

### SCHEDULE

The **Exception Covering Certain Fire Losses** (Paragraph **C**) applies to property located in the following state(s), if covered under the indicated Coverage Form, Coverage Part or Policy:

| State(s) | Coverage Form, Coverage Part Or Policy |
|---|---|
|  |  |
| Information required to complete this Schedule, if not shown above, will be shown in the Declarations. ||

**A.** The following definition is added with respect to the provisions of this endorsement:
"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act. The criteria contained in the Terrorism Risk Insurance Act for a "certified act of terrorism" include the following:

**1.** The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

**2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

IL 09 86 03 08                    © ISO Properties, Inc., 2005                    Page 1 of 2

SUPP APP 1013

**B.** The following exclusion is added:

**LIMITED EXCLUSION OF CERTIFIED ACTS OF TERRORISM**

We will not pay for loss or damage caused directly or indirectly by a "certified act of terrorism". Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss. But this exclusion applies only when one or more of the following are attributed to such act:

1. The terrorism is carried out by means of the dispersal or application of radioactive material, or through the use of a nuclear weapon or device that involves or produces a nuclear reaction, nuclear radiation or radioactive contamination; or

2. Radioactive material is released, and it appears that one purpose of the terrorism was to release such material; or

3. The terrorism is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical material; or

4. Pathogenic or poisonous biological or chemical material is released, and it appears that one purpose of the terrorism was to release such material.

When this terrorism exclusion applies in accordance with the terms of Paragraph **B.1.** or **B.2.**, the terrorism exclusion applies without regard to the Nuclear Hazard Exclusion in this Coverage Part or Policy.

**C. Exception Covering Certain Fire Losses**

The following exception to the exclusion in Paragraph **B.** applies only if indicated and as indicated in the Schedule of this endorsement.

If a "certified act of terrorism" excluded under Paragraph **B.** results in fire, we will pay for the loss or damage caused by that fire, subject to all applicable policy provisions including the Limit of Insurance on the affected property. Such coverage for fire applies only to direct loss or damage by fire to Covered Property. Therefore, for example, the coverage does not apply to insurance provided under Business Income and/or Extra Expense coverage forms or endorsements that apply to those coverage forms, or to the Legal Liability Coverage Form or the Leasehold Interest Coverage Form.

**D. Cap On Certified Terrorism Losses**

The following limitation applies to coverage for any one or more "certified acts of terrorism" that are not excluded by the terms of the exclusion in Paragraph **B.** and to any loss or damage that is covered and to which the exception in Paragraph **C.** applies:

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

This Paragraph, **D.**, does not apply to insurance provided under the Crime And Fidelity Coverage Part.

**E. Application Of Exclusions**

The terms and limitations of any terrorism exclusion, or the non-applicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Coverage Part or Policy, such as losses excluded by the War And Military Action Exclusion.

SUPP APP 1014

# EXHIBIT B



Cause Number: 13-045604

| | |
|---|---|
| JANE DOE, | § IN THE DISTRICT COURT |
| | § |
| Plaintiff, | § |
| | § |
| v. | § 193rd JUDICIAL DISTRICT COURT |
| | § |
| AJREDIN "DANNY" DEARI; DRITAN | § |
| KREKA; PASTAZIOS PIZZA, INC.; | § |
| ISLAND HOSPITALITY MANAGEMENT, | § |
| INC.; HYATT HOTELS CORPORATION; | § |
| and DOES 1-25, | § |
| | § |
| Defendants. | § DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

Plaintiff JANE DOE[1] ("Plaintiff") file *Plaintiff's Original Petition* ("Petition") against

Defendants AJREDIN "DANNY" DEARI; DRITAN KREKA; PASTAZIOS PIZZA, INC.;

ISLAND HOSPITALITY MANAGEMENT, INC.; HYATT HOTELS CORPORATION; and

DOES 1-25 (collectively referred to herein as "Defendants"), and for causes of action

respectfully shows this Court as follows:

### I.
### DISCOVERY CONTROL PLAN

1.      Pursuant to TEX. R. CIV. P. 190.1, 190.3, Plaintiff intends to conduct discovery

under a Level 2 Discovery Control Plan.

### II.
### PARTIES

2.      Plaintiff is a natural person who resides in Collin County, Texas.

---

[1] Due to the extremely personal and sensitive nature of this lawsuit, Plaintiff is proceeding under the pseudonym of "Jane Doe"; however, Defendants have full knowledge of Plaintiff's identity due to Defendants' involvement in the underlying acts and omissions that form the basis of this Petition. To the extent that Defendants or Defendants' counsel are genuinely unaware of Plaintiff's identity (which would likely be impossible due to criminal proceedings against at least one Defendant in Dallas County, Texas, Case No. F1111106), Plaintiff's counsel is happy to state Plaintiff's identity to this Court and Defendants' counsel in papers that are (1) filed under seal with this Court, and/or (2) not filed with this Court and, thus, not subject to public inspection.

PLAINTIFF'S ORIGINAL PETITION                                                                PAGE 1 OF 19

3.    Defendant AJREDIN "DANNY" DEARI (hereinafter, "Deari") is a natural person who resides—and may be served with service of process—at 15750 Spectrum #2211, Addison, Texas 75001.

4.    Defendant DRITAN KREKA (hereinafter, "Kreka") is a natural person who resides—and may be served with service of process—at 5549 Big River Drive, The Colony, Texas 75056.

5.    Defendant PASTAZIOS PIZZA, INC. (hereinafter, "Pastazios") is a Texas corporation that maintains its principal place of business in Dallas County, Texas. Pastazios may be served with service of process by serving its registered agent, Ajredin Deari, located at 1416 Tree Farm Drive, Plano, Texas 75093.

6.    Defendant ISLAND HOSPITALITY MANAGEMENT, INC. (hereinafter, "Island Hospitality") is a Florida corporation with its principal place of business in Palm Beach, Florida. Island Hospitality may be served with service of process by serving its registered agent, C T Corporation System, located at 350 N. Paul Street, Suite 2900, Dallas, Texas 75201.

7.    Defendant HYATT HOTELS CORPORATION (hereinafter, "Hyatt") is a Delaware corporation with its principal place of business in Chicago, Illinois. Hyatt may be served with service of process by serving its registered agent, United States Corporation Co., located at 211 East 7th Street, Suite 620, Austin, Texas 78701.

8.    Upon information and belief, Plaintiff alleges that the true identities and residences of Defendants JOHN DOE 1-25, respectively, are currently unknown to Plaintiff at this time. Plaintiff shall proceed with due diligence to discover the identities of Defendants JOHN DOE 1-25, respectively and, after said Defendants' true identities have been discovered, will amend this Petition accordingly.

---

**PLAINTIFF'S ORIGINAL PETITION**                                        **PAGE 2 OF 19**

SUPP APP 1017

9.      Upon information and belief, Plaintiff alleges that, at all material times, all Defendants were the agents, servants, employees, partners, authorized agents and/or joint venturers of every other Defendant and the acts of each Defendant were within the course and scope of the agency, employment, partnership, and/or joint venture such that each Defendant is jointly and severally liable for the damages alleged by Plaintiff herein.

### III.
### JURISDICTION

10.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy exceeds the minimum jurisdictional requirements.

11.     In accordance with TEX. R. CIV. P. 47, Plaintiff seeks monetary relief in excess of $1,000,000.00 due to Defendants' tortious conduct.

12.     This Court has personal jurisdiction over Defendant Deari and Defendant Kreka because said Defendants (1) are individuals and residents of the State of Texas, (2) transact business within the State of Texas, (3) maintain continuous and systematic contacts with the State of Texas, (4) purposefully avails themselves to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Deari and Defendant Kreka.

13.     This Court has personal jurisdiction over Defendant Pastazios because said Defendant (1) is a Texas corporation that maintains its principal place of business in Texas, (2) transacts business within the State of Texas, (3) maintains continuous and systematic contacts with the State of Texas, (4) purposefully avails itself to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Pastazios.

14.     This Court has personal jurisdiction over Defendant Island Hospitality because (1)

---

**PLAINTIFF'S ORIGINAL PETITION**                                    **PAGE 3 OF 19**

SUPP APP 1018

it transacts business within the State of Texas, (2) it has continuous and systematic contacts with the State of Texas, (3) it maintains multiple offices in Texas, owns property in Texas, and maintains bank accounts (used for the purpose of transacting business within the State of Texas and elsewhere) within the State of Texas, (4) it purposefully avails itself to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Island Hospitality.

15.    This Court has personal jurisdiction over Defendant Hyatt because (1) it transacts business within the State of Texas, (2) it has continuous and systematic contacts with the State of Texas, (3) it maintains multiple offices and bank accounts (used for the purpose of transacting business within the State of Texas and elsewhere) within the State of Texas, (4) it purposefully avails itself to the laws of the State of Texas, and (5) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Texas and involved Defendant Hyatt.

16.    Removal of this case to a federal court is inappropriate and statutorily unauthorized because (1) complete diversity of parties is lacking, (2) at least one Defendant is a forum-state defendant by virtue of its Texas incorporation and/or principal place of business being in Texas, and (3) Plaintiff has not alleged a federal question, federal cause of action, or alleged facts that would give rise to a federal question or federal cause of action; therefore, any attempt to remove this case to a federal court is frivolous and gives rise to sanctionable conduct.

## IV.
### VENUE

17.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a), venue is proper in Dallas County, Texas because (1) all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Dallas County, Texas, and (2) some or all of the Defendants resided in Dallas County, Texas at the time Plaintiff's causes of action accrued.

---

SUPP APP 1019

18. Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005, because venue is proper in Dallas County, Texas against at least one Defendant, venue is proper in Dallas County, Texas as to all Defendants.

## V.
### FACTUAL BACKGROUND

19. In early 2011, Plaintiff was 18 years old and a recent graduate from high school. Plaintiff excelled in school academically, graduating as the valedictorian of her class.

20. Like many young adults, Plaintiff was in search of an entry-level job at a local business in order to earn disposable income and garner working experience. During her search, Plaintiff was introduced to Defendant Deari and Defendant Kreka. Plaintiff was told that Deari and Kreka were the owners of two local bar/restaurants, and would be willing to meet with her to discuss potential employment opportunities.

21. On or about April 26, 2011, Plaintiff met Deari and Kreka at a restaurant in Dallas, Texas. Deari asked Plaintiff how old she was and Plaintiff informed both men that she was 18 years old. At the time, Defendant Deari was approximately 49 years old and Defendant Kreka was approximately 33 years old. The two Defendants subsequently tried to order Plaintiff an alcoholic beverage; however, the restaurant's server refused to bring the beverage because Plaintiff was underage.

22. Undeterred, the two Defendants decided that it would be easiest to order Plaintiff beverages at "Pastazios's Pizza" in Addison, Texas. On information and belief, Plaintiff alleges that "Pastazios's Pizza" is the assumed name of Defendant Pastazios and, additionally, the alter ego of Defendant Deari who holds himself out to the public and Texas Secretary of State as the registered agent, director, and president of Pastazios.

23. As planned, Defendant Deari and Defendant Kreka convinced Plaintiff to drive to

---

Pastazios. Prior to their arrival, Defendants purchased hard liquor from a store with the intention of serving the alcohol to Plaintiff.

24.     Upon arrival at Pastazios, Defendants Kreka, Deari, and Pastazios (through its employees, director, and president) began serving, selling, retrieving, and otherwise giving Plaintiff multiple "shots" of hard liquor and servings of beer. Defendants repeatedly and aggressively pressured Plaintiff into consuming—and Plaintiff, indeed, consumed—these beverages despite Defendants' knowledge that Plaintiff was not of the legal age to drink. Just as Defendants Deari, Kreka, and Pastazios planned, Plaintiff became intoxicated and she was, in fact, obviously intoxicated.

25.     After Plaintiff had consumed multiple shots of hard liquor and servings of beer that Defendants served, sold, retrieved, and otherwise gave to Plaintiff, Deari and Kreka decided that their next stop should be a local adult entertainment dance club. Deari retrieved his vehicle from Pastazios's parking lot and told Kreka and Plaintiff to get into the vehicle. Kreka moved into the driver's seat and Plaintiff, who was highly intoxicated, sat in the back of the vehicle. Plaintiff then lost consciousness.

26.     Plaintiff's next memory is vomiting in a gas station parking lot before losing consciousness again. Shortly thereafter, Plaintiff awoke in a hotel room located 4900 Edwin Lewis Drive, Addison, Texas 75001—a premise that is owned, operated, and otherwise possessed by Island Hospitality and Hyatt (hereinafter, "the Premises Defendants")—wherein she had been involuntarily disrobed and was actively being raped by Defendant Deari.

27.     Plaintiff repeatedly insisted that Defendant Deari stop the attack, but he did not. It was only after Plaintiff made multiple demands for Defendant Deari to stop did the sexual assault eventually end. Fearful of another attack, Plaintiff locked herself in the bathroom.

---

**PLAINTIFF'S ORIGINAL PETITION**                                        **PAGE 6 OF 19**

28.     While still in the hotel room, Defendant Deari called Defendant Kreka on the telephone and told him that Plaintiff was "really freaking out, dude", and asked for Kreka to retrieve him from the Premises Defendants' property. With the knowledge that a sexual assault had just occurred (one in which Defendant Kreka conspired to commit, facilitated, aided, and abetted), Kreka retrieved Deari from the crime scene (unimpeded by the Premises Defendants) thereby assisting Deari's evasion of law enforcement.

29.     Plaintiff alleges that the Premises Defendants knew, or reasonably should have known, of the reasonably foreseeable, unreasonable risks of harm from criminal activity at its premises to Plaintiff taking into account the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Premises Defendants' property. The Premises Defendants allowed Defendant Deari and Defendant Kreka to reserve a room at its hotel, enter it with an unconscious 18 year-old woman, rape her, and come and go from its property in an unimpeded fashion such that Defendants could evade a police investigation without resistance.

30.     After the attack on Plaintiff ceased and Deari and Kreka left the Premises Defendants' property, a friend of Plaintiff's arrived at the hotel to help. After learning what happened, the friend immediately notified the Addison Police Department. While investigating the crime scene, Defendant Deari came back to the hotel (presumably to retrieve the underwear he left, which was taken into evidence by the police department), and Deari was arrested, charged with the crime of sexual assault, indicted, and has a criminal trial pending. At this point in time, Defendant Kreka has not been charged for the crimes he aided, abetted, facilitated, and conspired to commit.

31.     Plaintiff was immediately transmitted to the hospital and underwent a series of examinations, tests, and administered massive quantities of treatments for the injuries she

**PLAINTIFF'S ORIGINAL PETITION**                                                          **PAGE 7 OF 19**

incurred during the rape.

32.     Within a matter of days following the sexual assault, Plaintiff went back to the hospital after she experienced severe pain in her pubic region. Upon information and belief, the doctors informed Plaintiff that she had contracted herpes, an incurable sexually-transmitted disease, during the rape. The doctors conducted a blood test on Plaintiff wherein the specific strand of herpes was identified. It has recently been discovered that the results of a mandatory blood/sexually-transmitted disease test ordered by the Court in "The State of Texas v. Danny Deari" has confirmed that Plaintiff's attacker (who did not utilize latex contraception during the attack), Defendant Deari, is infected with the same derivation of the herpes virus.

33.     As a proximate result of the criminal, despicable, extreme, outrageous, and tortious acts of Defendants alleged herein, Plaintiff has foreseeably suffered through, and will continue to suffer through, extreme emotional distress, pain and suffering, and mental anguish as the sexual assault is constantly replayed in her mind and the aftermath displayed on her body. Plaintiff is forced to shoulder the burden of Defendants' criminal and tortious acts for the rest of her life which, according to the federal government's "National Vital Statistics Reports", is expected to be another 61.6 years.[2] Plaintiff has incurred, and will continue to incur, substantial damages proximately caused by Defendants.

## VI.
### CAUSES OF ACTION

COUNT 1: ASSAULT – THREAT OF BODILY INJURY

34.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 33 of Plaintiff's Petition.

35.     On or about April 26, 2011, Defendants intentionally or knowingly threatened

---

[2] *See* U.S. Department of Health and Human Service, NATIONAL VITAL STATISTICS REPORTS Vol. 61, No.3, September 24, 2012 at 20.

PLAINTIFF'S ORIGINAL PETITION                                                    PAGE 8 OF 19

Plaintiff with imminent bodily injury. Defendants' threat of imminent bodily injury caused Plaintiff to be apprehensive, which was a foreseeable result of Defendants' actions.

36.     Each and every Defendant is liable for the threat of bodily injury committed against Plaintiff because each and every Defendant participated in the tortious act themselves or, alternatively, assisted the tortious act against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted each other to allow the ultimate threat of bodily injury against Plaintiff to take place.

37.     Defendants' threat of imminent bodily injury to Plaintiff was a cause of the damages alleged herein.

**COUNT 2: ASSAULT (BATTERY) –BODILY INJURY AND OFFENSIVE CONTACT**

38.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 37 of Plaintiff's Petition.

39.     Plaintiff incorporates by reference, as if fully set forth herein, the statutory language of TEX. PENAL CODE § 22.011 describing the felony of "Sexual Assault". Plaintiff alleges that Plaintiff was the victim of the crime, Sexual Assault, which Defendants committed against Plaintiff (as described in TEX. PENAL CODE § 22.011(a),(b),(f)) on or about April 26, 2011, and that the sexual assault has caused Plaintiff's damages alleged herein.

40.     Defendants intentionally, knowingly, and/or recklessly made physical contact with Plaintiff's person causing bodily injury—that is, physical pain, illness, or impairments of Plaintiff's physical condition—and Plaintiff did not, and could not, consent to the harmful physical contact.

41.     Alternatively, Defendants intentionally or knowingly caused to be made physical contact with Plaintiff when Defendants knew, or reasonably should have believed, that Plaintiff

**PLAINTIFF'S ORIGINAL PETITION**                                    **PAGE 9 OF 19**

would regard the contact as offensive or provocative. Indeed, said physical contact was offensive, provocative, and committed by Defendants despite never having consent from Plaintiff.

42.     As a causal result of Defendants' battery of Plaintiff's person, Plaintiff suffered immediate, consequential, and subsequent injuries—including pain, illness, and physical impairment—that were foreseeable to Defendants.   The assault committed by Defendants on Plaintiff's person was a cause of the damages alleged by Plaintiff herein.

43.     Each and every Defendant is liable for the crimes, assault, battery, and sexual assault of which Plaintiff is a victim because each and every Defendant participated in the tortious and felonious acts themselves or, alternatively, assisted the crimes, assault, battery, and sexual assault against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted the crimes, assault, battery, and sexual assault by providing intoxicating substances to Plaintiff, a mode of transportation for the crimes, assault, battery, and sexual assault to occur, and/or a location—which was foreseeably unsafe and unreasonably dangerous—for the crimes, assault, battery, and sexual assault to take place.

44.     In addition to committing, conspiring to commit, or aiding and abetting assault, battery, and/or sexual assault against Plaintiff, the investigation is still ongoing as to whether or not Defendants individually—or collectively in furtherance of a conspiracy and/or whilst aiding and abetting each other—should be charged with, criminally prosecuted for, and civilly held liable for the felony of "Aggravated Sexual Assault", as defined by TEX. PENAL CODE § 22.021 and fully incorporated by reference herein.

**COUNT 3: SEXUAL ASSAULT—TEX. PENAL CODE § 22.01**

45.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19

---

**PLAINTIFF'S ORIGINAL PETITION**                                              PAGE 10 OF 19

through 44 of Plaintiff's Petition.

**COUNT 4: FALSE IMPRISONMENT**

46.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 45 of Plaintiff's Petition.

47.     Without legal authority or justification, Defendants willfully detained or participated in the detainment of Plaintiff without Plaintiff's consent.  Defendants accomplished the unlawful detainment of Plaintiff with violence, threats that were calculated to inspire—and, in fact, inspired—a reasonable fear of injury to Plaintiff, intoxicating substances, and/or other means that were intended to cause—and, in fact, caused—Plaintiff to be unable to exercise her will in going anywhere she was lawfully allowed to go. Said false imprisonment took place at the hotel owned and operated by the Premises Defendants.

48.     The false imprisonment committed by Defendants against Plaintiff was a proximate cause of the damages alleged by Plaintiff herein.

**COUNT 5: NEGLIGENCE**

49. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 48 of Plaintiff's Original Petition.

50.     Defendants owed Plaintiff legal duties that Defendants breached thereby proximately causing Plaintiff's damages.

51.     For example, Defendants Pastazios and Deari—as the individual who holds himself out as the registered agent, director, and president of Pastazios—had a duty to control its employees, a duty to supervise its employee's activities, a duty to prevent an employee from causing an unreasonable risk of harm to Plaintiff, a duty to use ordinary care in hiring and retaining its employees, a duty to not place Plaintiff in harm's way of foreseeable criminal

---

**PLAINTIFF'S ORIGINAL PETITION**                                     **PAGE 11 OF 19**

activity, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. Said Defendants breached those duties it owed Plaintiff by, amongst other things, negligently providing intoxicating substances to Plaintiff and placing here in harm's way. Defendant Kreka, by way of example, owed Plaintiff a legal duty to protect Plaintiff from harm when the danger was caused, in part, by Kreka and the harm was apparent to Kreka such that he was in a position to protect Plaintiff from the harm, a duty to not place Plaintiff in harm's way of foreseeable criminal activity, a duty to not operate a vehicle when legally intoxicated thereby placing Plaintiff in danger and, ultimately, causing her to arrive at the location where she was sexually assaulted, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. Defendant Kreka breached each and every one of these duties as detailed in this Petition. The Premises Defendants, for example, owed Plaintiff a duty to use ordinary care in maintaining its premises in a safe condition and to inspect the premises to ensure the safety of its occupants, a duty to protect Plaintiff against unreasonable and foreseeable risks of harm from the criminal acts of third parties due to the Premises Defendants' status (as landowner) and ability to control the security and safety of the premises, a duty not to injure Plaintiff in a willful, wanton, or grossly negligent manner or allow another to do so on its premises when it knew, or reasonably should have known, such conduct would take place, a duty to make safe conditions on its property in order to protect Plaintiff, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. As the owner and operator of the location where Plaintiff was sexually assaulted, falsely imprisoned, and subjected to extreme and outrageous intentional infliction of emotional distress, there can be no dispute that the Premises Defendants breached each and every one of the duties it owed Plaintiff.

52.    Defendants breached the duties it owed to Plaintiff (as set forth in this Petition)

---

thereby proximately causing Plaintiff's injuries and the damages alleged herein.

## COUNT 6: PREMISES LIABILITY

53.    Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 52 of Plaintiff's Petition.

54.    Plaintiff's cause of action for Premises Liability is alleged against the Premises Defendants, only. Plaintiff reserves the right to supplement and amend this cause of action.

55.    The Premises Defendants facilitated the assault and tortious conduct on Plaintiff through the use or misuse of the property—located at 4900 Edwin Lewis Drive, Addison, Texas 75001—owned, operated, controlled by, franchised by, licensed by, and/or otherwise possessed by the Premises Defendants.

56.    The Premises Defendants owed Plaintiff a duty to exercise ordinary care in protecting Plaintiff from unreasonable and reasonably foreseeable risks of harm (including criminal activity at its premises considering the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Premises Defendants' property) especially in light of the Premises Defendants' status as landowner and ability to control the security and safety of the premise. The Premises Defendants had a duty to inspect and make safe any dangerous conditions or situations on its property or give Plaintiff an adequate warning of the dangerous conditions or situations.

57.    The Premises Defendants breached the legal duties it owed Plaintiff thereby proximately causing Plaintiff's damages alleged herein.

## COUNT 7: DRAM SHOP LIABILITY

58.    Plaintiff's cause of action for Dram Shop Liability is alleged against Defendant Deari—in his capacity as registered agent, director, and president of Pastazios—and Pastazios,

SUPP APP 1028

only. As used within Section VI(Count 8) of Plaintiff's Original Petition, said Defendants shall be referred to as the "Dram Shop Defendants." Plaintiff reserves the right to supplement and amend this cause of action.

59.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 58 of Plaintiff's Petition.

60.     On or about April 26, 2011, the Dram Shop Defendants held Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages and did, in fact, sell or serve multiple alcoholic beverages to Plaintiff who, at the time, was an 18 year-old "adult recipient" of said beverages.

61.     To the extent that the Dram Shop Defendants did not hold Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages on or about April 26, 2011, Plaintiff alternatively alleges that the Dram Shop Defendants did not have said licenses yet still sold Plaintiff, an 18 year-old "adult receipt", alcoholic beverages.

62.     After the Dram Shop Defendants provided the alcoholic beverages to Plaintiff, it was apparent, or readily became apparent, to the Dram Shop Defendants that Plaintiff was obviously intoxicated.

63.     Plaintiff's intoxication—as a result of Defendants' actions—was one of the proximate causes of the injuries incurred and the damages alleged by Plaintiff herein.

**COUNT 8: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS [ALTERNATIVE REMEDY]**

64.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 63 of Plaintiff's Petition.

65.     As an alternative remedy to Plaintiff's claims detailed in this Petition at Section (VI)(Count 1-Count7 ), Plaintiff alleges that no alternative cause of action would provide

---

**PLAINTIFF'S ORIGINAL PETITION**                                      **PAGE 14 OF 19**

SUPP APP 1029

Plaintiff with a remedy for the severe emotional distress incurred by Plaintiff which was proximately caused by Defendants' tortious conduct.

66.     Plaintiff—an individual—was and is a victim of Defendants' intentional or reckless actions that were calculated to cause severe emotional distress to Plaintiff.

67.     Defendants' intentional or reckless actions towards Plaintiff were extreme and outrageous and, ultimately, proximately caused Plaintiff to suffer severe emotional distress.

**COUNT 9: PARTICIPATORY LIABILITY—AIDING AND ABETTING AND CONCERT OF ACTION**

68.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 67 of Plaintiff's Petition.

69.     Among the Defendants was a primary actor/actors who committed an underlying tort, or torts, against Plaintiff.  Defendants had knowledge that the primary actor's conduct constituted a tort and Defendants gave the primary actor assistance, substantial assistance, and/or encouragement to commit the tort against Plaintiff. Defendants' assistance, substantial assistance, and/or encouragement was a substantial factor in causing the tort to be completed and a substantial factor in the damages incurred by Plaintiff as alleged herein.

70.     Alternatively, Defendants' own conduct—separate and apart from the primary actor—was a breach of duty to Plaintiff and a substantial factor in causing Plaintiff's injuries.

71.     Due to Defendants' joint assistance, encouragement, aiding and abetting, and/or concert of action, Plaintiff alleges that Defendants should be held jointly and severally responsible for the whole of damages incurred by Plaintiff.

**COUNT 10: PARTICIPATORY LIABILITY—CONSPIRACY**

72.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 71 of Plaintiff's Petition.

---

73.     As fully described in this Petition, Defendants are, and were, individuals or individual entities that acted together as a combination of two or more individuals or entities.

74.     Throughout Defendants' interactions with Plaintiff on or about April 26, 2011, the object of Defendants' combination was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

75.     Defendants had a meeting of the minds on the object or course of action of its conspiracy, and at least one Defendant committed an unlawful, overt act in furtherance of Defendants' object or course of action.

76.     Plaintiff suffered the damages alleged herein as a proximate result of Defendants' wrongful act or acts.

### COUNT 11: EXEMPLARY DAMAGES

77.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 76 of Plaintiff's Original Petition.

78.     Defendants' tortious conduct was malicious, fraudulent, and/or grossly negligent.

79.     Defendants' malicious, fraudulent, and/or grossly negligent was carried out by Defendants personally, through Defendants' authorized agents, managers, officers, directors, vice-principals, and/or principals of the Defendants who were acting within the course and scope of their agency, employment, partnership, and/or joint venture.   Alternatively, Defendants' malicious, fraudulent, and/or grossly negligent conduct was subsequently approved by or ratified by Defendants.

80.     Defendants intentionally breached the legal duties it owed Plaintiff such that it could take undue advantage of Plaintiff and/or otherwise maliciously treat Plaintiff. The acts or omissions of Defendants, when viewed objectively from the Defendants' standpoint, involved an

---

**PLAINTIFF'S ORIGINAL PETITION**                                         PAGE 16 OF 19

extreme degree of risk when considering the probability and magnitude of the potential harm to Plaintiff and others.

81.     Additionally, Defendants had actual, subjective awareness of the risk to Plaintiff and others but proceeded anyway with a conscience indifference to the rights, safety, or welfare of Plaintiff and others.

82.     Defendants' conduct was performed and/or designed with a specific intent to cause substantial injury or harm to Plaintiff. As alleged fully herein, Defendants' conduct is an example of why punitive damages exist, and Plaintiff alleges that Defendants' conduct rises to the level warranting the imposition of exemplary damages against Defendants at trial of this matter.

## VII.
### DAMAGES

83.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 19 through 82 of Plaintiff's Petition.

84.     Plaintiff has incurred significant damages due to Defendants' criminal, tortious, and outrageous conduct. Plaintiff seeks all losses sustained as a natural, probable, foreseeable, and/or proximate result of Defendants' wrongful conduct, including:

   a. General damages;

   b. Actual damages;

   c. Physical pain and suffering incurred in the past and future;

   d. Mental anguish incurred in the past and future;

   e. Disfigurement incurred in the past and future;

   f. Physical impairment incurred in the past and future;

   g. Medical expenses incurred in the past and future;

SUPP APP 1032

h.  Loss of earning capacity incurred in the past and future;

i.  Lost wages incurred in the past and future;

j.  All reasonable and necessary attorneys' fees that Plaintiff is forced to incur pursuant to Texas common law and equity;

k.  Exemplary damages;

l.  Costs of court;

m.  Pre-judgment interest;

n.  Post-judgment interest; and

o.  All other relief, in law and in equity, to which Plaintiff may be justly entitled.

## VIII.
### DEMAND FOR JURY

85.  Plaintiff demands a jury trial and tenders the appropriate fee.

## IX.
### REQUEST FOR DISCLOSURE

86.  Under TEX. R. CIV. P. 194, Plaintiff hereby makes the demand that Defendants disclose, within the timeframe provided by the TEXAS RULES OF CIVIL PROCEDURE, the information and material described in TEX. R. CIV. P. 194.2(a)-(l).

## X.
### PRAYER

87.  WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein. Plaintiff further prays that, upon trial by jury, she have judgment against Defendants for the damages enumerated herein, as well as all other relief, in law and in equity, to which Plaintiff may show herself to be justly entitled.

SUPP APP 1033

Respectfully submitted,

**G. MICHAEL GRUBER**
State Bar No. 08555400
mgruber@ghjhlaw.com
**ERIC POLICASTRO**
State Bar No. 24068809
epolicastro@ghjhlaw.com
**TREY H. CRAWFORD**
State Bar No. 24059623
tcrawford@ghjhlaw.com

**GRUBER HURST JOHANSEN HAIL SHANK LLP**
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
214.855.6800 (main)
214.855.6808 (facsimile)

**ATTORNEYS FOR PLAINTIFF**

SUPP APP 1034

# EXHIBIT C

Filed
13 August 13 P5:14
Gary Fitzsimmons
District Clerk
Dallas District

Cause Number:  DC-13-04564

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd  JUDICIAL DISTRICT COURT |

v.   **193ʳᵈ  JUDICIAL DISTRICT COURT**

AJREDIN —DANNY" DEARI; DRITAN
KREKA; PASTAZIOS PIZZA, INC.;
ISLAND HOSPITALITY MANAGEMENT,
INC.; HYATT HOTELS CORPORATION;
HYATT HOUSE FRANCHISING, L.L.C.;
GRAND PRIX FLOATING LESSEE, LLC;
INK ACQUISITION, LLC; INK
ACQUISITION II, LLC; INK
ACQUISITION III, LLC; INK LESSEE,
LLC; INK LESSEE HOLDING, LLC;
CHATHAM TRS HOLDING, INC.;
CHATHAM LODGING, L.P.; JEFFREY
H. FISHER, Individually; POST
PROPERTIES, INC.; and DOES 1-25,

*Defendants.*        **DALLAS COUNTY, TEXAS**

## PLAINTIFF'S FIRST AMENDED PETITION

Plaintiff JANE DOE[1] (—Plaintiff") files *Plaintiff's First Amended Petition* (—Petition")

against Defendants AJREDIN —DANNY" DEARI; DRITAN KREKA; PASTAZIOS PIZZA,

INC.; ISLAND HOSPITALITY MANAGEMENT, INC.; HYATT HOTELS CORPORATION;

HYATT HOUSE FRANCHISING, L.L.C.; GRAND PRIX FLOATING LESSEE, LLC; INK

ACQUISITION, LLC; INK ACQUISITION II, LLC; INK ACQUISITION III, LLC; INK

LESSEE, LLC; INK LESSEE HOLDING, LLC; CHATHAM TRS HOLDING, INC.;

CHATHAM LODGING, L.P.; JEFFREY H. FISHER, Individually; POST PROPERTIES INC.;

---

[1] Due to the extremely personal and sensitive nature of this lawsuit, Plaintiff is proceeding under the pseudonym of —Jane Doe"; however, Defendants have full knowledge of Plaintiff's identity due to Defendants' involvement in the underlying acts and omissions that form the basis of this Petition. To the extent that Defendants or Defendants' counsel are genuinely unaware of Plaintiff's identity (which would likely be impossible due to criminal proceedings against at least one Defendant in Dallas County, Texas, Case No. F1111106), Plaintiff's counsel is happy to state Plaintiff's identity to this Court and Defendants' counsel in papers that are (1) filed under seal with this Court, and/or (2) not filed with this Court and, thus, not subject to public inspection.

---

**PLAINTIFF'S FIRST AMENDED PETITION**                    **PAGE 1 OF 27**

and DOES 1-25 (unless otherwise noted herein, "Defendants" refers to all named Defendants, collectively), and for causes of action respectfully shows this Court as follows:

## I.
### DISCOVERY CONTROL PLAN

1.      Pursuant to TEX. R. CIV. P. 190.1, 190.3, Plaintiff intends to conduct discovery under a Level 2 Discovery Control Plan.

## II.
### PARTIES

2.      Plaintiff is a natural person who resides in Collin County, Texas.

3.      Defendant AJREDIN "DANNY" DEARI (hereinafter, "Deari") is a natural person who has generally appeared in this case.

4.      Defendant DRITAN KREKA (hereinafter, "Kreka") is a natural person who has generally appeared in this case.

5.      Defendant PASTAZIOS PIZZA, INC. (hereinafter, "PPI") is a Texas corporation that has generally appeared in this case.

6.      Defendant ISLAND HOSPITALITY MANAGEMENT, INC. (hereinafter, "Island Hospitality") is a Florida corporation that has generally appeared in this case.

7.      Defendant HYATT HOTELS CORPORATION (hereinafter, "Hyatt") is a Delaware corporation with its principal place of business in Chicago, Illinois and has generally appeared in this case.

8.      Defendant HYATT HOUSE FRANCHISING, L.L.C. (hereinafter, "Hyatt House")—named in Plaintiff's Original Petition as JOHN DOE 1 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Kansas limited liability company with its principal place of business in Chicago, Illinois.

---

**PLAINTIFF'S FIRST AMENDED PETITION**                    **PAGE 2 OF 27**

Defendant Hyatt House can be served with service of process by serving its registered agent, Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, located at 211 E. 7th Street, Suite 260, Austin, Texas 78707.

9.      Defendant GRAND PRIX FLOATING LESSEE, LLC (hereinafter, "Grand Prix")—named in Plaintiff's Original Petition as JOHN DOE 2 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Delaware limited liability company with its principal place of business in Palm Beach, Florida. Defendant Grand Prix can be served with service of process by serving its registered agent, C T Corporation System, located at 350 North Saint Paul Street, Dallas, Texas 75201.

10.     Defendant INK ACQUISITION, LLC (hereinafter, "Ink Acquisition")—named in Plaintiff's Original Petition as JOHN DOE 3 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Florida limited liability company with its principal place of business in Florida. Defendant Ink Acquisition regularly engages or, alternatively, engaged in business in the State of Texas because it contracts or contracted by mail or otherwise with a Texas resident or residents regarding a contract that is performable in whole or in part in the State of Texas and because it committed a tort in whole or in part in the State of Texas; however, despite engaging in business in the State of Texas, Defendant Ink Acquisition has not designated or maintained a resident agent for service of process in the State of Texas nor does it maintain a regular place of business in the State of Texas. Thus, pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042 and 17.044, Ink Acquisition may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who may forward said process to Defendant Ink Acquisition's foreign registered agent, C T Corporation, at 1200 South Pine Island Road, Plantation, Florida 33324.

---

11.     Defendant INK ACQUISITION II, LLC (hereinafter, ―Ink Acquisition II")—named in Plaintiff's Original Petition as JOHN DOE 4 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Florida limited liability company with its principal place of business in Florida. Defendant Ink Acquisition II regularly engages or, alternatively, engaged in business in the State of Texas because it contracts or contracted by mail or otherwise with a Texas resident or residents regarding a contract that is performable in whole or in part in the State of Texas and because it committed a tort in whole or in part in the State of Texas; however, despite engaging in business in the State of Texas, Defendant Ink Acquisition II has not designated or maintained a resident agent for service of process in the State of Texas nor does it maintain a regular place of business in the State of Texas. Thus, pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042 and 17.044, Defendant Ink Acquisition II may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who may forward said process to Defendant Ink Acquisition II's foreign registered agent, C T Corporation, located at 1200 South Pine Island Road, Plantation, Florida 33324.

12.     Defendant INK ACQUISITION III, LLC (hereinafter, ―Ink Acquisition III")—named in Plaintiff's Original Petition as JOHN DOE 5 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Florida limited liability company with its principal place of business in Florida. Defendant Ink Acquisition III regularly engages or, alternatively, engaged in business in the State of Texas because it contracts or contracted by mail or otherwise with a Texas resident or residents regarding a contract that is performable in whole or in part in the State of Texas and because it committed a tort in whole or in part in the State of Texas; however, despite engaging in business

---

**PLAINTIFF'S FIRST AMENDED PETITION**                                        **PAGE 4 OF 27**

in the State of Texas, Defendant Ink Acquisition III has not designated or maintained a resident agent for service of process in the State of Texas nor does it maintain a regular place of business in the State of Texas. Thus, pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042 and 17.044, Defendant Ink Acquisition III may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who may forward said process to Defendant Ink Acquisition III's foreign registered agent, C T Corporation, located at 1200 South Pine Island Road, Plantation, Florida 33324.

13.     Defendant INK LESSEE, LLC (hereinafter, ―Ink Lessee‖)—named in Plaintiff's Original Petition as JOHN DOE 6 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Delaware limited liability company with its principal place of business in Florida. Defendant Ink Lessee can be served with service of process by serving its registered agent, National Corporate Research, Ltd., located at 800 Brazos Street, Suite 400, Austin, Texas 78701.

14.     Defendant INK LESSEE HOLDING, LLC (hereinafter, ―Ink Lessee Holding‖)—named in Plaintiff's Original Petition as JOHN DOE 7 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Delaware limited liability company with its principal place of business in Florida. Defendant Ink Lessee Holding regularly engages or, alternatively, engaged in business in the State of Texas because it contracts or contracted by mail or otherwise with a Texas resident or residents regarding a contract that is performable in whole or in part in the State of Texas and because it committed a tort in whole or in part in the State of Texas; however, despite engaging in business in the State of Texas, Defendant Ink Lessee Holding has not designated or maintained a resident agent for service of process in the State of Texas nor does it maintain a regular place of business in the

SUPP APP 1040

State of Texas. Thus, pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042 and 17.044, Defendant Ink Lessee Holding may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who may forward said process to Defendant Ink Lessee Holding's foreign registered agent, National Corporate Research, Ltd., located at 615 South DuPont Highway, Dover, Delaware 19901.

15.     Defendant CHATHAM TRS HOLDING, INC. (hereinafter, "Chatham Holding")—named in Plaintiff's Original Petition as JOHN DOE 8 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Florida limited liability company with its principal place of business in Florida. Defendant Chatham Holding regularly engages or, alternatively, engaged in business in the State of Texas because it contracts or contracted by mail or otherwise with a Texas resident or residents regarding a contract that is performable in whole or in part in the State of Texas and because it committed a tort in whole or in part in the State of Texas; however, despite engaging in business in the State of Texas, Defendant Chatham Holding has not designated or maintained a resident agent for service of process in the State of Texas nor does it maintain a regular place of business in the State of Texas. Thus, pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042 and 17.044, Defendant Chatham Holding may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who may forward said process to Defendant Chatham Holding's foreign registered agent, Corporation Service Company, located at 1201 Hays Street, Tallahassee, Florida 32301.

16.     Defendant CHATHAM LODGING, L.P. (hereinafter, "Chatham Lodging")—named in Plaintiff's Original Petition as JOHN DOE 9 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Delaware

limited partnership with its principal place of business in Florida. Defendant Chatham Lodging regularly engages or, alternatively, engaged in business in the State of Texas because it contracts or contracted by mail or otherwise with a Texas resident or residents regarding a contract that is performable in whole or in part in the State of Texas and because it committed a tort in whole or in part in the State of Texas; however, despite engaging in business in the State of Texas, Defendant Chatham Lodging has not designated or maintained a resident agent for service of process in the State of Texas nor does it maintain a regular place of business in the State of Texas. Thus, pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042 and 17.044, Defendant Chatham Lodging may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who may forward said process to Defendant Chatham Lodging's foreign registered agent located at The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

17.     Defendant JEFFREY H. FISHER (hereinafter, ―Fisher")—named in Plaintiff's Original Petition as JOHN DOE 10 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a natural person who is believed to be a resident of, and domiciled in, the State of Florida and believed to be located at 252 El Bravo Way, Palm Beach, Florida 33480. Defendant Fisher engages or engaged in business in the State of Texas because he contracts or contracted by mail or otherwise with a Texas resident or residents regarding a contract that is performable in whole or in part in the State of Texas and because he committed a tort in whole or in part in the State of Texas; however, despite engaging in business in the State of Texas, Defendant Fisher has not designated or maintained a resident agent for service of process in the State of Texas nor does he maintain a regular place of business in the State of Texas. Thus, pursuant to TEX. CIV. PRAC. & REM. CODE §§ 17.042 and 17.044,

SUPP APP 1042

Defendant Fisher may be served with process by serving the Texas Secretary of State, 1019 Brazos Street, Austin, Texas 78701 who may forward said process to Defendant Fisher at his home address located at 252 El Bravo Way, Palm Beach, Florida 33480.

18.     Defendant POST PROPERTIES, INC. (hereinafter, ―Post Properties")—named in Plaintiff's Original Petition as JOHN DOE 11 but whose identity, after a diligent and reasonable search and investigation by Plaintiff, has become known to Plaintiff—is a Georgia corporation with its principal place of business in Georgia. Defendant Post Properties can be served with service of process by serving its registered agent, C T Corporation System, located at 350 North Saint Paul Street, Dallas, Texas 75201.

19.     Upon information and belief, Plaintiff alleges that the true identities and residences of Defendants JOHN DOE 12-25, respectively, are currently unknown to Plaintiff at this time. Plaintiff shall proceed with due diligence to discover the identities of Defendants JOHN DOE 12-25, respectively, and after said Defendants' true identities have been discovered, Plaintiff will amend this Petition accordingly.

20.     Upon information and belief, Plaintiff alleges that, at all material times, Defendants Hyatt, Hyatt House, Island Hospitality Management, Grand Prix, Ink Acquisition, Ink Acquisition II, Ink Acquisition III, Ink Lessee, Ink Lessee Holding, Chatham Holding, Chatham Lodging, and Fisher (collectively referred to herein as ―Alter Ego Defendant" or ―Alter Ego Defendants") were the agents, servants, employees, partners, authorized agents and/or joint venturers of every other Alter Ego Defendant and the acts of each Alter Ego Defendant was within the course and scope of the agency, employment, partnership, and/or joint venture such that each Alter Ego Defendant is jointly and severally liable for the damages Alter Ego Defendants caused Plaintiff as alleged herein and, further, that each Alter Ego Defendant is

SUPP APP 1043

jointly and severally responsible for the acts and/or omissions of every other Alter Ego Defendant. Plaintiff specifically alleges and asserts the alter ego theory of liability against the Alter Ego Defendants because the Alter Ego Defendants are simply the alter ego of each other due to such a unity of interest and ownership between the business entities and its equitable owner or owners that the separate personalities of the business entities and shareholder/equitable owner or owners do not, in reality, exist, and because if the acts complained of herein are those of the business entities themselves than an inequitable result to Plaintiff would occur. Thus, Plaintiff specifically alleges that any and all acts or omissions taken by any of the Alter Ego Defendants, indeed, acts or omissions taken by all Alter Ego Defendants.

## III.
### JURISDICTION

21.     This Court has subject matter jurisdiction over this lawsuit because the amount in controversy exceeds the minimum jurisdictional requirements.

22.     In accordance with TEX. R. CIV. P. 47, Plaintiff seeks monetary relief in excess of $1,000,000.00 due to Defendants' tortious, outrageous, and grossly negligent conduct.

23.     This Court has personal jurisdiction over Defendants Deari, Kreka, PPI, Hyatt, and Island Hospitality because the foregoing Defendants have generally appeared in this case.

24.     This Court has personal jurisdiction over Defendants Hyatt House, Grand Prix, Ink Acquisition, Ink Acquisition II, Ink Acquisition III, Ink Lessee, Ink Lessee Holding, Chatham Holding, Chatham Lodging, Fisher, and Post Properties because each of the aforementioned Defendants (1) engage in, and transact business within, the State of Texas, (2) maintain continuous and systematic contacts with the State of Texas, (3) purposefully avail, or availed, itself to the laws of the State of Texas, (4) committed a tort or torts, in whole or in part, in the State of Texas against a Texas resident, and (5) a substantial part of the events or

---

**PLAINTIFF'S FIRST AMENDED PETITION**                                    **PAGE 9 OF 27**

omissions giving rise to Plaintiff's claims occurred in Texas and involved said Defendants.

25.    Removal of this case to a federal court is inappropriate and statutorily unauthorized because (1) complete diversity of parties is lacking, (2) at least one Defendant is a forum-state defendant by virtue of its status as a Texas business entity and/or principal place of business being located in Texas, and (3) Plaintiff has not alleged a federal question, federal cause of action, or alleged facts that would give rise to a federal question, federal cause of action, and/or ―federal officer‖ removal jurisdiction; therefore, any attempt to remove this case to a federal court is frivolous and gives rise to sanctionable conduct.

## IV.
### VENUE

26.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a), venue is proper in Dallas County, Texas because (1) all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Dallas County, Texas, and (2) some or all of the Defendants resided in Dallas County, Texas at the time Plaintiff's causes of action accrued.

27.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005, because venue is proper in Dallas County, Texas as to at least one Defendant, venue is proper in Dallas County, Texas as to all Defendants.

## V.
### FACTUAL BACKGROUND

28.    Plaintiff expressly incorporates by reference, as if fully set forth herein, paragraphs 1 through 27 of Plaintiff's Petition.

29.    In early 2011, Plaintiff was 18 years old and a recent graduate from high school. Plaintiff excelled in school academically, graduating as the valedictorian of her class.

30.    Like many young adults, Plaintiff was in search of an entry-level job at a local

---

**PLAINTIFF'S FIRST AMENDED PETITION**                                      **PAGE 10 OF 27**

business in order to earn disposable income and garner working experience. While networking for such a job, Plaintiff was introduced to Defendant Deari and Defendant Kreka. Plaintiff was told that Deari and Kreka were the owners of two local bar/restaurants, and would be willing to meet with her to lend any insight they may have.

31.     On or about April 26, 2011, Plaintiff met Deari and Kreka at a restaurant in Dallas, Texas. Although this meeting was not employment-related, Plaintiff met with said Defendants merely to continue networking.

32.     Deari asked Plaintiff how old she was and Plaintiff informed both men that she was 18 years old. At the time, Defendant Deari was approximately 49 years old and Defendant Kreka was approximately 33 years old. The two Defendants subsequently tried to order Plaintiff an alcoholic beverage; however, the restaurant's server refused to bring the beverage because Plaintiff was underage.

33.     Undeterred, Deari and Kreka decided that it would be easiest to order Plaintiff beverages at Defendant PPI's Addison, Texas location. Indeed, Defendant Deari was, and is, the registered agent, director, and president of PPI.  On information and belief, Plaintiff alleges that PPI, as lessor, leases the physical space for its Addison, Texas location from Defendant Post Properties, as lessee (as confirmed by Century Surety Company, CCP672836).

34.     As the two men had planned, Defendant Deari and Defendant Kreka convinced Plaintiff to drive to PPI. Prior to their arrival, Defendant Deari purchased hard liquor from a store with the intention of personally serving the alcohol to Plaintiff. Neither Deari nor PPI were licensed by the Texas Alcoholic Beverage Commission to sell or serve hard liquor.

35.     Upon arrival at PPI, Defendants Kreka and Deari began serving, retrieving, and otherwise giving Plaintiff multiple ―shots" of hard liquor. Defendant PPI's other employees—

who were acting within the course and scope of their employment—also negligently served Plaintiff beer without ever asking for identification. Defendants Deari and Kreka repeatedly and aggressively pressured Plaintiff into consuming—and Plaintiff, indeed, consumed—alcoholic beverages despite their knowledge that Plaintiff was not of legal age to drink. Just as Defendants Deari and Kreka planned, Plaintiff became intoxicated and she was, in fact, obviously intoxicated. PPI's other employees negligently failed to identify Plaintiff's over-service.

36.     After Plaintiff had consumed multiple shots of hard liquor and servings of beer, Deari and Kreka decided that their next stop should be to take Plaintiff to a local adult entertainment establishment. Deari retrieved his vehicle from PPI's parking lot and told Kreka and Plaintiff to get into the vehicle. Kreka moved into the driver's seat and Plaintiff, who was highly intoxicated, sat in the back of the vehicle. Plaintiff then lost consciousness.

37.     Plaintiff's next memory is vomiting in a gas station parking lot before losing consciousness again. Sometime thereafter, Plaintiff regained consciousness in a hotel room located at 4900 Edwin Lewis Drive, Addison, Texas 75001 wherein she had been involuntarily disrobed and was actively being raped by Defendant Deari. Said hotel is a premise that was, and is, owned, operated, controlled, managed, and/or otherwise possessed by the Alter Ego Defendants as owner, franchisor, franchisee, assignor, assignee, lessor, lessee, transferor, transferee, manager, and as the alter egos of each other and/or Hyatt and/or Fisher. Said premises lacked any reasonable degree of security that could have, and would have, prevented or mitigated the reasonably foreseeable attack on Plaintiff.

38.     Plaintiff repeatedly insisted that Defendant Deari stop the attack, but he did not. It was only after Plaintiff made multiple demands for Defendant Deari to stop did the sexual assault eventually end. Fearful of another attack, Plaintiff locked herself in the bathroom.

39.     While still in the hotel room—and without ever being impeded by the Alter Ego Defendants—Defendant Deari called Defendant Kreka on the telephone and told him that Plaintiff was ―really freaking out, dude", and asked for Kreka to retrieve him from the Alter Ego Defendants' premises. With the knowledge that a sexual assault had just occurred (one in which Defendant Kreka conspired to commit, facilitated, aided, and abetted), Kreka retrieved Deari from the crime scene (again, unimpeded by the Alter Ego Defendants) thereby assisting Deari's evasion of law enforcement.

40.     Plaintiff alleges that the Alter Ego Defendants knew, or reasonably should have known, of the reasonably foreseeable, unreasonable risks of harm from criminal activity at its premises to Plaintiff taking into account the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Alter Ego Defendants' property. The Alter Ego Defendants negligently and grossly negligently allowed Defendant Deari and Defendant Kreka to reserve a room at its hotel, enter it with an unconscious 18 year-old woman, rape her, and come and go from its property in an unimpeded fashion such that Defendants could evade a police investigation without resistance.

41.     After the attack on Plaintiff ceased and Deari and Kreka left the Alter Ego Defendants' premises, a friend of Plaintiff's arrived at the hotel to help. After learning what happened, the friend immediately notified the Addison Police Department. While investigating the crime scene, Defendant Deari—while smoking a cigar—came back to the hotel (presumably to retrieve the underwear he left, which was taken into evidence by the police department), and Deari was arrested, charged with the crime of sexual assault, indicted, and has a criminal trial pending. At this point in time, Defendant Kreka has not been charged for the crimes he aided, abetted, facilitated, and conspired to commit; however, on information and belief Plaintiff

alleges that the State of Texas is well within the statute of limitations for such a crime to arrest, charge, and indict Kreka for his involvement in the attack on Plaintiff.

42.     Plaintiff was immediately transmitted to the hospital and underwent a series of examinations, tests, and administered massive quantities of treatments for the injuries she incurred during the rape.

43.     Within a matter of days following the sexual assault, Plaintiff went back to the hospital after she experienced severe pain in her pubic region. Upon information and belief, the doctors informed Plaintiff that she had contracted herpes, an incurable sexually-transmitted disease, during the rape. The doctors conducted a blood test on Plaintiff wherein the specific strand of herpes was identified. It has recently been discovered that the results of a mandatory blood/sexually-transmitted disease test ordered by the Court in ‒The State of Texas v. Danny Deari" has confirmed that Plaintiff's attacker (who did not utilize latex contraception during the attack), Defendant Deari, is infected with the same derivation of the herpes virus and undoubtedly infected Plaintiff.

44.     As a proximate result of the despicable, extreme, outrageous, tortious, and grossly negligent acts and omissions by Defendants alleged herein, Plaintiff has foreseeably suffered, and will continue to suffer, through extreme emotional distress, pain, mental anguish, and suffering as the sexual assault is constantly replayed in her mind and the aftermath displayed on her body. Plaintiff is forced to shoulder the burden of Defendants' horrible acts for the rest of her life which, according to the federal government's ‒National Vital Statistics Reports", is expected to be another 61.6 years.[2] Plaintiff has incurred, and will continue to incur, substantial damages that were all proximately caused by Defendants.

---

[2] *See* U.S. Department of Health and Human Service, NATIONAL VITAL STATISTICS REPORTS Vol. 61, No.3, September 24, 2012 at 20.

---

SUPP APP 1049

## VI.
### CAUSES OF ACTION

COUNT 1: ASSAULT – THREAT OF BODILY INJURY

45. Plaintiff's first cause of action is alleged against Defendants Deari and Kreka, only. As used in this cause of action, ―Defendants‖ refers to Defendant Deari and Defendant Kreka.

46. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 45 of Plaintiff's Petition.

47. On or about April 26, 2011, Defendants intentionally or knowingly threatened Plaintiff with imminent bodily injury. Defendants' threat of imminent bodily injury caused Plaintiff to be apprehensive, which was a foreseeable result of Defendants' actions.

48. Defendants are liable for the threat of bodily injury committed against Plaintiff because Defendants participated in the tortious acts themselves or, alternatively, assisted the tortious act against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted each other to allow the ultimate threat of bodily injury against Plaintiff to take place.

49. Defendants' threat of imminent bodily injury to Plaintiff was a cause of the damages alleged herein.

COUNT 2: ASSAULT (BATTERY) –BODILY INJURY AND OFFENSIVE CONTACT

50. Plaintiff's second cause of action is alleged against Defendants Deari and Kreka, only. As used in this cause of action, ―Defendants‖ refers to Defendant Deari and Defendant Kreka.

51. Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 50 of Plaintiff's Petition.

52. Plaintiff incorporates by reference, as if fully set forth herein, the statutory

---

**PLAINTIFF'S FIRST AMENDED PETITION** **PAGE 15 OF 27**

language of TEX. PENAL CODE § 22.011 describing the felony of ―Sexual Assault". Plaintiff alleges that Plaintiff was the victim of the crime, Sexual Assault, which Defendants committed against Plaintiff (as described in TEX. PENAL CODE § 22.011(a),(b),(f)) on or about April 26, 2011, and that the sexual assault has caused Plaintiff's damages alleged herein.

53.     Defendants intentionally, knowingly, and/or recklessly made physical contact with Plaintiff's person causing bodily injury—that is, physical pain, illness, or impairments of Plaintiff's physical condition—and Plaintiff did not, and could not, consent to the harmful physical contact.

54.     Alternatively, Defendants intentionally or knowingly caused to be made physical contact with Plaintiff when Defendants knew, or reasonably should have believed, that Plaintiff would regard the contact as offensive or provocative. Indeed, said physical contact was offensive, provocative, and committed by Defendants despite never having consent from Plaintiff.

55.     As a causal result of Defendants' battery of Plaintiff's person, Plaintiff suffered immediate, consequential, and subsequent injuries—including pain, illness, and physical impairment—that were foreseeable to Defendants.  The assault committed by Defendants on Plaintiff's person was a cause of the damages alleged by Plaintiff herein.

56.     Defendants are liable for the crimes, assault, battery, and sexual assault of which Plaintiff is a victim because Defendants participated in the tortious and felonious acts themselves or, alternatively, assisted the crimes, assault, battery, and sexual assault against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted the crimes, assault, battery, and sexual assault by providing intoxicating substances to Plaintiff, a mode of transportation for the crimes, assault, battery, and sexual assault to occur, and/or a location—

which was foreseeably unsafe and unreasonably dangerous—for the crimes, assault, battery, and sexual assault to take place.

57.     In addition to committing, conspiring to commit, or aiding and abetting assault, battery, and/or sexual assault against Plaintiff, the investigation is still ongoing as to whether or not Defendants individually—or collectively in furtherance of a conspiracy and/or whilst aiding and abetting each other—should be charged with, criminally prosecuted for, and civilly held liable for the felony of ―Aggravated Sexual Assault‖, as defined by TEX. PENAL CODE § 22.021 and fully incorporated by reference herein.

COUNT 3: SEXUAL ASSAULT—TEX. PENAL CODE § 22.01

58.     Plaintiff's third cause of action is alleged against Defendants Deari and Kreka, only. As used in this cause of action, ―Defendants‖ refers to Defendant Deari and Defendant Kreka.

59.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 58 of Plaintiff's Petition.

COUNT 4: FALSE IMPRISONMENT

60.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 59 of Plaintiff's Petition.

61.     Without legal authority or justification, Defendants willfully detained or participated in the detainment of Plaintiff without Plaintiff's consent.  Defendants accomplished the unlawful detainment of Plaintiff with violence, threats that were calculated to inspire—and, in fact, inspired—a reasonable fear of injury to Plaintiff, intoxicating substances, and/or other means that were intended to cause—and, in fact, caused—Plaintiff to be unable to exercise her will in going anywhere she was lawfully allowed to go. Said false imprisonment took place at the

hotel owned and operated by the Alter Ego Defendants and restaurant—due to Plaintiff's physical inability and/or lawful ability to leave in such an unconscious and/or intoxicated state—possessed, owned and/or controlled by Post Properties and PPI.

62.     The false imprisonment committed by Defendants against Plaintiff was a proximate cause of the damages alleged by Plaintiff herein.

**COUNT 5: NEGLIGENCE**

63.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 62 of Plaintiff's Original Petition.

64.     Defendants owed Plaintiff legal duties that Defendants breached thereby proximately causing Plaintiff's damages.

65.     For example, Defendant PPI had a duty to control its employees, a duty to supervise its employee's activities, a duty to prevent an employee from causing an unreasonable risk of harm to Plaintiff, a duty to use ordinary care in hiring and retaining its employees, a duty to not place Plaintiff in harm's way of foreseeable criminal activity, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. PPI breached those duties it owed Plaintiff by, amongst other things, negligently providing intoxicating substances to Plaintiff, negligently hiring its employees, negligently supervising its employees, and/or placing her in harm's way.  Defendant Kreka, by way of example, owed Plaintiff a legal duty to protect Plaintiff from harm when the danger was caused, in part, by Kreka and the harm was apparent to Kreka such that he was in a position to protect Plaintiff from the harm, a duty to not place Plaintiff in harm's way of foreseeable criminal activity, a duty to not operate a vehicle when legally intoxicated thereby placing Plaintiff in danger and, ultimately, causing her to arrive at the location where she was sexually assaulted, and a duty to treat Plaintiff in a manner that would

not subject her to physical or mental injury. Defendant Kreka breached each and every one of these duties as detailed in this Petition. Defendants PPI and Post Properties, for example, had a duty to ensure that invitees at the PPI Addison, Texas location would be safe, secure, and that the normal and lawful activities that would otherwise take place at the restaurant would not harm its invitees. Defendants PPI and Post Properties breached these duties owed to Plaintiff. Post Properties also had a duty to protect Plaintiff, and the public as a whole, from unlawful lessees of its property by conducting a reasonable investigation into its lessees and/or terminate a lease upon the happening of an unlawful event (such as PPI's citation from the Texas Alcoholic Beverage Commission in 2002 for serving a minor alcohol); however, Post Properties clearly breached these duties. The Alter Ego Defendants, for example, owed Plaintiff a duty to use ordinary care in maintaining its premises in a safe and secure condition and to inspect the premises to ensure the safety of its occupants, a duty to protect Plaintiff against unreasonable and foreseeable risks of harm from the criminal acts of third parties due to the Alter Ego Defendants' status (as landowner and, further, the heightened duty owed by an innkeeper) and ability to control the security and safety of the premises, a duty not to injure Plaintiff in a willful, wanton, or grossly negligent manner or allow another to do so on its premises when it knew, or reasonably should have known, such conduct would take place, a duty to make safe conditions on its property in order to protect Plaintiff, and a duty to treat Plaintiff in a manner that would not subject her to physical or mental injury. As alleged fully herein, there can be no dispute that the Alter Ego Defendants breached each and every one of the duties it owed Plaintiff.

66.     Defendants breached the duties it owed to Plaintiff (as set forth in this Petition) thereby proximately causing Plaintiff's injuries and the damages alleged herein.

<u>COUNT 6</u>: PREMISES LIABILITY

67.      Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 66 of Plaintiff's Petition.

68.      Plaintiff's cause of action for Premises Liability is alleged against the Alter Ego Defendants, PPI, and Post Properties, only. Plaintiff reserves the right to supplement and amend this cause of action. As used in this cause of action, "Defendants" refers to the Alter Ego Defendants, PPI, and Post Properties.

69.      The Alter Ego Defendants facilitated the assault and tortious conduct on Plaintiff through the use or misuse of the property—located at 4900 Edwin Lewis Drive, Addison, Texas 75001—owned, operated, controlled by, franchised by, licensed by, managed, leased, assigned, and/or otherwise possessed by the Alter Ego Defendants and, further, PPI and Post Properties facilitated the assault and tortious conduct on Plaintiff through the use or misuse of PPI's Addison, Texas location that was owned, operated, controlled by, franchised by, licensed by, managed, leased, assigned, and/or otherwise possessed by PPI and Post Properties.

70.      Defendants owed Plaintiff a duty to exercise ordinary care in protecting Plaintiff from unreasonable and reasonably foreseeable risks of harm (including criminal activity at its premises considering the history, frequency, proximity, regularity, publicity, and similarity of criminal conduct on or near the Alter Ego Defendants' property) especially in light of Defendants' status as landowner and/or innkeeper that possessed the ability to control the security and safety of the premise and its employees. Defendants had a duty to inspect and make safe any dangerous conditions or situations on its property or give Plaintiff an adequate warning of the dangerous conditions or situations; however, Defendants failed to do so.

71.      Defendants breached the legal duties it owed Plaintiff thereby proximately

SUPP APP 1055

causing Plaintiff's damages alleged herein.

**COUNT 7: DRAM SHOP LIABILITY**

72.     Plaintiff's cause of action for Dram Shop Liability is alleged against Post Properties, PPI, and Deari—in his capacity as registered agent, director, and president of PPI—, only. As used in this cause of action, ―Dram Shop Defendants‖ refers to PPI, Post Properties, and Deari. Plaintiff reserves the right to supplement and amend this cause of action.

73.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 72 of Plaintiff's Petition.

74.     On or about April 26, 2011, the Dram Shop Defendants held Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages and did, in fact, sell or serve multiple alcoholic beverages to Plaintiff who, at the time, was an 18 year-old ―adult recipient‖ of said beverages. However, Dram Shop Defendants were not authorized to sell hard liquor at PPI's Addison, Texas location.

75.     To the extent that the Dram Shop Defendants did not hold Texas Alcoholic Beverage Commission licenses for the sale or service of alcoholic beverages on or about April 26, 2011, Plaintiff alternatively alleges that the Dram Shop Defendants did not have said licenses yet still sold Plaintiff, an 18 year-old ―adult receipt‖, alcoholic beverages.

76.     After the Dram Shop Defendants provided the alcoholic beverages to Plaintiff, it was apparent, or readily became apparent, to the Dram Shop Defendants that Plaintiff was obviously intoxicated.

77.     Plaintiff's intoxication—as a result of the Dram Shop Defendants' acts or omissions—was one of the proximate causes of the injuries incurred and the damages alleged by Plaintiff herein.

---

<u>COUNT 8</u>: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS [ALTERNATIVE REMEDY]

78.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 77 of Plaintiff's Petition.

79.     As an alternative remedy to Plaintiff's claims detailed in this Petition at Section (VI)(Count 1—Count 7), Plaintiff alleges that no alternative cause of action would provide Plaintiff with a remedy for the severe emotional distress incurred by Plaintiff which was proximately caused by Defendants' tortious conduct.

80.     Plaintiff—an individual—was and is a victim of Defendants' intentional or reckless actions that were calculated to cause severe emotional distress to Plaintiff.

81.     Defendants' intentional or reckless actions towards Plaintiff were extreme and outrageous and, ultimately, proximately caused Plaintiff to suffer severe emotional distress.

<u>COUNT 9</u>: PARTICIPATORY LIABILITY—AIDING AND ABETTING AND CONCERT OF ACTION

82.      Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 81 of Plaintiff's Petition.

83.     Among the Defendants was a primary actor, or primary actors, who committed an underlying tort, or torts, against Plaintiff.  Defendants had knowledge that the primary actor's conduct constituted a tort and Defendants gave the primary actor assistance, substantial assistance, and/or encouragement to commit the tort against Plaintiff. Defendants' assistance, substantial assistance, and/or encouragement was a substantial factor in causing the tort to be completed and a substantial factor in the damages incurred by Plaintiff as alleged herein.

84.     Alternatively, Defendants' own conduct—separate and apart from the primary actor—was a breach of duty to Plaintiff and a substantial factor in causing Plaintiff's injuries.

85.     Due to Defendants' joint assistance, encouragement, aiding and abetting, and/or

concert of action, Plaintiff alleges that Defendants should be held jointly and severally responsible for the whole of damages incurred by Plaintiff.

## COUNT 10: PARTICIPATORY LIABILITY—CONSPIRACY

86.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 85 of Plaintiff's Petition.

87.     As fully described in this Petition, Defendants are, and were, individuals or individual entities that acted together as a combination of two or more individuals or entities.

88.     Throughout Defendants' interactions with Plaintiff on or about April 26, 2011, the object of Defendants' combination was to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

89.     Defendants had a meeting of the minds on the object or course of action of its conspiracy, and at least one Defendant committed an unlawful, overt act in furtherance of Defendants' object or course of action.

90.     Plaintiff suffered the damages alleged herein as a proximate result of Defendants' wrongful act or acts.

## COUNT 11: EXEMPLARY DAMAGES

91.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 90 of Plaintiff's Original Petition.

92.     Defendants' tortious conduct was malicious, fraudulent, and/or grossly negligent.

93.     Defendants' malicious, fraudulent, and/or grossly negligent was carried out by Defendants personally, through Defendants' authorized agents, managers, officers, directors, vice-principals, and/or principals of the Defendants who were acting within the course and scope of their agency, employment, partnership, and/or joint venture.   Alternatively, Defendants'

malicious, fraudulent, and/or grossly negligent conduct was subsequently approved by or ratified by Defendants.

94.     Defendants intentionally breached the legal duties it owed Plaintiff such that it could take undue advantage of Plaintiff and/or otherwise maliciously treat Plaintiff. The acts or omissions of Defendants, when viewed objectively from the Defendants' standpoint, involved an extreme degree of risk when considering the probability and magnitude of the potential harm to Plaintiff and others.

95.     Additionally, Defendants had actual, subjective awareness of the risk to Plaintiff and others but proceeded anyway with a conscience indifference to the rights, safety, or welfare of Plaintiff and others.

96.     Defendants' conduct was performed and/or designed with a specific intent to cause substantial injury or harm to Plaintiff. As alleged fully herein, Defendants' conduct is an example of why punitive damages exist, and Plaintiff alleges that Defendants' conduct rises to the level warranting the imposition of exemplary damages against Defendants at trial of this matter.

## VII.
### DAMAGES

97.     Plaintiff incorporates by reference, as if fully set forth herein, paragraphs 1 through 96 of Plaintiff's Petition.

98.     Plaintiff has incurred significant damages due to Defendants' criminal, tortious, and outrageous conduct. Plaintiff seeks all losses sustained as a natural, probable, foreseeable, and/or proximate result of Defendants' wrongful conduct, including:

    a.   General damages;

    b.   Actual damages;

c.   Physical pain and suffering incurred in the past and future;

d.   Mental anguish incurred in the past and future;

e.   Disfigurement incurred in the past and future;

f.   Physical impairment incurred in the past and future;

g.   Medical expenses incurred in the past and future;

h.   Loss of earning capacity incurred in the past and future;

i.   Lost wages incurred in the past and future;

j.   All reasonable and necessary attorneys' fees that Plaintiff is forced to incur pursuant to Texas common law and equity;

k.   Exemplary damages;

l.   Costs of court;

m.   Pre-judgment interest;

n.   Post-judgment interest; and

o.   All other relief, in law and in equity, to which Plaintiff may be justly entitled.

## VIII.
### DEMAND FOR JURY

99.   Plaintiff demands a jury trial and tenders the appropriate fee.

## IX.
### REQUEST FOR DISCLOSURE

100.   In Plaintiff's Original Petition, Plaintiff made the demand that all then-named Defendants make the disclosures required by TEX. R. CIV. P. 194 and, without waiving Plaintiff's right to compel further responses, if necessary, Plaintiff states that those Defendants have served disclosure responses.

101.   Plaintiff hereby makes the demand that Defendants Hyatt House, Grand Prix, Ink

---

**PLAINTIFF'S FIRST AMENDED PETITION**                                          **PAGE 25 OF 27**

Acquisition, Ink Acquisition II, Ink Acquisition III, Ink Lessee, Ink Lessee Holding, Chatham Holding, Chatham Lodging, Fisher, and Post Properties disclose, within the timeframe provided by the TEXAS RULES OF CIVIL PROCEDURE, the information and material described in TEX. R. CIV. P. 194.2(a)-(l).

## X.
### PRAYER

102.    WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein. Plaintiff further prays that, upon trial by jury, she have judgment against Defendants for the damages alleged herein, as well as all other relief, in law and in equity, to which Plaintiff may show herself to be justly entitled.

Respectfully submitted,

| | |
|---|---|
| **ROYCE WEST** | **G. MICHAEL GRUBER** |
| State Bar No. 21206800 | State Bar No. 08555400 |
| royce.w@westllp.com | mgruber@ghjhlaw.com |
| **VERETTA FRAZIER** | **ERIC POLICASTRO** |
| State Bar No. 00793264 | State Bar No. 24068809 |
| veretta.f@westllp.com | epolicastro@ghjhlaw.com |
| **NIGEL REDMOND** | **TREY CRAWFORD** |
| State Bar No. 24058852 | State Bar No. 24059623 |
| nigel.r@westllp.com | tcrawford@ghjhlaw.com |
| **WEST & ASSOCIATES, L.L.P.** | **GRUBER HURST JOHANSEN HAIL SHANK LLP** |
| P.O. Box 3960 | 1445 Ross Avenue, Suite 2500 |
| Dallas, Texas 75208-1260 | Dallas, Texas 75202 |
| Ofc.:  (214) 941-1881 | 214.855.6800 (main) |
| Fax:   (214) 941-1399 | 214.855.6808 (facsimile) |

**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

In addition to serving a copy of *Plaintiff's First Amended Petition* along with the citation and summons to all Defendants that have yet to make an appearance in this case, the undersigned hereby certifies that, pursuant to TEX. R. CIV. P. 21, 21a, a true and correct copy of the foregoing was served in the manner indicated below on August 13, 2013 to the following individuals:

| | |
|---|---|
| *Via Facsimile* <br><br> Ramona Martinez <br> **Cobb Martinez Woodward PLLC** <br> 1700 Pacific Avenue, Suite 3100 <br> Dallas, TX 75201 <br> Facsimile: (214) 220-5252 <br> rmartinez@cobbmartinez.com <br> *Attorneys for Defendant Island Hospitality Management, Inc.* | *Via Facsimile* <br><br> James. R. Nelson <br> Eliot T. Burriss <br> **DLA Piper LLP (US)** <br> 1717 Main Street, Suite 4600 <br> Dallas, Texas 75201 <br> Facsimile: (214) 743-4545 <br> jr.nelson@dlapiper.com <br> eli.burriss@dlapiper.com <br> *Attorneys for Defendant Hyatt Hotels Corporation* |
| *Via Facsimile* <br><br> Lisa Songy <br> **Shannon, Gracey, Ratliff & Miller, LLP** <br> 901 Main Street, Suite 4600 <br> Dallas, Texas 75202 <br> Facsimile: (214) 245-3097 <br> lsongy@shannongracey.com <br> *Attorneys for Defendant Dritan Kreka* | *Via Certified Mail* <br><br> Pastazios Pizza, Inc. <br> *Pro se*, c/o Registered Agent Ajredin Deari <br> 2519 N. Fitzhugh Avenue <br> Dallas, Texas 75204 |
| *Via Certified Mail* <br><br> Ajredin —Danny" Deari <br> *Pro se* <br> 2519 N. Fitzhugh Avenue <br> Dallas, Texas 75204 | |

_____
Eric Policastro

---

**PLAINTIFF'S FIRST AMENDED PETITION**          **PAGE 27 OF 27**

SUPP APP 1062

# EXHIBIT D

SUPP APP 1063

FILED
DALLAS COUNTY
6/5/2015 4:50:53 PM
FELICIA PITRE
DISTRICT CLERK

**Cause Number:  DC-13-04564**

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd  JUDICIAL DISTRICT COURT |
| | § | |
| PASTAZIOS PIZZA, INC.; AJREDIN | § | |
| "DANNY" DEARI; and DRITAN KREKA | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S FOURTH AMENDED PETITION

Plaintiff JANE DOE[1] ("Plaintiff") files *Plaintiff's Fourth Amended Petition* ("Petition")

against Defendants PASTAZIOS PIZZA, INC.; AJREDIN "DANNY" DEARI; and DRITAN

KREKA (unless otherwise noted herein, "Defendants" refers to all named Defendants,

collectively), and for causes of action respectfully shows this Court as follows:

### I.
### DISCOVERY CONTROL PLAN

1. Pursuant to this Court's uniform Scheduling Order, discovery in this case is being

conducted under a Level 3 Discovery Control Plan.

### II.
### PARTIES

2. Plaintiff is a natural person who resides in Collin County, Texas.

3. Defendant PASTAZIOS PIZZA, INC. (hereinafter, "PPI" or "Pastazios") is a

Texas corporation that has generally appeared in this case.

4. Defendant AJREDIN "DANNY" DEARI (hereinafter, "Deari") is a natural

person who has generally appeared in this case.

---

[1] Due to the extremely personal and sensitive nature of this lawsuit, Plaintiff is proceeding under the pseudonym of "Jane Doe"; however, Defendants have full knowledge of Plaintiff's identity due to Defendants' involvement in the underlying acts and omissions that form the basis of this Petition.

---

**PLAINTIFF'S FOURTH AMENDED PETITION** **PAGE 1 OF 28**

5.      Defendant DRITAN KREKA (hereinafter, "Kreka") is a natural person who has generally appeared in this case.

## III.
### JURISDICTION

6.      This Court has subject matter jurisdiction over this lawsuit because the amount in controversy exceeds the minimum jurisdictional requirements.

7.      In accordance with TEX. R. CIV. P. 47, Plaintiff seeks monetary relief in excess of $1,000,000.00 due to Defendants' tortious and grossly negligent conduct.

8.      This Court has personal jurisdiction over Defendants PPI, Deari, and Kreka because the foregoing Defendants have generally appeared in this case.  This Court also has personal jurisdiction over Defendants PPI, Deari, and Kreka because each of the aforementioned Defendants (1) engage in, and transact business within, the State of Texas, (2) maintain continuous and systematic contacts with the State of Texas, (3) purposefully avail themselves to the laws of the State of Texas, (4) committed torts in the State of Texas against a Texas resident, and (5) a substantial part of the events giving rise to Plaintiff's claims occurred in Texas.

## IV.
### VENUE

9.      Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.002(a), venue is proper in Dallas County, Texas because (1) all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Dallas County, Texas, and (2) some or all of the Defendants resided in Dallas County, Texas at the time Plaintiff's causes of action accrued.

10.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 15.005, because venue is proper in Dallas County, Texas as to at least one Defendant, venue is proper in Dallas County, Texas as to all Defendants.

## V.
## FACTUAL BACKGROUND

11.     In early 2011, Plaintiff was 18 years old and a recent graduate from high school. Plaintiff excelled in school academically, graduating as the valedictorian of her class.

12.     Like many young adults, Plaintiff was in search of an entry-level job at a local business in order to earn disposable income and garner working experience. At the time, Plaintiff was an employee of Fox Sports Grill and was in the process of seeking another job in the same industry that would provide her with more disposable income.

13.     April 26, 2011 started out like any other day for Plaintiff. She woke up around 10 am and went to work the lunch shift at Fox Sports Grill. She got off work early that afternoon and went to get ready for a pre-planned interview that was set to take place around 3pm at Ringo's Pub. Earlier that day, Defendant Kreka, whom Plaintiff had met a few times prior, contacted Plaintiff to see if she would be interested in meeting him later that afternoon to potentially interview for a position at his restaurant, or at least discuss other possible networking opportunities that may assist Plaintiff in finding a higher paying job. Thus, when Plaintiff concluded her 3pm interview, Kreka suggested that she come meet him to discuss potential opportunities. Plaintiff drove to meet Defendant Kreka who then suggested that they go sit down at Back Nine bar and grill to continue their discussions. When they arrived at Back Nine that afternoon, Plaintiff was introduced to Defendant Deari, who also owned a restaurant—Defendant Pastazios Pizza—located in Post Addison Circle.

14.     While at Back Nine, Deari asked Plaintiff how old she was and Plaintiff informed both men that she was 18 years old. At the time, Defendant Deari was approximately 49 years old and Defendant Kreka was approximately 33 years old. The two Defendants subsequently tried to order Plaintiff an alcoholic beverage; however, the restaurant's server refused to bring

**PLAINTIFF'S FOURTH AMENDED PETITION**                                    **PAGE 3 OF 28**

SUPP APP 1066

the beverage because Plaintiff was underage.  Defendants Deari and Kreka continued drinking alcohol even while at Back Nine. Plaintiff would later discover that the two men had been drinking alcohol a good portion of the day. Plaintiff had not consumed any alcohol that day and had only been intoxicated "maybe once" prior in her life.

15.     Deari and Kreka then suggested that the three of them should move the conversation to Pastazios. Defendant Deari and Defendant Kreka was successful in convincing Plaintiff to drive to Pastazios. At no point in time could this meeting be fairly characterized as a "job interview" with Defendant Pastazios or with Defendant Deari. Prior to their arrival, Defendant Deari stopped at a liquor store and purchased a bottle of 80-proof hard liquor (Crown Royal Black) and took it with him and brought it into Pastazios, even though Deari was not officially scheduled to work that day. Neither Deari nor Pastazios were licensed by the Texas Alcoholic Beverage Commission to sell or serve hard liquor. Nonetheless, Pastazios' agents and even its manager knowingly allowed Deari to bring the hard liquor onto and inside the premises.

16.     Upon arriving at Pastazios at approximately 4:45pm, and without Plaintiff asking, Defendant Deari proceeded to walk inside of Pastazios, grab a round of beers, and placed one of the beers in front of Plaintiff and encouraged her to drink it. Plaintiff had not had anything to drink that day and was not looking to drink alcohol with someone more than twice her age. All of this took place out in the open and obviously for all to see, including all of the employees and agents of Pastazios.

17.     Deari then went back inside Pastazios and came out with a round of shots of Crown Royal Black that had been placed into 2-ounce plastic salad dressing cups from Pastazios and encouraged Plaintiff to drink it. Prior to that day, Plaintiff had very little experience concerning the effects of alcohol. Again, all of this took place out in the open and with the

SUPP APP 1067

knowing consent and approval of Defendant Pastazios and its other employees. At no point in time did anyone at Pastazios ask to see Plaintiff's identification prior to providing her with Pastazios' alcoholic products and goods.

18.     Throughout the course of approximately the next two hours, Pastazios and Deari continued to encourage and provide Plaintiff with more and more alcoholic products from within and owned by Pastazios, despite Plaintiff telling them she did not want anymore.  Once again, all of this taking place out in the open and with the seeming approval of Pastazios and their employees. After serving Plaintiff with her second beer from Pastazios and third 2-ounce shots of Crown Royal Black, things "started getting fuzzy" for Plaintiff. Pastazios then proceeded to provide plaintiff with yet another 2-ounce shot of 80 proof hard liquor. According to all eye witnesses, Plaintiff became extremely and obviously intoxicated to the point where she had trouble even standing. In total, Defendants provided Plaintiff with 5-6 shots of Crown Royal Black and 3 beers. In fact, Defendants provided Plaintiff with alcohol to the point that she "was intoxicated to a level where she was unaware of what was going on around her" and at many points completely non-responsive. Defendant Deari, although an agent of Pastazios, was never acting in the course and scope of his employment with Pastazios while Pastazios continued to provide Plaintiff with alcoholic products to Plaintiff. Defendant Deari was not on duty, he was not acting in furtherance of Pastazios' business, he was acting in any managerial or supervisory capacity, he was not serving any customers, and he was not performing any of his normal job duties or administrative  functions.

19.     Plaintiff began expressing grave concerns about her growing level of intoxication and her inability to function normally. Despite her desire to go home safely, Plaintiff was effectively detained as a direct result of being provided intoxicating products by Pastazios.

SUPP APP 1068

Defendants' Deari and Kreka were likewise obviously intoxicated at this point and any reasonably prudent restaurant operator would be able to tell that they posed a danger to themselves as well as others. Instead of Pastazios calling Plaintiff a cab, her parents, or a friend, instead, Pastazios allowed Defendants to try and load Plaintiff into a car where Defendants Deari and Kreka had decided that their next stop should be to take Plaintiff to a local all nude adult entertainment establishment. At this point, Plaintiff's memory begins to fade, as she starts going into and out of consciousness as a result of her open and obvious intoxication. Deari retrieved his vehicle from PPI's parking lot and told Kreka and Plaintiff to get into the vehicle. Kreka moved into the driver's seat and Plaintiff, who was obviously intoxicated, sat in the back of the vehicle. Plaintiff then lost consciousness.  All of this taking place out in the open and with the express, or at the very least, tacit approval of Pastazios and its agents and employees. Simply put, prior to leaving Pastazios, Plaintiff was intoxicated to the point where she was incapable of caring for or even defending herself from further risks of foreseeable harm.

20.    Plaintiff's next memory is vomiting in a gas station parking lot before losing consciousness again. Sometime thereafter, Plaintiff regained consciousness in a hotel room located at 4900 Edwin Lewis Drive, Addison, Texas 75001 (less than a half mile from Pastazios) wherein she had been involuntarily disrobed and was actively being raped by Defendant Deari.

21.    When Plaintiff regained consciousness and realized that she was actively being raped by someone more than twice her age that she barely knew, she repeatedly insisted that Defendant Deari stop the attack and "get off of her", but he did not. It was only after Plaintiff made multiple demands for Defendant Deari to stop did the sexual assault eventually end. Fearful of another attack, Plaintiff locked herself in the bathroom. Deari then left the hotel and went back to Pastazios.

22.     Plaintiff immediately called a friend to report what had happened and asked her friend for help. Shortly thereafter, a friend of Plaintiff's arrived at the hotel to help and at 8:32 pm called 911. The Addison Police were immediately dispatched to the scene. Plaintiff would later discover through this lawsuit that she was taken from Pastazios at approximately 6:45pm, Deari checked into the Hyatt House hotel (less than a half mile away) and Plaintiff was taken up to Room 221 by approximately 7:00 pm – less than 15 minutes after leaving Pastazios.

23.     While investigating the crime scene, Defendant Deari—while smoking a cigar—came back to the hotel at approximately 10:30pm (presumably to retrieve the underwear he left, which was taken into evidence by the police department), and Deari was arrested, charged with the crime of sexual assault and was subsequently indicted. At the scene, Deari told the police that he did not even have sex with Plaintiff, nor did he leave his underwear. Defendant Deari's story would drastically change over time as the investigation and discovery in this lawsuit unfolded.

24.     Plaintiff was immediately transmitted to the hospital and underwent a series of examinations, tests, and administered massive quantities of treatments for the injuries she incurred during the rape.

25.     Within a matter of days following the sexual assault, Plaintiff went back to the hospital after she experienced severe pain in her pubic region. The doctors informed Plaintiff that she had contracted herpes, an incurable sexually-transmitted disease, during the rape. The doctors conducted a blood test on Plaintiff wherein the specific strand of herpes was identified. The results of a mandatory blood/sexually-transmitted disease test ordered by the Court in "The State of Texas v. Danny Deari" has confirmed that Plaintiff's attacker (who did not utilize latex contraception during the attack), Defendant Deari, is infected with the same derivation of the herpes virus and undoubtedly infected Plaintiff. The examination that Plaintiff underwent at

SUPP APP 1070

Parkland hospital who submitted blood and urine samples taken of Plaintiff at approximately 11:30 pm that evening also revealed that Plaintiff's blood alcohol level was taken was 0.102 g/100mL –this is in spite of the fact that Plaintiff had previously vomited out even more alcohol that would otherwise have been in her system. The results of her urine test, as determined by the Southwestern Institute of Forensic Sciences at Dallas, also showed that Plaintiff had unknowingly been given the drug flunitrazepam metabolite (aka "Rohypnol") to Plaintiff which contributed to Plaintiff's virtual unconsciousness and inability to protect herself from unreasonable and foreseeable risks of serious bodily injury.

26.     On August 22, 2014, Defendant Deari judicially admitted, confessed and stipulated to committing the offense of aggravated assault, to wit: unlawfully, intentionally, recklessly and knowingly causing Plaintiff serious bodily injury on April 26, 2011. This crime was not committed by Deari in the course and scope of his employment with Pastazios. However, the bodily injuries Plaintiff sustained unquestionably arise out of Pastazios' negligent and grossly negligent acts alleged herein and, but for said negligence, Plaintiff would not have been injured at all.

27.     As a proximate result of the tortious, and grossly negligent acts and omissions by Defendants alleged herein, Plaintiff has foreseeably suffered, and will continue to suffer, through extreme emotional distress, pain, mental anguish, and suffering for the rest of her life which, according to the federal government's "National Vital Statistics Reports", is expected to be another 61.6 years.[2] Plaintiff has incurred, and will continue to incur, substantial damages and bodily injuries arising out of the acts and omissions alleged herein.

## VI.
### CAUSES OF ACTION

---

[2] *See* U.S. Department of Health and Human Service, NATIONAL VITAL STATISTICS REPORTS Vol. 61, No.3, September 24, 2012 at 20.

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                         **PAGE 8 OF 28**

**COUNT 1: ASSAULT – THREAT OF BODILY INJURY (DEFENDANTS DEARI AND KREKA)**

28. Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs. Plaintiff's first cause of action is alleged against Defendants Deari (while he was not acting in the course and scope of his employment with Pastazios) and Kreka, only. As used in this cause of action, "Defendants" refers to Defendant Deari and Defendant Kreka.

29. As further alleged herein, on or about April 26, 2011, Defendants intentionally and/or knowingly threatened Plaintiff with imminent bodily injury. Defendants' threat of imminent bodily injury caused Plaintiff to be apprehensive, which was a foreseeable result of Defendants' actions.

30. Defendants are liable for the threat of bodily injury committed against Plaintiff because Defendants participated in the tortious acts themselves or, alternatively, assisted the tortious act against Plaintiff in furtherance of the civil conspiracy to do so or, alternatively, aided and abetted each other to allow the ultimate threat of bodily injury against Plaintiff to take place.

31. Defendants' threat of imminent bodily injury to Plaintiff was a cause of the damages alleged herein.

32. Under Texas law, the elements of assault are the same in civil and criminal suits and it is the law of this State that an assault is both an offense against the peace and dignity of the State, as well as an invasion of private rights. For that reason, the definition of assault, whether in a criminal or civil trial, is the same. On August 22, 2014, Defendant Deari judicially admitted, confessed and stipulated to committing the offense of aggravated assault, to wit: unlawfully, intentionally, recklessly and knowingly causing Plaintiff serious bodily injury on April 26, 2011. Thus, Plaintiff hereby pleads that Defendant Deari is hereby barred and judicially estopped from challenging liability under this cause of action and the only element to be proven

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                                        **PAGE 9 OF 28**

under this cause of action at trial is the issue of damages.

### COUNT 2: ASSAULT (BATTERY) –BODILY INJURY AND OFFENSIVE CONTACT (DEFENDANTS DEARI AND KREKA)

33.     Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs.

34.     Plaintiff's second cause of action is alleged against Defendants Deari, individually, and Kreka, only. As used in this cause of action, "Defendants" refers only to Defendants Deari (while acting outside the course and scope of his employment) and Kreka.

35.     Plaintiff incorporates by reference, as if fully set forth herein, the statutory language of TEX. PENAL CODE §§ 22.01, 22.011 describing the felonies of "Assault" and "Sexual Assault". Plaintiff alleges that Plaintiff was the victim of the aforementioned crimes that Defendants committed against Plaintiff on or about April 26, 2011, and that said crimes have caused Plaintiff's damages alleged herein.

36.     Defendants intentionally, knowingly, and/or recklessly made physical contact with Plaintiff's person causing bodily injury—that is, physical pain, illness, or impairments of Plaintiff's physical condition—and Plaintiff did not, and could not, consent to the harmful physical contact.

37.     Alternatively, Defendants intentionally or knowingly caused to be made physical contact with Plaintiff when Defendants knew, or reasonably should have believed, that Plaintiff would regard the contact as offensive or provocative. Indeed, said physical contact was offensive, provocative, and committed by Defendants despite never having consent from Plaintiff.

38.     As a causal result of Defendants' battery of Plaintiff's person, Plaintiff suffered immediate, consequential, and subsequent injuries—including pain, illness, and physical

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                                    **PAGE 10 OF 28**

SUPP APP 1073

impairment—that were foreseeable to Defendants.  The assault committed by Defendants on Plaintiff's person was a cause of the damages alleged by Plaintiff herein.

39.     Under Texas law, the elements of assault are the same in civil and criminal suits and it is the law of this State that an assault is both an offense against the peace and dignity of the State, as well as an invasion of private rights. For that reason, the definition of assault, whether in a criminal or civil trial, is the same. On August 22, 2014, Defendant Deari judicially admitted, confessed and stipulated to committing the offense of aggravated assault, to wit: unlawfully, intentionally, recklessly and knowingly causing Plaintiff serious bodily injury on April 26, 2011. Thus, Plaintiff hereby pleads that Defendant Deari is barred and judicially estopped from challenging liability under this cause of action and the only element to be proven under this cause of action at trial is the issue of damages.

**COUNT 3: SEXUAL ASSAULT—TEX. PENAL CODE § 22.011 (DEFENDANT DEARI)**

40.     Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs.

41.     Plaintiff's third cause of action is alleged against Defendant Deari, individually, only. As used in this cause of action, "Defendant" refers to Defendant Deari, while acting outside the course and scope of his employment.

42.     Plaintiff incorporates by reference, as if fully set forth herein, the statutory language of TEX. PENAL CODE § 22.011 describing the felony of "Sexual Assault". Plaintiff alleges that Plaintiff was the victim of the aforementioned crime that Defendant Deari committed against Plaintiff on or about April 26, 2011, while acting outside the course and scope of his employment with Defendant Pastazios and that said crimes have caused Plaintiff's damages alleged herein.

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                                           **PAGE 11 OF 28**

43.     Plaintiff further pleads and incorporates by reference, as if fully set forth herein, the statutory language of TEX. PENAL CODE § 22.011(b) describing the circumstances under which a person cannot legally consent which apply to this case. These include when: (1) the other person has not consented and the actor knows the other person is unconscious or physically unable to resist; (2) the other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring; or (3) the actor has intentionally impaired the other person's power to appraise or control the other person's conduct by administering any substance without the other person's knowledge. As further alleged herein, Plaintiff never gave Defendant Deari consent, nor was she capable of consenting under the above reference provisions set forth herein.

44.     Moreover, under Texas law in sexual assault cases, a jury is to be instructed that a defendant's own intoxicated state may not be considered as a defense to the commission of a sexual assault. Thus, Plaintiff hereby pleads and invokes said provision and requests that the jury be instructed accordingly.

## COUNT 4: NEGLIGENCE (DEFENDANT PASTAZIOS)

45.     Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs. This cause of action applies to Defendant Pastazios, only.

46.     As further alleged herein, Pastazios owed Plaintiff various legal duties that Pastazios breached thereby proximately causing Plaintiff's damages and serious bodily injuries.

47.     For example, based upon the special relationship between Plaintiff, an invitee to the premises, and Pastazios that is created under the Restatement of Torts § 314A, Pastazios owed Plaintiff a duty to protect her against unreasonable risks of harm, as well as to render aid and care until she could be cared for by others. Pastazios also had a duty created under

---

Restatement of Torts § 318 to exercise reasonable care so as to control the conduct of its customers and invitees from harming others, including Plaintiff. Pastazios had the right, ability and responsibility to control the conduct occurring on its property, knew or had reason to know of the necessity of taking appropriate action to prevent foreseeable harm to its invitees, including Plaintiff, had the opportunity to prevent such foreseeable harm, yet consciously chose not to intervene. Pastazios also had a duty pursuant to Restatement of Torts § 319 to prevent tortfeasors from committing torts at its restaurant which it had the right and ability to control and prevent. Pastazios further had a duty to exercise reasonable care so as to control its employees, representatives and agents' actions and inactions while on Pastazios' premises (regardless of whether said individuals were acting in the course and scope of their employment with Pastazios) to prevent them from intentionally or negligently causing bodily injury or otherwise harming others, including Plaintiff. Pastazios further owed Plaintiff a duty to use the appropriate legal standard of care in maintaining its premises in a safe and secure condition and to inspect the premises to ensure the safety of its occupants from foreseeable risks of harm. Pastazios likewise had a legal duty to take reasonable steps to protect its invitees, including Plaintiff, from unreasonable and foreseeable risks of harm—including risks of harm from the criminal or grossly negligent acts of third parties. Pastazios had a duty not to injure Plaintiff in a willful, wanton, or grossly negligent manner or allow another to do so on Pastazios' premises when it knew, or reasonably should have known of an unreasonable risk of harm to its invitees, including Plaintiff. Pastazios had a legal duty to treat its invitees, including Plaintiff, in a manner that would not unreasonably subject her to physical or mental bodily injury, or other unreasonable and foreseeable risks of harm. Pastazios also had a duty to use ordinary care in the hiring of competent employees, a duty to reasonable train its employees, and a duty to use ordinary care in

SUPP APP 1076

supervising its employees. In light of the risks of unreasonable harm present on April 26, 2011, the foreseeability of such risks of harm, and the likelihood of bodily injury to Plaintiff—weighed against the social utility of Pastazios' actions and inactions and the minimal burden of Pastazios in guarding against such foreseeable and unreasonable risks of harm, there is no question that Pastazios had a multitude of legal duties that it owed to Plaintiff.

48.     As further alleged herein, Pastazios breached each and every one of these duties it owed Plaintiff. By way of example, Pastazios knowingly and negligently put Plaintiff in harm's way on April 26, 2011; Pastazios knowingly and negligently allowed tortfeasors to use Pastazios premises and property as instrumentalities in committing torts inflicted upon Plaintiff; Pastazios failed to exercise ordinary care by allowing third parties to furnish Plaintiff with inordinate amounts of alcohol and liquor to the point where she was virtually unconscious and lacking the ability to protect herself from unreasonable and foreseeable risks of serious bodily injury; in the alternative, Pastazios failed to exercise ordinary care by allowing its agents to furnish Plaintiff with inordinate amounts of alcohol and liquor to the point where she was virtually unconscious and lacking the ability to protect herself from unreasonable and foreseeable risks of serious bodily injury; Pastazios failed to exercise ordinary care by allowing third parties to supply flunitrazepam metabolite (aka "Rohypnol") to Plaintiff without her knowledge which contributed to Plaintiff's virtual unconsciousness and inability to protect herself from unreasonable and foreseeable risks of serious bodily injury; in the alternative, Pastazios failed to exercise ordinary care by negligently monitoring agents under its control, thus, allowing Plaintiff to unknowingly be provided flunitrazepam metabolite (aka "Rohypnol") which contributed to Plaintiff's virtual unconsciousness and inability to protect herself from unreasonable and foreseeable risks of serious bodily injury; Pastazios failed to exercise ordinary care by failing to take reasonable steps

to render aid and care for Plaintiff until such time as she could reasonably be expected to be cared for by herself or by others; Pastazios failed to exercise ordinary care by failing to contact a taxi, a friend, or parents who would be able to ensure that Plaintiff was taken out of harm's way when she was clearly incapable of doing so herself due to the state Pastazios allowed her to be in prior to leaving the premises; Pastazios failed to exercise ordinary care by negligently monitoring the premises to ensure her safety and security when, under the circumstances existing at the time, she was clearly within the zone of foreseeable and unreasonable risks of harm; Pastazios failed to exercise ordinary care by negligently monitoring and controlling the conduct of its other customers and invitees while they were on Pastazios' property and still under Pastazios' control, and knew or had reason to know of the necessity of taking appropriate action to prevent foreseeable and unreasonable risks of harm to Plaintiff; Pastazios failed to exercise ordinary care in controlling its employees, representatives and agents' actions and inactions while on Pastazios' premises (regardless of whether said individuals were acting in the course and scope of their employment with Pastazios) to prevent them from intentionally or negligently causing bodily injury or otherwise harming others, including Plaintiff, when such risks were readily apparent under the circumstances existing at the time; Pastazios failed to exercise ordinary care in maintaining its premises in a safe and secure condition and by failing to exercise ordinary care in inspecting the premises to ensure the safety of its occupants from foreseeable risks of harm; Pastazios failed to exercise ordinary care by failing to take any reasonable steps to protect its invitees, including Plaintiff, from unreasonable and foreseeable risks of harm— including risks of harm from the criminal or grossly negligent acts of third parties; Pastazios failed to exercise ordinary care by failing to treat its invitees, including Plaintiff, in a manner that would not unreasonably subject her to physical or mental bodily injury, or other unreasonable

and foreseeable risks of harm; and Pastazios failed to exercise ordinary care by in the hiring of competent employees, reasonably training them, and reasonably supervising them.

49.     Said breaches set forth above constitute gross negligence on the part of Pastazios because, when viewed objectively from the standpoint of Pastazios at the time of their occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and of which Pastazios had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff. In the alternative, Pastazios is grossly negligent because of the acts of other Defendants to the extent any other grossly negligent Defendant was a vice principal of Pastazios and was acting in the course and scope of that Defendant's employment, or to the extent Pastazios ratified said Defendant's grossly negligent conduct.

50.     As a proximate cause of Pastazios' breaches of these legal duties, Plaintiff suffered and will continue to suffer damage and serious bodily injuries that will remain with her for the rest of her adult life. But for said breaches, Plaintiff never would have suffered the serious bodily injuries complained of herein. Pastazios' breaches, acts and omissions were a substantial factor in causing Plaintiff's damages and bodily injuries complained of herein, without which, such harm would not have occurred. Under the circumstances that existed at the time, a restaurant operator of ordinary intelligence would have reasonably anticipated the dangers Pastazios' negligent and grossly negligent acts and omissions created for others, including Plaintiff, as well as the general character of the damages and bodily injuries Plaintiff suffered as a result of said negligence and gross negligence. It is undeniable that Plaintiff's damages and bodily injuries complained of herein arose out of the inherent nature of Pastazios' negligent and

grossly negligent acts and omissions.

51.     Moreover, any alleged intentional or negligent acts of any other person or Defendant that contributed to Plaintiff's injuries did not act to extinguish Pastazios' liability for its own negligence and gross negligence and do not constitute an "outside agency," and do not rise to the level of a new and independent cause that would extinguish Pastazios' liability. Any purported acts or intervening forces Pastazios may allege to be a "new and independent cause" fails said acts were foreseeable to Pastazios under the circumstances that existed at the time. In the alternative, even if said intervening forces were unforeseeable, the chain of causation flowing from Pastazios' negligence was continuous and unbroken. *See Biaggi v. Patrizio Restaurant Inc.,* 149 S.W.3d 300, 306 (Tex. App.—Dallas 2004); *see also S&A Beverage Co. of Beaumont v. DeRouen*, 753 S.W2d 507 (Tex. App. – Beaumont 1988, pet. denied). Stated differently, Plaintiff's damages and bodily injuries complained of herein did not solely arise out of or result from any criminal acts of other Defendants.

52.     All of Plaintiff's damages and bodily injuries complained of herein arise out of Pastazios' breaches of its legal duties owed to Plaintiff—without which, Plaintiff never would have been injured. Any alleged new and independent cause alleged by Pastazios is legally and necessarily dependent on Pastazios' own prior and contemporaneous negligence and gross negligence. *See S&A Beverage Co. of Beaumont*, 753 S.W2d 507.

<u>COUNT 5</u>: DRAM SHOP LIABILITY (DEFENDANT PASTAZIOS)

53.     Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs.

54.     Plaintiff's cause of action for Dram Shop Liability is alleged against Pastazios only.

---

SUPP APP 1080

55.     As further alleged herein, on or about April 26, 2011, Pastazios held a Texas Alcoholic Beverage Commission license for the sale, service or provision of alcoholic goods or products and did, in fact, sell, serve, provide, or otherwise distribute multiple alcoholic products to Plaintiff when, at the time, it was apparent, obvious, and evident to Pastazios that Plaintiff was obviously intoxicated. As further alleged herein, it was it is visible, evident, and easily observable to Pastazios that Plaintiff was obviously intoxicated at the time she was provided such alcoholic products by Pastazios.

56.     Such signs of obvious intoxication of Plaintiff were self-evident from the circumstances and observations that any ordinary person could see throughout the course of the approximate 2 hours in which Pastazios was providing Plaintiff with its alcoholic products while on the premises. The testimony and admissions from multiple eye witnesses, the fact that Plaintiff was sometimes non-responsive, in and out of consciousness, the physical clues that an ordinary person could observe, the shear amount of alcoholic products Pastazios distributed to Plaintiff, the changes in her behavior, clearly manifested the fact that Plaintiff was a danger to herself and others. Moreover, Plaintiff's blood alcohol levels taken several hours after she was last provided alcoholic products by Pastazios, statements and observations made by the Addison Police Department and treating medical providers at Parkland hospital, testimony that Plaintiff has virtually no memory after the time she left Pastazios until she woke up while actively being raped, as well as the testimony of the multiple instances of vomiting likewise show that Pastazios had provided Plaintiff with alcoholic products at a time when she was obviously intoxicated and a danger to herself and dangers from others.

57.     Plaintiff's intoxication—as a result of the provision and/or distribution of alcoholic products by Pastazios was a proximate cause of Plaintiff's damages and bodily injuries

complained of herein. In fact, all of Plaintiff's damages and bodily injuries arise out of the products provided and/or distributed to her by Pastazios. But for Plaintiff's intoxication at the hands of Pastazios, Plaintiff would not have suffered the damages and serious bodily injuries complained of herein. As such, Pastazios provision and/or distribution of alcoholic products to Plaintiff while she was obviously intoxicated was a "substantial factor in bringing about the injury and without which no harm would have been incurred." *See El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex. 1987). A restaurant of ordinary intelligence should have anticipated the dangers that its negligent acts created for others, including Plaintiff, and would reasonably anticipate the general character of the bodily injury suffered by Plaintiff which arose out of such negligence. *See S&A Beverage Co.*, 753 S.W2d 507.

58.    Moreover, any alleged intentional or negligent acts of any other person or Defendant that contributed to Plaintiff's injuries did not act to extinguish Pastazios' liability for its own negligence and gross negligence, do not constitute an "outside agency," and do not rise to the level of a new and independent cause that would extinguish Pastazios' liability. Any purported acts or intervening forces Pastazios may allege to be a "new and independent cause" fails said acts were foreseeable to Pastazios under the circumstances that existed at the time. In the alternative, even if said intervening forces were unforeseeable, the chain of causation flowing from Pastazios' negligence was continuous and unbroken. *See Biaggi v. Patrizio Restaurant Inc.,* 149 S.W.3d 300, 306 (Tex. App.—Dallas 2004); *see also S&A Beverage Co. of Beaumont v. DeRouen*, 753 S.W2d 507 (Tex. App. – Beaumont 1988, pet. denied). Stated differently, Plaintiff's damages and bodily injuries complained of herein did not solely arise out of or result from any criminal acts of other Defendants.

59.    All of Plaintiff's damages and bodily injuries complained of herein arise out of

SUPP APP 1082

and/or result from Plaintiff's intoxication at the hands of Pastazios'—without which, Plaintiff never would have been injured. Any alleged new and independent cause alleged by Pastazios is legally and necessarily dependent on Pastazios' own prior and contemporaneous negligence and gross negligence. *See S&A Beverage Co. of Beaumont*, 753 S.W2d 507. This is so even though the physical act of being raped occurred a half mile away from the premises. *See id.* Thus, Plaintiff hereby pleads that Pastazios is barred as a matter of Texas law from submitting the issue of "new and independent cause" to the Court or jury in these proceedings. *See id.; see also Biaggi*, 149 S.W.3d at 304-305 (Tex. App. – Dallas 2004).

60.     Pleading in the alternative, to the extent Pastazios claims that other Defendants—namely Defendant Deari—is responsible for the provision of alcoholic products to Plaintiff, Defendant Deari was acting under the actual and/or apparent authority of Pastazios and, thus, the provision of alcohol by Defendant Deari is imputed to Pastazios as a matter of Texas law. This is the case irrespective of whether Defendant Deari was acting in the course and scope of his employment with Pastazios.

61.     Under Texas proportionate responsibility law, to the extent that the jury apportions responsibility to anyone other than Pastazios, Plaintiff is entitled to fully recover from Pastazios "without assuming the risk of [Defendant Deari's] insolvency. *See Biaggi*, 149 S.W.3d at 304-305 (Tex. App. – Dallas 2004). In such instances, Texas law makes clear that Plaintiff is entitled to fully recover from Pastazios, and it is Pastazios "who may then recover from [other Defendants] based upon the percentages of responsibility that the jury assessed between them." Plaintiff hereby pleads and invokes said rights recognized under Texas law.

## COUNT 6: FALSE IMPRISONMENT/DETENTION (DEFENDANT PASTAZIOS)

62.     Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding

paragraphs. This cause of action only applies to Defendant Pastazios.

63.     Without legal authority or justification, Defendant Pastazios willfully detained or participated in the detainment of Plaintiff without Plaintiff's consent and without the authority of law.  Pastazios willfully accomplished the detainment of Plaintiff by virtue of providing her with intoxicating products and substances handled and/or distributed by Pastazios to the point where Plaintiff was virtually unconscious and/or incapable of freely moving herself from one place to another. Such detention was willful, was without Plaintiff's consent, and placed her in a position where she could not exercise her will in going where she could otherwise lawfully go. Pastazios' actions, combined with Plaintiff's vulnerabilities and the oppressive circumstances surrounding these events had the effect of unlawfully detaining Plaintiff in a manner which ultimately caused her to suffer serious bodily injuries and consequential damages arising out of said detainment.

64.     The false imprisonment and detainment committed by Pastazios was a proximate cause of the damages and serious bodily injury suffered by Plaintiff as alleged herein.

**COUNT 7: PREMISES LIABILITY (DEFENDANT PASTAZIOS)**

65.     Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs. Plaintiff's cause of action for Premises Liability is alleged against Defendant Pastazios only.

66.     Under Texas law, a premises-liability defendant may be held liable for a dangerous condition on the property if it assumed control over and responsibility for the premises. As further alleged herein, Pastazios exercised actual and contractual control over the premises.  Thus, Pastazios, owed Plaintiff, as an invitee, a legal duty to avoid risks of harm that are unreasonable and foreseeable. Pastazios also had a duty to inspect and make safe any dangerous conditions or situations on its property or give Plaintiff an adequate warning of the

---

dangerous conditions or situations; however, Pastazios failed to do so.

67. Pastazios failed to exercise ordinary care by, among other things, failing to take any reasonable steps to protect its invitees, including Plaintiff, from unreasonable and foreseeable risks of harm—including risks of harm from the criminal or grossly negligent acts of third parties.

68. Said breaches set forth above constitute gross negligence on the part of Pastazios because, when viewed objectively from the standpoint of Pastazios at the time of their occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and of which Pastazios had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff. In the alternative, Pastazios is grossly negligent because of the acts of other Defendants to the extent any other grossly negligent Defendant was a vice principal of Pastazios and was acting in the course and scope of that Defendant's employment, or to the extent Pastazios ratified said Defendant's grossly negligent conduct.

69. As a proximate cause of Pastazios' breaches of these legal duties, Plaintiff suffered and will continue to suffer damage and serious bodily injuries that will remain with her for the rest of her adult life. But for said breaches, Plaintiff never would have suffered the serious bodily injuries complained of herein. Pastazios' breaches, acts and omissions were a substantial factor in causing Plaintiff's damages and bodily injuries complained of herein, without which, such harm would not have occurred. Under the circumstances that existed at the time, a restaurant operator of ordinary intelligence would have reasonably anticipated the dangers Pastazios' negligent and grossly negligent acts and omissions created for others, including

SUPP APP 1085

Plaintiff, as well as the general character of the damages and bodily injuries Plaintiff suffered as a result of said negligence and gross negligence. It is undeniable that Plaintiff's damages and bodily injuries complained of herein arose out of the inherent nature of Pastazios' negligent and grossly negligent acts and omissions.

70.     Moreover, any alleged intentional or negligent acts of any other person or Defendant that contributed to Plaintiff's injuries did not act to extinguish Pastazios' liability for its own negligence and gross negligence and do not constitute an "outside agency," and do not rise to the level of a new and independent cause that would extinguish Pastazios' liability. Any purported acts or intervening forces Pastazios may allege to be a "new and independent cause" fails said acts were foreseeable to Pastazios under the circumstances that existed at the time. In the alternative, even if said intervening forces were unforeseeable, the chain of causation flowing from Pastazios' negligence was continuous and unbroken. *See Biaggi v. Patrizio Restaurant Inc.,* 149 S.W.3d 300, 306 (Tex. App.—Dallas 2004); *see also S&A Beverage Co. of Beaumont v. DeRouen*, 753 S.W2d 507 (Tex. App. – Beaumont 1988, pet. denied). Stated differently, Plaintiff's damages and bodily injuries complained of herein did not solely arise out of or result from any criminal acts of other Defendants.

71.     All of Plaintiff's damages and bodily injuries complained of herein arise out of Pastazios' breaches of its legal duties owed to Plaintiff—without which, Plaintiff never would have been injured. Any alleged new and independent cause alleged by Pastazios is legally and necessarily dependent on Pastazios' own prior and contemporaneous negligence and gross negligence. *See S&A Beverage Co. of Beaumont*, 753 S.W2d 507.

72.     As further alleged herein, Pastazios breached its legal duties owed to Plaintiff, and those breaches proximately caused Plaintiff's damages and bodily injuries alleged herein.

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                                    **PAGE 23 OF 28**

### COUNT 8:   PARTICIPATORY LIABILITY—AIDING AND ABETTING AND CONCERT OF ACTION
(ALL DEFENDANTS)

73.   Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs.

74.   Among the Defendants was a primary actor, or primary actors, who committed an underlying tort, or torts, against Plaintiff.  Defendants had knowledge that the primary actor's conduct constituted a tort and Defendants gave the primary actor assistance, substantial assistance, and/or encouragement to commit the tort against Plaintiff. Defendants' assistance, substantial assistance, and/or encouragement was a substantial factor in causing the tort to be completed and a substantial factor in the damages incurred by Plaintiff as alleged herein.

75.   Alternatively, Defendants' own conduct—separate and apart from the primary actor—was a breach of duty to Plaintiff and a substantial factor in causing Plaintiff's injuries.

76.   Due to Defendants' joint assistance, encouragement, aiding and abetting, and/or concert of action, Plaintiff alleges that Defendants should be held jointly and severally responsible for the whole of damages incurred by Plaintiff.

### COUNT 9: EXEMPLARY DAMAGES (ALL DEFENDANTS)

77.   Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs.

78.   Defendants' tortious conduct was not only negligent, it was malicious and/or grossly negligent.

79.   Defendants' malicious and/or grossly negligent acts and omissions were carried out by Defendants personally, through Defendants' authorized agents, managers, employees, vice-principals, and/or principals of Defendant Pastazios. Alternatively, Defendants Deari and Kreka' malicious and/or grossly negligent conduct was subsequently approved by or ratified by

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                                      **PAGE 24 OF 28**

Defendant Pastazios.

80.     Defendants intentionally breached the legal duties it owed Plaintiff such that it could take undue advantage of Plaintiff and/or otherwise maliciously treat Plaintiff. The acts or omissions of Defendants, when viewed objectively from the Defendants' standpoint, involved an extreme degree of risk when considering the probability and magnitude of the potential harm to Plaintiff and others.

81.     Additionally, Defendants had actual, subjective awareness of the risk to Plaintiff and others but proceeded anyway with a conscience indifference to the rights, safety, or welfare of Plaintiff and others.

82.     Defendants' conduct was performed and/or designed with a specific intent to cause substantial injury or harm to Plaintiff. As alleged herein, Defendants' conduct is an example of why punitive damages exist, and Plaintiff alleges that Defendants' conduct rises to the level warranting the imposition of exemplary damages against Defendants at trial.

83.     Pursuant to TEX. CIV. PRAC. & REM. CODE § 41.008(c), there is no cap on the amount of exemplary damages that may be awarded by the jury.

## VII.
### DAMAGES

84.     Plaintiff incorporates by reference, as if fully set forth herein, all of the preceding paragraphs.

85.     Plaintiff has incurred significant damages due to Defendants' tortious and grossly negligent conduct. Plaintiff seeks all losses sustained as a natural, probable, foreseeable, and/or proximate result of Defendants' wrongful conduct, including:

      a.   General damages;

      b.   Actual damages;

---

SUPP APP 1088

c.  Physical pain and suffering incurred in the past and future;

d.  Mental anguish incurred in the past and future;

e.  Disfigurement incurred in the past and future;

f.  Physical impairment incurred in the past and future;

g.  Medical expenses incurred in the past and future;

h.  Loss of earning capacity incurred in the past and future;

i.  Lost wages incurred in the past and future;

j.  Out of pocket costs;

k.  Loss of consortium;

l.  Loss of companionship and society in the past and future;

m.  Loss of enjoyment of life in the past and future;

n.  Injury to reputation in the past and future;

o.  All reasonable and necessary attorneys' fees that Plaintiff is forced to incur pursuant to Texas common law and equity;

p.  Exemplary damages;

q.  Costs of court;

r.  Pre-judgment interest;

s.  Post-judgment interest; and

t.  All other relief, in law and in equity, to which Plaintiff may be justly entitled.

## VIII.
### DEMAND FOR JURY

86.  Plaintiff demands a jury trial and has tendered the appropriate fee.

## IX.
### PRAYER

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                                      **PAGE 26 OF 28**

87.    WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein. Plaintiff further prays that, upon trial by jury, she have judgment against Defendants for the damages alleged herein, as well as all other relief, in law and in equity, to which Plaintiff may prove herself to be justly entitled.

Respectfully submitted,

_____

| | |
|---|---|
| **ROYCE WEST** | **G. MICHAEL GRUBER** |
| State Bar No. 21206800 | State Bar No. 08555400 |
| royce.w@westllp.com | mgruber@ghjhlaw.com |
| **VERETTA FRAZIER** | **TREY CRAWFORD** |
| State Bar No. 00793264 | State Bar No. 24059623 |
| veretta.f@westllp.com | tcrawford@ghjhlaw.com |
| **NIGEL REDMOND** | **BRIAN E. MASON** |
| State Bar No. 24058852 | State Bar No. 24079906 |
| nigel.r@westllp.com | bmason@ghjhlaw.com |
| **WEST & ASSOCIATES, L.L.P.** | **GRUBER HURST JOHANSEN HAIL SHANK LLP** |
| P.O. Box 3960 | 1445 Ross Avenue, Suite 2500 |
| Dallas, Texas 75208-1260 | Dallas, Texas 75202 |
| Ofc.:   (214) 941-1881 | 214.855.6800 (main) |
| Fax:   (214) 941-1399 | 214.855.6808 (facsimile) |

**ATTORNEYS FOR PLAINTIFF**

SUPP APP 1090

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, pursuant to TEX. R. CIV. P. 21, 21a, a true and correct copy of the foregoing was filed on June 5, 2015 and was served on June 5, 2015 to the following individuals:

| *Via Facsimile and E-mail* | *Via Certified Mail, Return Receipt Requested* |
|---|---|
| *Ajredin "Danny" Deari*<br>*Pastazios Pizza, Inc.*<br><br>Samuel H. Johnson<br>**Rosenberg & Johnson, P.C.**<br>Facsimile: (972) 918-5274 | *Dritan Kreka, pro se*<br><br>5549 Big River Drive<br>The Colony, Texas 75056 |

_____

Trey Crawford

---

**PLAINTIFF'S FOURTH AMENDED PETITION**                    **PAGE 28 OF 28**

# EXHIBIT E

SUPP APP 1092

■◢■ **CENTURY**
■░■ **INSURANCE GROUP**™

DIVISION OF MEADOWBROOK INSURANCE GROUP℠

May 24, 2013

**Via Certified and Regular Mail**
**91 7108 2133 3936 4102 0982**

Pastazios Pizza, Inc.
5026 Addison Circle
Addison, TX 75001-3332

RE:   *Doe v. Pastazios Pizza, Inc., et al.*
      Named Insured:     Pastazios Pizza, Inc.
      Policy No.:        CCP672836
      Policy Period:     September 21, 2010 – September 21, 2011
      Date of Loss:      April 26, 2011
      Claim No.:         01-088423

I am a Claims Attorney for Century Insurance Group, a division of Meadowbrook Insurance Group, assigned to oversee this claim on behalf of Century Surety Company ("Century"). As you know, Century is in receipt of the Petition filed on behalf of Jane Doe against Ajredin "Danny" Deari, Dritan Kreka, and Pastazios Pizza, Inc, as well as others, in the District Court for Dallas County, TX as Suit No. 13-04564 (hereinafter "the Doe Action"). Upon review of the petition and the above-referenced policy, Century has determined that coverage may be available for this claim. As such, Century agrees to provide a defense and indemnity to Pastazios Pizza, Inc. subject to a full and complete reservation of rights.

Please read this letter carefully for a more detailed explanation of Century's coverage position.

## I. FACTUAL BACKGROUND

The following facts are based largely upon the allegations contained in the Petition. The Petition's allegations are reviewed here, simply for the purpose of explaining Century's coverage position. Century's review of those allegations should not be construed as a comment on their truthfulness, as Century does not mean to assert that any, or all, of the allegations contained in the Petition are true. That said, please promptly advise us if you believe we have misconstrued, or misunderstood, those allegations.

The Doe Action, filed April 24, 2013, alleges that on April 26, 2011, Jane Doe came to interview for a job at your establishment. Ms. Doe, a minor, alleges that she was provided alcoholic beverages to the point of unconsciousness. She alleges that while unconscious she was driven by Dritan Kreka and Ajredin "Danny" Deari to a hotel where she was raped by Mr. Deari. As a result of this incident, the Doe Action brings claims of assault, battery, sexual assault, false imprisonment, negligence, premises liability, dram shop liability, intentional infliction of emotional distress, participatory liability – aiding and abetting, and participatory liability – conspiracy. Specifically, the Doe Action alleges that you had a duty to use ordinary care in hiring and retaining employees, a duty to control your employees, a duty to supervise your employees' activities, and a duty to prevent an employee from causing an unreasonable risk of

Shana M. Bereche
Claims Attorney
SBereche@centurysurety.com | 602-216-6568
Mailing Address: P.O. Box 163340 Columbus, Ohio 43216-3340
Physical Address: 23733 N. Scottsdale Rd., Suite 100, Scottsdale, AZ 85255
Phone: 888-651-6424   Fax: 614-895-7040   Website: www.centurysurety.com

Pastazios Pizza, Inc.
May 24, 2013
Page 2 of 11

harm to Ms. Doe. The Doe Action alleges you violated these duties by providing intoxicating substances to Ms. Doe and placing her in harms way. The Doe Action seeks to recover for medical expenses, pain and suffering, disfigurement, physical impairment, attorneys' fees and punitive damages.

## II. POLICY LANGUAGE

Century issued policy number CCP672836 to Named Insured, Pastazios Pizza, Inc., for the period spanning September 21, 2010 to September 21, 2011. The policy provides Commercial General Liability coverage subject to liability limits of $1,000,000 per Occurrence, $2,000,000 products completed operations limit, and $2,000,000 in the aggregate, and a deductible of $500 per claim.

Pertinent portions of the policy read as follows:

### SECTION I – COVERAGES
### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
1. **Insuring Agreement**
   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:
      **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and
      **(2)** Our right and duty to defend ends when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.
   b. This insurance applies to "bodily injury" and "property damage" only if:
      **(1)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";
      **(2)** The "bodily injury" or "property damage" occurs during the policy period; and
      **(3)** Prior to the policy period, no insured listed under Paragraph **1.** of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.

      . . . .

Pastazios Pizza, Inc.
May 24, 2013
Page 3 of 11

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

1. **Insuring Agreement**

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result. But:

      **(1)** The amount we will pay for damages is limited as described in Section III – Limits Of Insurance; and

      **(2)** Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages **A** or **B** or medical expenses under Coverage **C**.

      No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages **A** and **B**.

   b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period.

2. **Exclusions**

   This insurance does not apply to:

   a. **Knowing Violation Of Rights Of Another**

      "Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

. . . .

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as:

. . . .

   d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

   e. A trust, you are an insured. Your trustees are also insureds, but only with respect to their duties as trustees.

2. Each of the following is also an insured:

   a. Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" or "volunteer workers" are insureds for:

      **(1)** "Bodily injury" or "personal and advertising injury":

Pastazios Pizza, Inc.
May 24, 2013
Page 4 of 11

        **(a)** To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), to a co-"employee" while in the course of his or her employment or performing duties related to the conduct of your business, or to your other "volunteer workers" while performing duties related to the conduct of your business;

        **(b)** To the spouse, child, parent, brother or sister of that co-"employee" or "volunteer worker" as a consequence of Paragraph **(1)(a)** above;

        **(c)** For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs **(1)(a)** or **(b)** above; or

        **(d)** Arising out of his or her providing or failing to provide professional health care services.

    **(2)** "Property damage" to property:

        **(a)** Owned, occupied or used by,

        **(b)** Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

        you, any of your "employees", "volunteer workers", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company).

**b.** Any person (other than your "employee" or "volunteer worker"), or any organization while acting as your real estate manager.

**c.** Any person or organization having proper temporary custody of your property if you die, but only:

    **(1)** With respect to liability arising out of the maintenance or use of that property; and

    **(2)** Until your legal representative has been appointed.

**d.** Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part.

**3.** Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization. However:

**a.** Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

**b.** Coverage **A** does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

**c.** Coverage **B** does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization.

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations.

## SECTION V – DEFINITIONS

. . . .

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

Pastazios Pizza, Inc.
May 24, 2013
Page 5 of 11

CLL 1902 (03/06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**LIQUOR LIABILITY COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

In consideration of the premium charged this policy has been issued subject to the following changes, additional conditions and exclusions:

1. It is agreed that **Section I – Coverages, Coverage A Bodily Injury and Property Damage Liability, 2. Exclusions** is changed as follows:
   a. **Expected or Intended Injury** is deleted and entirely replaced by the following:
      a. **Expected or Intended Injury**

         "Bodily injury" or "property damage" expected or intended from the standpoint of any insured.

   c. **Liquor Liability** as stated in the Commercial General Liability Coverage Part and as amended in CGL 1701 is deleted in its entirety and replaced by the following:

   **Liquor Liability Exclusion**

      c. **Liquor Liability**
         "Liquor Liability" is defined as "Bodily injury" or "property damage" for which any insured may be held liable by reason of:
         a. Causing or contributing to the intoxication of any person;
         b. Furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or
         c. Violation of any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

         We have neither a duty to defend nor a duty to indemnify any insured for any claim or suit, and this insurance does not apply, if any proximate or contributing cause of an "occurrence" arises out of "liquor liability". This exclusion applies to all insureds regardless of whether you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages.
         **However this exclusion does not apply to claims within the "products-completed operations hazard".**

2. Additional exclusions:
   This insurance does not apply to:

   **Liquor License Not In Effect**
   "Bodily injury" or "property damage" arising out of any alcoholic beverage sold, served or furnished while any required license is suspended or after such license expires, is cancelled or revoked.

Pastazios Pizza, Inc.
May 24, 2013
Page 6 of 11

### Alcohol Related Disease

Mental anguish, sickness, disease or any other condition arising out of, caused by or in any way related to the use or consumption over time of alcohol, liquor or any other product containing alcohol.

3.  It is agreed that **Section I – Coverages, Coverage C. Medical Payments** is deleted in its entirety.

4.  The following is added to **SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS**

    In the event this policy is filed with any governmental entity instead of or as a replacement for a statutory or other legally required Liquor Bond, this policy will not be construed to cover or insure any requirements or obligations of such bond.

5.  LIMITS of INSURANCE

    It is a condition precedent to coverage under this endorsement that all such claims arising out of coverage granted here under are covered within and will reduce the products-completed operations aggregate limit shown in the Declarations.

All other terms and conditions of this policy remain in force.

**CGL 1701 (05/10)**

#### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

#### SPECIAL EXCLUSIONS AND LIMITATIONS ENDORSEMENT

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

A.  **In consideration of the premium charged this policy has been issued subject to the following exclusions being added to Coverages A & B:**

    This insurance does not apply to:

. . . .

4.  **Criminal Acts**
    a.  "Bodily Injury" or "property damage" arising out of or resulting from a criminal act committed by any insured, including any additional insureds or
    b.  "Bodily Injury" or "property damage" arising out of or resulting from a criminal act at the direction of any insured, including any additional insureds.

5.  **Punitive, Exemplary, Treble Damages or Multipliers of Attorneys' Fees**

    Claims or demands for payment of punitive, exemplary or treble damages whether arising from the acts of any insured or by anyone else for whom or which any insured or additional insured is legally liable; including any multiplier of attorney's fees statutorily awarded to the prevailing party.

. . . .

D.  **It is agreed that the following changes are made to SECTION V – DEFINITIONS:**

Pastazios Pizza, Inc.
May 24, 2013
Page 7 of 11

The following definitions are deleted and entirely replaced:

. . . .

3. **Item 13. "Occurrence" is deleted in its entirety and replaced with the following:**

   13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions. All "bodily injury" or "property damage" arising out of an "occurrence" or series of related "occurrences" is deemed to take place at the time of the first such damage or injury even though the nature and extent of such damage or injury may change; and even though the damage may be continuous, progressive, cumulative, changing or evolving; and even though the "occurrence" causing such "bodily injury" or "property damage" may be continuous or repeated exposure to substantially the same general harmful conditions.

4. **Item 14. "Personal and advertising injury" is deleted in its entirety and replaced with the following:**

   14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

   a. False arrest, detention or imprisonment;

   b. Malicious prosecution;

   c. The wrongful eviction from, wrongful entry into, or invasion of the right of privacy occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor; or

   d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services.

. . . .

5. **Item 17. "Property Damage" is deleted in its entirety and replaced with the following.**

   17. "Property damage" means:

   a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

   For the purposes of this insurance, electronic data is not tangible property.

   As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

   For the purposes of this insurance, "property damage" is not physical injury to tangible property, any resultant loss of use of tangible property, nor loss of use of tangible property that is not physically injured that arises out of failure to complete or abandonment of "your work".

Pastazios Pizza, Inc.
May 24, 2013
Page 8 of 11

**CGL 2146 (07/98)**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ABUSE OR MOLESTATION EXCLUSION**

This endorsement modifies insurance provided under the following:

COMMERCIAL GENERAL LIABILITY COVERAGE PART

The following exclusion is added to Paragraph **2., Exclusions** of **Section I – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**

This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of:

1.  The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

2.  The negligent:

    a.  Employment;
    b.  Investigation;
    c.  Supervision;
    d.  Reporting to the proper authorities, or failure to so report; or
    e.  Retention;

    of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph **1.** above.

While we have quoted specific portions, Century reserves its right to rely on other portions of the policy's language as well.  We encourage you to read the policy in its entirety so you are familiar with the coverage available.

## III.  CENTURY'S COVERAGE POSITION

Please refer to the Insuring Agreement for Coverage A, quoted above for easy reference. That part of the policy indicates that Century will pay those sums the Insured is held liable for as a result of "bodily injury" caused by an "occurrence" during the policy period.  While the Petition clearly contains allegations of bodily injury, we reserve the right to deny coverage under this portion of the policy to the extent that the injuries were not caused by an "occurrence" as that term is defined by the policy.

Note that the Liquor Liability Coverage Endorsement, also quoted above, removes the policy's Liquor Liability exclusion and indicates that Century will pay those sums the Insured is held liable for as a result of "bodily injury" resulting from the Insured's causing or contributing to the intoxication of any person so long as your liquor license was in effect on the date of loss. However, a number of other policy provisions may act to limit or preclude coverage entirely.

First, please note that the policy's Expected or Intended Injury exclusion will act to bar all coverage for "bodily injury" expected or intended from the standpoint of any insured. The

SUPP APP 1100

Pastazios Pizza, Inc.
May 24, 2013
Page 9 of 11

Petition clearly alleges that the injuries to Ms. Doe were the result of a series of intentional acts perpetrated by the owners and/or employees of Pastazio's. Century therefore reserves the right to limit or deny coverage pursuant to the Expected or Intended Injury exclusion.

Second, please review the policy's exclusion entitled "Abuse or Molestation Exlusion," also quoted above. That exclusion bars coverage for claims of "bodily injury" arising out of or resulting from any actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured. It further indicates that coverage is barred for claims of negligent employment, investigation, supervision, reporting to authorities or retention of a person for whom any insured is or ever was legally responsible for whose conduct included actual or threatened. The Petition centers on allegations that Mr. Deari, with the aid and assistance of Mr. Kreka, raped Ms. Doe and thereby caused a number of injuries. Century therefore reserves the right to deny all coverage pursuant to this exclusion as well.

Third, please also review the Criminal Acts exclusion quoted above. If the "bodily injury" alleged arose out of a criminal act committed by any insured or at the direction of any insured, there is no coverage for this claim. The Petition alleges that a number of crimes were committed by Mr. Deari and Mr. Kreka and we understand that criminal charges are currently pending against both. As such, Century reserves the right to limit or deny coverage pursuant to this exclusion as well.

Please also refer to the Insuring Agreement for Coverage B, also quoted above. That part of the policy indicates that Century will pay those sums the Insured is held liable for as a result of "personal and advertising injury" caused by an offense arising out of your business during the policy period. "Personal and advertising injury" is defined to include a number of offenses, including false imprisonment. As such, some coverage may be available under this portion of the policy as well. However, this part of the policy is subject to the same Criminal Acts exclusion discussed above. Century reserves its right to deny coverage pursuant to this exclusion. Additionally, the exclusion quoted above and entitled "Knowing Violation Of Rights Of Another" acts to bar coverage for claims of "personal and advertising injury" caused with the knowledge that the act would violate the rights of another. Century reserves the right to deny coverage pursuant to this exclusion as well.

Please carefully review the "Who Is An Insured" provision of your policy, also quoted above. As an organization your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Similarly, your stockholders are insureds but only with respect to their liability as stockholders. Employees are also insureds, but only for acts within the scope of their employment by you or while performing duties related to the conduct of the business. To the extent that Danny Deari and Dritan Kreka were not acting within their duties as officers or directors and were not acting within the scope of their employment with Pastazio's, they will not qualify as insureds under the policy and there may be no coverage. Century reserves the right to deny coverage for this reason as well.

Lastly, please note that the exclusion for Punitive, Exemplary Treble Damages or Multipliers' of Attorney's Fees will act to bar all coverage for any punitive damages sought. Century reserves the right to deny coverage pursuant to this exclusion.

There may be other reasons why coverage does not apply. As such, this letter should not be construed as waiving any of Century's rights under the policy, or applicable law, to limit and/or deny coverage. Century reserves the right to rely on any additional facts, policy provisions, or

Pastazios Pizza, Inc.
May 24, 2013
Page 10 of 11

other relevant information that may affect coverage to alter its position in the future. Similarly, Century does not waive its right to disclaim coverage for any other valid reason which may arise.

Century hereby specifically reserves the right to pursue a declaratory judgment action to seek an order finding no coverage. Additionally, we reserve the right to recoup any fees and expenses incurred in your defense if, in fact, no coverage is available for this claim.

## IV. **ASSIGNMENT OF DEFENSE**

As Pastazio Pizza, Inc.'s insurance carrier, Century has assigned its defense to:

Roy Stacy
Stacy & Conder, LLP
901 Main Street, Suite 6220
Dallas, TX 75202-3790
Phone: (214)748-5000
Fax: (214)748-1421
Email: stacy@stacyconder.com

We ask that Pastazios Pizza, Inc's representative(s) not discuss this matter with anyone except Mr. Stacy, someone from his law firm, or a representative from Century Insurance. We also request that Pastazios Pizza, Inc's representative(s) provide Mr. Stacy with all information and cooperation needed to fully defend it in this case. This may include, but is not limited to, the representative's assistance with responding to discovery requests and time needed to complete a deposition and attend trial, if necessary.

## V. **CONCLUSION**

Century trusts that you understand its coverage position, but if you have any questions or concerns please do not hesitate to contact us. Further, if you believe we have omitted any relevant information, or are aware of, or become aware of, any additional information that you believe could affect Century's coverage position, please contact us immediately. Century reserves its right to consider additional information and reassess its coverage position should the circumstances so warrant.

Very truly yours,

**CENTURY INSURANCE GROUP**

Shana M. Bereche
Claims Attorney

SMB/jt

Pastazios Pizza, Inc.
May 24, 2013
Page 11 of 11

cc:    Roy Stacy
       Stacy & Conder, LLP
       via email to: stacy@stacyconder.com

       The Hutson Group, Inc.
       via email to: kim@thehutsongroup.com

       RISC, Inc.
       via email to: learl@gorisc.com

| WARNING |
|---|
| "Any person who knowingly and with intent to defraud any insurance company files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties." |
| Revised 01/2013 |

# EXHIBIT F

**GRUBER I HURST I ELROD I JOHANSEN I HAIL I SHANK**

AttorneyslCounselors
A Limited Liability Partnership
1445 Ross Avenue Suite 2500
Dallas, Texas 75202-2711
214.855.6800 main
214.855.6808 fax

Trey H. Crawford
214.855-6866 (direct)
214.855-6808 (facsimile)
tcrawford@ghetrial.com

June 11, 2015

**VIA E-MAIL:**
Y.W. Peter Chen
David R. Dotson
Chen Dotson, PLLC
10455 N. Central Expressway
Suite 109-348
Dallas, Texas 75231
Email: peter@chendotson.com
       david@chendotson.com

Re:   *Jane Doe v. Pastazios Pizza, Inc., et al.*, Dallas County, TX Cause No. DC-13-
      04564
      Century's Insured — Pastazios Pizza, Inc. ("Pastazios")
      Century's Policy No. — CCP672836
      Century's Claim No. — 01-088675

**CONFIDENTIAL SETTLEMENT COMMUNICATION PER TEX. R. EVID. 408**

Dear Mr. Chen and Mr. Dotson:

Pursuant to TEX. R. EVID. 408 and FED. R. EVID. 408, please be advised that this letter is intended to be, and should only be treated as, an inadmissible and confidential settlement communication.

I write you on behalf of my client, Plaintiff Jane Doe (hereinafter, "Plaintiff"), in the above-entitled action (hereinafter, "Litigation"). As you know, Plaintiff has asserted various causes of action against Pastazios including, negligence, dram shop liability, premises liability, and false imprisonment. The factual and legal basis for these claims is more fully set forth in Plaintiff's Fourth Amended Petition that was filed in the Litigation on June 5, 2015.

As you are aware Pastazios is an "insured" under the "Commercial Lines Policy, CCP672836" (hereinafter, "Policy") between Century and Pastazios. Plaintiff has been demanding tender of the policy limits under the Policy in exchange for a full and final release of all "insured(s)" under the Policy since as early as July 29, 2013. Specifically, Plaintiff "stowerized" Century and its insureds on July 29, 2013 and again on February 27, 2014. Plaintiff even invited Century to participate in the

June 11, 2015
Page - 2

mediation of this Litigation in Plaintiff's correspondence dated June 24, 2014. It is our understanding that Century has (wrongfully) denied coverage and even denied a defense of the claims filed against Pastazios in this case in a blatant and bad faith breach of Century's obligations under the Policy. Moreover, Century refused to even participate in the mediation of this Litigation, despite the fact that its insured's liability and coverage has been reasonably clear since the inception of the Litigation.

This letter is Plaintiff's final attempt for Pastazios and its insurer to accept responsibility for Pastazios' negligent and grossly negligent acts and omissions that were a proximate cause of Plaintiff's significant damages and serious bodily injuries arising out of the events of April 26, 2011.

As has been previously communicated to Pastazios and its insurer, and as more fully set forth in Plaintiff's Fourth Amended Petition, liability against Century's insured(s) is reasonably clear and, indeed, liability has only become clearer as discovery in this Litigation has unfolded over the last several years. Moreover, Plaintiff's damages and serious bodily injuries arising out of Pastazios' negligent and grossly negligent acts and omissions far exceed the policy limits under the Policy.

Pursuant to *G.A. Stowers Furniture v. The American Indemnity Company*, 15 S.W.2d 544 (Tex. Comm. App. 1929, holding approved) and TEX. INS. CODE § 541.060(a)(2)(A), Plaintiff once again demands payment of the policy limits under the Policy in exchange for a full and final release of liability of all claims and causes of action, known or unknown, asserted or yet to be asserted, by Plaintiff against Century's insured(s), including Pastazios. This includes a full and final release from liability for any and all of Plaintiff's hospital or medical liens as a result of the incident that forms the basis of Plaintiff's claims in the Litigation.

Tender of the policy limits under the Policy shall be made payable to "Gruber Hurst Elrod Johansen Hail Shank LLP, on behalf of Plaintiff Jane Doe in Case No. DC13-04564". This offer shall expire and automatically be revoked at **5:01 p.m. CST on Monday, June 22, 2015.** If tender of the policy limits under the Policy is not received by this time, there will be no further settlement discussions and Plaintiff shall proceed to trial on July 7, 2015 and obtain a final judgment against Pastazios in an amount that far exceeds the policy limits under the Policy.

If you have any questions or comments regarding Plaintiff's final offer, please do not hesitate to contact me directly at tcrawford@ghetrial.com or (214) 855-6866.

Sincerely,

Trey H. Crawford

June 11, 2015
Page - 3

cc:     <u>**VIA E-MAIL**</u>:
        Scott M. Seidel as Trustee for
        Pastazios Pizza, Inc., Creditor Trust
        c/o Davor Rukavina
        Thomas Berghman
        Munsch Hardt Kopf & Harr, P.C.
        Email: <u>drukavina@munsch.com</u>
               <u>tberghman@munsch.com</u>

SUPP APP 1107

# EXHIBIT G

538L

000352

Cause Number: DC-13-04564

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd JUDICIAL DISTRICT COURT |
| | § | |
| PASTAZIOS PIZZA, INC.; and | § | |
| AJREDIN "DANNY" DEARI, | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## <u>FINAL JUDGMENT</u>

On July 7, 2015, the Court called this case to trial. Plaintiff JANE DOE ("Plaintiff") appeared personally and through her attorneys of record and announced ready for trial. Defendant PASTAZIOS PIZZA, INC. ("PASTAZIOS") appeared through its corporate representative and attorneys of record and announced ready for trial. Defendant AJREDIN "DANNY" DEARI ("DEARI"), individually, appeared personally and through his attorney of record and announced ready for trial. All parties agreed to try this case to the bench in front of Honorable Carl Ginsberg and all three parties proceeded accordingly.

On July 7, 2015, Plaintiff began her case in chief, introduced and admitted evidence to the Court, and called various witnesses to testify. Pastazios and Deari defended the claims brought by the Plaintiff against each Defendant, respectively, presented counter-evidence, and cross examined witnesses. On July 9, 2015, after a three-day adversarial trial, all parties rested, the evidence was closed, and all parties presented closing arguments to the Court. At the close of the evidence and closing arguments, Plaintiff's claims against Pastazios and Deari, respectively, as well as Defendants' affirmative defenses were submitted to the Court for final determination based on the evidence presented by all parties at trial.

---

**FINAL JUDGMENT** PAGE 1 OF 3

Having heard the evidence and closing arguments from all counsel of record, the Court announced its decision on the record.

It is, therefore, ORDERED as follows:

1.      Plaintiff shall have and recover from PASTAZIOS and DEARI, jointly and severally, the following actual damages, which the Court finds are recoverable under Texas law and are supported by the evidence presented at trial:

| | |
|---|---|
| a. Physical pain and mental anguish (past) = | $2,000,000.00 |
| b. Physical pain and mental anguish (future) = | $5,000,000.00 |
| c. Loss of earnings capacity (past) = | $500.00 |
| d. Loss of earnings capacity (future) = | $1,300,000.00 |
| e. Disfigurement (past) = | $250,000.00 |
| f. Disfigurement (future) = | $500,000.00 |
| g. Physical Impairment (past) = | $2,000,000.00 |
| h. Physical Impairment (future) = | $5,000,000.00 |
| i. Reasonable and necessary medical care expenses (past) = | $6,836.83 |
| j. Reasonable and necessary medical care expenses (future) = | $375,000.00 |
| **TOTAL =** | **$16,432,336.83;** |

2.      Plaintiff shall have and recover from PASTAZIOS and DEARI, jointly and severally, pre-judgment interest on the above-referenced damages in the past only in the amount of $478,804.59, calculated as simple interest at the rate of 5% per annum from April 24, 2013 until July 24, 2015 (821 days) plus an additional $583.20 per day in pre-judgment interest from July 25, 2015 until the day before this Final Judgment is signed;

---

**FINAL JUDGMENT**                                                          PAGE 2 OF 3

SUPP APP 1110

3.      Plaintiff shall have and recover from PASTAZIOS $2,500,000.00 in exemplary damages, which the Court finds are recoverable under Texas law and are supported by clear and convincing evidence presented at trial;

4.      Plaintiff shall have and recover from DEARI $2,500,000.00 in exemplary damages, which the Court finds are recoverable under Texas law and are supported by clear and convincing evidence presented at trial;

5.      Post-judgment interest shall be awarded on all sums awarded to Plaintiff at the rate of 5% per annum, compounded annually, from and after the date of this Final Judgment until it is satisfied in full;

6.      Plaintiff shall have and recover all of her costs of court in the amount of $6,484.28 from PASTAZIOS and DEARI, jointly and severally; and

7.      All writs and processes necessary or appropriate for the enforcement or collection of this Final Judgment or the costs of court may be issued as necessary.

All relief not expressly granted herein is denied. This Final Judgment finally disposes of all claims and all parties and is an appealable final judgment.

Signed this 27th day of July, 2015.

_____
Honorable Carl Ginsberg, District Judge
193rd Judicial District Court

---

**FINAL JUDGMENT**                                                     PAGE 3 OF 3

# EXHIBIT H

SUPP APP 1112

358L
000498

Cause Number: DC-13-04564

| | | |
|---|---|---|
| JANE DOE, | § | IN THE DISTRICT COURT |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | 193rd JUDICIAL DISTRICT COURT |
| | § | |
| PASTAZIOS PIZZA, INC.; and | § | |
| AJREDIN "DANNY" DEARI, | § | |
| | § | |
| *Defendants.* | § | DALLAS COUNTY, TEXAS |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case was originally filed by Plaintiff on April 24, 2013. On July 7, 2015, the Court called this case to trial. Plaintiff JANE DOE ("Plaintiff") appeared personally and through her attorneys of record and announced ready for trial. Defendant PASTAZIOS PIZZA, INC. ("Pastazios") appeared through its corporate representative and attorneys of record and announced ready for trial. Defendant AJREDIN "DANNY" DEARI ("Deari"), individually, appeared personally and through his attorney of record and announced ready for trial. The parties agreed to try this case to the bench in front of Honorable Carl Ginsberg and all three parties proceeded accordingly.

On July 7, 2015, Plaintiff began her case in chief, introduced and admitted evidence to the Court, and called various witnesses to testify. Pastazios and Deari vigorously defended the claims brought by the Plaintiff against each Defendant, respectively, presented counter-evidence, and cross examined witnesses. On July 9, 2015, after a three-day adversarial trial, all parties rested, the evidence was closed, and closing arguments were presented by all parties. At the close of the evidence and after closing arguments, Plaintiff's claims against Pastazios and Deari, respectively, as well as Defendants' affirmative defenses were submitted to the Court for final determination based on the evidence. Having heard the evidence and closing arguments from all

SUPP APP 1113

counsel of record, the Court hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.      In April 2011, Plaintiff was a recent graduate from high school. Plaintiff excelled in school academically, graduating as the valedictorian of her high school class. As of April 26, 2011, Plaintiff was an employee of Fox Sports Grill and was in the process of seeking another job in the same industry that would provide her with more income.

2.      On the afternoon of April 26, 2011, Plaintiff met Dritan Kreka at Back Nine Bar and Grill to discuss potential job opportunities at his restaurant and bar. When she arrived at Back Nine, Plaintiff was introduced to Deari, who was the owner of another restaurant— Defendant Pastazios Pizza—located in Post Addison Circle. At the time, Deari was 49 years old and Kreka was 33 years old. Shortly thereafter, Deari and Kreka convinced Plaintiff that the three of them should move the conversation to Pastazios. At no point in time on April 26, 2011 was Plaintiff interviewing for or seeking a job at Pastazios. Prior to their arrival, Deari stopped at a liquor store and purchased a bottle of 80-proof hard liquor (Crown Royal Black) and took it with him and brought it into Pastazios.

3.      Plaintiff was an invitee of Pastazios. Upon arriving at Pastazios at approximately 4:30pm, and without Plaintiff asking, Deari walked inside of Pastazios, grabbed three beers and three shots of Crown Royal Black that had been placed into 2-ounce plastic salad dressing cups owned by Pastazios, placed one of the beers and one of the 2-ounce shots in front of Plaintiff, and encouraged her to drink it. Prior to that day, Plaintiff had very little experience concerning the effects of alcohol. At no point in time did anyone at Pastazios ask to see Plaintiff's identification prior to providing her with Pastazios' alcoholic products. Throughout the course of approximately the next two hours, Pastazios continued to provide Plaintiff with more alcoholic

FINDINGS OF FACT AND CONCLUSIONS OF LAW                              PAGE 2 OF 16

SUPP APP 1114

products from Pastazios. After serving Plaintiff with her second beer from Pastazios and third 2-ounce shot of Crown Royal Black, Plaintiff became obviously intoxicated to the point where she had trouble standing. In total, Plaintiff was provided with at least five 2-ounce shots of Crown Royal Black and three beers.

4.      While still at Pastàzios, Plaintiff expressed concerns about her growing level of intoxication and her inability to function normally. Prior to leaving Pastazios, Plaintiff was intoxicated to the point where she was incapable of caring for or defending herself. Deari then retrieved his vehicle from Pastazios' parking lot and pulled it out in front of Pastazios. Kreka moved into the driver's seat and the two men put Plaintiff in the back seat of the vehicle. Plaintiff lost consciousness shortly thereafter.

5.      Plaintiff's next memory is vomiting in what she believed to be a gas station parking lot before losing consciousness again. When Plaintiff regained consciousness she was in a hotel room located at 4900 Edwin Lewis Drive, Addison, Texas 75001 (less than a mile from Pastazios) wherein she had been involuntarily disrobed and was actively being sexually assaulted by Deari. Plaintiff repeatedly insisted that Deari stop the attack and get off of her, but he did not. Deari stopped the sexual assault after multiple demands made by Plaintiff. Plaintiff locked herself in the bathroom. Deari then left the hotel leaving his underwear behind at the scene.

6.      Plaintiff called a friend to report what had happened and the Addison Police were dispatched to the scene. Plaintiff was immediately transmitted to the hospital and underwent a series of examinations, tests, and administered massive quantities of drugs.

7.      Within a matter of days following the sexual assault, Plaintiff went back to the hospital after she experienced severe pain in her pubic region. The doctors informed Plaintiff that she had contracted herpes during the assault.

SUPP APP 1115

8.     To the extent necessary, each of these findings of fact shall be treated as a conclusion of law.

## CONCLUSIONS OF LAW

### GENERAL NEGLIGENCE (DEFENDANT PASTAZIOS ONLY)

1.     Pastazios owed Plaintiff various legal duties that Pastazios breached, thereby proximately causing Plaintiff damages and serious bodily injuries. Based upon the evidence presented at trial concerning the facts and circumstances surrounding the occurrence, the Court hereby finds the following:

a. Based upon the special relationship between Plaintiff, an invitee to Pastazios' premises, Pastazios owed Plaintiff a duty pursuant to Restatement of Torts § 314A to protect her against unreasonable risks of harm, as well as to render aid and care until she could be cared for by others;

b. Pastazios owed Plaintiff a legal duty created under Restatement of Torts § 318 to exercise reasonable care so as to control the conduct of its customers and invitees from harming others, including Plaintiff;

c. Pastazios had the right, ability and responsibility to control the conduct occurring on its premises, knew or had reason to know of the necessity of taking appropriate action to prevent foreseeable harm to its invitees, including Plaintiff, had the opportunity to prevent such foreseeable harm, yet consciously chose not to intervene;

d. Pastazios owed a legal duty to Plaintiff pursuant to Restatement of Torts § 319 to prevent tortfeasors from committing torts on its premises which it had the right and ability to control and prevent;

e. Pastazios owed Plaintiff a legal duty to exercise reasonable care so as to control its employees, representatives and agents' actions and inactions while on Pastazios' premises to prevent them from causing bodily injury or otherwise harming others, including Plaintiff;

f. Pastazios owed Plaintiff a legal duty to follow the applicable legal standard of care in maintaining its premises in a safe and secure condition and to inspect the premises to ensure the safety of its occupants from foreseeable risks of harm;

g. Pastazios owed Plaintiff a legal duty to take reasonable steps to protect Plaintiff from unreasonable and foreseeable risks of harm—including risks of harm from

SUPP APP 1116

criminal or grossly negligent acts of third parties;

h. Pastazios owed Plaintiff a duty not to injure Plaintiff in a grossly negligent manner or allow another to do so on Pastazios' premises when it knew, or reasonably should have known of an unreasonable risk of harm to its invitees, including Plaintiff;

i. Pastazios owed Plaintiff a legal duty to treat its invitees, including Plaintiff, in a manner that would not unreasonably subject her to physical or mental bodily injury, or other unreasonable and foreseeable risks of harm; and

j. In light of the risks of unreasonable harm present on April 26, 2011, the foreseeability of such risks of harm, and the likelihood of bodily injury to Plaintiff—weighed against the social utility of Pastazios' actions and inactions and the minimal burden of Pastazios in guarding against such foreseeable and unreasonable risks of harm, Pastazios owed Plaintiff a legal duty to use ordinary care in the hiring of competent employees, a duty to reasonably train its employees, and a duty to use ordinary care in supervising its employees.

2. On April 26, 2011, Pastazios breached each one of the duties set forth in Paragraph 1, above. Further, on April 26, 2011, Pastazios negligently put Plaintiff in harm's way; Pastazios negligently allowed tortfeasors to use Pastazios' premises and property as instrumentalities in committing torts inflicted upon Plaintiff causing her serious bodily injury; Pastazios failed to exercise ordinary care by allowing third parties to furnish Plaintiff with excessive amounts of alcohol to the point where she was virtually unconscious and lacking the ability to protect herself from unreasonable and foreseeable risks of serious bodily injury; Pastazios failed to exercise ordinary care by negligently monitoring agents and third-parties on its premises; Pastazios failed to exercise ordinary care by not taking reasonable steps to render aid and care for Plaintiff until such time as she could reasonably be expected to be cared for by herself or by others; Pastazios failed to exercise ordinary by not contacting a taxi, a friend, or Plaintiff's parents who would be able to ensure that Plaintiff was taken out of harm's way when she was clearly incapable of doing so herself due to the state Pastazios allowed her to be in prior to leaving the premises; Pastazios failed to exercise ordinary care by negligently monitoring the

SUPP APP 1117

premises to ensure her safety and security when, under the circumstances existing at the time, she was clearly within the zone of foreseeable and unreasonable risks of harm; Pastazios failed to exercise ordinary care by negligently monitoring and controlling the conduct of its other customers and invitees while they were on Pastazios' premises and/or under Pastazios' control, and knew or had reason to know of the necessity of taking appropriate action to prevent foreseeable and unreasonable risks of harm to Plaintiff; Pastazios failed to exercise ordinary care by not controlling its employees, representatives and agents' actions and inactions while on Pastazios' premises (regardless of whether said individuals were acting in the course and scope of their employment with Pastazios) to prevent them from causing bodily injury to others, including Plaintiff, when such risks were readily apparent under the circumstances existing at the time; Pastazios failed to exercise ordinary care by not maintaining its premises in a safe and secure condition and by not exercising ordinary care in inspecting the premises to ensure the safety of its occupants, including Plaintiff, from foreseeable risks of harm; Pastazios failed to exercise ordinary care by not taking reasonable steps to protect its invitees, including Plaintiff, from unreasonable and foreseeable risks of harm—including risks of harm from the criminal or grossly negligent acts of third parties; Pastazios failed to exercise ordinary care by not treating its invitees, including Plaintiff, in a manner that would not unreasonably subject her to physical or mental bodily injury, or other unreasonable and foreseeable risks of harm; and Pastazios failed to exercise ordinary care by not hiring competent employees, by not reasonably training them, and by not reasonably supervising them.

3.    Pastazios' breaches set forth in Paragraph 2 above constitute gross negligence on the part of Pastazios because, when viewed objectively from the standpoint of Pastazios at the time of their occurrence, involved an extreme degree of risk, considering the probability and

SUPP APP 1118

magnitude of the potential harm to others, including Plaintiff, and of which Pastazios had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff.

4.  Pastazios' breaches of its legal duties set forth in Paragraphs 1-2 above were a proximate cause of serious bodily injuries to Plaintiff and the damages set forth in Paragraph 31, below. Further, but for such breaches of Pastazios' legal duties, Plaintiff never would have suffered the serious bodily injuries and damages set forth in Paragraph 31, below. Additionally, Pastazios' breaches set forth in Paragraphs 1-2, above, were a substantial factor in causing Plaintiff's damages and bodily injuries, without which such damages and bodily injury would not have occurred. Under the circumstances that existed at the time, a restaurant operator of ordinary prudence would have reasonably anticipated the dangers that Pastazios' negligent acts and omissions created for others, including Plaintiff, as well as the general character of the damages and bodily injuries Plaintiff suffered as a proximate cause of said negligence. As such, Plaintiff's bodily injuries and the damages found in Paragraph 31 below, all arose out of Pastazios' negligence on April 26, 2011.

5.  Any alleged intentional or negligent acts of any other person or Defendant that may have caused or contributed to cause Plaintiff's injuries did not act to extinguish Pastazios' liability for its own negligence, do not constitute an "outside agency," and are not a new and independent cause that would extinguish Pastazios' liability. Any purported acts or intervening forces Pastazios alleged to have been a "new and independent cause" were foreseeable to Pastazios under the circumstances that existed at the time and, as such, the chain of causation flowing from Pastazios' negligence was continuous and unbroken.

6.  All of Plaintiff's bodily injuries and the damages awarded in Paragraph 31 below,

SUPP APP 1119

were a proximate cause and arose out of Pastazios' breaches of its legal duties owed to Plaintiff—without which, Plaintiff never would have been injured.

**DRAM SHOP LIABILITY (DEFENDANT PASTAZIOS ONLY)**

7.     As of April 26, 2011, Pastazios held a valid Texas Alcoholic Beverage Commission license for the sale, service or provision of alcoholic goods or products to its customers and invitees.

8.     On April 26, 2011, Pastazios provided alcohol products to Plaintiff on Pastazios' premises while it was apparent to Pastazios that Plaintiff was obviously intoxicated. All of the alcoholic products provided to and consumed by Plaintiff, on April 26, 2011, occurred on Pastazios' premises and were products that were sold, handled, distributed and/or disposed of by Pastazios to the Plaintiff. As such, Pastazios was a "provider" pursuant to TEXAS ALCOHOLIC BEVERAGE CODE § 2.02(b).

9.     On April 26, 2011, Pastazios sold, served, provided, or otherwise distributed multiple alcoholic products to Plaintiff when, at the time, it was readily apparent to Pastazios that Plaintiff was already obviously intoxicated to the extent that it was readily apparent that Plaintiff presented a clear danger to herself and others.

10.     Plaintiff's intoxication—as a result of the provision and/or distribution of alcoholic products by Pastazios—was a proximate cause of Plaintiff's bodily injuries and the damages awarded in Paragraph 31 below. But for Plaintiff's intoxication due to the negligence of Pastazios, Plaintiff would not have suffered the serious bodily injuries and damages awarded in Paragraph 31 below. Pastazios' provision and/or distribution of alcoholic products to Plaintiff while she was obviously intoxicated was a substantial factor in bringing about the damages and bodily injuries that Plaintiff sustained and without which no harm would have been incurred by

SUPP APP 1120

Plaintiff. A restaurant of ordinary prudence should have anticipated the dangers that its negligent acts created for others, including Plaintiff, and would reasonably anticipate the general character of the bodily injury suffered by Plaintiff that arose out of such negligence. As such, on April 26, 2011, Pastazios violated Section 2.02(b) of the TEXAS ALCOHOL & BEVERAGE CODE, and as a proximate cause of Pastazios' violation, Plaintiff sustained bodily injuries away from the premises and the damages awarded in Paragraph 31, below.

11. Any alleged acts of any other person or other Defendant do not extinguish or diminish any of Pastazios' liability for its own negligence, do not constitute an "outside agency," and are not a new and independent cause that would extinguish or diminish Pastazios' liability. Any purported acts or intervening forces Pastazios alleges to be a "new and independent cause" do not extinguish or diminish Pastazios' liability because such acts were foreseeable to Pastazios under the circumstances that existed at the time, and the chain of causation flowing from Pastazios' negligence was continuous and unbroken.

12. All of Plaintiff's bodily injuries and the damages awarded in Paragraph 31 below, were proximately caused by, and arose out of, Pastazios' violations of Section 2.02(b) of the TEXAS ALCOHOL & BEVERAGE CODE without which, Plaintiff never would have been injured.

**NEGLIGENCE – PREMISES LIABILITY (DEFENDANT PASTAZIOS ONLY)**

13. On April 26, 2011, Pastazios exercised actual and contractual control over the premises, including the patio area where Plaintiff was sitting on the occurrence in question. Plaintiff was not on a job interview with Pastazios at the time of the occurrence in question, but rather was an invitee of Pastazios. As such, Pastazios owed Plaintiff a legal duty to avoid risks of harm that are unreasonable and foreseeable. Pastazios also owed Plaintiff a legal duty to inspect and make safe any dangerous conditions or situations on Pastazios' premises or give Plaintiff an

SUPP APP 1121

adequate warning of the dangerous conditions or situations. Based on the frequency, similarity, proximity, recency, and publicity of prior crimes in the immediate vicinity of Pastazios, as well as the general nature and characteristics of the premises and the surrounding circumstances, the general nature of the harm inflicted on Plaintiff on April 26, 2011 was reasonably foreseeable to Pastazios.

14.     Pastazios breached its legal duties owed to Plaintiff set forth in Paragraph 13 above, by failing to exercise ordinary care by, and by failing to take any reasonable steps to protect its invitees, including Plaintiff, from unreasonable and foreseeable risks of harm, including risks of harm from the criminal or grossly negligent acts of third parties.

15.     The breaches set forth in Paragraph 14 above, constitute gross negligence on the part of Pastazios because, when viewed objectively from the standpoint of Pastazios at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and of which Pastazios had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff.

16.     Pastazios' breaches of these legal duties were a proximate cause of serious bodily injuries and damages to Plaintiff in the amounts awarded in Paragraph 31 below. But for these breaches, Plaintiff never would have suffered serious bodily injuries and never would have sustained the damages awarded to Plaintiff in Paragraph 31 below. Pastazios' acts and omissions were a substantial factor in causing Plaintiff's serious bodily injuries and the damages awarded to Plaintiff herein. Under the circumstances that existed at the time, a restaurant of ordinary prudence would have reasonably anticipated the dangers Pastazios' negligent acts and omissions created for others, including Plaintiff, as well as the general character of the damages and bodily

SUPP APP 1122

injuries Plaintiff suffered as a result of such negligence. As such, Plaintiff's bodily injuries and the damages awarded to Plaintiff in Paragraph 31 below all arose out Pastazios' negligent acts and omissions.

17.    Any alleged acts of any other person or other Defendant do not extinguish or diminish any of Pastazios' liability for its own negligence for premises liability, do not constitute an "outside agency," and are not a new and independent cause that would extinguish or diminish Pastazios' liability. Any purported acts or intervening forces Pastazios alleges to be a "new and independent cause" do not extinguish or diminish Pastazios' premises liability because such acts were foreseeable to Pastazios under the circumstances that existed at the time, and the chain of causation flowing from Pastazios' negligence was continuous and unbroken.

FALSE IMPRISONMENT/DETENTION (DEFENDANT PASTAZIOS ONLY)

18.    Without legal authority or justification, Pastazios negligently detained and/or imprisoned Plaintiff without Plaintiff's consent and without the authority of law.  Pastazios accomplished the detainment and/or imprisonment of Plaintiff by virtue of providing her with intoxicating products handled and/or distributed by Pastazios to Plaintiff to the point where Plaintiff was virtually unconscious and/or incapable of freely moving herself from one place to another. Pastazios' detention of Plaintiff was without Plaintiff's consent, and placed her in a position where she could not exercise her will in going where she could otherwise lawfully go. Pastazios' actions, combined with Plaintiff's vulnerabilities and the circumstances surrounding these events, had the effect of negligently detaining Plaintiff in a manner that proximately caused Plaintiff to suffer serious bodily injuries and the damages awarded in Paragraph 31 below, all of which arose out of such detainment.

19.    The false imprisonment and detainment committed by Pastazios was a proximate

SUPP APP 1123

cause of the serious bodily injury suffered by Plaintiff as well as all of the damages awarded to Plaintiff in Paragraph 31 below. But for Pastazios' false imprisonment and detainment, Plaintiff never would have sustained series bodily injuries and the damages awarded in Paragraph 31.

20. Any alleged acts of any other person or other Defendant do not extinguish or diminish any of Pastazios' liability for false imprisonment and detainment, do not constitute an "outside agency," and are not a new and independent cause that would extinguish or diminish Pastazios' liability. Any purported acts or intervening forces Pastazios alleges to be a "new and independent cause" do not extinguish or diminish Pastazios' liability for false imprisonment and detainment because such acts were foreseeable to Pastazios under the circumstances that existed at the time, and the chain of causation flowing from Pastazios' false imprisonment and detainment was continuous and unbroken.

ASSAULT – THREAT OF BODILY INJURY (DEFENDANT DEARI, INDIVIDUALLY, ONLY)

21. On April 26, 2011, Deari, individually, and while acting outside of the course and scope of his employment with Pastazios, intentionally and/or knowingly threatened Plaintiff with imminent bodily injury. Deari's threat of imminent bodily injury to Plaintiff caused Plaintiff to be apprehensive, which was a foreseeable result of Deari's actions.

22. Deari is liable for the threat of bodily injury committed against Plaintiff because Deari committed the tortious acts himself and did so while he was not acting in the course and scope of his employment with Pastazios, and while Deari was not acting in fulfillment of any of his duties as an executive, officer or director of Pastazios.

23. Deari's threat of imminent bodily injury to Plaintiff was a cause of the damages awarded to Plaintiff herein.

24. Deari's liability for assault was not a result of any actions or omissions made at

SUPP APP 1124

the direction of Pastazios, but rather resulted from Deari's individual conduct that was separate and distinct from Pastazios' negligent conduct.

## ASSAULT (BATTERY)—BODILY INJURY AND OFFENSIVE CONTACT (DEFENDANT DEARI, INDIVIDUALLY, ONLY)

25.    On April 26, 2011, Deari, individually, and while acting outside of the course and scope of his employment with Pastazios, committed an aggravated assault of Plaintiff away from Pastazios' premises in violation of TEX. PENAL CODE §§ 22.01. Deari, individually, intentionally, knowingly, and/or recklessly made physical contact with Plaintiff's person causing bodily injury—that is, physical pain, sickness, or impairments of Plaintiff's physical condition—and Plaintiff did not, and could not, legally consent to the harmful physical contact.

26.    Deari's violation of TEX. PENAL CODE §§ 22.01 was a cause of the damages awarded to Plaintiff herein.

27.    Deari violated TEX. PENAL CODE §§ 22.01 in his individual capacity while not acting in the course and scope of his employment with Pastazios, and while not acting in fulfillment of any of his duties as an executive, officer or director of Pastazios. Deari's liability for assault and battery was not a result of any actions or omissions made at the direction of Pastazios, but rather resulted from Deari's individual conduct that was separate and distinct from Pastazios' negligent conduct.

## SEXUAL ASSAULT—TEX. PENAL CODE § 22.011 (DEFENDANT DEARI, INDIVIDUALLY, ONLY)

28.    On April 26, 2011, Deari, individually, and while acting outside of the course and scope of his employment with Pastazios, sexually assaulted Plaintiff away from Pastazios' premises in violation of TEX. PENAL CODE §§ 22.011. On April 26, 2011, Deari, individually, intentionally, knowingly, and/or recklessly sexually assaulted Plaintiff, and Plaintiff did not, and could not, legally consent to the sexual contact. Deari, individually, did so when Plaintiff had

---

FINDINGS OF FACT AND CONCLUSIONS OF LAW                    PAGE 13 OF 16

SUPP APP 1125

not consented and when Deari knew Plaintiff was unconscious or physically unable to resist, and did so while Deari knew Plaintiff was unaware that the sexual assault was occurring.

29.    Deari's violation of TEX. PENAL CODE §§ 22.011 was a cause of the damages awarded to Plaintiff herein.

30.    Deari violated TEX. PENAL CODE §§ 22.011 in his individual capacity while not acting in the course and scope of his employment with Pastazios, and while not acting in fulfillment of any of his duties as an executive, officer or director of Pastazios. Deari's liability for sexual assault was not a result of any actions or omissions made at the direction of Pastazios, but rather resulted from Deari's individual conduct that was separate and distinct from Pastazios' negligent conduct found above.

**DAMAGES (EXCLUDING COURT COSTS AND PRE-JUDGMENT INTEREST)**

31.    Plaintiff sustained each of the following categories and amounts of damages, which are recoverable under Texas law and are supported by a preponderance of the evidence:

| | |
|---|---|
| a. Physical pain and mental anguish (past) = | $2,000,000.00 |
| b. Physical pain and mental anguish (future) = | $5,000,000.00 |
| c. Loss of earnings capacity (past) = | $500.00 |
| d. Loss of earnings capacity (future) = | $1,300,000.00 |
| e. Disfigurement (past) = | $250,000.00 |
| f. Disfigurement (future) = | $500,000.00 |
| g. Physical Impairment (past) = | $2,000,000.00 |
| h. Physical Impairment (future) = | $5,000,000.00 |
| i. Reasonable and necessary medical care expenses (past) = | $6,836.83 |
| j. Reasonable and necessary medical care expenses (future) = | $375,000.00 |

SUPP APP 1126

TOTAL =                                                                    $16,432,336.83

32.    Each category and amount of damage set forth in Paragraph 31 above is recoverable by Plaintiff for each and every cause of action that is the subject of these Findings of Facts and Conclusions of Law.  Plaintiff is entitled to recover from Pastazios and Deari, jointly and severally, each category and each amount of the actual damages set forth in Paragraph 31.

33.    In addition to the damages set forth in Paragraph 31 above, Plaintiff shall have and recover from Defendant Pastazios $2,500,000.00 in exemplary damages which the Court finds is recoverable under Texas law and is supported by clear and convincing evidence presented at trial.

34.    In addition to the damages set forth in Paragraph 31 above, Plaintiff shall have and recover from Defendant Deari $2,500,000.00 in exemplary damages which the Court finds is recoverable under Texas law and is supported by clear and convincing evidence presented at trial;

### PRE-JUDGMENT INTEREST, POST JUDGMENT INTEREST, AND COURT COSTS

35.    Plaintiff is entitled to recover from Defendants, jointly and severally, pre-judgment interest on the above referenced damages in the past in the amount of $478,804.59, calculated as simple interest at a rate of five-percent (5%) per annum from April 24, 2013 through July 24, 2015 (821 days) plus an additional $583.20 per day in pre-judgment interest from July 25, 2015 until the day before this Final Judgment is signed.

36.    Plaintiff is entitled to recover post judgment interest from Defendants, jointly and severally, on all sums at the rate of 5% per annum, compounded annually, from and after the date the Final Judgment is signed until it is satisfied in full.

SUPP APP 1127

37.    Plaintiff shall have and recover all of her costs of court from Defendants, jointly and severally.

38.    To the extent necessary, each of these conclusions of law shall be treated as a finding of fact.

Signed on this the 7th day of August, 2015.

Honorable Carl Ginsberg
193rd Judicial District Court

# Exhibit 6

SUPP APP 1129

# U.S. Bankruptcy Court
## Northern District of Texas (Dallas)
### Bankruptcy Petition #: 14-34323-hdh13

*Date filed:* 09/02/2014
*Date Plan Confirmed:* 03/09/2015
*Plan confirmed:* 03/09/2015
*341 meeting:* 10/20/2014
*Deadline for filing claims:* 01/20/2015

*Assigned to:* Harlin DeWayne Hale
Chapter 13
Voluntary
Asset

*Debtor*
**Danny Deari**
15750 Spectrum Drive #2211
Addison, TX 75001
DALLAS-TX
SSN / ITIN: xxx-xx-2928
*aka* **Ajredin Deari**

represented by **Joyce W. Lindauer**
Joyce W. Lindauer Attorney,
PLLC
12720 Hillcrest Road
Suite 625
Dallas, TX 75230
(972) 503-4033
Fax : (972) 503-4034
Email: joyce@joycelindauer.com
*TERMINATED: 11/03/2014*

**Gregory Wayne Mitchell**
The Mitchell Law Firm, L.P.
12720 Hillcrest Road
Suite 625
Dallas, TX 75230
972-463-8417
Fax : 972-432-7540
Email: greg@mitchellps.com

*Trustee*
**Thomas Powers**
125 E. John Carpenter Frwy., Suite 1100
Irving, TX 75062-2288
214-855-9200

represented by **Thomas Dwain Powers4**
125 E. John Carpenter Frwy.,
Suite 1100
Irving, TX 75062-2288
(214) 855-9200
Fax : (214) 965-0758
Email: cmecf@dallasch13.com

*U.S. Trustee*
**United States Trustee**
1100 Commerce Street
Room 976
Dallas, TX 75242
214-767-8967

| Filing Date | Docket Text |
|---|---|
| | |

SUPP APP 1130

| 09/02/2014 | 1 (13 pgs) Chapter 13 voluntary petition. Fee Amount $310. Filed by Danny Deari (Lindauer, Joyce) |
|---|---|
| 09/02/2014 | 3 (1 pg) Certificate of credit counseling dated 8/31/2014 . Filed by Debtor Danny Deari. (Lindauer, Joyce) |
| 09/02/2014 | 4 (2 pgs) First Meeting of Creditors with 341(a) meeting to be held on 10/20/2014 at 08:30 AM at Dallas Ch13 Ofc. Proof of Claim due by 01/20/2015. (Admin, ) (autoassign) |
| 09/03/2014 | 5 (2 pgs) Notice of deficiency. Schedule A due 9/16/2014. Schedule B due 9/16/2014. Schedule C due 9/16/2014. Schedule D due 9/16/2014. Schedule E due 9/16/2014. Schedule F due 9/16/2014. Schedule G due 9/16/2014. Schedule H due 9/16/2014. Schedule I due 9/16/2014. Schedule J due 9/16/2014. Summary of Schedules and Statistical Summary of Certain Liabilities and Related Data 28 USC sec. 159 due 9/16/2014. Statement of Financial Affairs due 9/16/2014.Statement of Income/Means Test Form due 9/16/2014. Chapter 13 Plan due by 9/16/2014. Employee Income Records due 9/16/2014. (Rueter, Karyn) |
| 09/03/2014 | Receipt of filing fee for Voluntary petition (chapter 13)(14-34323-13) [misc,volp13a] ( 310.00). Receipt number 19561843, amount $ 310.00 (re: Doc# 1). (U.S. Treasury) |
| 09/05/2014 | 6 (3 pgs) BNC certificate of mailing. (RE: related document(s)5 Notice of deficiency. Schedule A due 9/16/2014. Schedule B due 9/16/2014. Schedule C due 9/16/2014. Schedule D due 9/16/2014. Schedule E due 9/16/2014. Schedule F due 9/16/2014. Schedule G due 9/16/2014. Schedule H due 9/16/2014. Schedule I due 9/16/2014. Schedule J due 9/16/2014. Summary of Schedules and Statistical Summary of Certain Liabilities and Related Data 28 USC sec. 159 due 9/16/2014. Statement of Financial Affairs due 9/16/2014.Statement of Income/Means Test Form due 9/16/2014. Chapter 13 Plan due by 9/16/2014. Employee Income Records due 9/16/2014.) No. of Notices: 1. Notice Date 09/05/2014. (Admin.) |
| 09/05/2014 | 7 (3 pgs) BNC certificate of mailing - meeting of creditors. (RE: related document(s)4 First Meeting of Creditors with 341(a) meeting to be held on 10/20/2014 at 08:30 AM at Dallas Ch13 Ofc. Proof of Claim due by 01/20/2015. (Admin, ) (autoassign)) No. of Notices: 11. Notice Date 09/05/2014. (Admin.) |
| 09/08/2014 | 8 (2 pgs) Notice of Appearance and Request for Notice *for Jeffrey R. Erler and Laura M. Fontaine* by Laura Marie Fontaine filed by Creditor Jane Doe. (Fontaine, Laura) |
| 09/08/2014 | 9 (159 pgs; 16 docs) Motion for relief from stay Fee amount $176, Filed by Creditor Jane Doe Objections due by 9/23/2014. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 Part 1 of 2 # 6 Exhibit 5 Part 2 of 2 # 7 Exhibit 6 # 8 Exhibit 7 # 9 Exhibit 8 # 10 Exhibit 9 # 11 Exhibit 10 # 12 Exhibit 11 # 13 Exhibit 12 # 14 Exhibit 13 # 15 Exhibit 14) (Fontaine, Laura) |
| 09/08/2014 | 10 (8 pgs; 2 docs) Motion for expedited hearing(related documents 9 Motion for relief from stay) Filed by Creditor Jane Doe (Attachments: # 1 Exhibit A - Declaration of Eric Policastro) (Fontaine, Laura) |
| 09/08/2014 | Receipt of filing fee for Motion for relief from stay(14-34323-hdh13) [motion,mrlfsty] ( 176.00). Receipt number 19584606, amount $ 176.00 (re: Doc# 9). (U.S. Treasury) |

SUPP APP 1131

| | |
|---|---|
| 09/09/2014 | <u>11</u> (3 pgs) Notice of hearing filed by Creditor Jane Doe (RE: related document(s)<u>9</u> Motion for relief from stay Fee amount $176, Filed by Creditor Jane Doe Objections due by 9/23/2014. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Exhibit 3 # 4 Exhibit 4 # 5 Exhibit 5 Part 1 of 2 # 6 Exhibit 5 Part 2 of 2 # 7 Exhibit 6 # 8 Exhibit 7 # 9 Exhibit 8 # 10 Exhibit 9 # 11 Exhibit 10 # 12 Exhibit 11 # 13 Exhibit 12 # 14 Exhibit 13 # 15 Exhibit 14)). Hearing to be held on 9/22/2014 at 09:30 AM Dallas Judge Hale Ctrm for <u>9</u>, (Fontaine, Laura) |
| 09/11/2014 | <u>12</u> (1 pg) Order granting motion for expedited hearing (Related Doc# <u>10</u>)(document set for hearing: <u>9</u> Motion for relief from stay) Entered on 9/11/2014. Hearing to be held on 9/22/2014 at 09:30 AM Dallas Judge Hale Ctrm for <u>9</u>, (Rielly, Bill) |
| 09/13/2014 | <u>13</u> (2 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)<u>12</u> Order granting motion for expedited hearing (Related Doc<u>10</u>)(document set for hearing: <u>9</u> Motion for relief from stay) Entered on 9/11/2014. Hearing to be held on 9/22/2014 at 09:30 AM Dallas Judge Hale Ctrm for <u>9</u>,) No. of Notices: 1. Notice Date 09/13/2014. (Admin.) |
| 09/16/2014 | <u>14</u> (4 pgs; 2 docs) Motion to extend time to file schedules or new case deficiencies, excluding matrix Filed by Debtor Danny Deari (Attachments: # <u>1</u> Matrix) (Lindauer, Joyce) |
| 09/17/2014 | <u>15</u> (3 pgs) Witness and Exhibit List filed by Creditor Jane Doe (RE: related document(s) <u>9</u> Motion for relief from stay Fee amount $176,). (Erler, Jeffrey) |
| 09/17/2014 | <u>16</u> (2 pgs) Witness and Exhibit List filed by Debtor Danny Deari (RE: related document (s)<u>9</u> Motion for relief from stay Fee amount $176,). (Lindauer, Joyce) |
| 09/19/2014 | <u>17</u> (18 pgs) Objection to (related document(s): <u>9</u> Motion for relief from stay Fee amount $176, filed by Creditor Jane Doe)*Debtor's Objection to Motion for Relief from the Automatic Stay* filed by Debtor Danny Deari. (Lindauer, Joyce) |
| 09/19/2014 | <u>18</u> (1 pg) Order granting <u>14</u> Motion to extend time to file deficient documents. (Re: related document(s) <u>5</u> Notice of deficiency) Chapter 13 Plan due by 9/26/2014 for <u>5</u>, Employee Income Records due 9/26/2014 for <u>5</u>, Schedule A due 9/26/2014 for <u>5</u>, Schedule B due 9/26/2014 for <u>5</u>, Schedule C due 9/26/2014 for <u>5</u>, Schedule D due 9/26/2014 for <u>5</u>, Schedule E due 9/26/2014 for <u>5</u>, Schedule F due 9/26/2014 for <u>5</u>, Schedule G due 9/26/2014 for <u>5</u>, Schedule H due 9/26/2014 for <u>5</u>, Schedule I due 9/26/2014 for <u>5</u>, Statement of Income/Means Test Form due 9/26/2014 for <u>5</u>, Statement of Financial Affairs due 9/26/2014 for <u>5</u>, Summary of Schedules and Statistical Summary of Certain Liabilities and Related Data 28 USC sec. 159 due 9/26/2014 for <u>5</u>, Entered on 9/19/2014. (Tello, Chris) |
| 09/21/2014 | <u>19</u> (2 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)<u>18</u> Order granting <u>14</u> Motion to extend time to file deficient documents. (Re: related document(s) <u>5</u> Notice of deficiency) Chapter 13 Plan due by 9/26/2014 for <u>5</u>, Employee Income Records due 9/26/2014 for <u>5</u>, Schedule A due 9/26/2014 for <u>5</u>, Schedule B due 9/26/2014 for <u>5</u>, Schedule C due 9/26/2014 for <u>5</u>, Schedule D due 9/26/2014 for <u>5</u>, Schedule E due 9/26/2014 for <u>5</u>, Schedule F due 9/26/2014 for <u>5</u>, Schedule G due 9/26/2014 for <u>5</u>, Schedule H due 9/26/2014 for <u>5</u>, Schedule I due 9/26/2014 for <u>5</u>, Statement of Income/Means Test Form due 9/26/2014 for <u>5</u>, Statement of Financial Affairs due 9/26/2014 for <u>5</u>, Summary of Schedules and Statistical Summary of Certain Liabilities |

SUPP APP 1132

| | |
|---|---|
| | and Related Data 28 USC sec. 159 due 9/26/2014 for 5, Entered on 9/19/2014.) No. of Notices: 1. Notice Date 09/21/2014. (Admin.) |
| 09/22/2014 | 20 (1 pg) Court admitted exhibits date of hearing 9/22/2014. CREDITOR JANE DOE EXHIBITS EXHIBITS 1-9, and 11-16 ADMITTED (EXHIBITS 3 AND 5 NOT FOR THE TRUTH OF THE MATTERS ASSERTED THEREIN.) (RE: related document(s)9 Motion for relief from stay Filed by Creditor Jane Doe.) (Whittington, Nicole) |
| 09/22/2014 | Hearing held on 9/22/2014. (RE: related document(s)9 Motion for relief from stay Fee amount $176, Filed by Creditor Jane Doe ADVISEMENT (Baird, Dennis) (Entered: 09/24/2014) |
| 09/23/2014 | 21 (2 pgs) Order granting motion for relief from stay by Creditor Jane Doe (related document # 9) Entered on 9/23/2014. (Tello, Chris) |
| 09/24/2014 | 22 Request for transcript regarding a hearing held on 9/22/2014. The requested turn-around time is ordinary 30 day (Baird, Dennis) |
| 09/25/2014 | 23 (3 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)21 Order granting motion for relief from stay by Creditor Jane Doe (related document 9) Entered on 9/23/2014.) No. of Notices: 1. Notice Date 09/25/2014. (Admin.) |
| 09/26/2014 | 24 (20 pgs) Schedules A through J. Filed by Debtor Danny Deari (RE: related document (s)5 Notice of deficiency). (Lindauer, Joyce) |
| 09/26/2014 | 25 (7 pgs) Statement of financial affairs . Filed by Debtor Danny Deari (RE: related document(s)5 Notice of deficiency). (Lindauer, Joyce) |
| 09/26/2014 | 26 (8 pgs) Chapter 13 statement of current monthly and disposable income . Filed by Debtor Danny Deari (RE: related document(s)5 Notice of deficiency). (Lindauer, Joyce) |
| 09/26/2014 | 27 (13 pgs) Chapter 13 plan and motion for valuation dated: 9/2/2014 for 60 months with objection to claims filed by Debtor Danny Deari. (Lindauer, Joyce) |
| 09/29/2014 | 28 (2 pgs) Employee income records. Debtor is filing copies of pay stubs from 60 days prior to petition date. Filed by Debtor Danny Deari (RE: related document(s)5 Notice of deficiency). (Lindauer, Joyce) |
| 10/02/2014 | 29 (5 pgs) Exhibit D with Amended petition filed for the following: To Include Alias and Pending Bankruptcy for Pastazio's Pizza . filed by Debtor Danny Deari (RE: related document(s)1 Voluntary petition (chapter 13)). (Lindauer, Joyce) |
| 10/03/2014 | 30 (1 pg) Disclosure of compensation of attorney for debtor (Amended). Filed by Debtor Danny Deari. (Lindauer, Joyce) |
| 10/09/2014 | 31 (1 pg) Trustee's Notice of intent to dismiss case for failure to make the first payment due to the Trustee (Powers, Thomas) |
| 10/14/2014 | 32 (2 pgs) INCORRECT ENTRY: WRONG EVENT CODE USED. SEE DOC. 35.Support/supplemental document(Summary of Schedules) filed by Debtor Danny Deari |

SUPP APP 1133

| | (RE: related document(s)5 Notice of deficiency, 24 Schedules). (Lindauer, Joyce) MODIFIED text on 10/15/2014 (Rueter, Karyn). |
|---|---|
| 10/14/2014 | 33 (2 pgs) Trustee's Notice of hearing on debtor's final chapter 13 plan *with Certificate of Service* Pre-Hearing conference set for *11/25/2014 at 8:30 A.M.* at *125 E. John Carpenter Frwy, Suite 1100, Irving, Texas* (Powers, Thomas) |
| 10/14/2014 | 34 (82 pgs) Transcript regarding Hearing Held 09/22/14 RE: DEFENDANT'S MOTION FOR RELIEF FROM STAY. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING. TRANSCRIPT RELEASE DATE IS 01/12/2015. Until that time the transcript may be viewed at the Clerk's Office or a copy may be obtained from the official court transcriber. Court Reporter/Transcriber eScribers, Telephone number 973-406-2250. (RE: related document(s) Hearing held on 9/22/2014. (RE: related document(s) 9 Motion for relief from stay Fee amount $176, Filed by Creditor Jane Doe ADVISEMENT). Transcript to be made available to the public on 01/12/2015. (Kurtzer, Benjamin) |
| 10/14/2014 | 35 (2 pgs) Summary of Schedules. Filed by Debtor Danny Deari . (Rueter, Karyn) (Entered: 10/15/2014) |
| 10/19/2014 | 36 (7 pgs) Statement of financial affairs *(Amended)*. Filed by Debtor Danny Deari. (Lindauer, Joyce) |
| 10/19/2014 | 37 (5 pgs) Amended Schedules: I J. Filed by Debtor Danny Deari. (Lindauer, Joyce) |
| 10/19/2014 | 38 (7 pgs) Amended Schedules: B C. Filed by Debtor Danny Deari. (Lindauer, Joyce) |
| 10/20/2014 | 39 (6 pgs) INCORRECT ENTRY. FILER TO REFILE. Notice *of Substitution of Counsel* filed by Debtor Danny Deari. (Mitchell, Gregory) Modified on 10/22/2014 (Bibbs, P.). |
| 10/21/2014 | 40 (3 pgs) Continuance of meeting of creditors to *11/06/2014 at 9:00 a.m. Meeting to be held at 125 E. John Carpenter Frwy, Suite 1100, Irving, Texas* (Powers, Thomas) |
| 10/22/2014 | 41 (6 pgs; 2 docs) Motion to substitute attorney Joyce Lindauer with Gregory W. Mitchell Filed by Debtor Danny Deari (Attachments: # 1 Proposed Order) (Mitchell, Gregory) |
| 10/22/2014 | 42 (2 pgs) Trustee's Notice of intent to dismiss case *for failure to Cooperate as necessary to enable the Trustee to perform his duties under the Bankruptcy Code as required by Section 521(a)(3)*. (Powers, Thomas) |
| 11/03/2014 | 43 (2 pgs) Order granting motion to substitute attorney adding Gregory Wayne Mitchell for Danny Deari, terminating Joyce W. Lindauer. (related document # 41) Entered on 11/3/2014. (Tello, Chris) |
| 11/05/2014 | 44 (3 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)43 Order granting motion to substitute attorney adding Gregory Wayne Mitchell for Danny Deari, terminating Joyce W. Lindauer. (related document 41) Entered on 11/3/2014.) No. of Notices: 2. Notice Date 11/05/2014. (Admin.) |

SUPP APP 1134

| | |
|---|---|
| 11/07/2014 | <u>45</u> (3 pgs) Continuance of meeting of creditors to *11/13/2014 at 9:00 a.m. Meeting to be held at 125 E. John Carpenter Frwy, Suite 1100, Irving, Texas* (Powers, Thomas) |
| 11/10/2014 | <u>46</u> (2 pgs) Trustee's Notice of intent to dismiss case *for failure to appear the 341 Meeting of Creditors and/or to provide identification to the Trustee* (Powers, Thomas) |
| 11/13/2014 | <u>47</u> (1 pg) Trustee's Notice of withdrawal of of *for Failure to Cooperate with the Trustee as necessary to enable the Trustee to perform his duties under the Bankruptcy Code as required by Section 521(a)(3).* filed by (RE: related document(s)<u>42</u> Notice of intent to dismiss case) (Powers, Thomas) |
| 11/14/2014 | <u>48</u> (3 pgs) Meeting of creditors chapter 13 (held) *and concluded* (Powers, Thomas) |
| 11/17/2014 | <u>49</u> (1 pg) Financial management course certificate filed by Trustee Thomas Powers. (Powers, Thomas) |
| 11/18/2014 | <u>50</u> (5 pgs) Objection to confirmation of plan (RE: related document(s)<u>27</u> Chapter 13 Plan) filed by Creditor Jane Doe. (Fontaine, Laura) |
| 11/25/2014 | <u>51</u> (4 pgs) Notice of hearing *on confirmation* filed by Debtor Danny Deari (RE: related document(s)<u>27</u> Chapter 13 plan and motion for valuation dated: 9/2/2014 for 60 months with objection to claims filed by Debtor Danny Deari.). Hearing to be held on 12/16/2014 at 02:00 PM Dallas Judge Hale Ctrm for <u>27</u>, Confirmation hearing to be held on 12/16/2014 at 02:00 PM at Dallas Judge Hale Ctrm. (Mitchell, Gregory) |
| 11/26/2014 | <u>52</u> (1 pg) Trustee's Notice of withdrawal of of *for Failure to appear at the 341 meeting of creditors and/or to provide identification to the Trustee* filed by (RE: related document (s)<u>46</u> Notice of intent to dismiss case) (Powers, Thomas) |
| 12/03/2014 | <u>53</u> (1 pg) Trustee's Notice of continuance *of Confirmation set on Confirmation Docket. Continued hearing to be held on 12/30/2014 at 8:30 a.m. at 125 E. John Carpenter Frwy, Suite 1100, Irving, Texas* (RE: related document(s)<u>33</u> Notice of confirmation hearing on final plan 13 (batch)) |
| 12/03/2014 | <u>54</u> (13 pgs) Amended Schedules: B C G. Filed by Debtor Danny Deari. (Mitchell, Gregory) |
| 12/03/2014 | <u>55</u> (13 pgs) Changing an existing creditor on the matrix. Amended Schedules E. Filed by Debtor Danny Deari. (Mitchell, Gregory) |
| 12/03/2014 | <u>56</u> (16 pgs) Amended chapter 13 plan without objection to claims filed by Debtor Danny Deari (RE: related document(s)<u>27</u> Chapter 13 Plan). (Mitchell, Gregory) |
| 12/04/2014 | <u>57</u> (7 pgs; 2 docs) Application to employ Samuel Johnson as Special Counsel Filed by Debtor Danny Deari (Attachments: # <u>1</u> Exhibit A - Affidavit of Samuel Johnson) (Mitchell, Gregory) |
| 12/05/2014 | <u>59</u> (9 pgs) Adversary case 14-03151. Complaint by Jane Doe against Danny Deari. Fee Amount $350. Nature(s) of suit: 68 (Dischargeability - 523(a)(6), willful and malicious injury). (Fontaine, Laura) |

SUPP APP 1135

| | |
|---|---|
| 12/11/2014 | <u>60</u> (2 pgs) Witness and Exhibit List filed by Debtor Danny Deari (RE: related document (s)<u>27</u> Chapter 13 Plan, <u>50</u> Objection to confirmation of plan, <u>56</u> Chapter 13 Plan). (Mitchell, Gregory) |
| 12/12/2014 | <u>61</u> (3 pgs) Witness and Exhibit List filed by Creditor Jane Doe (RE: related document(s) <u>50</u> Objection to confirmation of plan). (Fontaine, Laura) |
| 12/15/2014 | <u>62</u> (2 pgs) Withdrawal *of Objection to Confirmation of Plan* filed by Creditor Jane Doe (RE: related document(s)<u>50</u> Objection to confirmation of plan). (Fontaine, Laura) |
| 12/17/2014 | <u>63</u> (2 pgs) Trustee's Objection to confirmation of Chapter 13 plan *with Certificate of Service* (Powers, Thomas) |
| 12/31/2014 | <u>64</u> (4 pgs) Certificate of No Objection filed by Debtor Danny Deari (RE: related document(s)<u>57</u> Application to employ Samuel Johnson as Special Counsel ). (Mitchell, Gregory) |
| 01/05/2015 | <u>65</u> (2 pgs) Trustee's Notice of hearing on debtor's final chapter 13 plan *with Certificate of Service* Pre-Hearing conference set for *2/26/15 at 8:30 A.M.* at *125 E. John Carpenter Frwy, Suite 1100, Irving, Texas* (Powers, Thomas) |
| 01/06/2015 | <u>66</u> (2 pgs) Trustee's motion to dismiss chapter 13 case *for failure to Obtain Confirmation and/or Reduce Attorney Fees.* Pre-hearing conference to be held on *2/26/15* at *8:30 A.M.* at *125 E. John Carpenter Freeway Suite 1100 Irving Texas* (Powers, Thomas) |
| 01/13/2015 | <u>67</u> (2 pgs) Order denying confirmation of chapter 13 plan Entered on 1/13/2015 (RE: related document(s)<u>27</u> Chapter 13 Plan filed by Debtor Danny Deari). (Tello, Chris) |
| 01/15/2015 | <u>68</u> (3 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)<u>67</u> Order denying confirmation of chapter 13 plan Entered on 1/13/2015 (RE: related document(s)<u>27</u> Chapter 13 Plan filed by Debtor Danny Deari).) No. of Notices: 2. Notice Date 01/15/2015. (Admin.) (Entered: 01/16/2015) |
| 01/21/2015 | <u>69</u> (2 pgs) Order granting application to employ Samuel Johnson of Johnson Law, PLLC as Special Counsel for Danny Deari, debtor. (related document # <u>57</u>) Entered on 1/21/2015. (Tello, Chris) |
| 01/23/2015 | <u>70</u> (3 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)<u>69</u> Order granting application to employ Samuel Johnson of Johnson Law, PLLC as Special Counsel for Danny Deari, debtor. (related document <u>57</u>) Entered on 1/21/2015.) No. of Notices: 3. Notice Date 01/23/2015. (Admin.) |
| 01/28/2015 | <u>71</u> (2 pgs) Notice of Appearance and Request for Notice *by Century Surety Company* by Benjamin Warren Kadden filed by Interested Party mp Century Surety Company. (Kadden, Benjamin) |
| 01/28/2015 | <u>72</u> (6 pgs; 2 docs) Motion for leave *to Proceed Without Local Counsel* Filed by Interested Party mp Century Surety Company Objections due by 2/23/2015. (Attachments: # <u>1</u> Proposed Order) (Kadden, Benjamin) |
| 02/06/2015 | |

SUPP APP 1136

| | |
|---|---|
| | <u>73</u> (2 pgs) Order granting motion for leave to proceed without local counsel (related document # <u>72</u>) Entered on 2/6/2015. (Tello, Chris) |
| 02/06/2015 | <u>74</u> (23 pgs; 4 docs) INCORRECT ENTRY; WRONG EVENT CODE USED. ATTY TO RE-FILE PLEADING. Motion for leave *To File Formal Proof of Claim After Deadline* Filed by Creditor Johnson Broome, P.C. Objections due by 3/2/2015. (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Exhibit 2 # <u>3</u> Proposed Order) (Johnson, Samuel) Modified on 2/10/2015 (Luna, G). |
| 02/06/2015 | <u>77</u> (23 pgs; 4 docs) Motion to file formal proof of claim after deadline Filed by Creditor Johnson Broome, P.C. Objections due by 3/2/2015. (Attachments: # <u>1</u> Exhibit 1 # <u>2</u> Exhibit 2 # <u>3</u> Proposed Order) (Brown, D.) (Entered: 02/19/2015) |
| 02/08/2015 | <u>75</u> (3 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)<u>73</u> Order granting motion for leave to proceed without local counsel (related document <u>72</u>) Entered on 2/6/2015.) No. of Notices: 2. Notice Date 02/08/2015. (Admin.) |
| 02/09/2015 | <u>76</u> (2 pgs) Trustee's Amended Objection to confirmation of Chapter 13 plan *with Certificate of Service* (Powers, Thomas) |
| 02/26/2015 | <u>78</u> (2 pgs) Notice *of Withdrawal* filed by Creditor Johnson Broome, P.C. (RE: related document(s)<u>77</u> Motion to file formal proof of claim after deadline Filed by Creditor Johnson Broome, P.C. Objections due by 3/2/2015. (Attachments: # 1 Exhibit 1 # 2 Exhibit 2 # 3 Proposed Order) (Brown, D.)). (Johnson, Samuel) |
| 02/27/2015 | <u>79</u> (12 pgs; 4 docs) Application for compensation for Samuel Harris Johnson, Special Counsel, Period: 12/3/2014 to 1/31/2015, Fee: $3165, Expenses: $37.27. Filed by Attorney Samuel Harris Johnson Objections due by 3/13/2015. (Attachments: # <u>1</u> Exhibit Invoices # <u>2</u> Exhibit Fee Application Cover Sheet # <u>3</u> Proposed Order) (Johnson, Samuel) |
| 03/05/2015 | <u>80</u> (13 pgs; 2 docs) INCORRECT ENTRY: Incorrect event code used, see doc. 81 for correction: Motion for relief from stay - agreed Filed by Interested Party mp Century Surety Company (Attachments: # <u>1</u> Proposed Order) (Kadden, Benjamin) Modified on 3/6/2015 (Brown, D.). |
| 03/05/2015 | <u>81</u> (13 pgs; 2 docs) Motion for relief from stay Fee amount $176, Filed by Interested Party Century Surety Company Objections due by 3/19/2015. (Attachments: # <u>1</u> Proposed Order) (Brown, D.) (Entered: 03/06/2015) |
| 03/06/2015 | <u>82</u> (1 pg) Clerk's notice of fees due in the amount of $176.00 for Motion for relief from stay filed by Century Surety Company. (RE: related document(s)<u>81</u> Motion for relief from stay Fee amount $176, Filed by Interested Party Century Surety Company Objections due by 3/19/2015. (Attachments: # 1 Proposed Order) (Brown, D.)) (Brown, D.) |
| 03/09/2015 | <u>83</u> (4 pgs) Order confirming chapter 13 plan Entered on 3/9/2015 (RE: related document (s)<u>56</u> Chapter 13 Plan filed by Debtor Danny Deari). (Moroles, D.) |
| 03/09/2015 | <u>84</u> (2 pgs) Notice of hearing filed by Interested Party Century Surety Company (RE: related document(s)<u>81</u> Motion for relief from stay Fee amount $176, Filed by Interested Party Century Surety Company Objections due by 3/19/2015. (Attachments: # 1 Proposed |

SUPP APP 1137

| | |
|---|---|
| | Order) (Brown, D.)). Hearing to be held on 3/30/2015 at 10:30 AM Dallas Judge Hale Ctrm for <u>81</u>, (Kadden, Benjamin) |
| 03/10/2015 | Receipt of Lift Stay Filing Fee - $176.00 by BR. Receipt Number 334024. (admin) |
| 03/11/2015 | <u>85</u> (2 pgs) Trustee's Response opposed to (related document(s): <u>79</u> Application for compensation for Samuel Harris Johnson, Special Counsel, Period: 12/3/2014 to 1/31/2015, Fee: $3165, Expenses: $37.27. filed by Spec. Counsel Samuel Johnson) filed by Trustee Thomas Powers. (Powers4, Thomas) |
| 03/11/2015 | <u>86</u> (2 pgs) Notice of prehearing conference hearing. Prehearing conference to be held on *4/30/2015* at *8:30 AM* in the *Dallas Ch. 13 Office*. If unresolved at the prehearing conference, a hearing will be held before the court as noted on the PDF document. filed by Spec. Counsel Samuel Johnson (RE: related document(s)<u>79</u> Application for compensation for Samuel Harris Johnson, Special Counsel, Period: 12/3/2014 to 1/31/2015, Fee: $3165, Expenses: $37.27. Filed by Attorney Samuel Harris Johnson Objections due by 3/13/2015. (Attachments: # 1 Exhibit Invoices # 2 Exhibit Fee Application Cover Sheet # 3 Proposed Order)). (Johnson, Samuel) |
| 03/11/2015 | <u>87</u> (5 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)<u>83</u> Order confirming chapter 13 plan Entered on 3/9/2015 (RE: related document(s)<u>56</u> Chapter 13 Plan filed by Debtor Danny Deari). (Moroles, D.)) No. of Notices: 1. Notice Date 03/11/2015. (Admin.) |
| 03/22/2015 | Announcement of AGREED ORDER regarding hearing scheduled for 3/30/2015. Agreed order to be uploaded by Benjamin Warren Kadden, filed by Interested Party Century Surety Company, Trustee Thomas Powers (RE: related document(s)<u>81</u> Motion for relief from stay Fee amount $176, Filed by Interested Party Century Surety Company Objections due by 3/19/2015. (Attachments: # 1 Proposed Order) (Brown, D.)). (Kadden, Benjamin) |
| 04/10/2015 | <u>88</u> (2 pgs) Agreed Order granting motion for relief from stay by Interested Party Century Surety Company (related document # <u>81</u>) Entered on 4/10/2015. (Rebecek, B) |
| 04/15/2015 | <u>89</u> (5 pgs) Trustee's recommendation concerning claims, objection to claims and plan modification if required *with COS*. Pre-Hearing conference to be held on *6/25/2015* at *8:30 A.M.* at *125 E. John Carpenter Frwy, Suite 1100, Irving, Texas*. (Powers, Thomas) |
| 04/30/2015 | Hearing held on 4/30/2015. (RE: related document(s)<u>79</u> Application for compensation for Samuel Harris Johnson, Special Counsel, Period: 12/3/2014 to 1/31/2015, Fee: $3165, Expenses: $37.27. Filed by Attorney Samuel Harris Johnson) (ALLOWED; FEES TO BE DIVIDED BETWEEN THIS CASE AND CHAPTER 11 CASE) (Adams-Williams, Erica) (Entered: 05/01/2015) |
| 06/02/2015 | <u>90</u> (1 pg) Order granting application for compensation (related document # <u>79</u>) granting for Samuel Harris Johnson, fees awarded: $1582.50, expenses awarded: $18.63 Entered on 6/2/2015. (Tello, Chris) |
| 06/04/2015 | <u>91</u> (2 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)<u>90</u> Order granting application for compensation (related document <u>79</u>) granting for Samuel |

SUPP APP 1138

| | Harris Johnson, fees awarded: $1582.50, expenses awarded: $18.63 Entered on 6/2/2015.) No. of Notices: 2. Notice Date 06/04/2015. (Admin.) |
|---|---|
| 07/02/2015 | 92 (2 pgs) Order on trustee's recommendations concerning claims, objection to claims and plan modification (If required) Entered on 7/2/2015 (RE: related document(s)89 Trustee's recommendation concerning claims/plan). (Tello, Chris) |
| 07/04/2015 | 93 (3 pgs) BNC certificate of mailing - PDF document. (RE: related document(s)92 Order on trustee's recommendations concerning claims, objection to claims and plan modification (If required) Entered on 7/2/2015 (RE: related document(s)89 Trustee's recommendation concerning claims/plan).) No. of Notices: 1. Notice Date 07/04/2015. (Admin.) |
| 08/07/2015 | 94 (2 pgs) Trustee's notice of additional claims filed *by JANE DOE (TT Clm 31)* Objections due by 9/9/2015. (Powers, Thomas) |
| 09/09/2015 | 95 (12 pgs) Objection to (related document(s): 94 Trustee's notice of additional claims filed) filed by Creditor Jane Doe. (Fontaine, Laura) |
| 09/09/2015 | 96 (2 pgs) Objection to (related document(s): 94 Trustee's notice of additional claims filed) *95 Jane Doe's Objection to Trustee's Notice of Proposed Treatment of Claim* filed by Debtor Danny Deari. (Mitchell, Gregory) |
| 09/10/2015 | 97 (3 pgs) Reply to (related document(s): 95 Objection filed by Creditor Jane Doe) filed by Creditor Jane Doe. (Fontaine, Laura) |
| 09/15/2015 | 98 (1 pg) Notice of withdrawal of filed by (RE: related document(s)94 Trustee's notice of additional claims filed) (Powers, Thomas) |
| 10/02/2015 | 99 (3 pgs) Trustee's motion to dismiss chapter 13 case RE: Failure to provide tax return *The pre-hearing will be held on 10/29/2015 at 8:30 A.M. at 125 E. John Carpenter Freeway Suite 1100, Irving, Texas. Any unresolved matter will be heard on 10/29/2015 at 2:00 P.M. Objections due 10/26/2015.* Pre-hearing conference to be held on *10/29/2015 at 8:30 A.M.* at . (Powers, Thomas) |
| 11/05/2015 | 100 (1 pg) Trustee's Notice of withdrawal of *of Trustee's Motion to Dismiss for Failure to Cooperate set on Motion to Dismiss re Tax Return on 10/29/2015* filed by (RE: related document(s)99 Motion to dismiss case RE: Failure to provide tax return by 13 trustee with prehrg conf (batch)) (Powers, Thomas) |
| 11/20/2015 | 101 (115 pgs; 2 docs) Motion for relief from stay Fee amount $176, Filed by Creditor Post Addison Circle Limited Partnership Objections due by 12/4/2015. (Attachments: # 1 Exhibit Exhibits) (DApice, Peter) |
| 11/20/2015 | 102 (3 pgs) Notice of hearing *on Motion of Post Addison Circle Limited Partnership for Relief from the Automatic Stay Pursuant to 11 U.S.C. 362(d)* filed by Creditor Post Addison Circle Limited Partnership (RE: related document(s)101 Motion for relief from stay Fee amount $176, Filed by Creditor Post Addison Circle Limited Partnership Objections due by 12/4/2015. (Attachments: # 1 Exhibit Exhibits)). Preliminary hearing to be held on 12/9/2015 at 01:30 PM at Dallas Judge Hale Ctrm. (DApice, Peter) |
| | |

SUPP APP 1139

| | |
|---|---|
| 11/20/2015 | Receipt of filing fee for Motion for relief from stay(14-34323-hdh13) [motion,mrlfsty] ( 176.00). Receipt number 21460490, amount $ 176.00 (re: Doc# 101). (U.S. Treasury) |
| 11/23/2015 | 103 (3 pgs) (Kadden, Benjamin) has withdrawn from the case filed by Interested Party Century Surety Company. (Kadden, Benjamin) |
| 11/24/2015 | 104 (3 pgs) Amended Notice of hearing filed by Creditor Post Addison Circle Limited Partnership (RE: related document(s)101 Motion for relief from stay Fee amount $176, Filed by Creditor Post Addison Circle Limited Partnership Objections due by 12/4/2015. (Attachments: # 1 Exhibit Exhibits)). Preliminary hearing to be held on 12/9/2015 at 01:30 PM at Dallas Judge Hale Ctrm. (DApice, Peter) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 11/30/2015 12:35:11 | | | |
| **PACER Login:** | wf0013:2661254:0 | **Client Code:** | 99999.000001-10918 |
| **Description:** | Docket Report | **Search Criteria:** | 14-34323-hdh13 Fil or Ent: filed From: 11/16/2012 To: 11/30/2015 Doc From: 0 Doc To: 99999999 Term: included Headers: included Format: html Page counts for documents: included |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |

SUPP APP 1140

# Exhibit 7

SUPP APP 1141

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS (DALLAS)

```
                                    )   Case No. 14-34324-HDH-11
In re                               )   Dallas, Texas
                                    )
PASTAZIOS PIZZA, INC.,              )
                                    )   November 24, 2015
                        Debtor.     )   9:01 AM
                                    )
_____)
```

TRANSCRIPT OF HEARING
[145] EXPEDITED MOTION TO ENFORCE CONFIRMED PLAN
BEFORE THE HONORABLE HARLIN D. HALE,
UNITED STATES BANKRUPTCY JUDGE

Transcription Services:                    eScribers
                                           700 West 192nd Street
                                           Suite #607
                                           New York, NY 10040
                                           (973) 406-2250

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

SUPP APP 1142

APPEARANCES:

For the Plan Trustee:  DAVOR RUKAVINA, ESQ.
                       DEBORAH M. PERRY, ESQ.
                       THOMAS D. BERGHMAN, ESQ.
                       MUNSCH, HARDT, KOPF & HARR P.C.
                       500 North Akard Street
                       Suite 3800
                       Dallas, TX 75201


For Century Surety     GREGORY G. HESSE, ESQ.
Company:               JAMES W. BOWEN, ESQ.
                       HUNTON & WILLIAMS LLP
                       1445 Ross Avenue
                       Suite 3700
                       Dallas, TX 75202


For Jane Doe:          TRICIA R. DELEON, ESQ.
                       LAURA M. FONTAINE, ESQ.
                       TREY H. CRAWFORD, ESQ.
                       MICHAEL GRUBER, ESQ.
                       GRUBER HURST ELROD JOHANSEN
                       HAIL SHANK LLP
                       1445 Ross Avenue
                       Suite 2500
                       Dallas, TX 75202

SUPP APP 1143

THE CLERK: All rise.

THE COURT: Good morning. Please be seated. Thank you very much.

I'll take appearances in Pastazios.

MR. RUKAVINA: Your Honor, good morning. Davor Rukavina for the trustee. With me I have Ms. Deborah Perry and Thomas Berghman. The trustee is also present.

THE COURT: Welcome.

MR. HESSE: Good morning, Your Honor. Greg Hesse, and I've got my partner, James Bowen. We're here on behalf of Century Surety Company.

THE COURT: Good morning.

MS. DELEON: Good morning, Your Honor. Tricia DeLeon with the law firm of Gruber Hurst Elrod Johansen Hail Shank. I've also got my partners here with me, Mr. Gruber, Mr. Crawford, and Laura Fontaine.

THE COURT: Welcome to our court.

We spent a significant amount of time on this. Do you want to make an opening statement or do you just want to move into the record?

MR. HESSE: Your Honor, if I may approach -- if I may ask the Court. In light of -- wait, let me again -- in light of your order on our last motion for continuance that you entered yesterday, that you want to focus narrowly on the issue of whether the actions of Century violate the plan, I

SUPP APP 1144

would suggest the following, because the concern that Century has on this hearing today is that there's going to be a full-blown evidentiary hearing on whether the plan went effective and was substantially consummated, because one of the issues that -- the fact issues on whether the plan was substantially consummated is whether the trust was duly formed, because that was the transaction that was contemplated.

With regard to that, Century hasn't had an ample opportunity to do discovery.  And so we would object to this hearing going forward on that standpoint.  My suggestion, on the other hand, to get to your narrow issue, would be to treat Century's objection as, effectively, a motion for summary judgment.  We could rely upon the pleadings and the transcripts that have been filed in this case, the schedules, the plan, the order confirming the plan, and other pleadings, as well as the notice of appeal and other pleadings that have been filed in the Court of Appeals, which I think we can identify specifically what they are in the notebooks.  And then you can decide whether making the assumption that the plan was effective, and assuming the plan was substantially consummated, whether those actions violated the plan.  And then we would reserve our rights to a full evidentiary hearing, after having a chance to do full discovery, on whether the trust was duly formed, that resulted in the plan

SUPP APP 1145

going effective and the plan being substantially consummated.

That would be our suggestion on how to proceed today, just on the motion for summary judgment, assuming, for purposes of today only, that the plan went effective and was substantially consummated.

THE COURT: Mr. Rukavina?

MR. RUKAVINA: Pardon me. Your Honor, we would object to that. It is high time to put to bed or to put to rest these issues about whether the plan was consummated, whether there is a trust. The trustee sat for a deposition yesterday. The trustee produced, I think, over 16,000 pages of documents. Ms. Lindauer produced documents. Century has known of this issue since our prior hearing, some three or four weeks ago, when they alleged that the trust was not duly formed. Century examined both Ms. Lindauer and Mr. Seidel on that date, and we are prepared to go forward, with minimal evidence, on the issue that is before Your Honor today with respect to what Century is purporting to do. And I would ask for a brief opening -- brief, because I understand that the Court has spent a lot of time preparing for today.

THE COURT: We have. I will say you can make whatever record you want to make. It's not my intention to do by a motion a declaratory judgment, though, so be warned of that. All right?

MR. RUKAVINA: Okay.

SUPP APP 1146

THE COURT:  You may proceed.

MR. HESSE:  If I can understand then correctly, Your Honor, then you're not going to make any findings that the trust was duly formed?

THE COURT:  It's not my intention to go into that. That's done by declaratory judgment, not by motion.

MR. RUKAVINA:  Your Honor, let me just cover a few brief topics then, that we will go over today.  The first one is:  what is Century trying to do?  And really here I was concerned, when we started filing this motion, that we were overreacting, that perhaps Century was not in fact trying to appeal for the trust.

Now, immediately we offered a stipulation on an agreed order that clarified that, that Century was not trying to appeal for the trust.  We've offered that since; it has been rejected.  Century, in none of its objections before Your Honor, has said, no, we're not trying to appeal for the trust. Century has contested every motion to continue.  And of course Century's pleadings speak for themselves, before the appellate court, where Century is, in fact, seeking relief for Pastazios, relief for the trust.

So to the extent that there are any concerns about what Century is trying to do, the Court can certainly ask Mr. Hesse, Century can clarify, but I don't think we're wrong.  I don't think we've overreacted.  Century's pleadings speak for

SUPP APP 1147

themselves, and it has rejected every attempt at a compromise.

As I made it clear in my pleadings, we are not trying to speak, in any way, to prevent Century today from appealing in its own right, to the extent it has that right. I want Your Honor to understand why Century is doing what it is doing. Of course there's been a judgment; October 26th was the appeal deadline. The trustee did not appeal. On November 10th, Century tries to intervene and tries to get an extension of time to appeal. It filed its own extension motion late.

But Texas law does permit a carrier, in instances such as these, to intervene in an appeal. The requirement, however, is that the carrier must admit that the judgment is binding upon it. This is the theory that Century has of virtual representation. Century has made that argument before the appellate court, but it has denied that the judgment is binding upon it. Century wants to have its cake and eat it too.

So Century, the only thing it can do, therefore, is to appeal for the trust. And it's told you, in its response filed yesterday, that according to its view of the policy, it has the right to defend the insured. Never mind the obligation to do that for the last two and a half years, which it has not done, it is saying to Your Honor we have the right to appeal for the insured, and never mind that the policy doesn't define "suit" or "defense" in any which way whatsoever

SUPP APP 1148

relating to an appeal.

So this is why Century is trying to hijack the trust's rights, so that it can nominally pursue an appeal, in its own name, without having to admit that the judgment and the findings from Judge Ginsberg are binding upon it, and somehow tried, therefore, to appeal in the name of the trust.

And then we'll talk about prejudice today, but the prejudice will be manifest and obvious in that, amongst other things. Someone other than the trustee, other than the fiduciary, will be speaking for this trust. That someone will be making decisions that, frankly, could lead to a larger judgment, because there will be a cross-appeal, and because some sixty million dollars was sought from the state court, not twenty. That someone will make decisions as to what issues will be appealed and pursued or not. That someone will have a vested interest -- because they've sued us in front of Judge Solis -- to channel that appeal in such a way as to attack findings that go directly to coverage. That someone is not a fiduciary, and it has no obligations to the trust. And of course we'll talk about the language of the plan, the trust agreement.

But we are asking the Court for three things today. The first thing we're trying to understand, and we're asking for a finding from this Court, is that Ms. Doe's claim has been allowed pursuant to the terms of this plan. If her claim

SUPP APP 1149

has been allowed, pursuant to the terms of this plan, then really what Century wants to do is no longer of that much significance to the trustee. The trustee needs to understand whether Ms. Doe's claim has been allowed. And we will walk Your Honor through the plan documents, and we believe that her claim has been allowed. If her claim has not been allowed, then we are requesting either a determination or a prohibition from Your Honor to the effect that Century has no right or ability to speak for the trust or to seek any judicial relief for the trust.

And we will argue about the Rule 7001 implications. I'll take that up at closing. But we are seeking, again, limited relief today; to the effect that the Doe claim is allowed as against the trust, we don't need any kind of determination or declaratory relief here -- that it's allowed as against the trust, and that Century has no ability, because the trustee has the exclusive ability, pursuant to this Court's order, in a plan confirmation in which Century participated, to pursue any appeal of the Doe trust.

THE COURT: Thank you. Before Mr. Hesse, let's see if Ms. DeLeon -- did you want to -- I know that Doe joined in. Do you have anything? That way Mr. Hesse can address both of you.

MS. DELEON: Thank you, Your Honor. Tricia DeLeon on behalf of Jane Doe.

SUPP APP 1150

Your Honor, we agree with the relief that the trustee is seeking, specifically that the Jane Doe claim is allowed. As the Court is aware, our firm is counsel for Ms. Doe, the rape victim whose case was tried before the district court, and thankfully resulted in justice for. And we appreciate Your Honor's order, last night, denying the motion for a continuance, because we think it properly sets the tone for the very narrow scope of this hearing.

From our perspective, we don't believe any live testimony or deposition testimony is needed from the 30(b)(6) deposition that Century and the trustee took yesterday of Ms. Fontaine, who represented our firm. Nor do we believe any live testimony is needed today, simply because that testimony is not going to bear or be relevant on this Court's determination on if the plan or the confirmation order were violated by Century in this case.

Ms. Fontaine made herself available for several hours yesterday, and the trustee and Century did in fact depose her for about an hour, so they had that opportunity.

We also believe that this Court has jurisdiction, of course, to interpret its own orders, under Travelers Indemnity Company v. Bailey, from the U.S. Supreme Court. But based on some of the questions that Century's counsel asked our firm, via Ms. Doe's counsel yesterday, we fear that Century's desire of discovery, into irrelevant and pre-confirmation matters,

SUPP APP 1151

could touch upon matters that would take this Court out of jurisdiction. So therefore, we echo this Court's concern, and agree that your order denying the motion for continuance, stating that this hearing should be very narrow in scope, is exactly what we're here to do, and of course to object if there's any type of irrelevant testimony that's attempted to be coming in today through Century's counsel, via either the 30(b)(6) deposition or live testimony of any of the witnesses from Ms. Doe's counsel.

Thank you, Your Honor.

THE COURT: Thank you. Mr. Hesse?

MR. HESSE: Your Honor, I'll address the last comments first. Since you're not going to take up the issue of whether the trust was duly formed, then there's no need to go into any of the questions that were raised at the deposition yesterday. I dispute that it was done, because I think actually the issues that were raised prior to March 30 would be relevant to that declaratory judgment action, but since we're not going to be addressing those issues, that's not going to be an issue.

Let me now address Mr. Rukavina's comment with regard to the allowance of the Jane Doe claim.

THE COURT: Okay.

MR. HESSE: I'm not certain, candidly, Your Honor, that you have jurisdiction to do that, in that, under

SUPP APP 1152

28 U.S.C., Section 157(b)(2), Congress did not provide for your jurisdiction, as an accommodation to the plaintiff's party, for you to make determinations on the allowance of personal injury claims. So I'm not sure that you have jurisdiction to enter that order, number one.

Number two, I'm not sure that I have standing to object to that order, because that is an issue that comes pursuant to the trust agreement, and as we had a hearing on November 3rd about that issue, and you -- and Mr. Rukavina was standing right here, saying that my client was not scheduled, didn't file a claim, was not a creditor, it did not have standing, I thought I made a brilliant argument to say why we might have standing. You disagreed, and you found that Century did not have standing.

That being the case, I don't think we have standing to object to it. And to the extent that you're going to make a finding with regards to that, then I would ask that you include in your order that it's not binding upon Century, because it does not have standing to object to that. And I think that would -- if that's agreeable, I believe that would put that particular issue to bed.

We then get onto the issue of really what is going on here today, which is, in the trustee's motion, it is not a mere simple motion to enforce or interp -- enforce the terms of a plan or a confirmation order. What the trustee is

SUPP APP 1153

seeking is actually both a -- is an injunction.  They're asking the Court to enjoin Century from acting on its own rights in the Court of Appeals.

The reason this is not your typical motion to enforce is there are some provisions of this plan that are not typical or what you would -- what I would actually -- would expect.  Most notably, the plan of reorganization that was confirmed -- you know, I should -- if I may, could I provide you with a copy of our exhibits --

THE COURT:  Sure.

MR. HESSE:  -- so that you have them handy?

May I approach?

THE COURT:  Thank you.

MR. HESSE:  It would be -- now, these have not been admitted yet, but I would ask the Court to take judicial notice of Century's Exhibit A, which is the first plan of reorganization that was filed.  The plan of reorganization -- now, you can look at your own leisure.  And I've looked and I've scoured it, and I've been trying to find it, but it doesn't exist.  There is not a plan injunction.  The debtor did not receive a discharge.  There is not a discharge injunction.  The discharge provision, Your Honor, is Section 10.01.

So under the terms of the plan, there is no injunction that you're being asked to enforce.  Rather, you're

SUPP APP 1154

being asked to issue a new injunction, a new injunction against Century to require it to comply with the terms of this plan of reorganization. That requires an adversary proceeding, Your Honor, under Rule 7001. Now, the provisions of the plan do provide for the Court to retain jurisdiction to issue injunctions, and that would be Section 13.07 of the plan. But Section 13.07 of the plan does not alter the procedural due process rights that a creditor -- or that -- excuse me, that -- we're not a creditor; I'm sorry -- that a party would have in order to be subject to this Court's jurisdiction for issuing an injunction. So the procedural due process rights have not been altered. And similarly, there's not a change in the substantive rights that any party would have.

So adversary proceeding; they did not file an adversary proceeding, which also requires service of process. Century would file a motion to -- or has filed -- has included in its pleading a request that the Court dismiss the motion for failure to provide service of process. Under Fifth Circuit law, under Zale, it's very clear that if the trustee is seeking to enjoin a party, they have to go through the adversary proceeding process. They have not done so.

So that's point number one: they're seeking a real live injunction; they're not seeking to enforce or interpret this injunction.

SUPP APP 1155

Secondly, Your Honor, the plan's not binding upon Century. First of all, I'll point out to you that, under Section 1141, the Bankruptcy Code is very specific as to what parties are bound by a plan of reorganization. Section 1141 specifically says that the plan shall "bind the debtor" -- that would be Ms. Lindauer's client -- "any entity issuing securities under the plan" -- Century did not issue securities -- "any entity acquiring property" -- that would be the trust -- "any creditor" -- which is not Century -- "equity security holder" -- which is not Century -- "or general partner of the debtor". It's very specific.

I'll address the creditor issue. Again, Mr. Rukavina stood here on November -- well, on October 28th, and I think again on November 3rd, and told this Court: Century was not scheduled, Century did not file a proof of claim, Century is not a creditor. We agree. We agreed with him at the hearing, and we've gotten in our -- and I think the Court can take judicial notice of the schedules. Century was not listed as a creditor. It was not even listed as a party to an executory contract. You can look at the claims register; Century did not file a proof of claim. So we're not a creditor, and so, under 1141, we're not bound by the plan.

Now, interestingly, a couple of years ago, Judge Houser had this exact issue come up, and I think this kind of ties into a number of the other comments or requests from the

SUPP APP 1156

trustee.  And in the -- and this is cited in our pleadings, In re: Vallecito Gas, which is 440 B.R. 457.  Judge Houser had the ability to -- or had the opportunity to address whether an individual was bound by the confirmation order.  In the Vallecito Gas case, the individual, a gentleman by the name of Pugh, was the representative of a creditor.  Mr. Pugh is not listed on the schedules.  He did not file a proof of claim.  But he had notice of a plan.  He had notice of a confirmation order.  And he also -- and under the terms of the plan that was confirmed, the debtor sold a mineral interest free and clear of all liens, claims and encumbrances.  It just so happened that Mr. Pugh owned an overriding royalty interest in that same mineral lease.

The trustee tried to establish that Mr. Pugh is bound by the terms of the plan because that -- it would avoid his overriding royalty interest because he had notice of the plan, he was on the creditors' list, and he didn't object or appeal from the confirmation order.  Judge Houser noted -- or said that there was a dispute amongst the parties as to whether Pugh actually had notice of the confirmation order.  And she thought that that was just a -- while there was a factual dispute, she said it's simply immaterial to the motion.  So even though Pugh had notice, it was irrelevant.  And the Court agreed with Pugh that Section 1141 of the Bankruptcy Code doesn't apply since Pugh, individually, was not a creditor of

SUPP APP 1157

Vallecito.

It's very remarkably similar to this case, Your Honor. Century is not a creditor. It was not listed on the schedules. It did not file a proof of claim. It is not a creditor.

Now, the trustee is going to stand up and say, well, but Century's lawyer was at the confirmation hearing. Well, Century's lawyer was at the confirmation hearing, if you look at that transcript, because its motion for relief from the automatic stay, in order to proceed with this declaratory judgment action, was also heard that day. But the fact that Century was at the -- would have knowledge of the plan and confirmation order is really immaterial, because even if it did have knowledge, Section 1141 doesn't bind it unless it's a creditor.

Additionally, Your Honor, the very terms of the plan provide that Century is not bound by it. And I direct Your Honor to Section 10.02 of the plan. It's on page 16 of the plan, Your Honor.

THE COURT: Of Exhibit 8?

MR. HESSE: Of Exhibit 8, yes.

THE COURT: Excuse me. I'm not sure my copy has 10.02 here.

MR. HESSE: It does not have --

THE COURT: I mean, I have 8, but I don't see 10.02

SUPP APP 1158

in it.

MR. HESSE:  You don't have page 16?

THE COURT:  I do have page 16, but I don't -- did you say 10.02?

MR. HESSE:  10.01 -- 10.02; I'm sorry.  Are you looking at Exhibit 8?

THE COURT:  No.

MR. HESSE:  The first amended plan.

THE COURT:  I'm in 9.

MR. HESSE:  Okay.

THE COURT:  It was my bad.  Hold on just a second. What page now?

MR. HESSE:  Page 16.

THE COURT:  I have it now.

MR. HESSE:  Section 10.02 provides:  "The provision of this plan, pursuant to the Bankruptcy Code, Section 1141, shall bind Pastazios and all creditors, whether or not they accept this plan."  We've already gone through 1141, but to reconfirm, Century is not Pastazios and Century is not a creditor.  So under the express terms of the plan of reorganization, the plan is not binding upon Century.  And I think to the extent that, you know, we have this particular provision, I think that deals with all the res judicata arguments that the debtor has, that we're bound by the terms of the plan.  If the terms of the plan are binding, well,

SUPP APP 1159

Section 10.02 also is specifically binding, but it's not binding on Century, because it is not the debtor or a creditor.

So I think that we can dispose of this motion fairly quickly, Your Honor, by looking at the terms of the plan and whether or not it is binding upon Century. And so if you're looking at the injunctive provisions that the trustee is able to show success on the merits, I don't believe they could even show success on the merits based upon just the documents itself, which, to a certain extent, Your Honor, goes to my point that we could resolve this as a motion for summary judgment, based upon just the pleadings that were filed.

Finally, Your Honor, with regard to whether the actions in the Court of Appeals, whatever they are, the pleadings are here; you can look at the pleadings. I mean, we're filing on behalf of Century. We're trying to protect Century's rights. One of the provisions that will come up in the context of the Court of Appeals is the judgment that is being appealed from is the judgment against Pastazios. If we're going to go into the Court of Appeals to protect our own rights, it's relating to that judgment. And so I don't know how to really -- you know, we can't -- I cannot come up with a way to fashion a stipulation, that would carve out anything that would be satisfactory to Mr. Rukavina, that would also provide -- or would allow Century to step in, protect its

SUPP APP 1160

rights in the Court of Appeals, because the judgment in fact is the judgment from the state court.

So consequently, Your Honor, I think that we can dispense with this by noting that the plan doesn't bind us based upon its express terms and based on the express terms of 1141. Additionally, there's not an injunction that is here that you're seeking to be enforced, but they're actually asking the Court to issue a new injunction which requires an adversary proceeding, after notice, and a full opportunity for discovery and a hearing. And since your Court already said we're not going to make a determination as to whether the trust was formed, that really dispenses with a lot of the evidence that would have been at issue.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Hesse.

You may call your first witness, Mr. Rukavina.

MR. RUKAVINA: Before that, Your Honor, I'd ask to admit certain exhibits that I hope are of no controversy.

THE COURT: Okay.

MR. RUKAVINA: And if we can look at my exhibit list, it would be exhibits -- first it would be Exhibits A through N, as in Nancy, which are documents filed of record with this Court. So I move for A through N, Your Honor.

MR. HESSE: No objection for A through N, Your Honor.

(Documents were hereby received into evidence as Debtor's

SUPP APP 1161

Exhibits A through N, as of this date.)

THE COURT: A through N admitted.

MR. RUKAVINA: Then also what I hope is going to be noncontroversial, YY, ZZ, AAA, BBB, CCC, DDD, all the way through KKK, again, filings before the appeal court and Judge Solis and the state court judgment.

MR. HESSE: Your Honor, we object to Exhibit YY, and that's the pleading in the state court action. I don't believe it has any relevance today.

MR. RUKAVINA: I'll remove YY.

THE COURT: Any problem with all but YY on the range from -- the range was from YY through KK.

MR. HESSE: Through KK?

MR. BOWEN: KKK, Your Honor.

THE COURT: Or KKK. Sorry.

MR. HESSE: No objection to ZZ. Sorry.

MR. BOWEN: No objection to BBB, CCC, or DDD.

Was there anything else, Mr. Rukavina, that I missed?

MR. RUKAVINA: Yes, the last page, EEE through KKK. And I apologize about the numbering. It's not the clearest.

MS. DELEON: And AAA; I don't think that was --

THE COURT: AAA?

MR. BOWEN: Yes, AAA.

THE COURT: And I don't think you said one way or on AAA, which is the findings of the state court.

SUPP APP 1162

MR. BOWEN:  Sorry, Your Honor.  I'm struggling a bit here.

THE COURT:  It's okay.

MR. BOWEN:  Yes, Your Honor.  No.  No objection to AAA.

Tell me again; I'm sorry.  Mr. Rukavina?

MR. RUKAVINA:  Sure.  So EEE through KKK.

MR. BOWAN:  No objection to EEE, FFF -- correct me if I'm doing something wrong -- GGG, HHH, III, JJJ, or KKK.

THE COURT:  Then ZZ through KKK -- is that right?

MR. RUKAVINA:  Yes, Your Honor.

THE COURT:  -- are admitted.

(Documents were hereby received into evidence as Debtor's Exhibits ZZ through KKK, as of this date.)

MR. RUKAVINA:  Your Honor, I will call --

MR. HESSE:  Your Honor, while we're going through exhibits, why don't we go ahead and also include O --

MR. RUKAVINA:  You're on my list?

MR. HESSE:  I'm on your list:  O, P --

THE COURT:  Hold on just a second, Mr. Hesse.  Let me catch up with you.  All right, O.

MR. HESSE:  O, P, Q, R, S, T, and V.

MR. RUKAVINA:  Your Honor, no objection, except I don't think we have R.  I don't think we were able to get it on time.

SUPP APP 1163

MR. HESSE: R would be --

MR. RUKAVINA: R is blank; we were not able to get that transcript.

MR. HESSE: Your Honor, R would be Century's Exhibit 52.

MR. RUKAVINA: If counsel's representing that's the same, then no objection to Century 52.

MR. HESSE: Century 52 is the transcript of hearing on November 3, 2015 on the motion to clarify trust agreement.

THE COURT: R, though, I think is the October 28th transcript.

MR. HESSE: Oh, Your Honor, that would be Century Exhibit 49, transcript of hearing of motion for leave, trustee's expedited motion to clarify trust agreement, October 28th, 2005, 9 a.m.

THE COURT: Okay. Mr. Rukavina, the exhibits that have been listed you're okay with? They're on your list?

MR. RUKAVINA: Okay. I have no problem with that, but here's -- I have no problem with my -- I believe it started at O. I have no problem with my O through V. I'm telling Your Honor that there is no R. R is a 2013 transcript.

THE COURT: Yeah. So we will --

MR. RUKAVINA: Mr. Hesse was referring to the 2015 transcript. So again, we were not able to get all of the --

SUPP APP 1164

MR. HESSE: No -- no, that would be -- that would make no sense, because that's document number 142 in a bankruptcy court. That has to be a 2015.

MR. RUKAVINA: Yeah, you're probably correct about that.

MR. HESSE: And so I think the 2013 is a typographical error. That would be Century's Exhibit -- what did I say?

THE COURT: 49, I think.

MR. HESSE: 49.

MR. RUKAVINA: No objection to Century 49, Your Honor.

THE COURT: Okay. Century 49 is in.

(Document was hereby received into evidence as Century's Exhibit 49, as of this date.)

THE COURT: And O, P, Q, S, T, V of the trustee are in.

(Documents was hereby received into evidence as Trustee's Exhibits O, P, Q, S, T, V, as of this date.)

MR. RUKAVINA: Your Honor, I'll call Trey Crawford for purpose of authentication, and I hope I can proffer his testimony.

THE COURT: Okay.

MR. RUKAVINA: It's Exhibit QQ.

MR. BOWEN: Your Honor, we have no objection to

SUPP APP 1165

authenticity. Our objection to QQ is just relevance. It's a piece of discovery from the state court action, and we don't believe it has any relevance today, Your Honor.

THE COURT: Response on relevance?

MR. RUKAVINA: I'll make the relevance -- I'd ask the Court to carry the relevance objection.

THE COURT: Okay.

MR. RUKAVINA: I was going to call Mr. Crawford only to authenticate the document.

THE COURT: Okay. Mr. Crawford?

MR. RUKAVINA: May I proffer his testimony?

(Witness sworn)

THE COURT: You may be seated.

Yeah, you can proffer and then be subject to cross-examination.

MR. RUKAVINA: Okay. If you'll look at QQ while I'm proffering your testimony, please.

THE COURT: Let me switch books just a minute.

MR. RUKAVINA: It's in volume 1.

Your Honor, if called to testify, Mr. Crawford would testify that he was lead counsel for Ms. Doe in the underlying state court lawsuit. Exhibit QQ is a true and correct copy of certain disclosures served upon Mr. Crawford and his firm by insurance defense counsel hired for Pastazios Pizza at that time, prior to Century denying coverage and denying a defense.

SUPP APP 1166

And that would close his direct proffer.

THE COURT: Any questions of this witness?

MR. BOWEN: You're finished with this witness completely?

MR. RUKAVINA: Yes.

MR. BOWEN: No questions, Your Honor.

THE COURT: You want to make your relevance objection?

MR. BOWEN: I do assert the relevance objection to QQ just because it's an unsworn piece of discovery in the state court lawsuit. I can't imagine how it has any relevance to the questions the Court's being asked to address today.

THE COURT: Mr. Rukavina, I think you addressed this a little bit in one of your pleadings, but go ahead.

MR. RUKAVINA: Your Honor, it is Century that is arguing that there is no prejudice to the trust by proceeding as it has in the appeal. We will show Your Honor that when Century controlled anything to do in this lawsuit, their counsel, their chosen counsel chose to answer discovery in such a way as to give them an excuse to deny coverage. That goes to the heart of the reason why we're here today, the heart of why this Court should not allow someone else to speak for this trust

THE COURT: Anything else on the relevance objection?

MR. BOWEN: Your Honor, I don't understand -- the

SUPP APP 1167

question today is whether the Court is going to enforce the plan and make us file something in the Court of Appeals. So yes, we assert the relevance objection. I have nothing further to say.

THE COURT: QQ is admitted.

(Certain disclosures served upon Mr. Crawford were hereby received into evidence as Debtor's Exhibit QQ, as of this date.)

MR. RUKAVINA: Your Honor, I have nothing further for Mr. Crawford.

THE COURT: You did a good job, Mr. Crawford.

MR. CRAWFORD: Thank you. I even wore contacts.

MR. RUKAVINA: Your Honor, I'll call Mr. Seidel.

THE COURT: Mr. Seidel?

(Witness sworn)

THE COURT: You may be seated.

DIRECT EXAMINATION

BY MR. RUKAVINA:

Q. Sir, if you'll please identify yourself for the record.

A. Yes, sir. My name is Scott Seidel.

Q. Okay. Do you know Mr. Hesse from before?

A. Yes.

Q. How so?

A. He had called me with regard to a fee application for his firm in a case that I'd hired his firm in to be -- when I was

SUPP APP 1168

the trustee.

Q. What case was that?

A. It was called Tagnet (ph.).

Q. And was he with Hunton & Williams?

A. Yes.

Q. And did they do a lot of work?

A. Yeah, I paid him hundreds of thousands of dollars.

Q. All right. So --

A. Paid the firm.

Q. -- Hunton is your former lawyer?

A. Yes, Your Honor -- yes, sir.

Q. And what does it feel like today having Hunton examine --

MR. HESSE: I'm going to object to relevance, Your Honor.

THE COURT: Relevance?

MR. RUKAVINA: Your Honor, it's again that his former counsel is now going after him, purporting to add for the trust benefit in the Court of Appeals, again, to the prejudice issues.

THE COURT: Um-hum. Sustained.

MR. RUKAVINA: Okay.

Q. If you'll turn to Exhibit M, Mr. Seidel?

A. Yes.

Q. This is the order confirming the plan?

A. Yes.

SUPP APP 1169

Q. Okay. If you'll turn to page 3, the first ordered paragraph "defines creditor trust agreement", do you see that, sir?

A. Yes, sir.

Q. Have you signed a creditor trust agreement --

A. Yes, sir.

Q. -- with Pastazios?

A. Yes, sir.

MR. HESSE: Your Honor, we're not trying this issue today, so I would object to this being relevant. We'll stipulate that Mr. Seidel will testify that he signed the trust agreement and that they're -- for purposes of today's hearing, that the plan is effective, and that it's substantively consolidated, and that the trust -- and just so we -- that we're not -- only for purposes of today.

THE COURT: Well, the question was just whether he had signed. Overruled.

Q. And if we go a page further, you'll see that there's a provision on page 4 about the debtor paying 50,000 dollars to reacquire equity in the reorganized Pastazios Pizza. Do you see that, sir?

A. Yes, sir.

Q. Was that 50,000 dollars paid?

A. Yes, sir, finally.

Q. Okay. Approximately what time?

SUPP APP 1170

A.    In May.

Q.    Okay.  And Exhibit M, it's already been admitted, but just if you'll confirm for the Court that that is the trust agreement that Mr. Deari and you signed?

A.    Yes, sir, it is.

Q.    Okay.  Now, are you familiar with the Jane Doe litigation and the judgment entered in January -- I'm sorry, in July of this year?

A.    Yes, sir.

Q.    And how so?

A.    I was involved.  I was at the litigation.  I spoke with my counsel that I employed in the matter, and was there for not every minute of the trial but for the vast majority and for the decision that was made by the judge.

Q.    Okay.  And did you request Century to provide a defense against that claim?

A.    Yes, sir.

Q.    And did Century -- how did Century respond?

A.    They refused.

Q.    What did you do then to defend against that claim?

A.    I hired counsel.

Q.    Who did you hire?

A.    Chen Dawson (ph.).

Q.    And what did you have that counsel do?

A.    Anything and everything they could to defeat the claim.

SUPP APP 1171

Q.   You were trying to get a zero claim against the trust?

A.   I was trying to get a zero claim against the trust.

Q.   In your opinion, did they do everything that they could have?

A.   Yes, sir, and the judge in the state court even commented they had done a -- a good job.

Q.   Did we seek any kind of continuance from Judge Ginsberg prior to proceeding?

A.   Yes, sir.

Q.   What did he say?

A.   He said that he never says never, but in this instance, the Jane Doe suit, there was 99.9 percent chance there would not be a continuance; that matter had been pending too long.

A.   And ultimately a judgment was entered against the trust, correct?

A.   Yes, sir.

Q.   Were you surprised?

A.   I was surprised by the amount, yes, sir.

Q.   Were you surprised about the liability?

A.   Yes, sir.

Q.   Very briefly, did Mr. Deari admit to getting Ms. Doe drunk?

A.   Yes.

        MR. BOWEN:  Objection, Your Honor.  Hearsay.
Relevance.

SUPP APP 1172

MR. RUKAVINA: Your Honor, we'll let the findings of fact speak for themselves. The question goes to what is going on with the appeal, so I do think that there is some relevance to the trustee's decision making. But I heard Your Honor yesterday, in his order, say that this is going to be a narrow hearing today, and so I'm just going to ask for some guidance from the Court. I really -- I agree that the discussions with Century that were had about whether to fund an appeal or not are not relevant for today. It's only to the extent that Century makes them relevant. So if Your Honor will apply the goose and gander rule, I don't need to ask these questions.

THE COURT: I will.

Q. What was the appeal deadline?

A. October 26th.

Q. Did you appeal?

A. No, sir.

Q. Now, are you familiar with Century's pleadings, as they filed in the appeal court, seeking leave to appeal and seeking to intervene to appeal?

A. Yes.

Q. Okay. And do you have a problem with what Century was trying to do in the appeals court?

A. Yes.

Q. And why do you have a problem with that?

A. Well, because they're speaking on behalf of Pastazios in

SUPP APP 1173

that appeal process, and I think it's confusing.  And Century obviously is answerable only to itself and only has its motivations at heart, rather than a trustee of a trust that has fiduciary duties to creditors, et cetera.

Q.    How long have you been a bankruptcy trustee?

A.    Many years, twenty years.

Q.    Approximately how many bankruptcy estates have you administered?

A.    Thousands.

Q.    Can you administer a bankruptcy estate or a post-confirmation estate when someone else is purporting to act for you?

A.    No.

Q.    Have you ever seen such a thing before?

A.    No, but it was a tremendously unusual circumstance, so I thought it was necessary to bring this to the Court's attention.  You have an insurance company denying coverage yet trying to wrestle away and assert appeal -- appellate rights for the debtor.

Q.    When did Century first become interested, to your knowledge, and what all was going on with the lawsuit?

A.    Once we contacted them and made them aware of the large judgment that was entered; otherwise they ignored this completely.

Q.    Now, who's the fiduciary in this case?

SUPP APP 1174

A.   Me.

Q.   What do you understand your duties to be and to who?

A.   My duties are to my creditors, and narrow fiduciary duties.

Q.   And to the -- to the Court, with some oversight?

A.   Yes.

Q.   Okay.  Does Century have any duties, to your knowledge, fiduciary or otherwise, to this Court or to any of your beneficiaries?

A.   Absolutely not.

Q.   Now, if you'll look at Exhibit QQ, and if you'll look at the third page, in particular.  Do you see the answer to request number three?

A.   I do.

Q.   Okay.  And it asks Pastazios to state the factual basis of your claim.  Was Pastazios making a claim in that lawsuit?

A.   Not that I recall.

Q.   Do you have any idea for why an attorney would even answer this request?

A.   No.

Q.   Do you have any concern about how this request was answered by the insurance counsel hired for Pastazios by Century?

A.   Yes, it appears to be geared to vitiate coverage.

Q.   Because if it's not the result of negligence, then it's

the result of intentional, which is excluded, correct?

MR. BOWEN: Objection. Leading, Your Honor.

THE COURT: Sustained.

Q. Why is it geared towards excluding coverage?

A. Because of the negligence issue you mentioned. And if it's intentional then there would be no coverage.

Q. And if you look at response -- a little bit later, response number 7, "Please disclose any insuring agreements of which you are aware". You see the answer is, "Defendants will supplement".

A. Yes.

Q. Do you see that? Does that cause you any concern, the nondisclosure of the insurance policy?

A. Yes, it does.

Q. Okay. Does this Exhibit QQ relate, in any way, to your concerns about what Century is trying to do before the appellate court?

A. It does. It -- to me, it shows the motivations and the way that they will act in an appeal to vitiate coverage and not in the best interests of creditors of the estate, obviously.

Q. Okay. And will they have an opportunity to do so if they're appealing for the trust?

A. I believe so.

Q. Do you think they have a motive to do so?

SUPP APP 1176

A.   I believe they have a strong motive to do so.

Q.   Are we engaged with other litigation with Century right now anywhere regarding coverage?

A.   Yes.

Q.   And where is that?

A.   Federal district court.

Q.   Judge Solis?

A.   Judge Solis.

Q.   And how would you characterize that litigation?

A.   Tremendously contentious.

Q.   Okay.  Now, how much money did Ms. Doe seek from Judge Ginsberg at the state court trial -- or not how much money; what size of judgment did she ask for?

A.   They -- they were asking -- is that what you're saying?

Q.   Yes.

A.   That they were -- I think they were asking for sixty million dollars.

Q.   And ultimately a judge awarded some twenty million dollars; it goes up and down depending --

A.   Yes, Your Honor -- yes, sir, twenty -- twenty-ish.

Q.   Now, did you discuss with counsel for Ms. Doe, prior to making a decision whether to appeal or not, the potential that you might appeal?

A.   Yes.

Q.   Okay.  Was there any federal cross-appeal made?

SUPP APP 1177

A.   Yes.

Q.   Okay.  Does that give you any concern about allowing Century to appeal for the trust?

A.   Yes, it could expose the trust to greater damages and expense and delay, obviously.

Q.   Because of the potential for a cross-appeal?

A.   Yes.

Q.   Okay.  Any other issues that -- so we've identified concern that Century will be motivated by  its self-interest. We've identified the potential that their appeal could go haywire and actually have a higher liability against the trust.  We've identified the concern that you're the fiduciary and that Century has no obligation to this Court or anyone. Any other concerns about what Century's trying to do with the appeals court?

A.   No.

Q.   Let me ask you this:  how long will an appeal last?

A.   I don't -- it could last forever, I mean, years.  The delay that I mentioned earlier.

Q.   Is a a remand a potential?

A.   Remand is a potential, and then they could bring it back, and then we've got more expense starting over, and the trust doesn't have any funds to speak of.  We've got 40 -- 30, 40,000 dollars.  We can't afford another trial.

Q.   And how much of that 30 or 40,000 dollars is geared

SUPP APP 1178

towards paying what's owed Chen Dawson?

A.    A portion.

Q.    Okay.  And have you paid my firm anything?

A.    No, I haven't paid your firm one penny.

Q.    Have you paid yourself anything?

A.    No, of course not.

Q.    So if a remand happens, who's going to pay for --

A.    There's no money.

Q.    Not to mention the years of delay.

A.    Yes.

Q.    Okay.  Now, can you see your role as an effective fiduciary and trustee in this case being compatible with Century speaking for the trust on appeal?

A.    No.

Q.    Would you have any control over what Century might do?

A.    No, I wouldn't.

Q.    And who would face the potential liability if something went haywire with what Century was doing?

A.    Conceivably, me.

Q.    Has Century offered, in any way, to indemnify you, personally, or your counsel, or the trust?

A.    No, sir.

Q.    Okay. As far as the allowance of Ms. Doe's claim, just so I understand, the appeal deadline has run and you did not appeal?

SUPP APP 1179

A.    Correct.

Q.    And are you asking the Court to find that her claim is allowed?

A.    Yes, sir.

Q.    And why are you asking that?

A.    So that we can know where everyone lies in terms of rights, et cetera, duties.

MR. RUKAVINA:  Your Honor, I'll pass the witness. Thank you.

THE WITNESS:  Yes.

THE COURT:  Does debtor's counsel have any questions of the witness?

MS. DELEON:  No, Your Honor.

THE COURT:  I think it makes sense for both of you to go before Century goes.

MR. HESSE:  Thank you, Your Honor.

THE COURT:  Your turn.

MR. BOWEN:  Your Honor, before I begin asking questions I want to see if we can get some stipulations on pre-admitting some of our exhibits.  The list is a lot shorter now, Your Honor, in light of the Court's ruling yesterday, so what we're offering is Exhibits 58, 59, 60, 61, 67, 33, 47, 11.

UNIDENTIFIED SPEAKER:  Hold on.  One moment.

MR. BOWEN:  47, 11.  68 and 42.

SUPP APP 1180

THE COURT:  Let me switch books.

MR. BOWEN:  It's going to take me a bit, Your Honor.

MR. RUKAVINA:  Let me start with the easy ones.

THE COURT:  All right.  Let me switch books just for a minute.

UNIDENTIFIED SPEAKER:  Is there another book?

MR. RUKAVINA:  Your Honor, may I?

THE COURT:  Um-hum.

MR. RUKAVINA:  Your Honor, we have no objection to Century's 58, 59, 60, 61, 67 or 68.  Let me just take a look at 68 real quick to make sure that's the executed one.  Yes, it is.  It is.  Yeah, it is.  I'll stick it on the last page. It is.

Now, Your Honor, 42, 47, 33, and 11 go to issues which I believe Your Honor is excluding from consideration today.  And if those are going to come in then all of mine need to come in, and I need to be able to go ask the trustee some more questions.  These are communications regarding the purpose of the Trust, the conduct of the potential appeal.  So I would object to those based on the scope of this hearing as Your Honor has phrased it.

MR. BOWEN:  May I respond, Your Honor?

THE COURT:  You may.

MR. BOWEN:  I'm going to start with 33.  You understand I'm doing this out of order.

SUPP APP 1181

THE COURT:  All right.  Let me get to 33.

MR. BOWEN:  I mean, it might make more sense if we carried this, but, I mean, we'll explain it to the Court.

The witness was asked about why he chose not to appeal.  Exhibit 33 is his request asking Century to pay his appeal.

MR. RUKAVINA:  Your Honor, I don't recall asking Mr. Seidel why he chose not to appeal.  I recall asking him did he appeal.

MR. BOWEN:  Well, he also asked him, Your Honor, if there was a concern the judgement would get larger and delay and those kind of things, so --

MR. RUKAVINA:  Well, Your Honor, that relates not to his decision not to appeal.  That relates to his decision to contest Century's attempt to appeal.

MR. BOWEN:  Also, Your Honor, in Exhibit 33 the Trust states, and this is from Munsch, Hardt.  This would be Mr. Seidel's lawyer.  It states:

"Not only does the Trust request that Century fund an appeal but also that the Trust believes there may be valid appellate points."

MR. RUKAVINA:  Your Honor, again, I am prepared to respond to all of this, but then I need to include additional exhibits, and I need to ask Mr. Seidel additional questions.

THE COURT:  Why don't we take the other three

SUPP APP 1182

exhibits that are still outstanding?  That's 47, 11 and 42.

MR. BOWEN:  Okay.  Turning to 47, Your Honor, 47 is a response to 33 some months later.  It's from counsel Hunton & Williams for Century, and it attaches a stipulation that Century's offering to enter into, in which Century agrees to pay for an appeal.  The trustee would agree to appeal.  Trustee alone would select qualified and appropriate counsel, and trustee would control the appeal, and that the trustee would not waive any coverage rights.

So, I believe, Your Honor, this goes also directly to Mr. Seidel's testimony about how he didn't appeal because he was afraid the judgment was going to get larger and that it would cause delay and expense.  And he was worried about expense.

The fact is, Your Honor, that Century, at his request, offered to pay for the appeal and acceded to every one of his demands.

THE COURT:  Ms. Rukavina?

MR. RUKAVINA:  Well, Your Honor, there's two sides to every story, and I think that counsel -- I would like this exhibit to come in.  I would like Your Honor to know what happened.  I think Mr. Seidel would like Your Honor to know what happened.  We have no cause for concern before Your Honor or any judge that what we did was absolutely correct and that Century was negotiating with us in bad faith.

SUPP APP 1183

I want all this to come in. It's up to Your Honor. So long as, if it comes in, I get a chance to ask Mr. Seidel about this.

THE COURT: I'll admit the exhibits, and you can have a second pass at him and take an opportunity to offer to it.

MR. RUKAVINA: Thank you, Your Honor.

THE COURT: Just for the record, I guess I'll just say in the end 58, 59, 60, 61, 67, 33, 47, 11, 68 and 42 are now in.

(Notice of appeal filed by Century in the court of appeals was hereby received into evidence as Century's Exhibit 58, as of this date.)

(Motion to intervene filed by Century in the court of appeals was hereby received into evidence as Century's Exhibit 59, as of this date.)

(Motion for extension filed by Century in the court of appeals was hereby received into evidence as Century's Exhibit 60, as of this date.)

(Supplement filed by Century in the court of appeals was hereby received into evidence as Century's Exhibit 61, as of this date.)

(Response filed on behalf of Mr. Seidel in the court of appeals objecting to Century's efforts to intervene was hereby received into evidence as Century's Exhibit 67, as of this date.)

SUPP APP 1184

(Letter sent to Century by Mr. Seidel's lawyers shortly after judgment was entered in the Doe action was hereby received into evidence as Century's Exhibit 33, as of this date.)

(Letter from Hunton & Williams to Mr. Seidel's counsel was hereby received into evidence as Century's Exhibit 47, as of this date.)

(Creditor trust agreement was hereby received into evidence as Century's Exhibit 68, as of this date.)

(Document was hereby received into evidence as Century's Exhibit 42, as of this date.)

MR. RUKAVINA:  Your Honor, we haven't discussed 11. Just one second, please.

THE COURT:  Oh, I'm sorry.  I thought you were saying for the rest of it -- you said 11 --

MR. RUKAVINA:  No, that's fine.  11 is the same.  I would give the same responses I did to the other ones.

THE COURT:  All right.

MR. RUKAVINA:  Is 11 admitted?

THE COURT:  You may proceed.  11 is in.

(E-mail exchange between Mr. Seidel and Mr. Erler from February, 2015 was hereby received into evidence as Century's Exhibit 11, as of this date.)

CROSS-EXAMINATION

BY MR. BOWEN:

Q.   Mr. Seidel?

SUPP APP 1185

A.    Yes, sir.

Q.    If I understand correctly, you have no objection in this court to Century appealing in its own name.  You just don't want there to be any confusion that Century is appealing for you.  Is that a correct summary?

A.    That's fair.

Q.    Okay.  You have a witness notebook there in front of you?

A.    I do now.

Q.    Would you please look at Exhibit 58?  Exhibit 58 is the notice of appeal that Century filed in the court of appeals. Isn't that correct?

A.    Yes, sir.

Q.    It states very plainly that it's filed on behalf of Century Surety Company.  Right?

A.    Yes.

Q.    There's no indication, hint or any type of implication that Century is acting with your permission or in your stead, right?

A.    It says Century.

Q.    Well, it also does not say that --

A.    It does not say.

Q.    -- that Century is appealing for you, right?

A.    Correct.

Q.    If you'd look at Exhibit 59, please.

A.    Yes, sir.

SUPP APP 1186

Q.   This is Century's motion to intervene filed in the appellate court, right?

A.   Yes.

Q.   If I turn you -- turn to the page 1 -- she doesn't have a number on it, but it, not surprising, is the one before page 2.

A.   Yes.

Q.   Okay.  And it states right there at the top that it's being filed by Century Surety Company.  Right?

A.   It does.

Q.   Does not state that it's being filed by Century Surety Company for you or with your permission.  Right?

A.   Yes.

Q.   And, if you would, turn to page 6.  You see on paragraph 13 there the sentence that begins with the word "however"?

     "However, the trustee later refused to authorize an appeal, even though Century had agreed to its stated terms under a full reservation of right."

     I'm not asking you whether you agree with that whole statement, but wouldn't you agree that it's plainly apparent from this document that Century filed in the court of appeals that you oppose -- that you chose not to appeal on behalf of the Trust?

A.   It says that.

Q.   I'm sorry?

SUPP APP 1187

A.    It says that the trustee refused to authorize the appeal.

Q.    Okay.  Exhibit 60.  This is the motion for extension of time that Century filed in the court of appeals.

A.    Yes.

Q.    It states again on page 1 that it's being filed by Century Surety Company.  No indication that it's being filed by you or with your permission.  Right?

A.    Correct.

Q.    Again, if you'd turn to page 6.  Paragraph 11, same sentence from the other document.  Painfully apparent that -- from Century's papers filed in the court of appeals that you do not -- you have not chosen to appeal the judgment.  Right?

A.    It says the same sentence, trustee refused to authorize this -- the appeal.

Q.    Exhibit 61.  This is a supplement that Century filed in the court of appeals.  Let me ask you first, are Exhibit 58, 59, 60, and 61, are they all the documents that Century has filed in the court of appeals to date?

A.    My understanding.  I'm not positive.

Q.    Okay.

A.    If you say so, I believe you.

Q.    Turn to the page, page 1 on this one as well.

A.    Yes, sir.

Q.    It plainly states it's being filed by Century Surety

SUPP APP 1188

Company, right?

A.   It says Century Surety Company.

Q.   Doesn't say anything about filing it with your permission or on your behalf, right?

A.   Correct.

Q.   Now, Exhibit 67.  This is a response that your lawyers filed on your behalf in the court of appeals objecting to Century's efforts to intervene.  Right?

A.   Yes, sir.

Q.   Now, you would agree with me, wouldn't you, sir, that there's absolutely no confusion or could be absolutely no confusion in the court of appeals as to whether or not you chose to appeal this judgment?

A.   This makes it -- this response of the trustee obviously alerts anyone to that fact.

Q.   Yes.  And it makes it painfully obvious that you object in the court of appeals to Century being able to intervene in the appeal, right?

A.   Yes.

Q.   And that's an issue that's joined right now in the Dallas Court of Appeals.

A.   My understanding.  Yes, sir.

Q.   Now, you'd agree, sir, that one of your jobs as trustee is to defend contested claims?

A.   Yes.

SUPP APP 1189

Q.   Now, you made the decision, if I understand your prior testimony, not to appeal this twenty million dollar judgment. Right?

A.   Yes.

Q.   And that is true even though you believed that there were valid appeal points.  Right?

A.   No.

Q.   If you'd look at Exhibit 33, please.  Exhibit 33 is a letter that your lawyers sent to Century shortly after the judgment was entered in the Doe action, right?

A.   Yes.

Q.   In the next to the last paragraph on page 2, first, you're requesting Century to provide for an appeal.

A.   Yes.

Q.   That's right?

A.   Yes.

Q.   And in the next sentence you're saying the trustee believes that there may be valid appeal points.  Right?

A.   It says there may be valid appeal points.

Q.   And that's a true statement, right?  You believe there may be valid appeal points.

A.   There may be valid appeal points.  You have a twenty-one million dollar judgment.  There may be valid appellate.

Q.   And obtaining a reversal of that judgment against the Trust, that twenty million dollar judgment, that'd be a

SUPP APP 1190

positive thing, wouldn't it?

A.    Yes.

Q.    Okay.

A.    If you can assure me that that's the only thing that can happen here.

Q.    Well, what Century has asked -- is going to ask the Court to do, as far as you understand it, is to get the judgment reversed.  Right?

        MR. HESSE:  Objection, Your Honor.  That's speculation.  How could this man known what Century will ask in the future? objection

        MR. BOWEN:  Fair enough.  I withdraw that question, Your Honor.

        THE COURT:  Okay.

Q.    Now, you testified that, I believe, if I heard you correctly, you were concerned about a remand and maybe it had to be tried again.

A.    That is a concern.

Q.    Okay.  Now, you understand, sir, don't you, that before there could be a remand there would have to be a reversal of this twenty million dollar judgment, right?

A.    Yes.

Q.    Okay.  And in the event of a remand, your concern is that it would be tried again.  Right?

A.    It would be.  Yes.

SUPP APP 1191

Q.   How much did you pay the law firm you hired to try this lawsuit?

A.   I believe it was twenty-five.

Q.   Twenty-five thousand dollars?

A.   Thousand.  Right.  A lot less than twenty million.

Q.   A whole lot less than twenty million dollars, right?

A.   Yes, sir.

Q.   Now, if Century were allowed to appeal this judgment, it wouldn't cost you a dime, would it?

        MR. HESSE:  Objection.  Speculation.

        THE COURT:  Overruled.

A.   If Century were allowed, yeah, it would not.  It should not cost me any money.

Q.   If Century were allowed to appeal would it, as far as you know, jeopardize any of your coverage arguments that you're making in the Dallas Federal District Court?

A.   Could you repeat that question?  I'm sorry.

Q.   Fine.  If Century were allowed to appeal --

A.   Yes.

Q.   -- without your consent, without your agreeing, would it, as far as you know, jeopardize any of your coverage arguments in the Dallas Federal District Court

A.   I'm not sure of that.

        THE COURT:  If we could -- I know you're -- this is a critical area, but if we could take just a short recess?  We

SUPP APP 1192

have two matters on our 10 o'clock docket that --

MR. BOWEN: Okay.

THE COURT: -- that one's telephonic and one is short. I think both are short. Y'all could leave the courtroom if you want to for, I would think, less than ten minutes, all right?

MR. BOWEN: All right.

THE COURT: Mr. Seidel, during the recess do not speak with anyone about your testimony, including your attorneys. Do you understand that?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. We'll do a CourtCall for the 10 o'clock, and if y'all could just be back in a few minutes.

(Recess from 10:01 a.m. until 10:17 a.m.)

THE COURT: Sorry about that.

MR. BOWEN: Oh. We're not the only case on the Court's docket, are we?

THE COURT: Ready?

MR. BOWEN: I am, Your Honor.

THE COURT: You may proceed. Wait. One unusual move, I couldn't see Mr. Rukavina, he's so tall. But he's back there.

You may proceed.

BY MR. BOWEN:

Q. Mr. Seidel.

SUPP APP 1193

A.   Yes, sir.

Q.   After you requested Century to pay for your appeal and told them that you believe there may be meritorious grounds, if I understand correctly, there was a period of several weeks there where the parties went back and forth and discussed that topic.  Right?

A.   It would -- yes.  Many, many times.

Q.   Okay.  And if you'd look at Exhibit 47, please?

A.   47.  I have it.

Q.   Just to put this in context, this is a letter from Hunton & Williams to your counsel talking about that issue of whether or not you're going to appeal.  Right?

A.   Yes, sir.

Q.   And this is after, I want to say, three months of discussions on the topic?

A.   Yes, sir.

Q.   And this is on the appellate deadline.  Right?

A.   Yes, sir. .

Q.   Okay. And then attached to that is a stipulation.  Just so we're clear.  This is a stipulation that counsel for Century wrote up and sent to you for your agreement that sets forth the terms under which they were offering to fund the appeal if you would appeal the judgment.  Right?

A.   And at 5 o'clock on the deadline date Century sent us this proposal that didn't incorporate all our demands.

SUPP APP 1194

Q.    Okay.  You gave your deposition yesterday, right?

A.    I did.

Q.    And would you agree with me that your decision not to appeal had nothing to do with the time of day that this letter came in.  Is that a fair statement?

A.    That's a fair statement.

Q.    All right.  I mean, if it had come in on the 25th or at 8 a.m. on the 26th, your decision not to appeal would have been the same.  Right?

A.    Yeah.  Under these circumstances.

Q.    Okay.  And if you look at the stipulation -- I want to make sure it's clear what Century's willing to do -- point 1, Century's offering -- part of Century's offer is that you'll pursue an appeal of this twenty million dollar judgment on behalf of the Trust under a full reservation of your rights.  Do you see that, point 1?

A.    I do.

Q.    Point 2, Century agreed to be the sole source of funds.  They were going to pay one hundred percent of the costs of the appeal.  Right?

A.    Right.

Q.    Point 3, you would accept Century's offer to fund the appeal under a full reservation of its rights.  Right?

A.    That's what it says.

Q.    So basically everybody's going to keep their powder dry.

SUPP APP 1195

They're going to argue -- everybody's going to keep their arguments that they have at the time, argue about it later. Right?

A.   I don't know about that.

Q.   Well, that's what they're offering.  Both sides offer under a full reservation of rights.

A.   That's what -- that --

Q.   That's the point, right?

A.   It says full reservation of rights.

Q.   Goes on to say that you, and you alone, will get to select qualified and appropriate independent appellate counsel.  Right?

A.   It says that.

Q.   In point 5, trustee and independent appellate counsel will direct the appeal.  So you would get the chance of not only picking counsel but telling them what arguments to make and what arguments not to make on appeal.  Right?

A.   It says direct the appeal.

Q.   Solely up to you.  Right?

A.   It says direct appeal.  Yes, sir.

Q.   So if you chose -- if it were your wish to tell them to argue only reverse and render points as opposed to reverse and remand points, that'd be something that you could control. Right?

A.   Yes.

SUPP APP 1196

Q.   If it was your desire to have them not attack specific findings of fact that you thought were so important, something you could have controlled, right?

A.   It says "direct the appeal", yes.

Q.   All right.  You're familiar with the Gruber Hurst law firm, right?

A.   Yes, sir.

Q.   Gruber Hurst is the law firm who obtained the twenty million dollar judgment against Pastazios?

A.   Yes, sir.

Q.   Gruber Hurst is the law firm who brought you in as trustee.

A.   Yes.  That's fair.  I mean, they interviewed me.

Q.   Gruber Hurst is the one --

A.   The judge is the one that brought me in as trustee, in other words.

Q.   Gruber Hurst is the one who first identified you and brought you into this case, right?

A.   Yes.

Q.   Isn't it true that three days before you made your decision not to appeal Gruber Hurst threatened to sue you if you filed a notice of appeal?

A.   I get threatened all the time, but yes, they did, and --

Q.   Look at Exhibit 43, please.  The top of page 2.

     "If the trustee appeals the state court" --

SUPP APP 1197

A. I'm sorry. I lost you.

Q. All right. Top of page 2, the first full sentence. It starts with the word --

A. On what exhibit?

Q. Oh.

A. I thought you said 43.

Q. It is 43.

A. 43.

Q. Page 2.

A. Yes. The letter from Gruber.

Q. Right. Page 2.

A. Okay.

Q. Top of the page.

"If the trustee appeals the state court judgment he would be breaching his fiduciary duties to the Trust beneficiaries, including Ms. Doe."

See that?

A. I see that.

Q. So on the one hand, you have Century offering to pay for the appeal. You reserve your rights, and you get to choose to direct the appeal. On the other hand, you have the firm who brought you into this thing threatening to sue you if you do appeal. Right?

A. Yes. I get threatened all the time. I don't pay attention to it.

SUPP APP 1198

Q.   You didn't answer my question, sir.

A.   Um-hum.

Q.   Is it correct to say that Gruber Hurst brought you into this bankruptcy proceeding, before you were ever appointed trustee, for the purpose of suing Century, as opposed to defending the claims that they were bringing against Pastazios?

A.   No, sir.

        MR. HESSE:  Objection, Your Honor.  That would be speculation.

        MS. DELEON:  I'll join the objection.

        THE COURT:  Sustained.

Q.   If you would look at Exhibit 11, please, sir.  This is an e-mail exchange between you and Jeff Erler at Gruber Hurst way back in February of this year.  Is that right?

A.   Yes.

Q.   It's before you were appointed trustee.  Is that correct?

A.   Yes.

Q.   It was months before Gruber Hurst was able to obtain a judgment against Pastazios.  Right?

A.   Yes.

Q.   So as you understood it at the time, after you got your hands around it, Gruber Hurst's client was a claimant, was a proposed creditor of the estate, bankruptcy estate.  Right?

A.   Yes, sir.

SUPP APP 1199

Q.   And the first e-mail that Gruber Hurst sent to you on February 18th is Mr. Erler saying we anticipate appointing a litigation trustee, and he'd like to visit with you potentially about serving in that role.  You see that?

A.   I see it.

Q.   Then you asked him for information on that a couple of days later if she could run your conflicts.

A.   Yes, sir.

Q.   And his response to you is the primary litigation target for the litigation trust is Century Surety Company.  Right?

A.   It says that.  Yes, sir.

Q.   So before you were ever hired and appointed, Gruber Hurst contacted you, brought you on to sue Century to cover a judgment that they planned to get against Pastazios.  That sum it up?

A.   No.  The way I take this is that there's a potential that there's a claim.  If things go the way that it may go, Century may be an adverse party, and so that's what I was running a conflict check on.

Q.   Well, they don't tell you Jane Doe's name.  Right?

A.   Right.

Q.   She's clearly an adverse party at that point.  She's their client, right?

A.   Correct.

Q.   They don't say your initial adverse party will be Jane

SUPP APP 1200

Doe, do they?

A.   They do not.

Q.   But that was the reality of the situation.  When you were hired your first job was to defend Jane Doe's claims against Pastazios.  Right?

A.   Yes.

Q.   And it's your job as a trustee.

A.   Yes.

Q.   Right?  Now, --

A.   I did that.

Q.   Exhibit 68, sir.

A.   Yes.

Q.   Now that's the creditor trust agreement that you talked about earlier.

A.   Hold on a second.  Okay.

Q.   And this is the one that was signed.  Right?

A.   Yes.

Q.   And you didn't have anything to do with drafting this, did you?

A.   I did not, sir.

Q.   All right.  But you do understand that this trust agreement includes the concept of a trust advisory board.  Right?

A.   Yes.  We've talked about that at length.

Q.   Okay.  And then we also talked about -- and if you'd turn

SUPP APP 1201

to page 17 of it, there's a blank as to who the trust advisory board is to be.  Right?

A.    Right.  We've been --

MR. RUKAVINA:  Your Honor, I object to relevance grounds.  And hear me out for a moment.

This is the second time now that Century comes to Your Honor and says that there are standing issues with this Trust, but we shouldn't try them today, so don't make a finding, Judge.  And then they go into evidence on this.  So either they can play by the rules and interject the issue, and Your Honor can make a ruling, and we'll live by it, or this has no relevance to today's hearing.

THE COURT:  Response on relevance?

MR. BOWEN:  Your Honor, make no mistake about it. What's going on today is they're asking the Court help them, essentially, uphold this judgment.  And this document requires Mr. Seidel to only move forward under the guidance and review of a trust advisory board that was never appointed.

The obvious fact from looking at this is that the idea in this situation is to have an independent third-party professional serve on the trust advisory board.  What the evidence is going to show in a minute is that Godwin Gruber, Jeff Erler, the same man who hired him to be trustee, considered himself to be the sole member of this trust advisory board.

SUPP APP 1202

So what the evidence is going to show is if it worked out the way Godwin Gruber wanted, Godwin Gruber would have been the plaintiff, sued Pastazios, and the sole member of the advisory board overseeing and guiding the trustee, who had the right to fire the trustee. I believe that's plainly relevant to their efforts today to try to interfere with Century's appeal of this judgment.

THE COURT: Help me on how it's relevant on the narrow issue that's in front of the Court today.

MR. BOWEN: Well, Your Honor, I believe they've come into this court and they've essentially asked the Court -- the Court's not considering whether the plan's valid. I understand that. What they're asking the Court to do is, essentially, I believe, enter an injunction either stopping Century from or limiting Century's rights on appeal or forcing Century to file something that says it does not seek this. It does not move for the benefit of the trustee.

The trustee's filed this motion asking for that relief. And he's self-interested. He gets five percent of the recovery. And this was all prewired by the Gruber Hurst law firm.

THE COURT: Mr. Rukavina?

MR. RUKAVINA: Your Honor, again I have no problem trying that fully and fairly, but then Century can't say oh, and, Judge, whatever your ruling, it's not binding on us.

SUPP APP 1203

THE COURT:  Sustained on relevance.

MR. BOWEN:  All right.  I'm going to ask a question, and I'm not sure if this was covered by your objection.

BY MR. BOWEN:

Q.   Am I correct, sir, that whenever you made the decision not to appeal you were not acting under the guidance and supervision of a Trust or trust advisory board that's in this agreement approved by the Court?

MR. RUKAVINA:  Your Honor, I would object to relevance, to legal conclusion, and also mischaracterizing what happened.  There was no trust advisory board.  Moreover, the trust agreement doesn't require him to consult with the trust advisory board regarding the Doe claim.

THE COURT:  Sustained on relevance.

Q.   You are going to recover five percent of whatever judgment you get against Century, right?  You personally.

A.   I will recover five percent of any dollars I touch, which at this point is de minimis, and we've spent hundreds of thousands of dollars.

Q.   Right.  But if you get a twenty million dollar judgment against Century, based on this twenty million dollar judgment that you have against you, you get five percent of that.

A.   If twenty million dollars comes into the Trust, I would get five percent.

Q.   Okay.

SUPP APP 1204

MR. BOWEN:  I pass the witness, Your Honor.

THE COURT:  Mr. Rukavina?

REDIRECT EXAMINATION

BY MR. RUKAVINA:

Q.   Has your desire or hope for a commission motivated any single action that you have taken in this --

A.   Absolutely not.  It's disgusting that that's even being asserted.

Q.   And if you had defeated the Doe claim in front of Judge Ginsberg that means zero dollars, would you have been paid a lick in this case?

A.   I would have gotten 5 percent on 50,000 dollars, and I've had a little time in the case, and that'd be it.

Q.   So in --

A.   But the fifty --

Q.   So in --

A.   This five percent commission is not driving what I'm doing here.

Q.   In fact, you were jeopardizing your own commission by litigating the Doe claim in front of Judge Ginsberg.

A.   Absolutely, but that's what trustees do.

Q.   Now, you were asked about this Exhibit 11.  You don't have to look at it again.  But did Mr. Erler ever tell you not to contest the Doe claim?

A.   No, sir, he did not.

SUPP APP 1205

Q.   Did Mr. Erler ever try to influence on how you would contest the Doe claim?

A.   No, sir, he did not.

Q.   Other than Exhibit 43, which we'll get to in a moment, did Gruber Hurst ever give you any input on how you should defend the Doe claim on behalf of the Trust?

A.   No.

Q.   With respect to Exhibit 43, the one where they allege that you're breaching your fiduciary duty if you appeal, did you have me go do something about this?

A.   I had you slap him down.

Q.   And were they slapped down?

A.   They were slapped down.

Q.   Did you consider it in your decision --

THE COURT:  Is that a legal term, Mr. Seidel?

THE WITNESS:  It's a legal term, Your Honor.

Q.   Did you consider their threat in this letter in any way, shape or form in ultimately deciding not to appeal?

A.   No.  I was threatened by both sides in this matter no matter what I did.  Century said I would vitiate coverage if we did this or didn't do that.  Jane Doe said they'd sue me if I did this or didn't do that.  That rolls off my back.

Q.   Mr. Seidel, why don't we look at their motion to intervene, please, that counsel asked you about in my exhibits?  It is going to be DDD, Davor, Davor, Davor.  The

SUPP APP 1206

Davor cube.

A.   Must be a good one.

        THE COURT:  Did you say triple D?

        MR. RUKAVINA:  Triple D as in David, Your Honor.

A.   DDD.  I have it, sir.

Q.   Go back to that page 1, which doesn't have a page number on it.

A.   Okay.

Q.   Do you see where it talks about Pastazios and Century will suffer prejudice if Century is not permitted to intervene and pursue reversal of the final judgment against Pastazios?

A.   You keep using the name Pastazios, our debtor.

Q.   And on page 7 -- if we go to page 7, paragraph 15,

     "With the deadline to file a notice of appeal having passed, Century is now compelled to participate in the appeal in order to protect Pastazios' interest".

     Is that what it says?

A.   That's what it says, sir.

Q.   And if we go to page 8 and 9.

     "Without Century's participation in this appeal Pastazios will face joint and several liability that is incompatible with Texas law."

     Do you see that?

A.   I see that, and that's what it says, sir.

Q.   And on page 9,

SUPP APP 1207

"If the improper judgment against Pastazios stands, Pastazios will suffer extreme prejudice."

Do you see that?

A.    I see that, and that's what it says, Pastazios.

Q.    Who gets to decide whether the Trust suffers prejudice or not?

A.    I do.

Q.    Who gets to decide who controls the defense of the Doe claim?

A.    I do.

Q.    If you go to page 12 it talks about how it would be inequitable to allow the Doe judgment, et cetera, et cetera. Then it says,

"Such a result will prejudice Pastazios while increasing the trustee's potential compensation, which raises the question of whether the trustee has a conflict of interest."

Do you see that?

A.    I see that.

Q.    On page 17, if we go forward on page 17, where it begins with "On the other hand", "Pastazios would suffer prejudice if Century does not appeal".

Do you see that?

A.    I see -- that's exactly what it says.

Q.    And finally, it talks about, in the middle of the paragraph or the page there,

SUPP APP 1208

"Century's intervention under these circumstances will serve to protect Pastazios."

A.   Pastazios.

Q.   So do you feel like we're being unreasonable, or that we're just way out there in cuckoo land by reading this to be an appeal for Pastazios?

A.   No, I don't.  And I think this is a tremendously unusual circumstance, and I think we were compelled to bring this to the Court's attention, and that's what we're doing.

Q.   Yes.  Have we asked Century to clarify that it is not seeking appellate relief for the Trust?

A.   Yes.  A very simple one sentence would do it.

Q.   Has Century ever given us anything like that?

A.   Not to my knowledge.  In fact, they refused.

Q.   Okay.  Do you have any explanation for why they would refuse to give you that if they were not, in fact, trying to appeal for the Trust?

A.   I don't.

Q.   Okay.  Now, I'm going to take you through some other documents, and I'm going to try to be brief, so we're not going to go through all of them.

A.   Okay.

Q.   But we're going to study my exhibits this time.  Okay?

A.   Yes, sir.

Q.   Exhibit Z, as in zebra.  This is the same July 14th

SUPP APP 1209

document that counsel had you look at where you notified Century of the judgment --

A. Right.

Q. -- and requested a defense.

A. Right.

Q. Here. Now let's go to Exhibit AA.

A. AA. I'm with you.

MR. RUKAVINA: I'll move to admit Exhibit AA, Your Honor. It's my letter. I can authenticate it.

MR. BOWEN: I thought it had already been admitted, but there's no objection.

THE COURT: AA is in.

(Mr. Rukavina's letter was hereby received into evidence as Trustee's Exhibit AA, as of this date.)

Q. Now, you'll see that I'm writing there a paragraph that says,

"As an initial matter, let me make clear that we will provide all reasonable cooperation to Century concerning a potential appeal."

A. Yes.

Q. "As we previously informed you, the trustee lacks the resources to prosecute an appeal."

Were both of those sentences true and correct?

A. Yes, sir.

Q. Do you believe that we provided all reasonable

SUPP APP 1210

cooperation to Century concerning an appeal?

A.   Yes.

Q.   Is it true that the Trust lacked the funds to prosecute an appeal?

A.   Yes.

Q.   How much would an appellate lawyer have cost the Trust?

A.   Anywhere from 30 to 100,00 dollars.

Q.   And did the --

A.   Probably more.

Q.   Did the Trust have those funds?

A.   No.

Q.   Okay.  Now we'll skip a couple of these others to try to focus on what's relevant for today.  And go to Exhibit DD, David, David.  This a letter sent by Century to you?  Have you seen this letter before?

A.   I see DD, the letter to Davor.

Q.   Yes.

A.   I've seen it.

Q.   Okay.  And it says right there,

"Century Surety Company has decided to participate in the ongoing defense of Pastazios, the insured, subject to a full reservation of rights of all coverage issue."

Do you see that?

A.   I do.

Q.   Okay.  "This will be subject to the reservation of rights

SUPP APP 1211

previously sent and a supplemental reservation of rights to be supplied later."

Do you see that?

A.   I see that.

Q.   Anywhere in there does Century talk about funding an appeal?

A.   No.

Q.   Did you have any problem with Century reserving its rights on the coverage issues?  That means that Century would say notwithstanding our funding for you, we deny coverage and reserve all of our rights to litigate coverage.  Would you have any problem with that?

A.   Yes.

Q.   What problems did you have?

A.   Well, not -- with the reservation of rights we're okay.

Q.   Okay.  So, in other words, you didn't have a problem with Century reserving --

A.   Not with the reservation of rights.

Q.   What problem did you have?

A.   What I had -- what one of the lawyers at your firm pointed out is we had to be --

MR. BOWEN:  Objection, Your Honor.  Hearsay.

THE COURT:  Sustained on that.

MR. RUKAVINA:  Don't talk about what --

THE WITNESS:  Okay.  I'm done.

SUPP APP 1212

MR. RUKAVINA: -- what someone told you.

Q. What problem did you personally have with respect to what Century was talking about?

A. What we had to make sure here is that we weren't allowing Century to escape liability for previous breaches and/or revive any rights and obligations by virtue of getting this appeal done.

Q. Do you have an understanding of what a duty to cooperate is in the insurance world?

A. A vague one.

Q. What is your understanding?

A. That Century can, kind of, call the shots on what's being appealed and appellate points, et cetera.

Q. Okay. And was it your position that that duty existed or didn't exist any longer as of this time?

A. Yes. That they had breached, and so their duty had lapsed or evaporated.

Q. And is that the duty that you were worried about reviving if Century now --

A. Yes.

Q. -- funded an appeal?

A. Very much. Very much so, because I was worried -- concerned that they would try to vitiate coverage.

MR. RUKAVINA: Okay. Your Honor, I'll move to admit DD.

SUPP APP 1213

MR. BOWEN:  No objection, Your Honor.

THE COURT:  DD's in.

(Letter from Century Surety Company to Mr. Seidel was hereby received into evidence as Trustee's Exhibit DD, as of this date.)

Q.   Now, let's go to Exhibit EE.

MR. RUKAVINA:  Again, this is a letter from me, which I'll authenticate and I'll ask to admit.  Edward, Edward.

MR. BOWEN:  No objection, Your Honor.

THE COURT:  EE is in.

(Letter from Mr. Rukavina to Century Surety Company was hereby received into evidence as Trustee's Exhibit EE, as of this date.)

Q.   Now, the judge can read this letter for himself, but explain to me what prompted us to send this letter to Century?

A.   It was -- time was running out.  We had a month or so to either appeal or not appeal, and we'd been playing around with this.  So we wanted a definitive agreement, which had the offer that the trustee could accept for Century to fund an appeal.

Q.   Okay.

A.   And this articulated the require --

Q.   And you gave Century two alternative offers.  Correct?

A.   Correct.

Q.   And the first one speaks for itself.  It's just Century

SUPP APP 1214

admits liability and can do what it wants on the appeal. Did Century accept that offer?

A.   No.  They've always denied liability, which is such an interesting thing that we're all here.

Q.   The second offer contains five conditions.  And the judge can read them for himself, but explain to the judge the point of these five conditions.

A.   We had to be extremely cautious that we were not prejudicing creditors' rights with regard to any ability to recover.  So what we were doing was putting that all in writing and getting it all down so that if there was a funding of an appeal there was to be no tricks.  There was to be no revival of rights, duties, et cetera.  We were just going to do an appeal.

Q.   With your independent counsel?

A.   With my independent counsel.

Q.   And you alone would make the determination?

A.   Only me.

Q.   And then point one, I think, is the key, that the trustee's agreement would in no way revise any alleged obligation under the policy or law, including any alleged duty to cooperate with Century.

Now, if there was a duty to cooperate, and Century wanted the appeal pursued in a particular way, and you said no, I don't want to do that, were you concerned about what the

SUPP APP 1215

result would be?

A.   Yes.  I was concerned that they could control the trustee of the Trust on those issues.

Q.   And if you didn't do what they want then they'd say no coverage.

A.   That's exactly right.

Q.   Okay.  And the last sentence of this paragraph reads,

     "The Rule 11 agreement would also contain provisions agreeable to the trustee that Century would want to protect its position and ensure that it is not prejudiced."

     What was the point of that?

A.   It's a two-way deal.  I understand that they have to protect themselves too, so we put that sentence in there.

Q.   Okay.  Prior to October 26th, the letter that counsel asked you about, did Century ever send us a proposed agreement?

A.   No, they never did.

Q.   Okay.  Now, we can again skip some of these.  I do want to talk to you about Exhibit HH, but actually I want to talk to you about it with respect to Century's Exhibit 38.  Do you have Century's Exhibit 38 anywhere handy?

A.   Yeah, I can find it.

Q.   Century's Exhibit 38 includes a memorandum to Mr. Meyer Acentury (ph.) from Charlie Frazier, Century's appellate counsel.

SUPP APP 1216

A.    Yes.

Q.    Did you review this memorandum?

A.    I did.

Q.    And in this memorandum Century's appellate lawyer is providing several possibilities on how the judgment could be attacked.  Correct?

A.    Correct.

Q.    What is, in your opinion, the result on coverage if any of these five potential attacks are made?

A.    To be --

        MR. BOWEN:  Objection, Your Honor.  Lacks foundation.

        THE COURT:  Response?

        MR. RUKAVINA:  Your Honor, it's just his opinion.

        THE COURT:  Overruled.  Goes to the weight to give it.

A.    Could be harmed.

Q.    Do you believe that these five appellate points were geared more towards denial of coverage than a reversal of the judgment?

A.    I do.

Q.    Okay.  Now let's go back to my exhibits, please.

A.    Yes, sir.

Q.    And we'll go to Exhibit KK.

        MR. RUKAVINA:  This is my letter.  I can authenticate it.  I move to admit Exhibit KK.

SUPP APP 1217

MR. BOWEN:  No objection, Your Honor.

THE COURT:  KK is in.

(Letter from Mr. Rukavina was hereby received into evidence as Trustee's Exhibit KK, as of this date.)

Q.    This is three days before the appeal deadline, correct?

A.    Three days before the appeal deadline.

Q.    Okay.  And we still -- we write that we are confused by your letter.  Were we confused?

A.    We were totally confused.  We didn't know what they're doing.

Q.    So ultimately in this letter we conclude if Century has a firm offer to make and to avoid any confusion, the trustee requests that Century promptly send a proposed Rule 11 agreement that would contain the definitive terms of Century's proposal.  The trustee will be available all weekend to review and consider the same.

What was the point of sending that communication?

A.    You -- time was out.  We had to make a call now.

Q.    This was a Friday?

A.    This was a Friday.

Q.    Were you and I available all weekend?

A.    We made ourselves.  We weren't, but we made ourselves.

Q.    And did we conclude Century should not rely on or interpret this letter to suggest that the trustee will appeal. Do you see that?

SUPP APP 1218

A.    I see that.

Q.    Had you made a decision by then to appeal or not?

A.    I had not.

Q.    Okay.  LL is the same document.  I apologize.  MM is the same document that counsel asked you to looked at.

A.    The Rule 11 agreement?

Q.    No.  Hold on.  I'm wrong about that.  I apologize.  There were two October 26th letters.  Let's go to NN, Nancy, Nancy.  This is the same that counsel had you look at.  Let's just look at it here, because we don't have to shuffle binders that way.

A.    Okay.

Q.    Three days later, after this letter -- was that the first time that Century sent a proposed document?

A.    Yes.

Q.    Okay.  And what time did we get that?

A.    It was 5 o'clock.  People had left the offices for the day.

Q.    And this is the appeal deadline itself?

A.    This is the deadline.

Q.    Did you ignore this letter, or did you do anything about it?

A.    I absolutely didn't.  We scrambled every -- we found people out at dinner, interrupted dinners and things.  At 7 o'clock at night we got four lawyers on the phone talking

SUPP APP 1219

about this.

Q. Did you consider the stipulation attached here too to be a proposed defendant of the document?

A. I did not.

Q. Why?

A. Because it has this footnote about an agreement where they're going to --

Q. Read that footnote on the first page of the letter, sir.

A. Footnote on page 1 says,

"We can continue working on the stipulation language after the notice of appeal is filed."

Q. And how did you view that?

A. I took that as an agreement to agree in the future that if we can come to an agreement, which --

Q. And do you have --

A. It's been -- that's --

Q. -- an understanding as to whether an agreement to agree is enforceable?

A. It's -- not when I was in law school.

Q. Was the stipulation signed?

A. It was not signed.

Q. Was that a concern for you?

A. Yes, it was, because now I would -- they would have me sign it, and be binding on me but not on them.

Q. Okay. And let's look at point 6 of their proposed

SUPP APP 1220

stipulation.

A.   Yes, sir.

Q.   And let's read this, and I'm going to interject little by little, and I'm going to ask you questions.  So bear with me.

A.   Yes, sir.

Q.   So "Century and PPI Creditor Trust each fully reserve and retain their respective rights, if any, under the Century insurance policy at issue in this action and any potentially applicable law."

     No problems there, right?

A.   Right.

Q.   "This agreement will in no way modify or revise any alleged duty or obligation under the policy or law."

     Exactly what you want, right?

A.   Yup.

Q.   "As it exists on the date of this agreement, October 26, 2015."

     Do you recall that?

A.   I had a tremendous problem with that?

Q.   Why?

A.   Because on October 27th if they funded then everything is off.  All bets are off, and we're right back.  We're stepping right into the trap we were so concerned about.

Q.   Do you feel like you were being set up?

A.   I do.

SUPP APP 1221

Q.   Can you think of any reason why they would insert that date there other than to revive the duty to cooperate on October 27th?

A.   No.

Q.   After you've gone through this experience with Century, do you have a view as to whether you believe that they were negotiating with you in good faith or not?

A.   I do have such a view.

Q.   And what is your view?

A.   I do not believe they were negotiating in good faith.

Q.   And does that view also color your desire that they not control a potential appeal on behalf of the Trust?

A.   Yes.

Q.   And do you have any doubt that they will channel that appeal, as their lawyers' memorandum to you says, to destroy coverage?

A.   I have no doubt.

Q.   What is the largest asset, if only asset of this estate?

A.   It's the ability to recover from Century at this point.

Q.   And do you intend to prosecute that for the benefit of your beneficiaries?

A.   Yes, sir.

     MR. RUKAVINA:  Pass the witness.

     THE COURT:  Recross?

     MR. BOWEN:  Yes, Your Honor.  Thank you.

SUPP APP 1222

RECROSS-EXAMINATION

BY MR. BOWEN:

Q.   I don't want to go back through it, sir, but you spoke about some of the passages in the papers that we filed in the court of appeals say extreme prejudice and judgment, reversal of the judgment would benefit the Trust.  Remember going through that?

A.   A little bit.  Yes, sir.

Q.   Isn't it true that a twenty million dollar judgment against you is extreme prejudice?

A.   Twenty million dollar judgment is a big judgment, yes.

Q.   Yes.  And wouldn't you agree that obtaining the reversal of a twenty million dollar judgment is to your benefit, to a judgment debtor's benefit?

A.   To have no judgment there would be a benefit to the Trust by virtue of not having that obligation.

Q.   Okay.  You mentioned this issue about revising a duty or some such like that.

A.   Yes, sir.

Q.   Is it your testimony that your decision not to appeal this twenty million dollar judgment was based, at least in part, on an effort to preserve insurance coverage?

A.   There was many aspects that went into the decision.

Q.   But one of them, was it based on preserving coverage arguments, right?

SUPP APP 1223

A. Well, you had -- you had to protect any potential recovery for the Trust, and if that is insurance proceeds then it is insurance proceeds.

Q. My question is was one of the reasons -- I understand your testimony there were more than one -- was one of the reasons why you decided not to appeal was based on your desire to not run into coverage problems in the federal district court?

A. What was it -- not to revive any duties to cooperate, et cetera.

Q. On coverage. Yes, sir?

A. Yeah, on coverage so that --

Q. I'm sorry. Were you finished?

A. So that this Century couldn't be directing any of the appeal, et cetera.

Q. Now, I don't know if you recall this, but you've listed a number of reasons why you chose not to appeal. Not one of the reasons why you chose not to appeal was based on the merits of the appeal, was it?

A. Century made it easy. We never had to reach that, because they wouldn't get to the deal.

Q. Sir, my question is of all the things you considered about whether or not to appeal, none of them was based on whether or not an appeal had merit.

A. No, I wouldn't say that's true.

SUPP APP 1224

Q.   Did you analyze the merits of the appeal?

A.   I spoke with -- I spoke with counsel concerning the potentials of an appeal.

Q.   Now, you saw the memo that Mr. Charlie Frazier, the appellate counsel hired by Century, raised about possible arguments that could be made on appeal, right?

A.   Yes, sir.

Q.   Now, if you controlled counsel in the appeal, you could instruct counsel what arguments to make, what arguments not to make, right?

A.   That's correct.

Q.   You testified about how this stipulation came in from Century at 5 o'clock in the afternoon, right?

A.   Yes.

Q.   Now, I want to make sure that we're clear on this.  Does it make a -- did it make a difference in your decision to appeal whether it came in at 5 o'clock or 8 a.m. or the day before?  It wasn't a matter of timing, was it?

A.   It shows their callousness with regard to all this.  But in terms of where you --

Q.   I'm not asking you whether they were callous or not, sir.

A.   Right.

Q.   I'm asking you whether -- you made a decision after receiving that stipu --

A.   I --

SUPP APP 1225

Q.    Let me finish please.

A.    Yes, sir.

Q.    You made a decision after receiving that stipulation not to appeal?

A.    Correct.

Q.    It wasn't because you ran out of time?

A.    Correct.

Q.    You could have gotten an appeal filed in the next seven hours if you wanted to, right?

A.    Correct.

Q.    You could have filed a notice of appeal, if for no other reason, to preserve the appellate court's jurisdiction, and just withdrawn it later, right?

A.    I don't know about withdrawing it later, if there was going to be cross appeals, and I don't know if you can just withdraw it once a cross-appeal is --

Q.    Okay.  Well, you certainly could have -- you know for a fact, you could have filed a notice of appeal if for no other reason, to preserve the appellate jurisdiction, right?

A.    I could have.

Q.    Well, let me ask you this.  Did you ever look into the possibility of whether there was a period, say, of fifteen days, after October 26th, where you still could have filed a notice of appeal with the permission of the appellate court?

A.    I'm not sure about that, sir.

SUPP APP 1226

Q.   You never looked into that possibility, did you?

A.   I talked to my lawyers.  They said --

Q.   Did you ever look into that possibility, sir?

A.   Of whether there was additional time after October 26th?

Q.   Yeah, whether you could have, in fact, perfected an appeal up to November 10th, with the approval of the Court of Appeals.  Is that something you analyzed or looked into back on October 26th?

A.   It was discussed.  I discussed it with my lawyers.

Q.   Okay.  So even though -- did you understand at the time that there was a mechanism by which you possibly could get another fifteen days to appeal?

A.   I'm not sure I did.

Q.   All right.

          MR. BOWEN:  Pass the witness, Your Honor.

          THE COURT:  Any other questions of your witness?

          MR. RUKAVINA:  A few follow-up, Your Honor.

          I forgot to move to admit Century Exhibit 38.  That's the letter with the memorandum from lawyers.  I'd ask to admit Exhibit 38 right now.

          MR. BOWEN:  No objection.

          THE COURT:  Century 38 is admitted.

(Letter with memorandum from lawyers was hereby received into evidence as Century's Exhibit 38, as of this date.)

REDIRECT EXAMINATION

SUPP APP 1227

BY MR. RUKAVINA:

Q. There was this question of timing. Approximately what time did you round up your lawyers on the evening of October 26th to discuss Century's proposal?

A. I think by the time we got all the lawyers on the conference call, it was 7 o'clock that night.

Q. Was that a --

A. People were out to dinner. People were at various places.

Q. Was that a short or a long call?

A. It was a long call.

Q. By that time, how much time had gone by while you were discussing with Century the potential mechanism of an appeal?

A. A month.

Q. Was there any point in responding at 8 p.m. that night?

A. Not that I could see.

Q. Okay. You concluded that they were not negotiating in good faith?

A. That's what we decided.

Q. Did you ever have the wherewithal, or did you ever retain an appellate counsel to give you a thorough analysis of whether there were meritorious grounds for appeal?

A. This estate had no funds to do that. I can't spend all the money on this. There's a few dollars left, but that's for creditors. I can't spend it all on lawyers.

SUPP APP 1228

Q.   So any discussion about the merits of an appeal is largely academic?

A.   Yes.

Q.   Do you make it a practice to file a court document just to unfile it later?

A.   No, I do not.

Q.   Is that something that you would consider doing, just to preserve an appellate court's jurisdiction when you have no ability to fund that?

A.   I don't play games like that, no.

         MR. RUKAVINA:  Thank you.

         THE COURT:  Any other questions of this witness?

         MR. BOWEN:  No further questions, Your Honor.

         THE COURT:  You may step down, Mr. Seidel.  Thank you.

         THE WITNESS:  Thank you, Your Honor.

         MR. RUKAVINA:  Your Honor, we have no further evidence, and we're prepared for argument.

         THE COURT: All right.  Let's see.  Does Doe have any evidence?

         MS. DELEON:  No, we do not, Your Honor.

         THE COURT:  Okay, Mr. Hesse?

         MR. HESSE:  No, we do not, Your Honor.

         THE COURT: All right.  Why don't we take about a five-minute recess for y'all to visit among yourselves and get

SUPP APP 1229

your thoughts together.  How much time do you think you need in closing?

MR. RUKAVINA:  I think ten minutes, Your Honor.

THE COURT:  Okay.  And will Doe have a closing argument also?

MS. DELEON:  We may.  It depends.

THE COURT:  Okay.  You match their time --

MR. HESSE:  I could match that --

THE COURT:  -- Mr. Hesse.  Yes.

MR. HESSE:  -- thank you.

THE COURT:  All right.  We'll be in recess for about five minutes.

(Recess from 10:56 a.m. until 11:02 a.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated, thank you.

MR. HESSE:  I guess they capitulated.  I'll go get them.

THE COURT:  Mr. Hesse, you do some of your best work when nobody's here.  You better do it.

Ready?

MR. RUKAVINA:  I apologize, Your Honor.

THE COURT:  Not a problem.  Not a problem.

I'm not going to hold everybody to the minute, but do try to conclude by noon, just because we have to get the Chapter 13 docketed and prepare for that over the lunch hour.

SUPP APP 1230

MR. RUKAVINA: Your Honor, I guess sometimes when you live a hot and heavy and fast-moving case in front of multiple courts, you might not see the forest for the trees, or you might not see the tree for the forest, depending on your perspective and your native language.

And I hope Your Honor doesn't think that we're just here whining. You're our home court; you're the one that we owe our duties to. And what should be a routine coverage action has exploded. And the reason why it's exploded, in our humble view, is that Century is doing everything it can to undermine what this Court did in April.

Now, we're not here today to have the final and definitive trial on whether the plan is necessarily binding, but shame on anyone for telling Your Honor that they can file motions before you, have hearings before you, have a plan served on them, and that what Your Honor ruled is not binding, nah, nah, nah, nah, nah, nah.

Shame on anyone for coming to any court and accusing a judge of entering a sham plan. Shame on anyone for accusing Judge Ginsberg, who orally ruled that defense counsel did an exceptional job, and that these were the first -- the worst facts he'd ever seen, for alleging that he entered a sham judgement.

Shame on anyone for alleging that the trustee here is conspiring for personal monetary benefit, especially when that

SUPP APP 1231

someone rejected Stowers demand after Stowers demand, and could have settled this case for peanuts, and left its insured out to hang and dry for years, and only got upset or only got involved after the judgment came down.

I don't envy Ms. Doe her position. Here was a pizzeria that had some value, and here was the man who raped her, in charge of that pizzeria. What does a creditor do? Liquidate the pizzeria, convert the case and get nothing from that business? Well, that's not in her interest. Does she negotiate a confirmed plan where the man who raped her and gave her herpes is in charge of her recovery? Of course not.

She negotiates a plan that puts an independent third-party trustee in there to act for the benefit of everyone, knowing that that trustee is very likely to defend against her claim and put her to the test of her claim. And of course, as by far the largest creditor, she has input on who the trustee will be. And of course the trustee's compensated on a commission.

None of this is unknown, none of this is secret, none of this is outside the ordinary course of Chapter 11 confirmation. None of this is nefarious. We come to you, again, open kimono.

We come to you, saying, Judge, we don't know what's going on anymore. We need someone to say, stop; respect my orders. Don't interfere with your trustee. Don't take trust

SUPP APP 1232

assets. We've come here, open kimono, prepared for whatever Your Honor will rule. Certainly, today is not the end, nor is it the beginning of the end. I guess, as Churchill says, maybe it's the end of the beginning.

But they can't even tell Your Honor that, yes or no, we are or we're not appealing for this trust. No, they play word games. They take the trustee through documents. They can't even look at Your Honor, in full candor, and say, you know what, Judge? There really is no dispute. We're not seeking appeal relief for the trust. Boom. Mr. Rukavina's motion is gone. Thank you, gentlemen. I'll see you in the court of appeals. Have a good day.

Nor they can come and tell Your Honor, actually, we are seeking relief for the trust, and we're entitled to do so, and here's why. They're playing a game and they're hiding their true intentions. And those true intentions are most revealed by Exhibit QQ.

And I will have a talk with that lawyer. I will have a talk with that lawyer under oath, and I will ask him, how dare you answer a discovery request that you don't have to even respond to in such a way as to kill coverage? And I will have a talk with their appellate lawyer, who sent me that memorandum. And I will get all their documents about why each of those appeal points is geared towards killing coverage.

So the trustee, like any trustee, is in a very

SUPP APP 1233

strange position, like in any case.  On the one hand, he has to litigate against Ms. Doe, but on the other hand, he has to preserve trust assets for the benefit of everyone.  And the trustee simply was not going to let himself get set up.

If Century funded the appeal with a reservation of rights, with no prejudice, then the result would have been that there would be no prejudice to Century.  The result would have been that the duty to cooperate would have been revived. Now, does the trustee have a problem with cooperating with Century?  Of course not.

What the trustee has a problem with is Century either using that duty to cooperate to insist on how the trustee -- a fiduciary, who is charged by this plan with making independent decisions -- guides the appeal, or Century would say, hey, trustee, you're not doing what we want.  Breach of duty to cooperate, breach of policy, goodbye, there goes your dollars, there goes your recovery for your beneficiaries.  It was as simple as that.

And if Century had, in good faith, tried to have a good faith appeal without tying the trustee's hand, we wouldn't be here right now.  Another situation, Judge, of Century's own making.  And now Century, when it didn't get its way there, is trying to appeal for the benefit of this trust.

Some of these procedural questions, I guess, we don't have to decide today, definitively, whether Century is bound

SUPP APP 1234

by the provisions of this plan. I will note, and Your Honor has the pleadings, that Century has alleged that it's not, that Century has alleged that the assignment of the policy to the trust is void, that Century has alleged that the plan is a sham designed to enrich the trustee.

All of these issues are before Judge Solis. We have asked Judge Solis to indicate whether we should go to Your Honor on those issues or whether Judge Solis will rule on them, and hopefully, Judge Solis will give us some guidance. We don't have to decide that today.

But I ask Your Honor a simple question, a very, very simple analogy: pretend we're just in a plain Chapter 7 case, and a stranger to the bankruptcy -- no, not a creditor to the bankruptcy -- goes and takes a bar of gold from the estate, something that you have in rem jurisdiction for. Is Your Honor powerless to do anything about that? Or Your Honor learns that someone's about to go steal that bar of gold. Is Your Honor powerless to do something about that?

This is no different. Your Honor doesn't have to decide, necessarily, whether the plan is binding on Century or not to see that an outsider, a stranger, is usurping rights that this Court ordered be exclusive to the trustee. And I do not believe that Your Honor is powerless about that. I find it impossible to believe that Your Honor has no power to grant the trustee some relief.

SUPP APP 1235

On the Rule 7001 issue, it's always an issue, and it's always a problem. And in this case, the problem is magnified by the fact that we have an existing lawsuit in front of Judge Solis. Should I really have filed another lawsuit? Maybe I should have. Maybe I will. But I believe that I have a duty to minimize burden on the courts.

I provided immediate service on Century. They took extensive discovery. We're here today. Your Honor certainly has the ability to sua sponte convert this into an adversary proceeding, and Your Honor can apply the four elements of an injunction: the irreparable injury, the likelihood of success, the no injury to Century, and the public interest, which certainly supports, I think, this Court's intention, even if not literal order, be complied with.

I've walked Your Honor, in my motion, through the governing plan and trust agreement provisions. I'm not going to repeat that. Your Honor said that you worked on this. I believe Your Honor has.

There is no injunction in this plan. Good God, I wish there were. I would have put one in there. Okay, there's no injunction in this plan. But Your Honor said, Mr. Seidel, you're my trustee. You have the sole authority -- exclusive authority -- to litigate contested claims. You have exclusive authority over trust assets, which are included as the -- which are defined so as to include

SUPP APP 1236

cause of action, which is defined so as to include any litigation right, not just affirmative or offensive rights. And Your Honor said no one can claim an interest in the trust assets or trust revs, which Century is doing.

I'm not asking Your Honor to do any mental gymnastics. I'm not asking Your Honor to go out on a limb. I'm asking Your Honor to look at it and say, okay, I gave the trustee this exclusive authority; Century is invading that exclusive authority. You can do that today. And I'm hoping Your Honor will then also say, Century, stop.

I'm also asking that the Court decide whether the Jane Doe claim is allowed, because the appeal deadlines have run.

THE COURT: Now, how does that help you or what does that do for the trustee?

MR. RUKAVINA: It makes it clear that -- that really resolves everything, because then, Century can go and do what it wants before the court of appeals, subject to objections, and we no longer have to worry that what Century is doing is vitiating the provisions of the plan that govern the allowance of claims. In other words, it basically means that we no longer have to be terrified about Century doing something up there that's going to somehow come back and prejudice us as the trust.

And Century says, well, Judge, we don't have a

SUPP APP 1237

problem with that, but don't make it binding on us. At some point, Your Honor, I say put your foot down and say to Century: stop having these hearings, stop taking discovery, stop asking questions, stop going way out afield on what's really before me, or live with the consequences. Your Honor doesn't have to decide whether such a finding is binding or not on Century. That can be adjudicated or looked at in the future. But I think that everyone benefits, especially the trustee, by having some certainty on that.

The plan could not be clearer: the appellate deadline has expired. Now, Mr. Deari did appeal. I need to mention that to you. However, Texas law is black and white, and I can send you the case law -- I have it here somewhere -- that even if Mr. Deari succeeds on his appeal, it's not going to reverse the judgment as against us. There are some exceptions that wouldn't apply. So it's not technically correct that there has been no appeal filed, but the trustee has not appealed, and the deadline for a trustee to appeal under any circumstance, including that fifteen-day possibility to appeal later, has passed.

And on the issue of 157(b)(5), Congress is clear that Your Honor cannot liquidate a personal injury claim, but Congress is also clear that only Your Honor can allow that claim. So Your Honor ordered that the liquidation of it would happen in state court, as it did, but it's still always to the

SUPP APP 1238

bankruptcy court under 502(b) to allow or disallow a claim.

And Your Honor has predetermined how this claim will be allowed. It has been allowed. It has already been allowed. And that finding really would help everyone as we proceed forward in this litigation, so that they can protect whatever rights they think they have without having -- without us having to always be paranoid about that they're trying to somehow scramble the eggs or do away with the plan that Your Honor confirmed.

As your trustee, how do we do our job when someone else is appealing for the trust? Who are we answerable to? Who takes the consequences? Thank you, Judge.

THE COURT: You get to go last, too.

Ms. DeLeon.

MS. DELEON: Your Honor, we won't have a closing today, thank you.

THE COURT: Okay. I assume you're still in favor of having your client claim be deemed allowed, is that right?

MS. DELEON: Correct, Your Honor.

THE COURT: Okay.

MR. HESSE: Your Honor, after Mr. Rukavina's argument, I'm not sure what we're doing here. They can say that we're not -- that you -- they don't want you to -- that there's no injunction in the plan, so we're really not seeking to enforce the injunction -- an injunction that's there. So

SUPP APP 1239

we're not seeking to enforce that particular provision of the plan.

If I understood correctly, there was a concession that you don't have to find that the plan is binding upon Century, so I'm not sure what we're doing here. So there's a re -- I guess a reque -- I'm not sure what we're being requested to enjoin from doing. If they want to allow -- I mean, candidly, if you really want to play the game as to how the bankruptcy rules work, if I'm not mistaken -- and I'll point Your Honor to Century Exhibit 6, which is the claims register -- a copy of the claims register, Jane Doe filed an amended proof of claim around August 6th in 2015 in the amount of 19,417,625. There is no pending objection to it, so really, it's allowed as filed at this point in time. So I'm not sure that we really even need an order that it's allowed. But that's fine.

But I guess more to the point, to the extent that we wanted to come in and object to the claim, you've already found that we don't have standing, and that we don't have standing to object to it. So to the extent that you want to enter an order that it's allowed, I think it has to also be noted, because that order is going to be taken somewhere else, that Century does not have standing to object to it. The natural consequence of that, it's not binding upon Century because we wouldn't have the ability to say yay or nay about

SUPP APP 1240

it.

And so I guess if that's what we're going to do and that resolves everything, we can just get up and leave, but I'm not sure that that's really -- I'm not sure that's really what they're wanting.

I -- the question as to why we wouldn't enter into a one-pa -- a one-sentence stipulation in the court of appeals? It's really, I think, if you read through the -- if you think about it, Century intervenes on -- to protect its own rights. It is seeking a reversal of the judgment that was entered at the state court. The court of appeals will either allow us to do that or they won't.

Pastazios, through the trustee, has already made it abundantly clear that they don't consent to it, but if Century is successful on its appeal, one thing will happen -- it will result in a reversal of the judgment. Just the way it is. That's just the way it is. And so there's really no way to freight -- to put together a one-line stipulation that says we're not doing anything on behalf of Pastazios, because it's the judgments that's there. We're taking the actions on behalf of Cen -- of Century, but the effect of which is going to be a reversal -- it would be a reversal of the judgment or affirmation of the judgment, either one.

I think one thing should be also abundantly clear, is that since the trustee has not appealed or participated in the

SUPP APP 1241

appeal, that allowing Century to go forward will make it abundantly clear that there is no waiver by the trustee of any of its rights. So to the extent that there's a concern of a waiver by allowing Century to go forward, I think that that's very abundantly been resolved that they are not waiving any rights that they have. They've not agreed to anything. I don't think there's any con -- I don't think there's any way to argue that.

But going back to the -- kind of the technical things, if they're asking for an injunction against Century, we have procedural infirmities. We didn't -- they didn't initiate an adversary proceeding, they didn't serve us with process. This is not a motion to enforce, there's not a plan injunction. The plan -- and I'm with Mr. Rukavina, had I drafted this plan, there'd be a plan injunction.

Candidly, if I had drafted this plan, there'd be a better section 10.002 to make it clear as to who it's binding on it and who it's not binding on it, but that would've also provided people with notice. The notice that was given to Century is that it's not binding upon it because it's not a creditor. It's not scheduled, it didn't file a proof of claim. Everyone agrees it's not a creditor. So if the plan's not binding on it, there's no injunction that we're violating. I'm not sure what we're -- what you're being asked to enforce.

And that's, I guess, where my -- my problem I have

SUPP APP 1242

from a real theoretical standpoint. I'm also not sure I understand what the issue with regard to harm is, that we'd have to prove under an injunction. As the evidence has come out, they have asked Century to participate in an appeal. They are -- they said -- they advised us that they thought there were valid appellate points. For whatever reason, couldn't come to an agreement as to the terms on the appeal, but they did ask us to step in, so I'm not sure what the harm is for us stepping in after they've decided to waive their appeal rights.

And I think -- and it's something I'm going to note here, from a -- from a personal standpoint: I am not -- a number of these -- I'm not -- I didn't -- I wasn't the one who came in here and asked for the hearing. I think I asked two or three times that we continue it so we would have a chance to fully handle the issue.

THE COURT: We were working on one, and --

MR. HESSE: I kept saying --

THE COURT: -- thought you'd filed a third one.

MR. HESSE: I can -- and I apologize. I apologize for that, Your Honor.

THE COURT: No, no, no. We weren't offended at all by that --

MR. HESSE: But --

THE COURT: -- you're just representing your client.

SUPP APP 1243

MR. HESSE:  This was done on seven days' notice over my objection before it was even filed and requested.  And so you'll have to forgive us for thinking that there's an attempt to shove something down our throats.  And that we're -- we should be given a chance to present our -- preserve and present our case, and preserve and present our rights.

This is not my motion.  I'm not the one who keeps coming back to court.  But these are the -- these are the motions that are being filed by the trustee, which minds can differ as to whether they're well-founded or not, or the basis that they are arguing are justified.  But I'm not the one who keeps coming back to court.

We have a bigger case up in the federal district court.  There's concerns by both sides, I think, that there are things that are going -- being done in other courts that are going to effect that, and I think that's the concern that everybody has.

But I don't believe that what they're asking for you to do is allowed under the plan documents.  And as a consequence, we would request that you deny the motion.

THE COURT:  Thank you, Mr. Hesse.

Mr. Rukavina, you get to go last.

MR. RUKAVINA:  Will Century appeal the liability number and argue that twenty million is too much; four million is reasonable?  Will Century argue that, yes, the debtor was

SUPP APP 1244

negligent, but the finding of punitive damages is wrong, and therefore judgment should be less?  Or will Century argue that some of the findings of fact supported by the evidence should be set aside?  Those findings of fact that prove that this claim was always within the policy?

Century will have every motivation to steer the appeal in such a way as to use the exclusions in the policy -- criminality, for example, superseding cause, whatever those exclusions may be -- to attack the findings that go to those, so that we get no coverage, no defense costs, and they couldn't care about the size of the judgment against the trust.  That's cynical.  And we've shown you that a clever insurance defense lawyer serving two masters knows what they're doing, and that's what they're going to do here.

And Your Honor appointed an independent fiduciary, answerable to Your Honor precisely to ensure that everyone's rights are properly protected and preserved.  That's all we're trying to do.

THE COURT:  Thank you.  I know this is important to everyone.  We won't stop to write something up.  We'll give you a ruling as soon as we can.  We'll set up a CourtCall and have everyone, then, call back in for their CourtCall.  But it won't be today, obviously.  We'll be in recess.

THE CLERK:  All rise.

(Whereupon these proceedings were concluded at 11:24 AM)

SUPP APP 1245

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTOR: | | | | |
| Scott M. Seidel | 27 | 44 | 64, 87 | 82 |

| EXHIBITS: | DESCRIPTION | I.D. | EVID |
|---|---|---|---|
| For the Debtor: | | | |
| A - N | Documents | | 20 |
| ZZ - KKK | Documents | | 22 |
| QQ | Certain disclosures served upon Mr. Crawford | | 27 |
| For Century: | | | |
| 49 | Document | | 24 |
| 58 | Notice of appeal filed by Century in the court of appeals | | 43 |
| 59 | Motion to intervene filed by Century in the court of appeals | | 43 |
| 60 | Motion for extension filed by Century in the court of appeals | | 43 |

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

SUPP APP 1246

| 61 | Supplement filed by Century in the court of appeals | 44 |
| 67 | Response filed on behalf of Mr. Seidel in the court of appeals objecting to Century's efforts to intervene | 43 |
| 33 | Letter sent to Century by Mr. Seidel's lawyers shortly after | 44 |
| 47 | Letter from Hunton & Williams to Mr. Seidel's counsel judgment was entered in the Doe action | 44 |
| 68 | Creditor trust agreement | 44 |
| 42 | Document | 44 |
| 11 | E-mail exchange between Mr. Seidel and Mr. Erler from February, 2015 | 44 |
| 38 | Letter with memorandum from lawyers | 86 |

SUPP APP 1247

For the Trustee:

| | | |
|---|---|---|
| O, P, Q, S, T, V | Documents | 24 |
| AA | Mr. Rukavina's letter | 69 |
| DD | Letter from Century Surety Company to Mr. Seidel | 72 |
| EE | Letter from Mr. Rukavina to Century Surety Company | 73 |
| KK | Letter from Mr. Rukavina | 76 |

SUPP APP 1248

# C E R T I F I C A T I O N

I, Sharona Shapiro, the court approved transcriber, do hereby certify the foregoing is a true and correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

*Sharona Shapiro*

November 25, 2015

_____          _____

SHARONA SHAPIRO                              DATE

AAERT Certified Electronic Transcriber CET**D 492

SUPP APP 1249

# Exhibit 8

SUPP APP 1250

Davor Rukavina, Esq.
Texas Bar No. 24030781
Thomas D. Berghman, Esq.
Texas Bar No. 24082683
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 North Akard
Dallas, Texas  75201
Telephone: (214) 855-7500
Facsimile: (214) 978-4346

COUNSEL FOR
SCOTT M. SEIDEL, TRUSTEE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

In re:                                  §
                                        §        CASE NO. 14-34324-hdh-11
PASTAZIOS PIZZA, INC..                  §
                                        §            (Chapter 1)
        Debtor.                         §
                                        §

**TRUSTEE'S REPLY IN SUPPORT OF**
**MOTION TO CLARIFY TRUST AGREEMENT**

TO THE HONORABLE HARLIN D. HALE, U.S. BANKRUPTCY JUDGE:

COMES NOW, Scott M. Seidel (the "Trustee"), the duly appointed trustee of the

Pastazios Pizza, Inc. Creditors Trust (the "Trust"), and files this his *Reply* (the "Reply") in

support of his *Expedited Motion to Clarify Trust Agreement* (the "Motion") and in reply to the

*Amended Objection of Century Surety Company to Trustee's Expedited Motion to Clarify Trust*

*Agreement* (the "Objection"), filed by Century Surety Company ("Century"), respectfully stating

as follows:

**I.       CENTURY'S LACK OF STANDING**

1.      Century lacks standing to assert its Objection because it lacks standing regarding

any matter involving the "governance" of the Trust, as Century itself phrases the issue.

Generally, constitutional standing requires that a party has suffered some actual or threatened

---

TRUSTEE'S REPLY IN SUPPORT OF MOTION TO CLARIFY TRUST AGREEMENT—Page 1

SUPP APP 1251

injury, which can be fairly traced to the challenged action, and which is likely to be redressed by a favorable decision. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 542 (1986). More specifically, in the bankruptcy context, one has standing under the "person aggrieved" test if he is "directly and adversely affected pecuniarily by the order of the bankruptcy court." *Gibbs & Bruns LLP v. Coho Energy Inc. (In the Matter of Coho Energy Inc.)*, 395 F.3d 198, 203 (5th Cir. 2004).

2.      Century is not scheduled as a creditor, and Century never filed a proof of claim. Century is not a beneficiary of the Trust. The Motion seeks relief concerning solely an internal governance matter between the Trust and its beneficiaries, of no interest, pecuniary or otherwise, to Century. Moreover, Century did not vote on the confirmed plan, so any alleged deviance from the terms of the confirmed plan does not affect any right on which Century may have relied. In short, there is no "challenged action" affecting Century which can be redressed by a "favorable decision," and there is no "direct" and "adverse" "pecuniary interest" of Century affected by the Motion. There is nothing but an attempt by Century to interject itself into matters of no concern to it, for the clear and sole purpose of somehow bolstering its litigation position in the pending coverage action; in other words, to divert attention from its own gross breaches of its duties and its multi-million dollar liability by meddling in the internal governance of its litigation adversary.

3.      Furthermore, even if Century was a "party-in-interest" in the Bankruptcy Case, that does not confer standing on every issue. The Trust is a postconfirmation entity, and different rules apply in the postconfirmation world. Without being in any way, shape, or form a beneficiary of the Trust, Century simply has no role or say in its governance. Century bears the burden of proving its standing. *See, e.g., Croft v. Texas*, 562 F.3d 735, 746 (5th Cir. 2009). This it has not done, and this it cannot do.

SUPP APP 1252

## II. SUBSTANTIVE REPLY

4. Substantively, Century confuses the issue by alleging that the Motion seeks a modification of the Confirmed Plan, which the Trustee lacks standing to seek and which the Court lacks authority to grant. The issue is not one of modification. The Trustee is not asking this Court to rewrite something previously written. Rather, the Trustee is asking the Court to either compel the necessary parties (the Debtor and Ms. Doe) to do what they were supposed to have done (by filling in blanks), or the Court is asking the Court to find waiver of certain provisions because they were never effectuated. Neither of these avenues is novel and neither should be of any controversy, given that the Court's intervention is frequently requested even after confirmation because certain parties do not do what they were supposed to do, or because a debtor or plan proponent does not effectuate a provision of a confirmed plan. The question is therefore one of enforcement or waiver; not modification. There is no question that this Court has full authority over the issue, s*ee* 11 U.S.C. § 1142, that the Trustee has standing to file the Motion because the plan documents say so, and because the Trustee, as much as anyone, is entitled to clarification and certainly as to what his responsibilities are.

5. As between the two remedies—enforcement or waiver—both the Debtor and Ms. Doe support the conclusion of waiver. These were the two parties who negotiated the Confirmed Plan. Ms. Doe is the 99% Trust beneficiary. As the Court will hear, one additional sizable plan beneficiary also supports waiver, while the Trustee continues to attempt to contact the remaining Trust beneficiaries, who have very small claims as compared to the others. Insofar as a plan and trust document are *contracts*, and parties are generally free to waive protections afforded to them under a contact, and are generally free to amend their contract, the Trustee submits that this Court should follow the expressed wishes of the parties to the contract in finding waiver.

### III. NO UNREASONABLE DELAY

6. Century alleges that the Trustee delayed in seeking appropriate relief. To the extent that the Trustee delayed, the delay was caused first and foremost by his belief that there was a fully filled-in trust agreement that had simply not been provided to him. He has been in communications with the key parties for some time on that issue, being at times informed that there was such an agreement but that it could not be located. It must be remembered that the Trustee came in after the fact and of necessity had to rely on the work of others concerning the finalization of the trust's governance. The Trustee reasonably waited, rather than rushing to this Court, until it finally became clear that there was no signed agreement with blanks filled-in, at which point he sought and obtained a consensual resolution of the issues. At the same time, the Trustee was forced to "hit the ground running" on two fast-moving cases, including one that was going to trial in a matter of weeks (and after weeks of delay as the Debtor sought the $50,000.00 in funding required by the Confirmed Plan). In other words, there were more pressing issues at that time. And, with mediation with Century only concluding on October 20, 2015, the Trustee had good reason to believe that all outstanding issues would be resolved by agreement without the need to burden the Trust with the costs of the Motion, or this Court with holding a potentially unnecessary hearing. The Court can note that the Motion was filed only two (2) days after the failed mediation.

7. With respect to Munsch Hardt, for example, Century would have this Court believe that the Trustee somehow hid that fact from everyone even as he unreasonably delayed. Yet, at the confirmation hearing, the Debtor informed the Court that the Trustee had retained insurance counsel, although the name "Munsch Hardt" was not mentioned. On June 8, 2015, the undersigned appeared as counsel for the Trustee before the State Court, at which Ms. Doe was present. The undersigned informed the State Court that the Trustee was in the process of

SUPP APP 1254

retaining substitute trial counsel. On June 12, 2015, the Trustee filed his motion in the coverage action to substitute in for the Debtor. Ms. Doe—the beneficiary who apparently should have been on the trust advisory board—therefore knew immediately that the Trustee had retained Munsch Hardt as insurance coverage counsel, and separate state court trial counsel. Ms. Doe made no objection.

8.      Perhaps most importantly, even if there has been delay, it has not been prejudicial. It has certainly not been prejudicial to Century, unless Century believes that the Trustee having qualified counsel to represent the Trust against Century rises to the level of legal prejudice. After all, that is what Century really aims at through its Objection.

9.      With respect to Century's argument concerning *nunc pro tunc* relief, the Trustee has used that term in the Motion to easily convey the relief requested, but that relief is not *nunc pro tunc* in the usual way seen in bankruptcy cases. If the parties never filled in a blank or constituted the trust advisory board, then again it is a question of waiver and not one of seeking relief after the fact. If the parties are now compelled to fill in the blank, the Trust agreement says nothing of timing. In other words, the Trust agreement nowhere provides that the Trust will have counsel only *after* the blank is filled in or approval from the non-existent trust advisory board is obtained. The blank can be filled in now, or the trust advisory board can make a decision in the nature of ratification, without in any way affecting any work or compensation provided or incurred prior to such action.

## IV.      <u>MISCELLANEOUS CONTEMPTUOUS ARGUMENTS</u>

10.     Century alleges multiple other things, of no relevance to the Motion. Some are flat incorrect, such as Century's statement that the Trustee informed Century that "valid appeal points existed," while others concerning alleged collusion between the Trustee and Ms. Doe are without any basis in fact, are made without any reasonable investigation, and are actually proven

false by the clear record. It is worth noting that Century did <u>nothing</u> to protect its insured at trial. If Century had had its way, the Debtor and the Trust would have been wholly unrepresented at that trial (no doubt then using that as some defense to coverage). It was the Trustee, who took a sizable portion of the meager funds of the Trust, who retained defense counsel. That counsel did his job effectively and professionally, and the State Court disagreed with his position. That is what Century now refers to as "collusion," again diverting attention from the simple fact that it was Century who denied its insured a defense and that it was the Trustee, who took money from the creditors of the Trust, to provide that defense.

11.     Century makes more serious and contemptuous arguments, however, in the nature of a collateral attack on the Confirmed Plan. Century at all times had actual notice of the Confirmed Plan and the confirmation hearing, even appearing at the hearing. Century did not object. Yet Century now argues that the transfer of the underlying policy to the Trust is void as it violates an anti-assignment provision; that the Trustee has a conflict of interest with respect to the Trust; that the Trust represents a form of collusion designed to enrich the Trustee; and that the Trust and underlying documents have somehow prejudiced Century's rights. In fact, Century has sought leave in the coverage action to make precisely these kinds of arguments, again to divert attention from its own gross breaches of its duties.

12.     All of these arguments are nothing but an attempt to collaterally attack this Court's orders, binding on Century pursuant to 11 U.S.C. § 1141. The Trustee has previously cautioned Century against making such contemptuous arguments. The Trustee takes such arguments most seriously, and he will vigorously defend the Trust against such baseless, contemptuous, after-the-fact arguments. The Trustee will seek all available remedies, including fees and expenses for having to defend the Trust against these arguments.

---

SUPP APP 1256

## V.     PRAYER

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court strike the Objection based on a lack of standing, and that the Court grant the Trustee the relief requested in the Motion.

RESPECTFULLY SUBMITTED this 2d day of November, 2015.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.
    Texas Bar No. 24030781
    Thomas D. Berghman, Esq.
    Texas Bar No. 24082683
    3800 Ross Tower
    500 N. Akard Street
    Dallas, Texas 75201
    Telephone: (214) 855-7500
    Facsimile: (214) 855-4346

**COUNSEL FOR SCOTT M. SEIDEL, TRUSTEE**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 2d day of November, 2015, true and correct copies of this document were electronically served by the Court's ECF system on parties entitled to notice thereof, including on counsel for Century.

By: /s/ Davor Rukavina
    Davor Rukavina, Esq.

TRUSTEE'S REPLY IN SUPPORT OF MOTION TO CLARIFY TRUST AGREEMENT—Page 7
MHDocs 6644150_1 13229.3

# Exhibit 9

SUPP APP 1258



U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK

THE DATE OF ENTRY IS

ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed November 23, 2015**

_____
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 14-34324-hdh11 |
| Pastazios Pizza, Inc., | § | Chapter 11 |
| | § | |
| Debtor. | § | |

**ORDER DENYING CENTURY SURETY
COMPANY'S MOTION FOR CONTINUANCE**

On November 23, 2015, Century Surety Company ("Century") filed a motion[1] to continue

the hearing on the *Trustee's Expedited Motion to Enforce Plan and Confirmation Order Against

Century Surety Company* [Docket No. 145] (the "Motion to Enforce"). Scott M. Seidel, the trustee

of the Pastazios Pizza, Inc. Creditor Trust (the "Trustee" of the "Trust") filed an objection to the

---

[1] *Century Surety Company's Motion for Continuance of Expedited Hearing on Trustee's Motion to Enforce Plan and Confirmation Order Against Century or, in the Alternative, Request for Status Conference* [Docket No. 163] (the "Motion to Continue").

1

Motion to Continue,[2] and Century filed a reply.[3] The hearing on the Motion to Enforce is currently set for November 24, 2015 (the "Hearing"). The Motion to Enforce seeks compliance with the above-captioned debtor's confirmed plan of reorganization (the "Plan"), which the Trustee claims Century is violating in its filings with a state appellate court.

Century seeks a continuance of the Hearing, in large part, because it claims the need to depose all of the witnesses listed by the Trustee for the Hearing. The Court notes, as the Trustee points out in his objection, that four of the witnesses are listed to authenticate exhibits. It would not be necessary for Century to depose such witnesses. This Court further notes that the allegations in the Motion to Enforce are that Century has violated certain parts of the Plan and the confirmation order in this case. The Court does not expect a lot of testimony at the Hearing, as a comparison of what Century has filed in the state appellate court with this Court's orders and the Plan, will not require a great deal of testimony.

In their pleadings regarding the continuance, both sides seem to intend to draw this Court into a larger dispute about matters that may be before the state appellate court or the United States District Court. This Court intends to address the narrow inquiry of whether the confirmed Plan and this Court's orders have been violated by Century's filings in the state appellate court. Accordingly, the Motion to Continue will be denied. The parties should be prepared to put on a straightforward case as to whether the actions of Century violate the Plan or this Court's confirmation order.

**IT IS THEREFORE ORDERED** that the Motion to Continue is denied.

###END OF ORDER###

---

[2] Docket No. 166.

[3] Docket No. 167.

SUPP APP 1260

Dated:  December 4, 2015

Respectfully submitted,

*/s/ Charles T. Frazier, Jr.*
State Bar No. 07403100
cfrazier@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
4925 Greenville Avenue, Suite 510
Dallas, Texas  75206-4026
Telephone: (214) 369-2358
Telecopier: (214) 369-2359

Roger D. Townsend
State Bar No. 20167600
rtownsend@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
1844 Harvard Street
Houston, Texas 77008
Telephone: (713) 523-2358
Telecopier: (713) 522-4553

Dana Livingston
State Bar No. 12437420
dlivingston@adjtlaw.com
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas  78701
Telephone: (512) 482-9300
Telecopier: (512) 482-9303

COUNSEL FOR INTERVENOR/
APPELLANT IN INTERVENTION
CENTURY SURETY COMPANY

## CERTIFICATE OF SERVICE

I certify that the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court which will send notification of such filing to the following counsel of record on December 4, 2015.

Gregory W. Mitchell
greg@mitchellps.com
THE MITCHELL LAW FIRM, L.P.
12720 Hillcrest Road, Suite 625
Dallas, Texas 75230
(972) 463-8417
(972) 432-7540 Fax
*Attorneys for Ajredin "Danny" Deari*
Tom "Trey" Crawford III
tcrawford@ghjhlaw.com
GRUBER HURST ELROD JOHANSEN
HAIL SHANK LLP
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
(214) 855-6866
(214) 855-6808 Fax
*Attorneys for Jane Doe*

Y.W. Peter Chen
peter@chendotson.com
CHEN DOTSON PLLC
10455 N. Central Expressway
Suite 109-348
Dallas, Texas 75231
(972) 251-2436
(972) 476-1080 Fax
*Attorneys for Pastazios Pizza, Inc.*

Michael W. Huddleston
mhuddleston@munsch.com
J. Stephen Gibson
sgibson@munsch.com
Thomas D. Berghman
tberghman@munsch.com
MUNSCH, HARDT, KOPF & HARR, P.C.
500 North Akard Street, Suite 3800
Dallas, Texas 75201
(214) 855-7500
(214) 855-7584 Fax

Royce West
royce.w@westllp.com
Veretta Frazier
veretta.f@westllp.com
WEST & ASSOCIATES, L.L.P.
P.O. Box 3960
Dallas, Texas 75208-1260
(214) 941-1881
(214) 941-1399 Fax

Jeffrey S. Levinger
jlevinger@levingerpc.com
LEVINGER PC
1445 Ross Avenue, Suite 2500
Dallas, Texas 75202
(214) 855-6817
(214) 855-6808 Fax
*Attorneys for Trustee*

*/s/ Charles T. Frazier, Jr.*
Charles T. Frazier, Jr.